UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA                         MEMORANDUM AND ORDER
     - against-
                                                 09-CR-155
C.R.,

          Defendant.
--------------------------------------------------------------x
JACK B. WEINSTEIN, Senior United States District Judge:

APPEARANCES:

For the Government:

     Loretta Lynch, U.S. Attorney for the Eastern District of New York

        By:   Ali Kazemi

            Chantel Febus

For Defendant C.R.:

     Deirdre Von Dornum, Federal Defenders of New York

     Louis Freeman, Freeman, Nooter & Ginsberg, New York, NY

     Sam Talkin, Talkin, Muccigrusso & Roberts, L.L.P., New York, NY

I. Introduction.................................................................................................................... 4
II. Facts ............................................................................................................................. 8
  A. Defendant's Childhood ............................................................................................ 8
  B. Sexual History ...................................................................................................... 10
  C. Instant Offense ..................................................................................................... 12
  D. Guilty Plea........................................................................................................... 14
    i. Interpretation of the Statute – 18 U.S.C. § 2252(a)(2)........................................ 15
    ii. Pressures on Defendants and Defense Counsel to Plead Guilty ................................ 18
    iii. Content of Defendant's Files ...................................................................... 23
    ii. Impact on Victims...................................................................................... 31

1

E.  Threat… .......................................................................................................... 40

   i.  History ......................................................................................................... 42

   ii.  Industry ...................................................................................................... 46

   iii.  Content ...................................................................................................... 52

   iv.  Viewers ...................................................................................................... 56

   v.  Relationship Between Viewing and Acting; Real and Perceived Harms ................. 60

F.  Effect on Abused Children ................................................................................ 66

   i.  Abuse of Vicky and Punishment of Primary Abusers .............................. 92

   ii.  Testimony .................................................................................................. 93

      a.  Psychologist.......................................................................................... 93

      b.  Parents ................................................................................................ 112

      c.  Punishment of Primary Abusers ....................................................... 126

G.  Events while Defendant Awaited Sentence .................................................... 131

   i.  Education, Employment, and Treatment .................................................. 131

   ii.  Bail Revocation Hearings ........................................................................ 132

   iii.  Mental Health Evaluations ...................................................................... 133

      a.  New York Center for Neuropsychology & Forensic Behavioral Science Report ...................................................................................................... 134

      b.  Stutman Report .................................................................................. 136

      c.  Bureau of Prisons Evaluation ............................................................ 140

      d.  Hamill Report .................................................................................... 141

      e.  Barr Report ........................................................................................ 142

      f.  Prentky Report ................................................................................... 146

      g.  Sachsenmaier Report ........................................................................ 148

      h.  Leonhard Treatment .......................................................................... 150

H.  Hearings on Protection of Public and Treatment of Defendant. ................... 152

   i.  Probation .................................................................................................. 153

   ii.  Dr. Meg Kaplan ...................................................................................... 154

   iii.  Dr. Susan Sachsenmaier ......................................................................... 179

   iv.  Dr. Robert Prentky .................................................................................. 184

I.  Risk Assessment ............................................................................................. 208

      i.  Use of Static-99......................................................................... 209

      ii.  Universe for risk assessment and bias ................................................. 216

      iii.  Coding…………………………………………………………………222

      iv.  Development of Risk Assessment in Sentencing Generally............................ 236

  J.   Bureau of Prisons Program For Sex Offenders............................................ 247

      i.  Description ................................................................................ 247

      ii.  Trip of Court to Inspect Programs ...................................................... 267

III. Law ................................................................................................. 267

  A. Statutory History ............................................................................. 267

      i.  Federal Sentencing Scheme .............................................................. 267

      ii.  Mandatory Minimums .................................................................. 270

      iii.  Child Pornography Legislation and Guidelines ....................................... 271

      iv.  Judicial Interpretations.................................................................. 276

      v.  Public Policy Concerns .................................................................. 282

      vi.  Statute: Distribution of Child Pornography ........................................... 286

  B. Constitutional Issues ........................................................................ 287

      i.  Separation of Powers .................................................................... 287

      ii.  First Amendment Exceptions............................................................ 288

      iii.  Fourth Amendment ..................................................................... 288

      iv.  Irrationality.............................................................................. 289

      v.  Cruel and Unusual Punishment......................................................... 294

           a.  Proportionality.................................................................... 294

           b.  Excessive Child Pornography Incarceration Terms ................................... 300

           c.  Juvenile Limits ................................................................... 302

           d.  Science Supporting Immaturity Exception............................................. 305

               1.  Studies........................................................................... 305

               2.  Testimony ........................................................................ 314

      e. Unconstitutionality as Applied ......................................................... 323

IV. Application of Law to Facts...................................................................... 332

V.  Conclusion ......................................................................................... 347

  A.  Appendix A: Bureau of Prisons Sex Offender Programs. ............................... 350

3

B.   Appendix B: Tour of Federal Medical Center Devens ................................................... 351

C.   Appendix C: Internet Technologies Providing Access to Child Pornography .............. 359

D.   Appendix D: State Statutes on Juvenile Sentencing for Child Pornography................. 360

E.   Appendix E: Memorandum by Chief U.S. Probation Officer ........................................ 401

## I.   Introduction

Defendant, C.R., pled guilty to "distribution" of child pornography he had obtained using

a computer.  Others shared his still and video images through a networking program.  Access to

the pictures he acquired were alleged to constitute electronic "distribution" of child pornography.

See 18 U.S.C. § 2252(a)(2).

As indicated in Part II.D.i– ii, based upon defendant's allocution, he has not committed

acts necessary to establish the crime charged.  The guilty plea would not have been accepted if

not for the strong urging of defendant and his counsel.

Defendant was nineteen years old at the time of the offense.  He started using computers

to view this material when he was fifteen.

C.R. is subject to a statutory minimum prison sentence of five-years, with a maximum of

twenty years, and a Guidelines range of 63–78 months.  There also must be imposed what may

amount to lifetime control on defendant as a sex offender.  *See* 42 U.S.C. §§ 16911, 16915(a)(1)

(fifteen years for lowest risk federal offenders); § 16915(b) (possibility of early termination for

federal offenders after ten years); N.Y. Corr. Law § 168-h(1) (twenty years for lowest risk

offender).

As applied to this defendant and this case, the statutory minimum five-year sentence of

imprisonment is unconstitutional.  It is cruel and unusual.  *See* Part III.B.v, *infra*.  The Guidelines

sentence is excessive.

Imposed is a thirty-month sentence for intensive medical treatment in prison.  This will be followed by long term post-prison curative therapy and strict control for many years under supervised release by the court's probation service.  *See* Part IV, *infra*.  Society will be best protected by this regimen rather than by a longer term of imprisonment; C.R. should be prepared to assume a useful law-abiding life rather than one of a broken and dangerous, ex-prisoner deviant.  Were it not for Congress's strongly expressed preference for incarceration in these cases, the court would have imposed a long-term of supervised release with medical treatment outside of prison.

Further general or specific deterrence is not required.  The adult who abused the child in one of the abhorrent known victim child pornography video series found on defendant's computer was sentenced to fifty years in prison.  Another adult who stalked and harassed this child with pictures of her abuse was sentenced to twenty years in prison.  *See* Part II.F.ii.c, *infra*.

This case illustrates some of the troubling problems in sentencing adolescents who download child pornography on a file-sharing computer service.   Posed is the question: To protect the public and the abused children who are shown in a sexually explicit manner in computer images, do we need to destroy defendants like C.R.?

Widely shown video images are involved.   While "[a]ny social problem that exists at the intersection of adolescence, sex, technology, and criminal law compels strong reactions from all sides .  .  .  it often results in sensationalism and oversimplification of complex and multifaceted issues making it more difficult to discuss the problem rationally and productively."  Mary G. Leary, *Sexting or Self-Produced Child Pornography? The Dialogue Continues – Structured Prosecutorial Discretion within a Multidisciplinary Response*.  17 Va. J. Soc. Pol'y. & L. 486, 487-88 (2010).  Sexual development is complex and subtle.   It varies widely with the

5

individual.   The law will cause serious and unnecessary harm to adolescent defendants by applying a mechanical and unnecessarily harsh sentencing scheme to address the broad range of culpability and circumstances involved in child pornography crimes.

Part II of this memorandum discusses the facts of the case, including an overview of C.R.'s childhood, his sexual history, the instant offense, and his guilty plea.   The history of child pornography is briefly described.   An explanation of the child pornography industry, its content, and its viewers provides context for the instant offense.   Following is an examination of the real and perceived relationship between viewing such material and acting out by abusing children physically.   The harm in defendant's use of child pornography files is outlined in Part II.F, with a discussion of the punishment of those who create or use videos to harass the victim detailed in Part II.F. i–ii. Particular attention is given to the harms caused to a known victim widely shown in the internet "Vicky Series."   Described is the distress of "Vicky," her mother, and step–father; the criminal prosecution and sentence of the perpetrator of her abuse, her biological father; and the conviction and sentence of an individual who stalked "Vicky" over the internet.   Also covered in Part II are C.R.'s activities while awaiting sentence, including his education, employment, and mental health treatment; bond revocation hearings; and the extensive evaluations he has undergone. *See* Part II.G, *infra*.

Applicable law and its premises are discussed in Part III.   Statutory history is explained in subdivision A, covering the federal sentencing scheme, mandatory minimum prison terms, child pornography legislation, and relevant sentencing guidelines.   Explicated are judicial interpretations and public policy concerns.

Part III.A.vi covers the specific statute at issue, 18 U.S.C.   § 2252 (a)(2), distribution of child pornography.   Discussed in Part III.B are the constitutional arguments questioning the

6

imposition of a uniformly applied five-year mandatory minimum sentence of imprisonment.  It begins with consideration of separation of powers.  Also explored are First Amendment exceptions for child pornography, Fourth Amendment concerns, and lack of a rational basis for a five-year mandatory minimum sentence for non-commercial distribution of child pornography.  These approaches to the constitutional issues are rejected as grounds for finding that the mandatory statutory minimum violates the Constitution.  *See* Part III.B.i–iv.

The next section, Part III.B.v, scrutinizes the Eighth Amendment's proscription against "cruel and unusual punishments."  The constitutional "cruel and unusual" bar requires that the mandatory five-year statutory minimum not be applied in the present case.

Set out in Part IV, Application of Facts to Law, are the guidelines calculation and the reasons for a non-guideline sentence.  Various sentencing options are summarized including: (1) prison for many years, (2) a thirty–month prison term with full treatment and completion of a program for control of sex offenders at The Federal Medical Center Devens prison ("FMC Devens"), and continued long-term strict control and treatment outside of prison; and (3) a non-incarceratory probation sentence with outpatient mental health and sex offender treatment.  Adopted in the Conclusion, Part V, is the intermediate position, (2).  This solution provides the fullest protection of the public as well as the rehabilitation of the defendant.

Young C.R. is far from perfect—a characteristic shared with many.  But this is not a reason for destroying him in prison.

To better reflect the nuances in relevant sentencing vectors and their interaction in a case such as the present one, there has been set out below at greater length than is usual in a sentencing memorandum, large portions of the transcripts of testimony and other material informing the court's reasoning.  There were extensive evidentiary hearings with testimony from

a dozen expert witnesses in the fields of child sexual abuse; online child pornography; risk assessment; and treatment of sex offenders; and neuropsychology and adolescent brain development.

The court visited FMC Devens to observe its program of psychological treatment of sex offenders. *See* Appendix A and B.

Received in evidence was a comprehensive record of the defendant's background and his mental health. The crimes of receiving, viewing and distributing child pornography and the harms created were explored. Investigated was the nature of adolescent brain development and its impact on decision making, judgment, and impulsivity. Defendant's potential risk of recidivism and the methods of predicting dangers are outlined in Part II.I, *infra*.

## II.  Facts

### A.  Defendant's Childhood

The defendant, now twenty-one, was born the only child to parents who separated when he was under one year old. Shortly thereafter they were divorced under bitter circumstances. Presentence Investigation Report ("PSR") ¶¶ 44, 46. His biological mother, formerly a successful fashion designer, became a cocaine addict and exotic dancer. *Id.* at ¶¶ 44, 46, 49. She lost custody of defendant after a confrontation with local police and a Child Protective Services investigation. *Id.* at ¶ 46. C.R. had little to no contact with his biological mother throughout his early youth; he recalls only a single encounter with her when he was eight, followed by a handful of visits and unfulfilled promises to see him during his early teenage years. *Id.* at ¶¶ 49, 71.

After his parents divorced, C.R.'s thirty-two year old father and his father's twenty-two year old girlfriend established a joint residence. *Id.* at ¶ 51. The couple married after living

together for three years; they had one child, a daughter.  *Id.*  C.R. and his young stepmother developed a close relationship.  *Id.* at ¶ 51.  She was the primary caregiver and involved parent. *Id.*  When C.R. was fifteen, he discovered her in bed with a male family friend.  *Id.* at ¶ 52. The extramarital affair continued, and the marriage ended under nasty tensions.  *Id.*  The defendant's half-sister and stepmother then moved out.  *See id.* at ¶ 51.  C.R. continued to regard his stepmother as "the most important and nurturing person in his life."  *Id.* at ¶ 71.

Except for one failed semester at college and a short stint with his biological mother, the defendant always has lived with his father and this parent's female cohabitating companion of the moment.  *See id.* at ¶ 53, 54.

Following indictment, C.R. was ordered to comply with restricted home confinement rules.  He continues to live in his father's apartment, where this parent shares a bed with a twenty-four-year-old woman.  *Id.* at 54.  C.R. sleeps in a curtained-off portion of the dining room.  *Id.*

The defendant has worked part-time since his middle teens, most recently behind the counter of a donut shop.  *Id.* at ¶¶ 91-97.  He has never been financially independent.  *Id.* at ¶ 91; *see id.* at ¶ 54.  Intermittently he has attended college.  *Id.* at 85-87; s*ee also* Part II.G.i, *infra*.  Since court supervision began his college studies have been steady and satisfactory, and he has been receiving drug and sex offender therapy.

Now twenty-one years old, the defendant was evaluated shortly after his arrest, when he was nineteen, as "grossly naïve."  *Id.* at ¶ 70.  Expert mental health evaluations confirmed his continued neurological, psychiatric, and emotional immaturity.  *See infra* Part II.G.iii. Physically, he is slight, with the facial appearance of someone in his mid-teens.

At age fifteen—about the time his father and stepmother's connubial relationship was severed—C.R. began smoking marijuana and drinking alcohol.  One year later a friend introduced him to child pornography on the Internet, and he began watching the material with male and female peers.  *See* PSR at ¶¶ 26, 68, 79, 80.   Drug use increased markedly over the next few years.  *See id.* at ¶¶ 79-84.   By age eighteen, C.R. smoked marijuana "most waking hours."  PSR at ¶ 79.   In addition, he started abusing prescription medications, including antidepressants, sleeping pills, and narcotic painkillers; and he ingested Ecstasy, LSD, and hallucinogenic mushrooms.  *Id.* at ¶ 81.   For three years before he started looking at child pornography on his computer, C.R. spent hours each week downloading and viewing adult pornography, which he encountered for the first time when he saw it online at age thirteen.  *Id.* at ¶ 68.

Over the next three years the defendant collected more than a thousand child pornographic still images and over a hundred such videos, in addition to substantial adult pornography.  *See id.* at ¶ 68.  Prepubescent and pubescent boys and girls mainly between the ages of ten and seventeen were shown engaged in sexually explicit activities with each other and with adult males.  *See id.* at ¶¶ 9, 16, 68.

C.R. describes viewing child pornography out of curiosity and looking at the images and videos of prepubescents for purposes of sexual gratification.  *Id.* at ¶ 68.  His downloading of child pornography appears to have occurred only when he was high on drugs.  *Id.* at ¶ 26.

**B. Sexual History**

The defendant is unmarried, has no children, is not dating, and has never maintained a long-term romantic association.  *See id.* at ¶ 57.  His longest intimate relationship lasted for three months, with a girlfriend of his own age.  *See id.* at ¶ 68.

10

Defendant's first overt sexual encounter involved physical contact with his paternal half-sister—then eight years old—when he was fifteen. *Id.* at ¶ 11; *see id.* at ¶ 68. The incident occurred during a family vacation and involved touching of sexual organs. *Id.* at ¶ 11; *see id.* at ¶ 68. The father —with custody of his son and a temporary visit from his daughter—had placed the children in the same bed in a hotel room. *Id.* at ¶ 11.

Revealed during plea negotiations were two other incidents between these two children. One involved mutual touching when C.R. was sixteen and his half-sister was nine. *Id.* at ¶¶ 11. The other entailed oral-genital contact when she was eleven; he was eighteen and home from college. *See id.* at 14. She is now thirteen years old and he is twenty-one. *See id.* at ¶ 51.

The defendant's half-sister now resides with her mother, the defendant's former stepmother. *Id.* at ¶ 51. At this parent's request, a protective order barring contact between the half-siblings was entered by New York State Family Court. *See id.* at ¶¶ 21, 61. No criminal charges were based upon the incidents. The mother of the half-sister "had no prior impression of any possible abuse of [her daughter], and she did not think that the defendant had any sexual or emotional problems" until they were revealed during the present criminal prosecution. *Id.* at ¶ 20.

C.R. describes having limited sexual encounters with peer males from the time he was sixteen through nineteen years. *Id.* at ¶ 68. Between ages seventeen and eighteen, he interacted in a sexual manner with adults online, on occasion using a web camera. *Id.* At age nineteen, he had face-to-face sexual interactions with a forty-year-old man after meeting him online. *Id.* at ¶ 9. The defendant denies meeting with children online, in a sexual manner or otherwise. *Id.* at ¶ 68. First coitus occurred when the defendant and a peer female were eighteen. *Id.*

11

A history of engaging in sexual relations with individuals two to four years his junior was revealed.   Sexual activity included mutual touching with a fifteen-year-old boy, mutual touching and oral contact with a fifteen-year-old female, and mutual touching with a sixteen-year-old female.   *Id.*   These incidents occurred when C.R. was eighteen and nineteen.   *See id.*; ¶ 12.

The defendant's sexual orientation appears still to be developing.   It has been evaluated as "fluid" and "malleable."   *Id.* at ¶¶ 67, 73.

**C. Instant Offense**

The offense for which C.R. is being prosecuted occurred when he was living for a short time with his biological mother while attending community college in Queens, New York.   *See id.* at ¶ at 71.   She had met a man thirteen years' her junior at an addiction recovery program; they married.   *Id.* at ¶ 50.   The couple had a daughter, now six years old.   *Id.* at ¶ 50. Household dynamics were turbulent.   *Id.* at ¶ 71.   The biological mother and C.R. had a difficult relationship, and he never developed a closeness with his stepfather.   *Id.* To avoid confrontations, C.R. would return home from school late at night after everyone was asleep.   *See id.* at ¶ 71, 81.   High on marijuana and, occasionally, other drugs, he would download and view child pornography on a computer in the living room where he slept.   *See id.* at ¶¶ 26, 71.

During this period an undercover Federal Bureau of Investigation agent selected and transferred a child pornography file from defendant's computer, at the agent's initiative, through a peer-to-peer electronic file sharing program named "Gigatribe."   *Id.* at ¶ 5.   It provides for sharing of images and videos among a closed network of "buddies."   *See* Affidavit of Special FBI Agent Thomas Thompson ("Thompson Aff."), Docket Entry 1, at ¶¶ 7-9, Jan. 29, 2009 (describing mechanics of Gigatribe and other peer-to-peer programs); *see also, e.g.*, *United*

*States v. Griffin*, 510 F.3d 354, 356 (2d Cir. 2007) (describing mechanics of a similar program

called "KaZaa"); *United States v. Ladeau*, No.  09-CR-40021, at *1 (D.  Mass., Apr. 7, 2010)

(describing mechanics of Gigatribe).   The systems used by defendant operate as follows:

> Peer-to-peer file sharing programs, such as Gnutella, Limewire,
> KaZaa Lite, GigaTribe and Emule, allow its members to share all
> types of digital media, including images, movie clips and music, at
> no cost.   Peer-to-peer members must download the compatible
> software from the Internet to become part of the network;
> thereafter, they can both post (upload) and obtain (download)
> digital files from other members of that particular network.   Since
> such peer-to-peer networks have millions of digital files that can
> readily be shared at any time, its members must conduct a search
> for a particular type of file.   The users must type in a "keyword" to
> find the specific materials they are seeking.   Once the keyword is
> entered, the shareable contents that contain the specified keyword
> in their title or description are then displayed.   The users must
> manually select which particular digital files they want to
> download.   GigaTribe has the attribute of being a private, peer-to-
> peer file sharing community, with new users needing an emailed
> invitation from a pre-existing member to join, and if a user wants
> to access another user's files, the transaction takes place privately
> between the users' computer systems, without GigaTribe or
> another third-party database maintaining evidence or a history of
> their file sharing.

*See* PSR at ¶ 4; *see also* Appendix C, Internet Technologies Providing Access to Child

Pornography, attached.   Defendant used Gigatribe for only the thirty day "free" period offered

by this service.  *Id*. at ¶ 9.

The FBI agent observed a user, later identified as C.R., with the username "Boysuck0416." C.R. had created a "mini-profile" on the site listing his true gender and date of birth. *See* PSR at ¶ 5. After joining the defendant's "buddy list," the FBI agent viewed and downloaded ten videos and one still image of child pornography from the "added music" folder of the defendant's computer. *Id.*; *see also* Thompson Aff. at ¶ 9. It is this downloading by the FBI from defendants' files that is the basis for the present prosecution.

Based on the information obtained by the FBI, the government executed a search warrant of defendant's stepfather's and biological mother's home. PSR at ¶¶ 5-6. Seized by the agents were two computers used exclusively by defendant. *Id.* at ¶ 7. C.R. admitted to downloading and viewing child pornography videos on both computers through the Gigatribe website, and to trading videos and digital images via Limewire, another peer-to-peer program. *Id.* at ¶ 8.

C.R. had accessed files from between five and eight fellow Gigatribe users and shared his materials with ten to twenty other users. *Id.* at ¶ 9. The defendant never paid or charged for any child pornography. *Id.* at ¶ 26. Nor is there any indication that he used the Internet or any sort of pornography to meet or engage with any child, sexually or otherwise. "There appeared to be no child pornography material involving either very young (under 5 or 6) children, or scenes of bondage, sadism or violence." *Id.* at ¶ 16.

**D. Guilty Plea**

Defendant does not raise constitutional or other challenges to the procedures by which evidence was obtained against him. On September 16, 2009, the defendant, then twenty years old, appeared before a magistrate judge and pled guilty to Count One of a five-count indictment. Pleading Hr'g Tr. 3, Sept. 16, 2009. Charged in the count was that on November 17, 2008, the defendant distributed a video that contained child pornography in violation of 18 U.S.C. §

14

2252(a)(2).  *See* Indictment, Docket No. 11.  It was explained to defendant that a mandatory minimum five-year sentence was applicable, with a possible supervised release term of life and registration as a sex offender.  Hr'g Tr. 16, Sept. 16, 2009.

Although the government considered pursuing only possession charges—which would not have triggered the minimum—that option was abandoned after defendant voluntarily revealed his sexual history during plea negotiations.  *See* PSR at ¶ 11.

As indicated below, Part II.D.iii, the effect on one victim, "Vicky," of continued use of pictures of her abuse by many viewers was seriously adverse.  *See also, e.g.*, Gov. Exhs. 8-1, 8-2 (effect on other abused children who were known victims).  C.R. was one of the many thousands who viewed the Vicky series.  Whether a sentence of many years imprisonment for passive viewers will improve the victim's life is dubious.  *See generally* Aya Gruber, *A Distributive Theory of Criminal Law*, 52 Wm. of Mary L. Rev 1, 73 (2010).

### i.    Interpretation of the Statute – 18 U.S.C. §2252(a)(2)

Serious questions were raised *sua sponte* by the court as to whether C.R.'s conduct constituted "distribution" within the meaning of 18 U.S.C. § 2252(a).  The statute requires that the defendant "knowingly" "distributes" a "visual depiction of a minor engaged in sexual conduct."  *See* 18 U.S.C. § 2252(a); Sentencing Hr'g Tr. 9, May 10, 2011.  Dictionary definitions establish that "to distribute" is "an active not a passive verb."  Sentencing Hr'g Tr. 9.  "To receive," by contrast, has been interpreted as passive.  *See* Discussion of charges of receiving child pornography in Part II.E.i.  "[R]eceipt can be satisfied arguably by opening your computer intending that a visual signal come into the computer.  That's receipt.  Because you actually intend to, and actually receive, that's enough.  But with respect to distribution, just opening the computer seems to me not enough."  *Id* at 11.

15

"Distribute," the material element, has two subdivisions.  "One, he intends to distribute, he designs, intends; and two, he actually succeeds in distributing a communication, namely the visual depiction;" there must be "a communicator, namely the defendant [ ] and a communicant, somebody who actually received it."  Sentencing Hr'g Tr. 12 (statement of the court).  In this case the evidence has established that there was a communication and a communicant who received it.  The issues are whether the defendant intended to, and did, communicate.  The following colloquy between the court and the defendant shows that for the purposes of the plea, C.R. 1) did not intend to communicate, and 2) did not communicate.  Both are required for conviction.

> COURT:  Did you know that this file was being downloaded from your computer?
>
> DEFENDANT:  At the time that the download was occurring I actually was not home. . . .
>
> COURT:  Did you find out later that it had been downloaded?
>
> DEFENDANT:  Yeah, I did.
>
> COURT:  When?
>
> DEFENDANT:  When I came home from school.  But I had left my computer on.
>
> COURT:  Okay. Did you intend that the file be downloaded by this person?
>
> DEFENDANT:  Your Honor, no, I did not.  That site requires you to share with other people, as the agent said, but my intentions were not to distribute but more to just receive.

16

…

COURT:  Did you intend that anybody else, a specific person or general person receive it?

DEFENDANT:  No, it was not my intention.

. . .

COURT:  There is a serious question here.  The government agent downloaded without the defendant knowing or intending that he do so.  The defendant says he did not intend to deliver.  He did not deliver.  The government agent reached into the computer and took the image.  The defendant did not intend to deliver, he says.  If he is telling the truth, he did not violate the statute.

Sentencing Hr'g Tr. 16-17.

Congress did not design the statute for purely passive sharing of the kind this defendant [says he] engaged in with his state of mind. Given the seriousness of the consequences, mandatory five-years in federal prison, it cannot be said that Congress designed the statute so that the mere opening of one's computer, under these circumstances as described by the special agent, would require at least five-years in prison. . . . The government must prove both that one, the defendant intended some person to receive the image. Here the defendant has said in court that he did not so intend, but that he joined to receive not to transmit.  Two, that he actively transmitted the material to at least one person who received it.  The

17

> situation here is that the defendant says that his computer received
>
> [the request for delivery] while he was not home.  That is not
>
> sufficient under the statute.  The material elements of the statute
>
> have not been admitted.  C.R. stated that he was not home when
>
> the file was transmitted from his computer to the undercover
>
> government agent's computer, at the agent's request.  He also said
>
> he did not intend to transfer or distribute files to other individuals;
>
> the intention was to obtain, not to transmit child pornography."

Sentencing Hr'g Tr. 21-22 (statement of the court).

The defendant explained that his goal was to receive child pornography, but in achieving that goal he knew that he had to make his child pornography files available to others.  "There is an enormous legal difference between those two mental states [making available and giving or distributing]."  *Id.* at 22.  After examining the statute and dictionary definitions of the material term "distribute" the court interprets the statute to require both 1) an active intention to give or transfer a specific visual depiction to another person and 2) active participation in the actual delivery.

### ii.    Pressures on Defendants and Defense Counsel to Plead Guilty

Defendants and their counsel face enormous pressures when deciding whether or not to plead guilty to a charge such as the present one.  In this case there is the looming threat of a lengthy guidelines sentence should the defendant go to trial; the difficulty of obtaining an acquittal under the less onerous definition of the crime relied upon by the prosecution -- joining a file-sharing group and accepting an "invite" from another individual to be his "buddy," which allowed that "buddy" to select a child pornography file from defendant's computer and transfer it

18

to his own computer -- and the threat of a superseding indictment with an "advertisement charge" carrying a fifteen year mandatory minimum. All of these factors have a significant influence on the defendant's decision to plead. In addition, the delay in serving the sentence while appeals are prosecuted would impede defendant's ability to move on with his life and put the case behind him.

At his allocution, C.R. stated "[i]n November of 2008, I had an image of a minor engaged in sexual activity on my computer. Through a computer program, I permitted another individual to download this image from my computer. This image is the image identified in Count 1 of the indictment." Pleading Tr. 24, September 16, 2009. C.R. did not express an intention to transmit the files he located to other individuals.

C.R. was asked again by the court at the sentencing hearing if what he said in his pleading before a magistrate judge was truthful and voluntary, and if he still wished to plead guilty. *See* Sent'g Hr'g Tr. 8, May 10, 2011. He did not express any intention to distribute child pornography. *Id.* at 16. Defendant was told that if his case went to trial, the court would be prepared to inform the jury that the statute carried a mandatory minimum sentence of five-years. *See* Sentencing Hr'g Tr. 24-25, referring to *United States v. Polouizzi*, 564 F.3d 142, 162 (2d Cir. 2009) ("Even assuming *arguendo* that the district court had discretion to give such an instruction, it was certainly within the trial court's discretion to decline to instruct the jury on the mandatory minimum sentence."). He was also informed that any evidence of sexual contact with his half-sister would be subject to an *in limine* motion and likely would be excluded under Federal Rules of Evidence 403. *See* Sentencing Hr'g Tr. 30.

A Tentative Draft Memorandum and Order had been issued in March, 2011 outlining the proposed sentence. C.R. was aware, thus, that he would be highly likely (even after appeal) to

receive a term of incarceration no longer than five-years, whether he pled or went to trial.  *Id.* at 23-24.

      After the court explained all of these circumstances, C.R., after advice from his counsel, still insisted on pleading guilty.  Defense counsel explained the difficult considerations the defendant faced:

> MR. TALKIN:  Supposing that we do go to trial and . . . this distribution issue is a legal, technical issue, and certainly we would make a Rule 29 motion and we would hope that the court would grant it. . . .
>
> THE COURT: That's the way it has to be analyzed at this stage. Are there equitable reasons for accepting a plea to a crime the defendant does not admit he committed?
>
> MR. TALKIN: So if we are granted a Rule 29 and there's an appeal in this case, and it winds its way through the Second Circuit, and the Second Circuit makes a decision where they say . . . We're going to send this back but we are going to send it back to a different court. If that happens . . . then we cannot take to the bank that 60-month sentence.
>
> THE COURT: Excuse me. The general view in this court in cases like this is that a five-year maximum would apply in this case based upon consultations I have had with the judges.
>
> MR. TALKIN: Judge, we as lawyers cannot rely on that for a second. . . .  [A]ll of us do practice in this courthouse and it's our

belief that there's a reasonable possibility that other courts in this building would give more than 60 months. And there's another important consideration here. I believe, and it's always been the gorilla in the room, that if we decide to go to trial, a superseding indictment can come through with higher mandatory minimums.

THE COURT: Which higher mandatory minimum?

MR. TALKIN: The 15-year advertising mandatory minimum. Again, we'll get into a legal battle about whether it's proper for the government to bring it, we'll get into a legal battle about whether they can make out the elements of that crime. But, again, taking a step back and being an advocate for nobody else in this world but C.R., it is in his best interest—I, as his attorney, helping him make decisions about his life that are going to affect this young man's life for the rest of his life, a long life hopefully, it is our opinion that those risks I just detailed to the court are nowhere close to mere taking for a trial that we believe, knowing the evidence, unless the Rule 29 is granted, it's a very—it's a high, high, high probability of conviction. So what happens here is, we get into this appellate issue and then we're relying on the wheel of where this goes, or the Chief Judge, depending on what the procedures are, to decide which judge gets this case and how his life is determined. I don't think I'm doing my job if I let that happen.

Sentencing Hr'g Tr. 26-28.  The government agreed with defense counsel.  It added, "[t]he government believes the defendant has allocated to the offense.  He knowingly distributed child pornography files to another individual.  I think, your Honor, also [there is] another consideration . . . it appears from the government's perspective that this defendant wants to accept responsibility for the offense from a moral standpoint . . . that is the perception the government attorney has . . . observed over the course of these last two years.  He's clearly admitted to it on multiple occasions and it seems like something that he wants to do." *Id.* at 30.

The court has authority to reject a plea under Federal Rule of Criminal Procedure 11.  *See Santabello v. New York*, 404 U.S. 257, 262 (1977) ("There is of course no absolute right to have your plea accepted. . . .  A court may reject a plea in exercise of sound judicial discretion.").

C.R. had three competent and distinguished members of the bar representing him who informed him of his rights and advised him based on what they believed were his best interests.  A factual basis for the plea was established because there is substantial evidence to support each element of the crime.  The court finds for the present purposes that defendant's statements are truthful.  It does not find that he admitted to committing the crime charged or defined by this court.  Yet, a jury could reasonably find that defendant was not truthful when he testified that he did not intend to distribute his files to another individual.

Balancing the equities in the case, it is appropriate to accept a plea even if the defendant does not concede all material propositions of fact.  *See North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970) (court does not commit constitutional error in accepting a guilty plea despite defendant's claim of innocence as long as there is a strong factual basis for the plea"); Fed. R. Crim. Pro. 11( (b)(3) (Determining the Factual Basis for a Plea).

Relying on defendant's thoroughly considered decision to plead guilty, the strong belief of defense counsel that it is in the defendant's interest to do so, the prosecution's observations that the defendant wants to accept responsibility for the offense, the concurrence of his relatives—father and grandmother —who have stood by him, and the defendant's own high intelligence, the court accepts the plea.  It is the defendant's, not the court's, decision on this issue that should prevail in the absence of the most unusual circumstances.

### iii.   Content of Defendant's Files

This was not a victimless crime.   As revealed by testimony and other information, the child victims suffer not only from the initial physical sexual abuse of their tormentors, but also from the knowledge that their degradation will be repeatedly viewed electronically into near perpetuity by a large audience.

While defendant pled guilty only to Count 1 of the indictment, distribution on November 17, 2008 of filename "!NEW! (pthc) 2007 Tara 8 yr – Tara kutje (pedo) (ptsc).mpg" he had other such files on his computers which were available to others.  The testimony of Special F.B.I. Agent Thomas Thompson indicates the scope of defendant's files:

Q      Did there come a time when you conducted an examination of the

defendant's two computers that were seized during the execution

of the search warrant?

A      Yes.

Q      What did you discover as a result of your examination?

A      At least two hundred images containing child pornography and, approximately, one hundred video files containing child pornography.

Q      What type of child pornography did the defendant have on his two computers?

A      The majority involved boys between the ages of ten and twelve, engaged in sexual acts and also included some younger boys and girls.

Q      What sort of sexual acts were portrayed in the videos of child pornography?

A      Oral sex, anal sex, regular penetration.

Q      Was one video entitled:  PT 101 103 FO 3 CJ dash Gay PTHC, dad pops his eight YO boy's butt Cherry dash pre-teen Gay kiddie incest dot ADI?

A      Yes.

Q      What does that video depict?

A      Adult male anal penetrating a boy, approximately eight years old.

Q      Did you send forensic copies of defendant's computer to the Criminal Division of the Department of Justice?

A      Yes.

Q      Why did you do that?

A      For further analysis.

24

Q        Did you send images and video files obtained from the defendant's computer to anyone else?

A.       Yes. . . .  NC-MEC, the National Center of Exploited and Missing Children.

Q        What does NC-MEC do with the images and video files that are sent to them?

A        They compared them to, at that time, that base of known images, video files containing known victims of child pornography.

Q        They are able to identify known victims based on the images and videos that you send to them?

A        Yes.

Q        Do they ever create a report that identifies the known series on a computer that are seized from a computer?

A        Yes.

Q        Do they provide law enforcement contact information for those known victims?

A        Yes.

Q        What would you do with the information regarding law enforcement contact?

A        I would then contact the law enforcement contact to gain additional information about the child pornography series.

Q        And the known victims?

A        Yes.

Q       What is a known victim series?

A       A known victim series contains at least one child that was sexual

        abused, either on an image or video tape that has been identified by

        law enforcement.

Q       When you say identify, what do you mean by that?

A       They know it's a real person.

Q       Did the defendant's computer contain images and videos of any

        know victim series?

A       Yes.

Q       How do you know?

A       From the report that NC-MEC sent back to me.

Q       How many known victim's series were found on the defendant's

        computer?

A       At least 14.

Q       Did NC-MEC send you law enforcement contact information for

        those 14 known victim series found on the defendant's computers?

A       Yes.

Q       What, if anything, did you do with that information?

A       I then contacted the law enforcement contacts.

Q       And what did you do after you contacted them?

A       I obtained additional information, including the age of the victims,

        the number of victims involved and the time frame that abuse

        occurred.

Q    Did you ask for permission to access other information about the

     series?

A    Yes.

Q    Did NC-MEC also provide you—provide information in more

     detail, affidavits containing additional information about those 14

     victims in the known victim series found on his computers?

A    Yes.

Q    Does that NC-MEC report included a detailed description of the

     child sexual abuse that is depicted in the videos and images found

     on the defendant's computers?

A    Yes, depicts the series, gives detailed description of the child abuse

     in the series.

Q    Does it include information about circulation statistics for those

     particular known victim series?

A    Yes.

Q    Can you please explain to the Court what is meant by circulation

     statistics?

A    Those statistics are given—based upon law enforcement like

     myself, we come into contact with the child pornography that we

     send it down to NC-MEC that would count as one report or one

     instance of—that series being reported to NC-MEC.

Q    I'm showing you Government Exhibit One, which has been

     received into evidence.

Do you recognize the documents?

A        Yes.

Q        What is that?

A        This is the NC-MEC affidavit that was provided to the

government.

Q        Based upon the information that you collected from NC-MEC and

law enforcement contacts, did you create a summary chart for this

hearing?

A        Yes.

Q        I'm showing you what has been entered into evidence Government

Exhibit 2.   What is that?

A        This is a summary chart that I created based on the information

that I received from NC-MEC and the law enforcement contacts

associated with this series.

Q        What information does that summary chart include for each known

series?

A        Contains series name, the description of the child abuse in the

series, number of known victims in the series, age of victim or

victims at the time of abuse, the time frame of the abuse, where the

abuse occurred, and how many report regarding the series were

submitted to NC-MEC.

Q        Can you please read to the Court the time frames of abuse for some

of the series listed in Government Exhibit 2?

28

A        Sponge Bob or Sponge B occurred in 2003 and [sic] 2009.

Q        What sort of abuse is depicted in this Sponge B series?

A        The series contains images of prepubescent boys engaged in a

         series of sexual acts including oral sex, masturbation and anal

         penetration of the child.

Q        That series was found on the defendant's computer?

A        Yes.

Q        Can we please move to the TARA series.  .  .  .

Q        What is time frame of abuse for the TARA series?

A        2003 to 2008.

Q        Would you please explain to the Court what sort of sexual abuse if

         reflected in the TARA series?

A        The series contains images, videos files of a prepubescent female

         child engaged in graphic sexual acts with adult offenders,

         including oral sex, masturbation, foreign object penetration, rectal

         penetration and anal [sic] penetration.

Q        What is the time frame of abuse depicted in Dalmations?

A        2002 to 2004.

Q        And what sorts of abuse is depicted in Dalmations?

A        The series contains images and video files on eleven prepubescent

         male children engaged in sexual acts with each other and male

         offender, including oral sex and anal penetration.

29

Q       What is the age of the youngest victim depicted in this Dalmation

        series?

A       Seven.

Q       And that series was found in the defendant's computer?

A       Yes.

Q       What is the age of youngest victim depicted in the Sponge Bob

        series?

A       Six.

Q       And the age of the youngest victim depicted in the TARA series?

A       Five.

Q       . . . .  The time frame of the abuse for the Vicky series?

A       2000 to 2001.

Q       What is the age of the victims at the time of that abuse?

A       Between ten and eleven.

Q       And what is depicted in the Vicky series?

A       It contains still images and video files of prepubescent children

        engaged in a series of extremely sexual acts, include oral,

        masturbation, genital penetration and foreign object genital

        contact.   The files contain depictions of bondage.

Q       What is the age of the youngest victim abused in the Helen series?

A       Ages of four and eight.

Q       And what was depicted in the Helen series?

A        Contains images of prepubescent female children engaged in

graphic sexual acts, oral sex, sexual intercourse and anal

penetration.

Q        And that series was also found on the defendant's computer?

A        Yes . . . .

Q        Special Agent Thompson, of the known victim series that you just

described, how many have associated victims impact statements?

A        Three.

Q        Which ones were found on file on the defendant's computer?

A        Dalmation, TARA and Vicky.

Hr'g Tr. 21-28, Nov. 8, 2009.

### ii. Impact on Victims

The impact on victims of viewing their abuse is substantial.  *See* Part II.F., *infra*.  The

testimony of the government agent continued as follows:

Q        Could you please explain to the Court what a victim impact

statement is?

A        A victim impact statement, either the victim or a relative of the

victim describes the impact that the production of child

pornography has impacted their lives.

Q        Did you contact the law enforcement agencies in the district

responsible for coordinating the use of the victim impact

statements associated with those three series, Dalmation, TARA

and Vicky?

A       Yes.

Q       Did you obtain permission to use those victim impact statements?

A       Yes.

Q       Are the victims in the TARA and Dalmation series here to testify today?

A       No.

Q       Do you have permission to read their statement into the record?

A       Yes.

Q       How many victim impact statements are associated with the TARA series?

A       One.

Q       I'm showing you what has been admitted into evidence as Government Exhibit 3.   Do you see that?

A       Yes.

Q       Do you recognize that document?

A       Yes.

Q       What is it?

A       This is the impact statement related to the TARA series given by the victim's mother.

Q       Can you please read that victim impact statement into the record.

                          .   .   .   .

QUESTION:  How were you or members of your family affected by this crime?  You may continue your statement on an additional sheet of paper if you wish?

ANSWER:  On behalf of the victim I would like to submit a statement.   This child has been a bright light to me, other family members and the community.   She is very smart, determined child.  Excelling in just about everything she involves herself, school, art, cheer, tennis, and a most obedient child, always wanting to please others.   This defendant has participated in exploiting this innocent child into a dark side of life that is totally unacceptable.  She is in weekly counseling and has begun to have screaming nightmares sometimes, two, three times a week.   Her rights as a human being have been totally violated and I do not know how this will affect her in the long run physically and/or emotionally.   Her disclosures to me since December have been very little and she acts like nothing is different.   But her life has changed.   She was uprooted from her elementary school to another one, to protect her from malicious comments, and possibly to a new school system next year.  She cannot just go around unescorted for our fear that someone else may know the situation and prey on her and she cannot live in the house she grew up in because people have been watching the house, blogging about the situation and making statements about what should happen to the

house and windows were broken when all this first happened.   I

could go on but I offer these reasons the defendant should not be

allowed around children for a long time.

QUESTION:  Have you or members of your family received

counseling or therapy as a result of this crime?  Please explain?

ANSWER:  Yes, the victim, her brother and I have undergone

therapy.   The victim is still in therapy trying to come to terms and

deal with this event that she seemed to compartmentalize and place

somewhere deep inside her mind so those close to her wouldn't see

it.   Her brother and I, the mother, have just finished therapy to try

to help us deal with this event and how it has affected the victim as

well as all of us as a family.   The secretive nature of this offense

and all that transpired in the internet issues went along with it have

been hard for her brother and me as her mother to comprehend.

THE COURT:  Who is the person that violated the child?  Who

violated the child?

THE WITNESS:  I believe it was a friend associated with the

family.

.   .   .   .

Q      Special Agent Thompson how many victims from Dalmation

series?

A      Eleven.

Q        How many of those victims were depicted on the images you

         found on the defendant's computers?

A        At least three.

Q        Do you have victim impact statements from one or more  - -  from

         one or more of those three victims found on the defendant's

         computers?

A        Yes.

Q        How many victim impact statements do you have?

                    .  .  .  .

A        These are the impact statements of two of the victims in Dalmation

         series.

                       .  .  .  .

         QUESTION:  How old are you?

         ANSWER:  12.

         QUESTION:  What grade are you in.

         ANSWER:  Seven.

                       .  .  .  .

         QUESTION:  How old are you?

         ANSWER:  13.

         QUESTION:  What grade are you in.

         ANSWER:  Eighth grade.

QUESTION:  Please explain briefly what led you to originally be victimized or assaulted?  You could continue on another piece of paper if necessary to answer this or another question.

I met him at a fair and the next I met him through my brother. Then we hangout at his house.

.  .  .  .

QUESTION:  Explain how your life has been affected by having images of your victimization viewed and downloaded by other internet and knowing this is likely to continue occurring?

It makes me feel to be embarrassed and I don't like people having me on the internet.

QUESTION:  What sentenced would you like the judge to order for someone caught sending, receiving and possessing sexual explicit pictures of you.

ANSWER:  30 years in jail.

QUESTION:  Describe any psychological or emotional long term effects that have occurred and/or you expect will continue to occur as a result of the defendant sending sexually explicit pictures of you?

ANSWER:  Some people don't forget.

QUESTION:  Is there anything else you like the judge to know about how you feel as to what happened to you.

ANSWER:  Torture.

36

. . . .

Could you read the victim impact statement 4-2, which has been

admitted into evidence and that is the other Dalmation victim

impact statement that we have in connection with the files found

on the defendant's computer.

. . . .

"QUESTION:  How old are you?

ANSWER:  12.

QUESTION:  What grade are you in?

ANSWER:  Seven.

QUESTION:  Please explain briefly what led you to originally be

victimized or assaulted.  .  .  .

ANSWER:  I met him at the fair and next year we met through a

friend.   Hangout at his house.   He told the other kids to get us

involved.

QUESTION:  Explain how your life has been effected by having

images of your victimization viewed and downloaded by other

from the internet and from knowing this is likely continue

occurring.

ANSWER:  Makes me feel embarrassed.   Don't really tell

anybody.   Don't like to talk to police.

. . . .

37

Hr'g Tr. 21-37, Oct. 9, 2010..  The victim suggested an extreme form of punishment for

viewers.  *Id.*

    . . . .

    Q    I'd like to direct your attention to Government's Exhibit 2.

         Do you have that in front of you?

    A    Yes.

    Q    Could you please read for the Court the relevant

         information from Government's Exhibit 2 including the

         dates that the series were produced?

    A    Yes, Sponge Bob Series; age of victims at the time of

         abuse, six to eleven.   Timeframe of abuse, 2003 to 2009.

         Tara Series, age of victim at time of abuse, five to ten.

         Timeframe of abuse, 2003 to 2009.  Eric Series, ages of

         victims at the time of abuse, four to 12.  Timeframe of

         abuse, 2003 to 2004.  Football Series, ages of victims at the

         time of abuse, eight.   Timeframe of abuse, 2004.  Vicky

         Series, as already mentioned, timeframe of abuse, 2000 to

         2001.  Devon Series, timeframe of abuse, 2000 to 2001.

         Holy Cross Series, timeframe of abuse 2000 to 2001.

         The Boy Series, timeframe of abuse, 1999 to 2000.

         ET Series, timeframe of abuse, 1997 to 2000.

         Jane N Series, time of abuse, 197 to 1998.

         Helen Series, timeframe of abuse, 1994 to 1998.

38

Reiz Series, timeframe of abuse, 1989.

Q    And that first series you had mentioned was?

A    Sponge Bob was between 2003 and 2009.

. . . .

Q    Would it be fair to say that there were other series that have

also been produced more recently than the Vicky Series?

A    Yes.   And there is the Harry Series which is not in this

report because I got the information back too late.  . . .

Q    Was the Harry Series also found on this defendant's

computer?

A    Yes.

Q    During the course of your investigation in this case, have

your learned that the defendant was also distributing child

pornography?

A    Yes, the defendant was advertising, distributing, viewing

and possessing child pornography in this case as well he

was a hands on offender.

Q    When you say advertising child pornography, what do you

mean by that?

A    As in my prior testimony, in his Gigatribe, in his full name

field he had child pornography search terms.   So he was

advertising to other users on Gigatribe by putting these

39

search terms in this field that he was sharing child

pornography.

Q     And those search terms are code for child pornography?

A     Correct.

Q     During the course of this investigation, have you learned

that the defendant has kept sending sexually suggestive

pictures to his half-sister?

A     Correct.

Hr'g Tr. 41-43, October 9, 2010.

## E.  Threat

As detailed below, *see* Section III.A.iii, *infra*, interest in child pornography as an

American legislative problem emerged in the late 1970s.   In response to growing public

concern, Congress enacted the Protection of Children Against Sexual Exploitation Act of 1977.

Pub.  L. No.  95-225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251-52, 2256

(2006).  With each passing decade, the Congress has increased criminal sanctions, casting a

wider and finer net.  *See generally* U.S. Sentencing Comm'n, *The History of the Child*

*Pornography Guidelines* 6-9 (2009); *see also, e.g.*, Adam Walsh Child Protraction and Safety

Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006) (codified as 42 U.S.C. § 16911 (2006));

PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003).  Child Pornography

Prevention Act of 1996, Pub.  L.  No. 104-208, 110 Stat. 3009.

Little systematic scientific research has been published on the availability of child

pornography, nature of the images, motivations of viewers, relationship of viewing to acting out,

or impact of the material on children, viewers, and others.  *See* Kerry Sheldon & Dennis Howitt,

*Sex Offenders and the Internet* (2007) (noting lack of reliable data on these issues); Richard Wortley & Stephen Smallbone, U.S. Dep't of Justice, Office of Community Oriented Police Services, *Child Pornography on the Internet* 12 (2006) [hereinafter DOJ, Child Pornography on the Internet] (same); Max Taylor & Ethel Quayle, *Child Pornography: An Internet Crime* 27 (2003); Eva J. Klain et al., ABA Ctr.  On Children & the Law, National Center for Missing and Exploited Children, *Child Pornography: The Criminal-Justice System Response* 2-3 (2001) (same); *cf.*  Note, *Inequitable Sentencing for Possession of Child Pornography: A Failure to Distinguish Voyeurs from Pederasts*, 61 Hastings L.J.  1281, (2010) (discussing absence of empirical evidence underpinning sentencing guidelines); Suzanne Ost, *Children at Risk: Legal and Societal Perceptions of the Potential Threat that the Possession of Child Pornography Poses to Society*, 29 J.L.  & Soc'y 436, 443-47 (2002) (discussing lack of objective evidence in media coverage); Neil Malamuth & Mark Huppin, *Drawing the Line on Virtual Child Pornography; Bringing the Law in Line with the Research Evidence*, 31 N.Y.U. Rev. L. & Soc. Change 773, 789-90 (2007) (discussing absence of objective evidence in treatment by legislature and judiciary).

The Court of Appeals for the Second Circuit has recognized a dearth of data on critical issues affecting risks, dangers, and appropriate sentences in these cases.  *See, e.g.*, *United States v. Dorvee*, 604 F.3d 84, 94 (2d Cir. 2010) (finding error in sentencing court's "apparent assumption" about link between possession of child pornography and risk of acting out); *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (finding error in district court's reliance on defendant's history of sexual abuse of minor and "general proclivities" of child pornographers in finding probable cause to issue a search warrant in child pornography investigation).  *See also United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008) (recognizing the difference in

41

culpability between viewing and producing child pornography as well as the wide variation of sentences in child pornography cases).

### iv.   History

Changing over the years and within societies has been the view of what was malign adult or child pornography; appropriate sexual relationships of gender, age and class; social mores; and criminal or other legal inhibitions.  No one in authority now defends on any generally accepted moral or legal ground the sexual abuse of children for public viewing and commercial advantage.   Much of the public seemingly approves congressionally adopted strong criminal sanctions against child pornography, subject to constitutional limitations*.  See United States v. Polizzi*, 549 F. Supp. 2d 308, 378-86 (E.D.N.Y.  2008) (historical discussion).

By contrast with concern about sexual abuse is the acknowledged necessity of excluding from the circle of condemnation proud parents' photos and home videos of their naked infants held over their "kitchen sink" bath or of toddlers sans clothes in sunlight on the lawn (or even of not uncommon diapering scenes).  Sent by mail or electronically to grandparents (or shown on wide screen or television), such images would lack the essential scienter required for criminal condemnation – libidinal, erotic, carnal, erogenous, lustful, prurient, concupiscent, malicious, etc. – even thought they might conceivably be misused for malign purposes.  *See, e.g.*, Karen R. Long, *Lynn Powell's 'Framing Innocence' shows Oberlin rising up for an accused mother*, http://www.cleveland.com/books/index.ssf/2010/09/lynn_powells_framing_innocence.html, Sept. 6, 2010, (discussing prosecution and ultimate settlement of felony child pornography charges against mother for taking photographs of her eight-year-old daughter in the shower); Thomas Korosec, *1-Hour Arrest: When does a snapshot of a mother breastfeeding her child become kiddie porn? Ask the Richardson Police.,* Dallas Observer, April 17, 2003, *available at*

http://www.dallasobserver.com/2003-04-17/news/1-hour-arrest. *See also* Kate Taylor, *Artist's Daughter Wants Video Back*, N.Y. Times, Jul. 7, 2010 (discussing New York University's consideration, later abandoned, of acquiring films created by well-known artist Larry Rivers, depicting his two adolescent daughters, naked or topless, being interviewed by him about their developing breasts); *see also United States v. Szymanski*, No. 09-3524 (6th Cir. Feb. 7, 2011) (rejecting defendant's guilty plea because district court failed to adequately explain the rigorous scienter requirement necessary for a conviction under the receipt of child pornography statute). "[T]he Supreme Court interpreted § 2252(a) to mean that defendant convicted of receiving child pornography must have known, not just that he was receiving *something*, but that what he was receiving was child pornography." *Id.* at 7; *see also United States v. X-Citement Video, Inc*., 513 U.S. 64, 68, 70-73, 78 (1994). To avoid a Comstockian crisis of over-prosecution, good sense of prosecutors (however dangerous such reliance is in a democracy) must be assumed. *See also* Part II.E.iii, *infra*, on definition of content; *see also* Ekow N. Yankah, *A Paradox in Overcriminalization* 14 New Crim. L. Rev. 1, 34 (2011) ("[U]nchecked state power threatens to criminalize so much behavior as to leave the actual exertion of power over the citizen all too often at the whim of the state.").

Characterizations of a defendant viewer as an adult in child pornography cases tend to cluster around age fourteen. *See* Appendix D, State Juvenile Child Pornography Statutes, attached (age twelve (one state), age thirteen (two states). Age fourteen (fifteen states), age sixteen (nine states), age seventeen (two states), age eighteen (twelve states), age twenty (one state) unclear (eight states).

Bright-line age limits may fail to capture detailed social mores regarding sexual activities involving young people and use of electronic communication resources. *See, e.g.*, Brian Stelter

Andrew G. Oosterbaan, U.S. Dep't of Justice, *Report to LEPSG on the "Global Symposium for Examining the Relationship between Online and Offline Offenses and Preventing Sexual Exploitation of Children"* 7 (May 2009) ("18 as an age of consent is fairly arbitrary because each individual develops maturity at different ages . . . ."); Shannon Shafron-Perez, *Average Teenager or Sex Offender? Solutions to the Legal Dilemma Caused by Sexting*, J. Marshall J. Computer & Info. L. 431, 433-34 (2009) (critiquing as over-inclusive law that criminalizes "self-created" child pornography); Stephen F. Smith, *Jail for Juvenile Child Pornographers?: A Reply to Professor Leary*, 15 Va. J. Soc. Pol'y & Law, 505, 508-09 (2008) (arguing that "severe penalties afforded by child pornography offenses . . . are likely to be excessive as applied to minors who create sexually explicit images of themselves"); Mary G. Leary, *Sexting or Self-Produced Child Pornography? The Dialogue Continues—Structured Prosecutorial Discretion within a Multidisciplinary Response*, 17 Va. J. Soc. Pol'y & L. 486 (2010) (observing broad range of activities that fall under "sexting" and arguing for "structured prosecutorial discretion" within the context of a "multidisciplinary approach" to address "self-created" child pornography"); Stephanie Gaylord Forbes, *Sex, Cells, and Sorna: Applying Sex Offender Registration Laws to Sexting Cases*, 52 William & Mary L. Rev. 1717 (2010) (noting that "[s]exting is increasingly a part of popular culture" and discussing studies which found that 20 percent of teenagers had sent or posted nude or semi-nude images of themselves); Jan Hoffman,. *A Girl's Nude Photo, and Altered Lives,* N.Y. Times, Mar. 27, 2011, at A21 (describing incident in which the mass distribution via text of a fourteen-year old girl's nude picture, which she originally sent to her boyfriend, lead to prosecutions of her peers); Jan Hoffman, *States Struggle with Minors' Sexting,* N.Y. Times, Mar. 26, 2011(detailing attempts by state legislatures to modify child pornography laws or create sexting-specific offenses); Wendy N. Davis, *'Sext'*

*Education,* ABA Journal, May, 2011 at 20–21(discussing state and federal responses to teen sexting and citing research that "4 percent of teens ages 12 to 17 who own cellphones have sent nude or nearly nude images or videos of themselves, while 15 percent in that group have received such images of someone they know"); *What They're Saying About Sexting*, N.Y. Times, Mar. 26, 2011 (interviews with teens about sexting) ("There's a law?  I didn't know that.  How would you catch somebody when everyone does it?); *Massachusetts v. Oakes*, 491 U.S. 576, 593 (1989) (Brennan, J. dissenting) ("Many of the world's greatest artists—Degas, Renoir, Donatello, to name a few, have worked from models under 18 years of age."); *see* Max Taylor & Ethel Quayle, *Child Pornography: An Internet Crime* 43 (2003); Jenkins, Beyond Tolerance at 30-31 (2001) (discussing circulation of nude photographs of children and noting that accounts of sex with young children was commonplace in "19th Century erotic classics" like The Pearl magazine and Walter's My Secret Life); Richard Aldous, *The Lion and the Unicorn: Gladstone vs. Disraeli* 52-54 (1st Am. ed. 2007) (describing former British Prime Minister William Gladstone's sexual perversions, for which he regularly scourged himself in private penance). The daily press routinely reveals sexual eccentricities among some current American leaders. Many less eminent American visitors to Europe carried home supplies of "French pictures" and sexually explicit writings beginning as early as World War I.  *Cf.*, *United States v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705, 706-07 (2d Cir. 1934); *see also United States v. Polizzi*, 549 F. Supp. 2d at 378-86 (extended discussion history of pornography).

The line between popular media and child pornography has increasingly been blurred with the proliferation of television shows depicting young people in sexualized situations and youthful actors appearing in provocative photographs.  A new Music Television (MTV) drama called "Skins" portrays the "sexual and drug-fueled exploits of misfit teenagers." *See* Brian

45

Stetler, *A Racy Show with Teenagers Steps Back from a Boundary*, N.Y. Times, Jan. 20, 2011, at A1.  The show has raised questions about whether its portrayal of youth as young as fifteen, nude or scantily clad, and engaging in a variety of sexual activities such as "simulated masturbation, implied sexual assault, and . . . disrobing and getting into bed together" may run afoul of child pornography laws.  *Id.*  One scholar of free speech, art, and pornography noted, "There are times when I look at mainstream culture and think it is skirting up against the edge of child pornography law."  *Id.* at A3 (quoting Amy M. Adler).  *See also* Parents Television Council, *Sexualized Teen Girls: Tinseltown's New Target, A Study of Teen Female Sexualization in Prime-Time TV* (Dec. 2010), *available at* http://www.parentstv.org/FemaleSexualization/Study/ Sexualized_Teen_Girls.pdf (analyzing top ten television shows on broadcast television for viewers aged twelve to seventeen in the 2009–2010 season and finding teenage girls were more likely to be sexualized than adult women).  Of the scenes portraying young adult female characters, 86 percent were depicted as being of high school age.  *Id.*; Shari Weiss, *Miley Cyrus Shows Some Skin in Racy Leaked Photos*, NY Daily News.com (Dec. 24, 2010, 10:41 AM), http://www.nydailynews.com/gossip/2010/12/24/2010-12-24_new_racy_miley_cyrus_ photos_cap_off_scandalous_year_for_disney_star.html (discussing photographs of popular teenage celebrity in sexually explicit situations).

   **v.**   **Industry**

   A digital revolution of the 1980s and 1990s enormously increased the ways that child pornography can be created, accessed, and distributed.   New technologies abound for sending and receiving such materials over the Internet, including email, websites, social networking programs, chatrooms, and peer-to-peer file sharing programs.  *See* Appendix C, Internet Technologies Providing Access to Child Pornography.

Although it is impossible to quantify with precision the size of the child pornography market, there is a consensus that technological advances have led to its proliferation over the past twenty years. *See*, *e.g.*, Tim McGlone, *As child porn activity grows, efforts to trap offenders do, too*, The Virginian-Pilot (Jan. 16, 2011), *available at*, http://hamptonroads.com/2011/01/child-porn-activity-grows-efforts-trap-offenders-do-too, ("[C]hild pornography was a dying industry until the Internet and peer-to-peer networks developed. 'It went from almost dead to now a growing epidemic.'") (quoting Neil MacBride United States Attorney for the Eastern District of Virginia); U.S. Dep't of Justice, *The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress* 11-16 (August 2010) [hereinafter, DOJ, National Strategy] (noting view of law enforcement and prosecutors); Taylor & Quayle, *supra*, at 9 (indicating view among academics); Nat'l Center for Missing and Exploited Children, *Press Release: Child Porn Among Fastest Growing Internet Business* (Nov. 9, 2005), *available at* http://www.missing kids.com (reporting view of children's advocacy group). *But cf.* Jenkins, *supra*, at 32-34 ("News media [have] used extravagantly inflated statistics to present child porn as pressing social menace."); William A. Fisher & Azy Barak, *Internet Pornography: A Social Psychological Perspective on Internet Sexuality*, 38 J. of Sex Res. 4, 312, 313-14 (2001) (noting "inconsistencies and *prima facia* questionable claims in research on the prevalence of sexually explicit materials, on and off the Internet").

Child pornography was widely accessible even in the 1960s and 1970s, owing in part to changes in general views of sexuality in the United States and Europe. The late 1960s marked the beginning of a commercial boom in the production of such materials, particularly in the Netherlands and Scandinavian countries. Jenkins, *supra*, at 30-32. Magazines produced in this era, some of which established powerful "brand identities," depicted children of varying ages--

from toddlers to teenagers—in various states of undress and engaged in explicit sexual activities with each other and with adults.  *Id.* at 31.  As a result of the commercial importation and domestic production of magazines and films, it was "easy to walk into a store in New York, Los Angeles, or London to purchase what was frankly advertised as child porn." *Id.* at 32.  The commercial child pornography market garnered an audience beyond the "child porn world strictly defined" as magazines notionally devoted to rock music and radical politics in the 1970s would, on occasion, utilize pictures of pubescent nudes.  *Id.*

The existence of easily available subscription-based child pornography websites confirms the continued production and distribution of child pornography as a vast profit-making enterprise.  Much of the material is sent electronically from Eastern European and Asian countries, with constantly changing sources and shifts in computer centers that makes prosecution of producers and vendors difficult.

A single website uncovered by federal law enforcement officials is said to have grossed $1.4 million dollars in one month, with 35,000 individual subscribers in the United States alone. Taylor & Quayle, *supra*, at 5; *cf.*  Brad Stone, *Sex Ads on Craigslist Attract More Revenue, and More Scrutiny*, N.Y. Times, Apr. 26, 2010, at B1 (discussing revenue to classifieds website from sexual advertisements).  Oft-cited estimates of the annual revenue of child pornographic websites range from $3 billion to $21 billion.  *See, e.g.*, Wade Luders, *Child Pornography Web Sites: Techniques Used to Evade Law Enforcement*, 26 FBI L. Enforcement Bull. 7, at 17 (2007) (reporting that child pornography websites are capable of bringing in $3 billion annually); Kathryn Conroy, Letter to the Editor, N.Y. Times, May 28, 2010 at A22 (citing $3 billion estimate), filed in *United States v. Polouizzi*, (E.D.N.Y.), No. 06-CR-22, Docket No. 238; *Deleting Commercial Pornography Websites from The Internet: The U.S. Financial Industry's*

48

*Efforts to Combat the Problem: Hearing Before the Subcommittee on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 109th Cong. 86 (2006) (statement of Hon. Stupak) ("Child pornography is estimated to be $21 billion [annually]."). The reliability of these figures is not clear. *See, e.g.*, Carl Bialik, *Measuring the Child-Porn Trade*, Apr. 18, 2006, *available at* http://online.wsj.com/article/SB114485422875624000.html (questioning sources and methodology underpinning $21 billion estimate); *Theme Paper on Child Pornography for Second World Congress on Sexual Exploitation of Children: Child Pornography* 17 & n.23 (Yokohama 2001), [hereinafter Second World Congress, Theme Paper on Child Pornography] *available at* http://www.csecworldcongress.org/en/yokohama/Background/Theme_papers.htm (last accessed Aug. 15, 2010) (citing $3 billion estimate, but noting that its "provenance is uncertain"). However large its size, it is evident that there is a substantial continuing and highly profitable international market for child pornography.

Aiding the commercialization of child pornography production and distribution is an online market in which these images are accessed, viewed, and exchanged without the transfer of funds. As one commentator, writing in 2001, put it:

> In the mid-1970s, a child porn magazine containing thirty or so pictures might cost ten dollars in an American city. Today, the entire contents of that same magazine are available through the Internet for free, as are tens of thousands of other, more recent counterparts. A month or so of free Web surfing could easily accumulate a child porn library of several thousand images. The only payments or charges involved would be the standard fees for computer connect time and the cost of [computer hardware]. Prices in the child porn world have not just fallen, they have all but been eliminated.

Jenkins, *supra*, at 3.

This trend has been enhanced in recent years by the increased use of peer-to-peer file sharing programs, which allow individuals to share digital files, including videos and still pictures, over the Internet, often free of charge. *See* U.S. Gov't Accountability Office, GAO-03-351, *File Sharing Programs: Peer-to-Peer Networks Provide Ready Access to Child Pornography* 11-14 (2003) [hereinafter GAO, Peer-to-Peer Networks] (noting proliferation of child pornography over peer-to-peer networks); DOJ, National Strategy, *supra*, at 12-15 (citing studies identifying over 20 million unique Internet Protocol (IP) addresses offering child pornography on such networks); *see also generally Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919-20 (2005) (describing mechanics of peer-to-peer programs); GAO, Peer-to-Peer Networks, *supra*, at 21-25 (same); *cf.* Rachel Henes [New York City school social worker], *XXX Marks the Rot*, N.Y. Daily News, Jan. 2, 2011, at 22 ("sexting between kids as young as 12, videos of sexual acts going viral. . . . And boys aren't the only ones affected by our porn culture. Girls, who make up a portion of the 12-17 year olds that comprise the porn industry's largest consumer base, have internalized these messages too. The prevalence of porn tricks them into believing that sending naked pictures of themselves or engaging in oral sex rings in school stairwells is edgy, cool, even liberating.").

Newly produced or obtained images appear to have increased "value" for users by permitting individuals to gain "status" among underground online groups. Janis Wolak, David Finkelhor, and Kimberly J. Mitchell, *The Varieties of Child Pornography Production*, *in Viewing Child Pornography on the Internet: Understanding the Offense, Managing the Offender, Helping the Victims* 31, 43 (Ethel Quayle and Max Taylor eds. 2005) [hereinafter Wolak et al., *Varieties of Child Pornography Production*]. In this perverse market, the value of such images may increase with their uniqueness, abhorrence, or the extent to which they are seen to fill a "gap"

50

within a particular collection.  This view has been expressed by offenders who have been interviewed by academics and law enforcement officers.  *See, e.g.*, Howitt & Sheldon, *supra*, at 117 ("Particularly when the images were getting younger and I noticed . . .  you would get sets of images as well and that played quite a big part as well . . .  to get complete sets of things."); Taylor & Quayle, *supra*, at 161 (quoting an offender as stating: "You were hoping that someone would post something that you had a series of that had a few gaps . . .  you were hoping that somebody out there would post some."); *see also generally* Monique Mattei Ferraro & Eoghan Casey*, Investigating Child Exploitation and Pornography: The Internet, the Law, and Forensic Science* 73 (2005) (observing that when users discover "missing" pictures from well-known series, they are considered a "hero" among their online peers, referring to the phenomenon as "the online equivalent of baseball card trading.").

Because the posting of new materials is encouraged within online communities, *see, e.g.*, *Falso*, 544 F.3d at 118–21; Sheldon & Howitt, *supra*, at 28; Jenkins, *supra*, at 62–63, it has been hypothesized that individuals may be induced to sexually abuse children in order to provide images to their online communities in an effort to give them a sense of status and access to additional materials.   One father said he began molesting his daughter when she was five years old because he "needed 'fresh' images to provide others on the Internet before they would trade their own newest or least-circulated images with him."  DOJ, National Strategy, *supra*, at 18; *see also, e.g.*, Taylor & Quayle, *supra*, at 161 (quoting offender as stating: "I started offending against my daughter. . .  I was in chatrooms . . .  people would send lists of material that they had . . .  and they were reluctant to give me access to any of that material unless I could come up with some images that I could trade for this new material.").   How many children are being

abused because of this corrupt search for psychic and monetary gain is not clear; many of the images are old and used repeatedly.   *See* Part II.E.iii, iv., *infra*.

In the contemporary online world, some encounters with child pornography may be unintentional.  A persistent refrain in available research is that "juvenile [as well as other] users of peer-to-peer networks face serious risk of inadvertent exposure to pornography when searching and downloading images." GAO, Peer-to-Peer Networks, *supra*, at 14; *accord* Fed. Trade Comm., *Peer-to-Peer File-Sharing Technology: Consumer Protection and Competition Issues* 5-7, 10-16 (2005) [hereinafter FTC, Peer-to-Peer File Sharing].   Thus, there is a distinct possibility that criminal prosecution might arise from accidental exposure to child pornography on the Internet.  *See, e.g.*, *Polizzi* , 549 F. Supp. 2d 308, 354-58 (noting potential prosecution under section 2252 of title 28 of the United States Code for accidental computer-based possession and receipt); Note, *Child Pornography, The Internet, and the Challenge of Updating Statutory Terms*, 122 Harv. L. Rev. 2206 (2009) (similar).

### vi.    Content

There is no universal definition of child pornography.   Legal proscriptions vary widely by jurisdiction, both in terms of the age of the children and the nature of content proscribed.   *See* DOJ, Child Pornography on the Internet, *supra* at 7; Taylor & Quayle, *supra* at 28-30; Second World Congress, Theme Paper on Child Pornography, *supra* at 9-13.

Section 2256 of Title 18 of the United States Code stresses – but is not limited to – "sexually explicit conduct."  It provides that:

> (8) "Child pornography" is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture .  .  .  of sexually explicit conduct, where—

(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

(B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

U.S.C. § 2256. It further states that:

[S]exually explicit conduct" means actual or simulated—

(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person[.]

18 U.S.C. § 2256(2)(A); *accord* § 2256(2)(B). Although the statute as originally enacted defined a "minor" as an individual under the age of sixteen; it was amended in 1984 to cover persons up to age eighteen. *See* Pub. L. No. 98-292, §5(a)(1) (codified as amended at 18 U.S.C. § 2256(1)).

Depictions need not portray sexual contact with children to fall within the scope of the federal prohibition. Neither nakedness nor physical contact is required. "Lascivious exhibition of genitals or pubic area," 18 U.S.C. § 2256(2)(A)(v), has been interpreted broadly to include pictures focused on a child's pubic region, even where the subject is alone and clothed. *See, e.g.*, *United States v. Knox*, 32 F.3d 733, 744-45 (3d Cir. 1994); *United States v. Musumeci*, 307 Fed. Appx. 471, 473 (2d Cir. 2008) (approving *Knox*, 32 F.3d at 744-45).

Researchers investigating the nature of child pornography in the contemporary market have identified ten levels of image severity: (1) indicative; (2) nudist; (3) erotica; (4) posing; (5) erotic posing; (6) explicit erotic posing; (7) explicit sexual activity; (8) assault; (9) gross assault; and (10) sadistic/bestiality.  *See* Taylor & Quayle, *supra*, at 31-36.   The characteristics of depictions span a wide spectrum—from seemingly innocuous beach pictures to vile depictions of sexual assaults.  Although not completely consonant with legal definitions, the categories are helpful in understanding the contemporary child pornography market and its impact on victims and others.  *See* DOJ, Child Pornography on the Internet, *supra*, at 7 (utilizing taxonomy set forth in Taylor & Quayle, *supra*, at 31-36).

The most severe depictions include the grotesque.   Emblematic is a narrative description recently offered by a commentator and children's advocate:

> Child pornography . . .  depicts the rape of infants and
> children.   It includes oral, anal and vaginal penetration;
> digital penetration of the anus or vagina, tying and gagging
> children, ejaculating onto the children's faces and bodies,
> oral stimulation of the child or stimulation of the adults by
> the child, forcing the child to swallow ejaculate, urinating
> on the child . . .  up to and including snuff movies where
> the children are killed.  These children are left bleeding,
> bruised, and broken, many with significant internal injuries
> including ruptured bowels and vaginas.

Letter from Evin Daly, CEO/Founder, Child One International, May 24, 2010, filed in *United States v.  Polouizzi*, No. 06-CR-22, Docket No.  239.

A congressionally funded survey of Internet-related crimes indicates that many individuals arrested for child pornography possession had images falling on the severe end of the

54

spectrum—both in terms of the age of children depicted and the content. *See generally* Janis Wolak, David Finkelhor, and Kimberly Mitchell, *Child-Pornography Possessors Arrested in Internet-Related Crimes: Findings from the National Juvenile Victimization Study* (2005) [hereinafter Wolak et al., *Child Pornography Possessors*]. The majority of individuals surveyed were found to have pictures of prepubescent children engaged in sexually explicit activity: 83 percent had images of children below the ages of six and twelve; 92 percent had images of minors focusing on the genitals or showing explicit sexual activity; 80 percent had pictures showing sexual penetration of a child; and 71 percent had images showing sexual contact between an adult and a child. *Id.* at 4-5.

These findings are consistent with studies of the international child pornography market. Ongoing research of the European-based COPINE project—a multi-year initiative involving experts from various academic disciplines in collaboration with law enforcement—entails collection of large, random samples of archival child pornographic material from publicly available newsgroups. *See generally* Taylor & Quayle, *supra*, at 41. Of the images obtained, more than half depicted young girls, and nearly all included depictions of sexually explicit activities. *Id.* at 41. There is a prevalence of child pornography "series," depicting, for example, the same child being abused over a number of years. *Id.* at 38-41; *see also* Jenkins, *supra*, at 2 (describing series of pictures of one of the "most prized collections" on the Internet). Other collections are sequential images taken during the filming of particular pornographic videos in the 1960s and 1970s. Some research suggests that the harshest pictures may be incidental to a form of "sex tourism," and that the proportion of online images depicting prepubescent children and violent, sadistic acts may be increasing. *See, e.g.*, DOJ, National Strategy, *supra*, at 22

(noting that law enforcement officers are seeing more images depicting violent and sadistic acts, and showing younger children and toddlers); Jenkins, *supra*, at 186 (discussing sex tourism).

### vii.    Viewers

There is no single "profile" of the child pornography viewer.   A report by law enforcement officials indicates that he "may come from all walks of life and show few warning signs."   DOJ, Child Pornography on the Internet, *supra*, at 14; *see also, e.g.* Wolak et al., *Varieties of Child Pornography Production*, *supra*, at 34-36.   Perusal of newspaper headlines reveals that child pornography arrests, indictments, and convictions span socioeconomic and professional boundaries.   *See, e.g.*, *Victoria Attorney Indicted in Child Porn Case*, Times Record News Online/Associated Press, Aug. 20, 2010, http://www.timesrecordnews.com/ news/2010/aug/20/victoria-attorney-indicted-child-porn-case (attorney and local politician); CNN Wire Staff, *Former Alabama Prosecutor Arrested on Enticement, Child Porn Charges*, CNN.com, Aug. 18, 2010, http://www.cnn.com/2010/CRIME/08/10/alabama.da.sex.crime (attorney and state prosecutor), Robin Wilson, *Yale to Fire Professor for Child Pornography*, Chronicle of Higher Education Online, Mar. 10, 2000, http://www.chronicle.com/article/Yale-to-Fire-Professor-for/13724 (professor of geology); Rosa Prince, *Gary Glitter Faces 50 Child Porn Charges*, The Independent, Mar. 31, 1998, http://www.independent.co.uk/news/gary-glitter-faces-50-child-porn-charges-1153478.html (glam rock performer); *see also generally* DOJ, *supra*, at 14 (describing range of people involved in offenses); Wolak et al., Child Pornography Possessors, *supra*, at 34-46 (same); Mike Nelson, *Midlands Voices: Child-Porn Cases are Not all Alike*, Omaha World Herald Online, June 20, 2010; *cf.* Sysue Whitley, *Prison Time for Viewing Porn? A Teenage Boy Faces Decades in Prison For Visiting Sexually Explicit*

*Web Sites: But Was it Really Someone Else?*, ABC News Online, Apr. 12, 2007, http://www.abcnews.go.com (state charges brought and then dropped against sixteen year old).

Less diversity apparently exists among federal offenders prosecuted, in terms of age, race, and sex.  It has been said that: "[a]mong the few distinguishing features of offenders are that they are likely to be white, male, and between the ages of twenty-six and forty, and may be heavy Internet users."  DOJ, Child Pornography on the Internet, *supra*, at 14 (citing research). Younger offenders appear to be a rarity, but this may be due to a reluctance of some authorities to charge persons in this age group.  *See, e.g.*, Wolak et al., *Varieties of Child Pornography Production*, *supra*, at 34-36 (noting that 89 percent of a sample of individuals arrested for child pornography production in 2000 were older than twenty-eight years old); *cf.* U.S.  Sentencing Commission, *Annual Report* 35 (2009) (4.1 percent of federal offenders, for all federal offenses combined, were under the age of twenty-one).  *But cf.* Taylor & Quayle, *supra*, at 5 (observing that individuals as young as thirteen are involved in distribution of child pornography).

Analyses by law enforcement agencies imply that individuals who obtain and view child pornography over the Internet are diverse—not only in the nature of images viewed but also in their motivations for doing so.  *See* DOJ, Child Pornography on the Internet, *supra*, at 13-17; Taylor & Quayle, *supra*, at 62, 72; David Middelton et al., *What Sort of Person Could Do That? Psychological Profiles of Internet Pornography Users*, *in* Viewing Child Pornography on the Internet: Understanding the Offense, Managing the Offender, Helping the Victims, 100-06 (Ethel Quayle & Max Taylor eds., 2005); *see also, e.g.*, William Bernet & Anas Alkhatib, *Genomics, Behavior, and Testimony at Criminal Trials*, *in* The Impact of Behavioral Sciences on Criminal Law 291, 311 (Nira A. Farahany ed., 2009) ("Sexual offenders are a heterogeneous lot.  At one extreme, some are compulsive, violent, and sadistic—those likely to offend again at

57

the earliest opportunity.   At the other extreme, some sexual offenders have simply manifested transitory bad judgment and are unlikely to re-offend.").

Interviews with offenders confirm that child pornography is sought for a variety of reasons.   Key themes include the use of child pornography: (1) for sexual arousal; (2) for collecting; (3) as a way of facilitating social relationships; (3) as a way of avoiding real life; and (5) for other "recreational" purposes, including out of impulse, curiosity, or short-term entertainment.   Sexual arousal has been identified as a dominant motivating factor, often functioning in combination with the others.   *See* Sheldon & Howitt, *supra*, at 109-121; DOJ, Child Pornography on the Internet, *supra*, at 14; Taylor & Qualye, *supra*, at 80, 83.

Factors other than a desire for sexual gratification hold particular salience in the context of Internet pornography.   With respect to collecting, computer-related technologies permit users to amass vast and unique "libraries" of child pornography.   *See* DOJ, National Strategy, *supra*, at 11-12; Howitt & Sheldon, *supra*, at 117-119; Jenkins, *supra*, at 101.   Whereas in decades past, individuals might have obtained a limited number of "French pictures," magazines or videotapes in stores or through mail-order catalogues, today, many thousands of child pornographic images and videos can be obtained by clicking a button.   *See, e.g.*, DOJ, National Strategy, *supra*, at 12 (citing example of offender who amassed one million images and many videos, some running an hour in length).   "There is an Internet subculture of child pornography aficionados whose main interest seems to be not only enjoying viewing child pornography, but collecting it."   Ferraro & Casey, *supra*, at 73.

Social dimensions are substantial in the accessing, viewing, and trading of child pornography on the Internet.   While some Internet users may view and download child pornography with limited or no online interaction, *see* Sheldon & Howitt, *supra*, at 119-120,

others are drawn to a sense of "belonging" that comes with participating in online networks or communities of like-minded individuals.  Statements of offenders are illustrative.  *See, e.g.*, *id.* at 119 ("[The Internet] offered a kind of place to meet people and talk about similar fantasies . . . . I'm getting an element of feeling that I'm wanted . . .  I got a thrill of being . . .  accepted . . ."); *id.*  ("I was more interested in the conversations I was getting, the friendship I was getting . . . .  I was very lonely. . . .  [T]o prove that they were genuine they sent me the indecent stuff . . .  I had to prove . . .  that I [was] genuine by doing the same to them."); Taylor & Quayle, *supra*, at 139 ("I got almost . . .  more satisfaction from actually just interacting with my fellow paedoph[iles] . . .  [than] I did actually looking at the pictures."); *id.*  ("I wanted people to like me.  I've always been like that[.]").

A perceived sense of community may serve to normalize and reinforce deviant behavior of child pornographers, in some instances leading to a cycle of viewing increasingly graphic images, or even prompting the seeking out of individuals for illicit sexual encounters.  Such a cycle has been acknowledged by some offenders.  *See, e.g.*, Taylor & Quayle, *supra*, at 111-112 (discussing "downloading spiral," where user said he was "getting so much from something that wasn't real . . .  you go back to reality and reality feels even worse than it was before"); *id.* at 186 ("I was finding more and more explicit stuff on the computer and I was looking at the computer thinking oh . . .  they're doing it . . .  it can't be that bad . . .  it's there you know . . .  I'm not doing any harm and she doesn't seem to mind. . . ."); *id.*  ("I'd look at those [images] and all I wanted to do was abuse her . . . .  [I'd] make sure she was asleep and then I'd abuse."); *id.*  at 188 ("I was actually getting quite bored as it were . . .  with the sort of child pornography . . .  I was becoming sort of much more obsessed with bondage . . .  and sort of torture . . .  imagery.  So . . .  I'd kind of exhausted . . .  the potential that it had for sexual

arousal."). *But see id.* at 183 ("[T]he big thing I kept saying and I believed it . . . with every inch of my body . . . was that this was OK because . . . I'm not touching anybody . . . it's better for me to sit here fantasizing and looking at pictures . . . and . . . not doing anything else.").

A sizeable number of offenders appear to join the online world of child pornography precisely because it is disconnected with face-to-face interactions in the real world. *See generally* Taylor & Quayle, *supra*, at 97-119; Sherry Turkle, *Life on the Screen* (1995). To some, online pornography appears to be a coping mechanism, a way to avoid troubles of real life. *See, e.g.*, Sheldon & Howitt, *supra*, at 113 ("It's just coping with life. . . . [I]t was a form of escapism . . . to get out of my dilemma . . . . [W]hen I went on the net . . . [I] was swept away . . . I was in . . . m[y] own little world."). To others, it is a way of anonymous self-exploration or a way to satisfy curiosities. *See, e.g.*, Michele Ybarra, Kimberly J. Mitchell, *Exposure to Internet Pornography Among Child and Adolescents: A National Survey*, 8 CyberPsychology & Behav. 473, 474, 483 (2005) (discussing prevalence of older youths accessing pornography at a time when it is "developmentally appropriate to be sexually curious"). Some research indicates that involvement in Internet child pornography may be particularly appealing to individuals who "embrace . . . risk taking" or seek "immediate stimulus," whether sexual or otherwise. *See* Taylor & Quayle, *supra*, at 18, 175.

### viii.    Relationship Between Viewing and Acting; Real and Perceived Harms

Child pornography can, and often does, depict serious sexual and physical abuse of children. *See* Part II.E.iii, *supra*. A persistent concern is that observing child pornography might lead viewers to themselves sexually abuse children in the future. Reliable empirical evidence on this issue is lacking. A few statistically unreliable studies of convicted child

pornography offenders indicate that a considerable percentage have abused children in the past. *See, e.g.*, Michael L. Bourke & Andres E. Hernandez, *The "Butner Study" Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*, 24 J. Fam. Violence 183, 187 (2009) (observing that 85 percent of 155 prisoners participating in 18-month intensive residential sexual offender treatment program reported having committed acts of sexual abuse against minors); DOJ, *National Strategy*, *supra*, at 19 ("The National Juvenile Online Victimization (NJOV) study revealed contact offenses in one of every six cases that began as a child pornography investigation."); *see also, e.g.*, Kenneth Lanning, *National Center for Missing and Exploited Children, Child Molesters: A Behavioral Analysis* (5th ed. 2010) (reporting anecdotal information based on interviews with convicted offenders). These investigations have been widely cited as evidence of the risk of future dangerousness posed by individuals who view child pornography. *See, e.g.*, Audrey Rogers, *Child Pornography's Forgotten Victims*, 28 Pace L. Rev. 847, 852-54 (2008) (citing The Butner Study and NJOV survey); *Enhancing Child Protection Laws After the April 16, 2002 Supreme Court Decision,* Ashcroft v. Free Speech Coalition*: Hearing Before the Subcomm. on Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 107th Cong. 17 (2002) (statement of Michael J. Heimbach, Crimes Against Children Unit, Criminal Division, FBI) (citing Lanning, *supra*).

Somewhat dubious is the probative value of these largely anecdotally based inquiries on the effect of viewing presumably resting on questioning of convicted offenders. The universe itself is biased since the persons studied constitute the dangerous group likely to have been prosecuted. *See, e.g.*, L. Jill Rettinger, *The Relationship between Child Pornography and the commission of Sexual Offenses Against Children: A Review of the Literature* 2-4 (2000) (noting limitation of anecdotal studies of convicted offenders); Note, *Inequitable Sentencing for*

*Possession of Child Pornography: A Failure to Distinguish Voyeurs from Pederasts*, 61 Hastings L. J. 1282, 1294-98 (2010) (discussing methodological flaws of both types of studies); *see also, e.g.  United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008) (systematically dismantling Butner Study); Taylor & Quayle, *supra*, at 26-27 (describing Lanning Report 1st ed. (1992) as "lacking empirical validation"); *see also, e.g.*, Julian Sher & Benedict Carey, *Debate on Child Pornography's Link to Molesting*, N.Y. Times, July 19, 2007, http://www.nytimes.com/2007/07/19/us/19sex.html (noting controversy surrounding Butner Study).

    At most, these materials suggest some possible correlation between child pornography and contact offenses among a non-randomized subset of convicted offenders—many of whom were convicted in connection with a contact offense or suspicions of a contact offense.   As the authors of such studies caution, it would be fallacious to draw conclusions from them about causation or the likelihood that any particular child pornography offender will act out in the future.  *See, e.g.*, Andres E. Hernandez, *Position Paper: Psychological and Behavioral Characteristics of Child Pornography Offenders in Treatment* at 4  (2009) (unpublished manuscript) (author of Butner Study, noting, "some individuals in law enforcement are tempted to rely on a biased interpretation of our study (i.e., to prove that the majority of [child pornography] offenders are child molesters)" and asserting that "the argument that the majority of [child pornography] offenders are indeed contact sexual offenders . . . simply is not supported by the scientific evidence"), *available at* http://www.iprc.unc.edu/G8/Hernandez_position_pape r_Global_Symposium.pdf; *cf. United States v. Falso*, 544 F.3d 110, 122 (2d Cir.  2008) ("It is an inferential fallacy of ancient standing to conclude that, because members of group A . . .  are

likely to be members of group B . . . , then group B is entirely, or even largely composed of, members of group A.") (quotation marks omitted).

Scientifically acceptable empirical analyses have thus far failed to establish a causal link between the mere passive viewing of child pornography – particularly by male adolescents -- and the likelihood of future contact offenses.  *See, e.g.*, L. Webb, et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 464 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"), *available at* http://sax.sagepub.com /content/19/4/449.full.pdf+html; Jerome Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) ("[T]he consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2716325/pdf/1471-244X-9-43.pdf; Rettinger, *supra*, at 11 ("[T]he majority of studies in this area have been done in the context of adult, rather than child, pornography.  There are also methodological and ethical difficulties in examining such relationships."); Taylor & Quayle, *supra* at 72 ("Overall, there appears to be little support for the allegation of a direct causal link between viewing pornography and subsequent offending behavior."); *id.* at 93–94 ("The relationship between contact offenses and pornography remains unclear. . . .  [F]or some respondents, pornography was used as a substitute for actual offending, whereas for others, it acted as a blueprint and stimulus for a contact offense."); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 Sexual Abuse 201, 201 (2005) (noting, at the

63

time of publication, that there were "no published data on the future offending of child pornography offenders"); Jenkins, *supra*, at 173 ("[T]he statistics establish no causal link between child porn materials and actual behavior."); Sheldon & Howitt, *supra*, at 203–204 ("There is a common assumption that Internet child pornography offenses constitute stepping-stones that finally lead to direct sex offending against children.  This idea is common but . . . the evidence is not strong in its favor."); *cf.*  Stephen T.  Holmes & Ronald M. Holmes, *Sex Crimes: Patterns and Behavior* 157 (3d ed. 2009) ("Exposure to [adult] pornography may play a positive role in the maturational process of non-offenders.  The most important finding is that [contact] sex criminals, not only as adolescents but also as adults, see less pornography than [non-offenders].").

Rudimentary typologies with dubious dependability of offenders and empirical models have been developed to aid in predicting future dangerousness of sex offenders.  *See, e.g.*, Ian Friedman et al., *Sexual Offenders: How to Create A More Deliberative Sentencing Process*, 33 The Campion 12, 15 (2009) (discussing general sex offender typologies in context of Internet pornography offenses); Middelton et al., *supra*, at 99-106 (similar).  Because of the heterogeneous nature of offenders and the complexity of the cognitive and emotional processes involved, the predictive utility of these tools is limited, particularly in the context of adolescent child pornography viewers.  *See, e.g.*, L. Alvin Malesky, Jr. et al., *Child Pornography and the Internet*, *in Sex Offenders: Identification, Risk Assessment, Treatment, and Legal Issues* 302, 312-19 (Saleh et al., eds. 2003) (noting that, despite considerable advances in field of sex offender risk assessment generally, available risk assessment tools have limited predictive utility); *cf. Psychological Assessment of Sex Offenders*, *in* Viewing Child Pornography on the Internet: Understanding the Offence, Managing the Offender, Helping the Victims, 109, 123

64

(2005) (diagnosis of pedophilia is not a dispositive factor); Maggie Jones, *How Can You Distinguish a Budding Pedophile from a Kid with Real Boundary Problems?*, N.Y. Times Magazine, July 22, 2007 (discussing challenges of adequately diagnosing pedophilia, particularly among young people). *See also* Carissa Byrne Hessick, *Disentangling Child Pornography from Child Sex Abuse*, 88 Wash. U. L. Rev. 4, 853 (2011) (examining conflation of child sexual abuse with possession of child pornography and arguing against harsh sentencing for possession of child pornography).

Varying interactions of unquantifiable forces pushing in a variety of directions determine the appropriate sentence in child pornography cases. The assessment of whether an offender will act out in the future requires a prosecutor's and judge's careful, informed and somewhat experiential judgment—like other sentencing factors—on a case by case basis rather than by a rigid *a priori* scheme applicable to all cases. Ultimately, the judgment is based on rough calculations of nonquantifiable risks and benefits, cruelties and compassions; statute and precedent provide limited guidance in the individual prosecution. *Cf.* Justice David H. Souter, Harvard Commencement Remarks, Harvard Gazette Online (May 27, 2010), http://news.harvard.edu/gazette/story/2010/05/text-of-justice-david-souters-speech ("I don't forget my own longings for certainty, which heartily resisted the pronouncement of Justice Holmes, that certainty generally is illusion and repose is not our destiny. . . . [We] can still address the constitutional uncertainties the way they must have been envisioned, by relying on reason, by respecting all the words the Framers wrote, by facing facts, and by seeking to understand their meaning for living people."); William J. Brennan, *The Constitution of the United States: Contemporary Ratification,* 27 S. Tex. L. Rev. 433 (1986) (exploring the obligation of Article III judges to speak for the current community in interpreting the

Constitution); Stephen Breyer, *Judicial Review: A Practicing Judge's Perspective*, 78 Tex. L. Rev. 761 (2000) (discussing the "set of cases . . . in which there is an inevitable tension between the will of the elected legislature and the work of the unelected judge," noting that "every legal decision interacts . . . with other decisions, principles, standards, practices, and institutional understandings, always modifying the 'web' of the law; and every decision affects . . . the way in which that web, in turn, affects the world. . . . [I]n respect to constitutional matters, estimates of vertical effects—that is, the real world consequences of horizontal interactions—have a particularly important role to play."); Justice Samuel A. Alito, Jr., *Learned Hand: Undeniably Great Judge*, New York Law Journal, June 14, 2010, at 2; *Spector Motor Service v. Walsh, Inc.* 139 F.2d 809, 814 (2d Cir. 1944) ("In addition to the general course of decisions . . . we shall examine certain specific trends . . . more directly applicable to the present issue."); *id.* at 823 (Hand, J., dissenting) ("It is always embarrassing for a lower court to say whether the time has come to disregard a decision of a higher court, not yet explicitly overruled, because they parallel others in which the higher court has expressed a contrary view. I agree that one should not wait for formal retraction in the face of charges plainly foreshadowed; the higher court may not entertain an appeal in the case before the lower court, or the parties may not choose to appeal."); Essay, *The Roles of a Federal District Court Judge*, 76 Brook. L. Rev. 2, 454 (2011) ("Ultimately, it is the trial judge's conscience, exercised under the constraints of our rule of law, that guides the pen writing an opinion justifying a judgment.").

## F. Effect on Abused Children

The production of child pornography can severely harm children.  In the most extreme instances, they suffer not only physical and mental abuse, but death.  A well-publicized example is Thea Pumbroek.  When six years old she died of a cocaine overdose in the bathroom of an

Amsterdam hotel in the mid-1980s, while being filmed for a pornographic video.  *See* Taylor & Quayle, *supra*, at x–xi, 42–43.  The killing of children in the production of child pornography may not be accidental.  *Cf.*  Comment, *Sentencing "Cybersex Offender": Individual Offenders Require Individualized Conditions when Courts Restrict Their Computer Use and Internet Access*, 58 Cath. U. L. Rev.  779, 789 n.67 (2009) (discussing defendant who "expressed interest in chatroom message that advertised 'snuff films of little children'").

Many children who are not physically injured in the making of child pornography grow up knowing, or learning later, that their abuse has been frozen in time—sold, circulated, and traded long after physical trauma ended, often for use in masturbation.  *See, e.g.*, *United States v. Ferber*, 458 U.S.  747, 759 (1982) (noting harm suffered by child victims from circulation of images); *accord Osborne v. Ohio*, 495 U.S. 103, 110–111 (1989).  The following example is not atypical:

> When Amy was a little girl, her uncle made her famous in the worst way: as a star in the netherworld of child pornography. Photographs and videos known as 'the Misty series' depicting her abuse have circulated on the internet for more than 10 years, and often turn up in the collections of those arrested for possession of illegal images.  .  .  .  Amy's uncle is now in prison, but she is regularly reminded of his abuse whenever the government notifies her that her photos have turned up in yet another prosecution. More than 800 of the notices .  .  .  have arrived at Amy's home. .  .

*See* John Schwartz, *Child Pornography, and an Issue of Restitution*, N.Y. Times, Feb.  3, 2010. Analysis of messages posted by participants in "Wonderland"—a well-known and now defunct electronic bulletin board frequented by child pornographers—illustrates that demand for such images persists, and may even increase, over time:

[R]emember the case of 'Helena,' probably a British girl, who tragically, may be one of the best-known sex stars on the Web.   In the late 1980s, as a little girl of seven or eight, Helena became the subject of a photo series that depicted her not only in all the familiar nude poses of hardcore pornography but also showed her in numerous sex acts with Gavin, a boy of about the same age. Both are shown having sex with an adult man, presumably Helena's father.   The images are collectively known by various names but the commonest is "hel-lo," that is, "Helena/Lolita.' Since their first appearance they have had an astonishing afterlife; probably not a day has passed without the hel-lo images appearing anew on some electronic server somewhere in the world, and they are cherished by thousands of collectors worldwide.   They seem to be the standard starter kit for the child porn novice . . . .

Or we might consider the more recent KG and KX series, the 'kindergarten' photos, which together represent perhaps the most prized collections currently available on the Net.   KG is a series of hundreds (maybe thousands) of nude images of several very young girls, mainly between the ages of three and six years old, which each item including the girls' name—Helga, Inga, and so on.   The photographs date from the mid-1990s, and they likely derive from Germany or Scandinavia.   .   .   The KG collection exists alongside a still more sought-after version, KX, which depicts the same children in hard-core sexual situations with one or more men.   Put simply, most are pictures of four- and five-year old girls performing oral sex and masturbation on adult men.   The immense popularity of the KG images ensured an enthusiastic market for MX, which entered general circulation in early 2000.

*See* Jenkins, *supra*, at 2–3; *see generally* Taylor & Quayle, *supra*, at 8 ("Child pornography . . . represents and preserves that abuse or sexualized image for as long as that photograph [or video]

68

remains."); Ferao & Casey, *supra*, at 5 ("Child pornography is a permanent record of a child's sexual assault that exploits the victim each time it is viewed for pleasure.").  The harm to the victims, families, and communities arising from the production and continued circulation of such images is great, but impossible to quantify.  Feraro & Casey, *supra*, at 5.  *But cf.* Schwartz, *supra* (describing one child pornography victim's attempt to obtain restitution from possessors of images depicting the abuse she suffered years prior).

The testimony in the present case of a qualified psychologist, Dr.  Mary Anne Layden, described the effects on both the viewers and viewed:

> Q    Are you a licensed psychologist in the State of Pennsylvania?
>
> A    I am.
>
> Q    And how long have you been practicing as a psychologist?
>
> A    Twenty-five-years.
>
> Q    And can you please just tell us what degrees you have in psychology?
>
> A    I have a Bachelor of Science Degree in Psychology and a Ph.D. in psychology
>
> . . . .
>
> Q    Are you currently an Assistant Professor of Psychology in the Department of Psychiatry at the University of Pennsylvania?
>
> . . . .

Q        Are you a member of the American Psychological

Association and other similar associations?

A        I am.

Q        Have you given over 40 lectures about various issues

related to cognitive therapy?

A        Yes.

MS.  FEBUS: So, at this time, your Honor, is Mary Anne

Layden qualified as an expert in psychology?

THE COURT:   Yes.

Q        Dr.  Layden, have you treated adult survivors of sexual

abuse and trauma?

A        I have.

Q        And that class of or group of people that you treated, does

that include adult survivors who were also victims of child

pornography?

A        Yes.

Q        Have you treated sex offenders?

A        Yes.

Q         And among the group of sex offenders that you have

treated, has it also included sex offenders who are involved

in the distribution or trading of child pornography?

A        Yes.

Q       What are some of the immediate and long-term

        psychological harms that you observed based on your

        clinical experience with respect to victims?

A       The victims start with, at the time of the trauma, physical

        harms.  So, there may be anal ripping, there may be vaginal

        ripping, there may be sexually transmitted diseases that

        show up in the vagina, sometimes in the mouth, sometimes

        in the eyes.

        Once those problems are healed, though, sometimes it can

        take decades for some of those problems to heal.  Once

        they're healed, there are psychological consequences.

        Some of the psychological consequences show up in

        childhood.  Some of the psychological consequences show

        up in childhood and stay in the adult life; and there are

        other psychological consequences that don't show up until

        the adult life.

        Of the psychological consequences, you'll see depression.

        You'll see suicidality where these individuals feel that life

        is not worth living.  You'll see symptoms of post traumatic

        stress disorder and, in fact, the research on post traumatic

        stress disorder indicates that the most effective way to

        produce adult psychiatric problems is childhood sexual

        abuse.

71

When you look at the long-term research of individuals who have, as adults, have psychological problems, childhood sexual abuse shows up in their histories more than any other characteristic.

So, the psychological issues include the typical symptoms of post traumatic stress disorder and some others that are specific to the imagery problem. Some of those include reexperiencing. So, these are individuals who reexperienced their trauma sometimes for decades. The reexperiencing could be intrusive memories. They can be going through their day and memories of the trauma can come back unbidden. It can include nightmares where at nighttime they play over and over again sometimes for decades of the experience they had as a child. It can include flashbacks, and a flashback is when an individual is reexperiencing the trauma and can't tell that the trauma is not happening to them right at that moment.

So, decades later, they could be having an experience where they think, "I'm being raped and tortured right now," that's a flashback. So, reexperiencing is one of the common responses.

They also have the experience of post traumatic stress which is called arousal. Now, arousal means that these

victims are constantly anxious, they walk around anxious. It shows up first as hypervigilance, they are constantly scanning the environment. Checking, checking who's going to hurt me now? Who's going to hurt me now? Who's going to hurt me now? Those who have been photographed are also hypervigilant based upon the photographs. My patients tell me that when they go into the street they look at everyone they pass and say, "Did you see the pictures?" "Did you see the pictures?" "Did you see the pictures?" "Did you see the pictures?" They are constantly ruminating about who has seen those pictures. So, that the arousing and the anxiety and the hypervigilance exacerbated by the fact that the pictures are there, you'll see an exaggerated startle response in these individuals which is part of their arousal. You don't want to come up behind them and put your hand on their shoulder they will jump. You'll see that they can't sleep and this is one of the -- this is an arousal symptom as well.

You'll also see that above and beyond the reexperiencing and the arousal, that they have avoidance problems. So, they will avoid anything that psychologically feels connected to the trauma.

For many of the victims, that means for decades they will avoid any kind of activity that's sexual. Most of the victims will avoid males of all sorts. They will avoid the Internet. They will avoid anyone who is going to log onto the Internet, they have to leave the room. They will avoid using the computer. This is narrowing their options in life if they can't be the on the computer, interact with males or have sex. They are also going to avoid movies, news stories, anything that might remind them of their experience. So, avoidance is a huge problem for these individuals.

These are some of the typical symptoms of post traumatic stress but there are also cognitive symptoms that show up. There are changes in beliefs, that when you rape and torture a child, that child is trying to develop a view of life. They're trying to figure out what are the rules for living, what do I know about life, as they're trying to make sense out of what's happened to them.

These victims typically have five categories of beliefs. One is mistrust. They come to believe often that nobody can be trusted. Sometimes if the perpetrator is a close relative, a father, a father figure, an uncle, a brother, they come to

believe that intimate relationships are particularly

vulnerable and you can be hurt in intimate relationships.

So, their mistrust can be general but it can also be quite

targeted to intimate relationships.  They come to believe

that they are bad.   Because of the nature of childhood

thinking, children will make the mistake that it was their

fault, that they were raped; that somehow this has made

them defective, broken, morally corrupted.

Now, some of this belief in their badness can be

encouraged by perpetrators because perpetrators often want

to convince the child that the child produced this behavior.

 So, perpetrators can say to the child after they've raped

them, look what you made me do implying to the child you

do this, you caused this or they might say to the child you

liked this, you wanted warranted this.  And the child is

thinking I don't think I liked it, I don't think I wanted it, but

you're telling me I did.  So, this produces a confusion in the

child I can't trust my own responses.

The child also begins to believe that they're helpless.  I

can't stop people from doing things.  I can't prevent people

from hurting me.  So, the helplessness comes on.

They also believe sexually toxic beliefs.  So, part of the

message of the childhood is the child trying to decide what

is sex about and what they learn is sex is predatory; sex is narcissistic; sex is exploitive; sex is hurtful. The only thing you're good for is sex; all relationships are sexual.

These are toxic, highly toxic beliefs to their sex life and the boys, incredibly enough, the boys often think that because they've been raped in childhood that that has turned them into a gay person, that has somehow taken a heterosexual boy and made him become a homosexual boy and the sexual confusion that comes on from these boys who are heterosexual, who now believing they've been turned into homosexuals because they've been raped is a horrible trauma. And that belief that somehow I've been turned into a gay person can go on for decades and destroy the boy's sex life throughout his adult life.

Q.    Now, I would like for you to provide information about, you know, what are the impacts on the victims who already have these types of psychological traumas when they find out or become aware that their images, you know, images that capture that sexual abuse are circulating on the Internet?

A    Because they already have a belief in their helpless, the realization in their adult life, because children don't quite realize that these images are circulating on the Internet

76

permanently, and there's nothing they can do about it, it actually

deepens their helplessness.  It also deepens the issue of mistrust

because they believe that the fact that these images are viewed

means that all men are perpetrators; all men will look at children

being raped and tortured and get sexually aroused.   So, seeing and

knowing that these pictures are on the Internet deepens their

mistrust.

It also deepens their issues about boundaries and hopelessness.  In

childhood, they knew that they were physically invaded and they

couldn't stop it.  As adults, they know they're visually invaded and

they can't stop it.  For them, the difference between visual invasion

and physical invasion is not that different.  So, knowing that

they're out there just deepens the pathology that they're already

suffering from.

Q       In your clinical experience, have you observed the impact

        on victims in sexual abuse and child pornography when

        they realize or have concerns about whether people who are

        viewing their images are going to receive punitive

        measures of some type?

A       Whenever patients talk to me about perpetrators, one of the

        beliefs that they have that they've learned in their childhood

        is that their needs are unimportant and that perpetrators'

        needs are more important.  They believe that when the

calculus is done as to who is more important, perpetrator or

victim, that the society comes down on the side of the

perpetrator.

So, when they hear that perpetrators are given a slap on the

wrist it just deepens the belief that they, the victim, are

unimportant.

Q     Does that affect their recovery?

A     It makes the treatment much harder because it's hard to

convince them their needs are important when society is

saying, no, they're not.

Q     Earlier, I asked whether you have also treated sex offenders

who are also involved in consuming child pornography and

I believe you responded affirmatively?

A     Yes.

Q     Based upon your clinical experience, what impact or effect

on treatment and recovery for sex offenders does it have

when they are under the perception that they're not going to

be subjected to punitive measures?

A     When we're treating the offender, there are a number of

problems that have to be addressed or the treatment has no

chance of being effective.

One problem is called permission-giving beliefs. This is the belief that what I'm doing doesn't hurt anybody, it's normal. Everybody is doing it, therefore, I don't need to stop.

In the treatment with offenders, unless at some point in that treatment they admit and deeply understand, that looking at the pictures actually damages the victim, the treatment will not go forward. If they do not deeply understand that they must take responsibility and that punishment is part of the responsibility for what they did, the treatment will not go forward.

If they go into denial, if they go into lack of empathy, if they say this is not such a big problem, this isn't—I don't deserve to be punished, then the treatment will not go forward. The level of treatment we have right now is not as effective as we would like it to be but it's impossible unless that they admit that they hurt the victim, unless they admit that they deserve punishment, and even that given that some of them have a psychiatric disorder, that's no excuse for what they've done and the punishment is the first step in the treatment.

Q      So, there's a lack of some sort of punitive measure or punishment has some sort of effect on recovery treatment for the sex offender?

A      It has a negative effect on the recovery and treatment of the second offender.

Q        The next set of questions that I would like for you to
address deal with the impact of current child pornography
images on what's referred to often as a "Market For Child
Pornography."  What impact do current child pornography
images in your experience and your study of the issue, what
impact does that have?

A        To the individuals who are making the images only for
money, clearly some of those individuals would stop if
nobody would buy them.  For the individuals who are
making them for their own sexual gratification, once they
begin to look at those images, they often experience what's
called tolerance because the disorder they have is a
relapsing escalating kind of disorder.  They develop
tolerance and say these images are no longer strong
enough, titillating enough to get me sexually aroused so
now I'm going to need more and harder kinds and that's part
of the escalation of the disorder.

Q        And are these conditions or reactions that you've observed
in the course of your practice?

A        Yes.

Q        Can you explain for the Court how child pornography
images are used in ways to harm children who are not
depicted in them?

First being the issue of grooming.  Can you explain what grooming is and how child pornography factors in that?

A        The perpetrator may find that the child is initially unwilling to engage in sexual activity, so the perpetrators often use the child pornography to show the child and to disinhibit the child so that they will say, look, these children are doing it.  Look, these children are liking it.   Get familiar, get comfortable with this so that you'll be willing to do this with me.  So, they are trying to get the child's willingness to engage in the sexual activity by showing them the pictures.

Q        And that's the process of grooming that you are referring to?

A        That's the process of grooming.

Q        What, if anything, is the correlation between the consumption of child pornography for sexual pleasure and issues with respect to acting out, what may or may not be depicted in the images?

A        A number of studies have shown that the majority of individuals who use child pornography do it to sexually arouse themselves and that they have sexual interest in children.

81

And, in fact, in one study, they took a group of individuals who were using child pornography and a group of individuals who had offended against children and adults.   They interviewed both of these groups to see which ones would get the diagnosis of pedophilia and they found that the group of individuals who used child pornography were more likely to get the diagnosis of pedophilia than the group that involved individuals who had already raped a child or raped an adult.

So, the child pornography was actually a better predictor of pedophilia diagnosis than actually even hav[ing] raped a child.

     . . . .

Q    With respect to child pornography being used as a tool for grooming, you just testified about that.

A    Yes.

Q    How else might child pornography --

People who are having a sexual interest in children use child pornography to educate themselves?

A    It's used both as a teaching tool and a learning tool.   So, perpetrators often use it to teach themselves new techniques and they also use it to teach children new techniques so that things that a child would not ever think to do they'll show them the images so that they would be willing to do that.

And things that even the perpetrator might not think to do, they will look at those images to try to train themselves in new things that they can do.

Q        These are harms that are in child pornography images?

A        Yes.

Q        As used by people who view them?

A        Yes.  Let's say an individual who had never ejaculated into a baby's eyes will see that in a child pornography image and decide to do that and encourage a toddler to let them do that by showing them the image.  So, the perpetrator is learning to do something that they hadn't thought to do before and they're trying to convince the child that they should want to do that.

Q        .  .  .  .  The continued circulation of child pornography images on the Internet, would you consider that aggravating to someone who has the psychological conditions and symptoms that you previously outlined?

A        Absolutely.

Hr'g Tr. 111-29, Oct. 7, 2010.

THE COURT:  Have you treated, Doctor, adolescents who have used the internet to view child pornography but have not so far as we know acted out against children or others?

THE WITNESS:  The clinic where I work which is the Center For Cognitive Therapy at the University of Pennsylvania is mandated only for individuals who are over 18.  So, we have treated individuals who are 18 or 19 years old but if you're talking about younger than that?

THE COURT:  No.

THE WITNESS: No.

THE COURT: Well, if we define adolescents to include --

THE WITNESS: 18 or 19 years old.

THE COURT: More generally as up to 24 or 25, would that be appropriate to do so?

THE WITNESS: I have treated individuals between 18 and 24 who have and were the question who have looked at child pornography on the Internet?

THE COURT: Could we characterize them for purposes of discussion as adolescents?

THE WITNESS: I would not call them adolescents but I'll let you call them adolescents.

If we see individuals between 18 and 24, I'll agree that people between 18 and 24 have come to our clinic, have been treated, and some of them have been individuals who were looking at images of minors on the Internet.  I would agree with that statement.

THE COURT: And have not acted out?

THE WITNESS: And have not, as far as I know, have no contact offenses, yes; correct.

THE COURT: And can you treat them fairly successfully given appropriate conditions?

THE WITNESS: We wish the treatment was more effective than it is. A huge component is the motivation. A huge component is the psychological mindedness of the person. Do they have any insight into what's going on? Do they have a motivation to stop? For those individuals, and I've had many individuals who have presented to me that says, "I'm doing this stuff please help me stop." The treatment is pretty good for those individuals who are desiring to stop. If you can add in the insight as to why they're doing it and what are the consequences of their doing it then the treatment can be more effective, though, at this point in our history, I mean, we've gotten much better in understanding the nature of childhood, the research on childhood is expanding. We're still not as far along as we need to in terms of understanding childhood and how it works but at this point we think that we can often keep them from behaviorally acting out whether we say they've been cured.

Whether we say they're remission, there is still discussion about whether we call that "remission," but I have treated individuals who say, "I'm doing this please help me stop." They come into

treatment and they do stop.   So, to my knowledge, those

individuals do not, going forward, have contact offenses.

Now, that's not everybody because there are a number of people

who go on to have contact offenses after the treatment.

THE COURT: Are these people or is any part of the group that you

treated in this category mandated for treatment?

THE WITNESS: No.

THE COURT: They come in voluntarily?

THE WITNESS: They come in voluntarily either describing this as

their problem or come in voluntarily with some other problem and

this comes up in their treatment.

So, they'll come in and say I'm depressed and as we ask about they

they're depressed they start to list all the things that are making

them depressed and at some point in the treatment they say, oh, by

the way here's one of the other things that is bothering me and it

comes out.

So either they present saying, "I have this problem and I want to

stop," or they present with some other problem and then they want

to stop and other present about some other problem and say they

don't want to stop their behavior in this area; or they feel like they

shouldn't have to stop.

We have a number of individuals who say I shouldn't have to stop, the Government is wrong in making this illegal. That kind of a problem is also something that we deal with.

THE COURT: Having treated this group, if they were mandated to be treated by you and your colleagues, and if they wanted to be treated in the cooperative group[,] would the mandate itself interfere with the treatment or . . . improvement. That is, would mandating all other things being equal[,] be counter- productive.

THE WITNESS: I can only speak from my experience in which we've treated another mandated group. At our center, we have treated mandated individuals  who were substance abusers who were coming out of prison who were mandate[d] today have treatment after they came out of prison for their substance issues. That group was highly unmotivated to be in treatment.

THE COURT: That's a different kind of group.

THE WITNESS: That's the only mandated group that we've ever dealt with. So that mandating didn't seem to motivate them but I don't know about this group because we don't take any mandated ones in this particular group.

THE COURT: Would treatment while incarcerated rather than outpatient treatment while the person was amenable to the usual societal pressures and experiences improve or decrease the probability of treatment and improving.

87

THE WITNESS: In my clinical experience, one of the difficulties of treating individuals who have never been incarcerated is that they never had a significant point in time of environmental control. So, that they are asked to stay off the Internet. They asked in the therapy to stay off the Internet. They're asked to stay away from the pornography on the Internet and their ability to do that without some environmental control doing it for them is extremely difficult for them. It's sometimes helpful if I encourage them to produce environmental controls on their own so I say, okay, we need for you to have an Internet Service Provider that blocks at the server level, not that software stuff that you can get around, but at the server level to help you have environmental control so that it's not so easy for you to get onto the sites, that makes it a little easier. If they'll do that and so that the treatment has a better chance of work going I can get them into a clean Internet Service Provider so that it's harder to get onto the child pornography sites or the rape sites or whatever they're looking at. But for others who don't have that, the struggle they go through to stay away from the Internet material is horrendous. So, if the environment they're in controls that use, it might make it easier.

THE COURT: You use the term "substantial environmental control." Let's assume there is, because there are a whole series of degrees of environmental controls: You can be shackled, you can

have all computers taken away, you can be restricted to the home, and a lot of devices can be used.

THE WITNESS: Yes.

THE COURT: And incarceration is, of course, one of them.

THE WITNESS: Yes.

THE COURT:  If incarceration is used, what would be a substantial amount of incarceration? Life sentence of course would be sufficient because you'd be incapacitated assuming that it worked.  But less than that, how much? Six months? A year? Two years? Three years? Ten years?

THE WITNESS: I don't know how to answer that question other than part of the answer will be dependent upon their willingness to be engaged in the treatment while they're incarcerated.  Their access to treatment while they're incarcerated[,] so that can vary tremendously.

And the individuals that I treat, the amount of treatment they need varies tremendously.  Some are done within two years, their treatment is completed, some have not completed their treatment in two years.   So, it's difficult to say what is it because we don't have control over the variables of what kind of treatment are they getting and how engaged are they in the treatment and it's hard to say.

THE COURT: You understand the position the Court is in, it has a [defendant] - -

THE WITNESS: Yes.

THE COURT: who has looked at . . . these things.  .  .  .  So, the problem [is] what to do, and we can assume for purposes of discussion, that merely looking at it and being and having it available is hurtful to a group one way or another; right?

THE WITNESS: Yes.

THE COURT: That's almost a given.

So, the question is: What do you do with this individual before the Court?

THE WITNESS: Yes.

THE COURT: There's always the risk of [some]body being hurt out there.

THE WITNESS: Yes.

THE COURT:  .  .  .  And then you have the question of what kind of treatment they'll get while incarcerated, what kind of harm may come to them because of their own rapes, and the fact that they may be subjected to predators.   And then you have the quality of the treatment outside [the prison] and the spectrum of conditions that the Court can impose to reduce the possibility of looking at those images.   Do you want to say anything about that in view of your experience.  .  .  .

90

THE WITNESS:   . . .  Regrettably, in this situation, I know nothing about the defendant so it would be extremely difficult for me to make any predictions.  . . .

In my experience, it really is going to depend on the degree to which an evaluation of the individual says they're motivated to changes.  They're showing behavior to change.  I mean, clearly they're on their best behavior, they're going to show you their best behavior right after they're arrested.  We're on our best behavior at this point, what does that say?

The degree to which environmental controls are working on the outside versus they're not working.  The degree to which they're motivated to do it then the treatment is not going forward.  And if they're not motivated to the show up for their sessions, the treatment doesn't go forward and I supposed if you're incarcerated you show up [for] your sessions and you have more control as to whether they're showing up for the sessions.

THE COURT: We have considerable control because if they're not incarcerated they'll be under supervised release which can be very strict with a sword hanging over their head.  If they violate, they go to prison.

THE WITNESS: Yes.

Hr'g. Tr. 164-74, Oct. 7, 2010.

91

### i.  Abuse of Vicky and Punishment of Primary Abusers

The victims of a crime have a statutory right to be heard at sentencing.  *See* 18 U.S.C.  §

3771(a)(4) ("The right to be reasonably heard at any public proceeding in the district court

involving .  .  .  sentencing. . . .").  A child whose abuse was shown and either viewed, received,

sent, or held by a defendant is a "victim" since she may be harmed by any of these acts even if

they are removed in time and place from the actual physical abuse which was recorded on video

or any other device.

Her biological parents, guardians, custodians or others emotionally hurt by these acts are

also "victims" for purposes of defining crime victims' rights.  This follows from section

3771(b)(1) which reads:

> (1) In general - - In any court proceeding involving an offense against a crime
> victim, the court shall ensure that the crime victim is afforded the rights
> described in subsection (a).  . . . [T]he court shall make every effort to permit
> the fullest attendance possible by the victim and shall consider reasonable
> alternatives to the exclusion of the victim from the criminal proceeding.  The
> reasons for any decision denying relief . . . shall be clearly stated on the
> record.

The "victim" may appear in person or by personal representative.  *Cf.* 18 U.S.C.  §

3771(b)(2)(A)(i) (stating that in habeas corpus proceedings, "[t]hese rights may be enforced by

the crime victim or the crime victim's lawful representative"); *see also United States v. Bengis,*

*Noll, and Bengis*, 07-CR-4895, NYLJ 1202477276810, *4 - *10 (2d Cir. Jan. 10, 2011)

(extending the definition of "victim" by expanding the definition of "pecuniary loss" and

"property interest").

Victims' hearsay statements, testimony in any court, written communications to the court,

video transmissions or copies of statements made by telephone or other devices may be used to

bring a victim's views to the court's attention.   While the defendant has a right to see or hear such statements, limitations on cross-examination as well as sealing and clearing of the courtroom may be used to protect the victim, particularly where child pornography is involved.

In situations where the victim wishes the world at large to know of the crime, the court should normally provide a forum through the inclusion of the material in a published memorandum or otherwise.   In compliance with Section 3771, set out below are materials submitted to the court by and on behalf of "Vicky," one of the victims visualized on defendant's files.  It is an often duplicated depiction of a child being sexually abused when she was approximately five years old by her biological father who had been divorced from her mother and at the time had partial custody.

### ii.  Testimony

### a.  Psychologist

A clinical psychologist, Dr.  Randall Lee Green, testified to the effects on Vicky:

DIRECT EXAMINATION

Q     Dr.  Green, please state your occupation.

A     I'm a licensed clinical psychologist in the State of Oregon.

                              . . . .

Q     If you would please describe the degrees that you have in

       psychology?

A     Yes, I have an MS from Miami University in Oxford, Ohio,

       and that is in personnel counseling.  Then I got my Ph.D.

       in clinical psychology at Western Conservative Baptist

       Seminary in 1982 in Portland, Oregon.

93

Q      How long have you been practicing?

A      I've been practicing as a licensed psychologist since

February of 1984.

Q      Do you treat and assess victims of sexual abuse?

A      Yes, I do.

Q      For trauma?

A      Yes.

Q      How long have you been doing that?

A      I've been treating and/or assessing survivors of trauma of

all types including sexual abuse since the mid-1980s.

.  .  .  .

MS.  FEBUS: Has the doctor been qualified as an expert at this

point?

THE COURT: Yes.

Q      Did you conduct a trauma assessment for the victim

depicted in the child pornography series known as the

Vicky Series?

A      Yes, I did.

Q       How did you become involved in matters related to that?

A      I was contacted by the attorney representing her, Carol

Hepburn who practices in Seattle Washington, and she

asked me, knowing of my work in assessing victims of a

94

variety of different trauma experiences and asked me if I would do

an assessment of her client, the person known as Vicky in the

series.

. . . .

Q       So you have assessed Vicky in the past.  Those assessments

occurred in April of 2009, November 2009 and May of

2010?

A       Yes, the nature of the those assessments was a complete

psychological evaluation that included an extensive

interview of approximately eight hours with Vicky, a

couple of hours with her parents as collateral contacts,

psychological testing and review of records.

In November of 2009, because six months had lapsed and

there were upcoming cases where I was being asked to

provide testimony in restitution cases, I did what I call a

status report update and I spoke with her over the phone as

well as with her parents to get a sense of what had

transpired in the preceding six months.  Then again because

of the chronic nature of this matter, in late May, your

Honor, I again spoke with her on the phone to get an update

as to what

her status was and also again spoke with her parents.

Finally, though I didn't produce any report, I briefly spoke

with her parents prior to this hearing last weekend.

Q    In the course of your interviews with the person I'll refer to

as Vicky, did you become aware or learn about how her

images of sexual abuse ended up on the internet?

A    Yes, I did.

Q    Would you please explain that history.

A    Yes.

The perpetrator was her birth father.  And his initial abuse

of her occurred, at least it appears to be is all she can

remember is an episode when she was approximately four

or five-years of age.  And then again the primary abuse

occurred when she was 10 years old, your Honor.  And that

would be in—started Mother's Day weekend of 2000 and

went into sometime in the summer of 2001.

The abuse continued—excuse me, she finally stood up to

him and said no more, however, she did not disclose that

she had been abused to her mother and her— by the way,

her parents were divorced when she was approximately one

and a half years of age, in that range and so her mother

remarried.   And so she finally disclosed to her father when

she was—just right after her 16th birthday.  And that would

96

have been approximately six years or thereabouts after the abuse ended, five years after the abuse ended.

Her perpetrator, the birth father, contested her assertions of having been sexually abused and until such time as a few months later that some images taken of her were discovered on her personal computer.  And at that point within a month he was out on bail and he became an international fugitive and left the United States and ultimately ended up in China. This brought him to the attention and the case to the attention of the ICE agents and of course the U.S. Marshals Service and ultimately ended up in being publicized on American's Most Wanted in November of 2006.

It was at that time that once that program was out that I believe a law enforcement official in Canada put together that this person, Vicky, her images had been disseminated in a widespread manner on the internet and apparently it later came out that images were detected back as early as November 30th of 2002, but that was -- it was not known by Vicky or her family until they got that information following the program.

Can you describe the abuse was depicted in the images that was ended up on the Internet?

A       The images that were taken of her were very extensive and the abuse that was recorded is still on video form including acts of oral sex with the perpetrator with Vicky, causing her to perform oral sex on him, anal rape.  It is my understanding that some of that also consisted without a condom, insertion of a dildo in her body cavities, bondage, causing her to dress up in various types of outfits such as ballerina or school girl and causing her to engage in role play situations.  And apparently this was done in conjunction with individuals that the perpetrator had contact with over the internet or via phone and there would be scenarios played out in that context.

He caused her to sleep in the nude with him and to   the point where she felt it necessary to rumple her pajamas which were unused before she would go back home because she didn't want her mom to know that she hadn't been sleeping in pajamas when she had been visiting with her perpetrator father.

I believe that is most of the scope of the abuse that was recorded and later disseminated on the internet.

Q       .  .  .  .  Based on your assessments of Vicky, did she suffer from what might be referred to as a type one trauma?

A       Yes.

Q    Would you please explain what type one trauma is and then list some of the traumas that you observed in Vicky?

A    Yes. The way I have come to understand the trauma for the young lady known as Vicky is to think of a radioactive hazard symbol.  You have the circle in the center and instead of three, I'll say there is four radiating vectors from that.  The type one trauma which -- and I should describe type one.   That is a discrete event or a series of events with a beginning and end to it that is experienced as an invasive trauma where the victim or survivor of such experience feels powerless, helpless and violated.

So radiating from that core, one of the vectors impacts the meaning that Vicky ascribed to the world she was experiencing given the trauma.

I'll come back and elaborate on that in a minute.

The second vector . . . addresses the physiological neurobiological impact of being exposed to trauma that she experienced.

The third vector is the relational impact.

And the fourth vector is the affect or emotional repercussions in regard to the abuse by the perpetrator.

The first vector about the belief in the attribution of the way the world is and about herself, she viewed herself

99

initially to be damaged.  And shame always goes with

abuse and it certainly was with her.

The violation of trust was there on someone on whom she

relied for protection and validation and love.

The world for her insofar as the perpetrator caused was

shaken in that it was -- it was harmful, threatening and evil

and confusing.

At the same time when she went back to the rest of her life,

your Honor, she was buffered by a family that was

cohesive and caring, loving and stable.  So she had

buffering protective influences and that helped her contain

the severe damage done in that area.

The second vector, the physiological and the

neurobiological I will break into two areas to describe the

impact on her.

With survivors of trauma, and she is certainly in this

category, it's like you have an adrenalized experience with

the kind of invasive threat that is taking place and the

horrific things happening.

So it's kind of like one part of your nervous system has

your foot on the gas peddle and it's adrenalizing your

system and the other foot is on the brake and it's essential

to even come up with a diagnosis of post traumatic stress

disorder that you have both of those characteristic

dynamics.

The -- for Vicky, regarding the arousal, the hyperarousal,

she was having nightmares, she was having night terrors.

She was having anxiety.  She was having flooding of

anxiety, what we call panic attacks.   She had reactivated

symptoms of when things reminded her of him or the idea

of going over to see him, concentration problems at times.

And then the other, the hypo-arousal or the break part for

her was she tried not to think about those things.

She tried to block them out.  Not just tried to.  It wasn't all

effortful.  It was an automatic response.

So I saw that there were dissociative processes with her,

which means that she would essentially block out some of

the experiences she was going through at the time or tried

not to think about them.   He would ply her at times with

alcohol.  So there were times in her -- subsequent to her

abuse when she stopped it that she would use drinking to

help distance herself from her emotional and cognitive

thoughts.  And she also had some eating disorder issues and

 symptoms and tried to as best as possible not think about it.

The third vector of symptoms resulting from the

perpetrator's abuse of her was relational and I guess I would

101

first say relationship with self was significantly damaged.  A survivor of trauma, and she certainly characterizes this, learns to not trust feelings, not be present with thoughts and so some people refer to it as almost a sole divorce and in extreme cases sole death because a person learns to disconnect from the core of what they are.  And it interferes with their ability to be a cohesive individual.

 Also the, it affects the relationships with others.   She learned to be a chameleon so she would have these kinds of abuse experiences on visitation on a weekend just a few blocks away from her home with her mother and stepfather or on a longer period of time during the summer and then she would go back to school and her house and all of that. And so she learned to compartmentalize as best as she could for survival sake.  She would isolate herself at times, going out for a walk at night after her father went to bed and just roam the streets and sleep on porches and come back in the morning.

So -- and it also later on caused problems with her family relationships.

The final vector is the emotional or the affective.   And she was struggling as it relates to the type one perpetrator related abuse.  She dealt with certainly confusion, anger,

anxiety as I mentioned earlier, some depression, certainly shame. And so those were the repercussions emanating out from the initial abuse that she experienced from her father.

Q      Could you next explain what is referred to as type two trauma. Sometimes in my understanding it's the trauma that emanated from her knowledge that these images were available on the internet.

A      Yes.

So approximately five to six years after the, she stopped the abuse, about five-years after the abuse ended and while she was still dealing with her father being an international fugitive and the apprehension about that, then she is informed that her images of her having been exposed to the degradation and horrific experiences had been put out on the internet and had been out there for at that time approximately four years -- three to four years. What she explained to me, your Honor, was that she said with my— I'll refer to him as perpetrator, she didn't like to call him father because he gave that right up a long time ago, she said with the man who molested her and raped her, she said the chaos was mainly within me but the outside world was—they didn't know and was intact.

And for her, the knowledge of the dissemination of the most horrific of her experiences extrapolated that out knowing that there were hundreds, indeed thousands of people who were downloading these for their sexual interest or other motivations was a trauma of very significant magnitude.   She described it in a way that I thought this was like the Mickey Mouse movie Walt Disney movie Sorcerer's Apprentice about the nightmare of the broom, that he began to try to get rid of it and the more he chopped it, the more prolific it became until there were hundreds of thousands of them.   That's what was the experience to her.   She said from one perpetrator, the man she had known as a violater who she knew was sick, by that time she figured out he was sick, she had gotten some therapy.   But now the prospect that there were thousands of other people like her father dramatically and tragically for her generalized that to really incorporate -- well, it could be anyone in any profession.   She had no idea would had seen her images, still doesn't to this day in regards to whether the person coming in the store that she was working at or a fellow student in college may have been watching the images.

So that takes her into what we would call in my field a type two or a complex PTSD because a type two complex PTSD is related to an ongoing experience where the person remains captive in a situation in which they find themselves helpless or powerless.

She had by reporting to her mother or authorities and ultimately seeing justice done insofar as the perpetrator being ultimately captured and incarcerated in a federal prison, she had a sense that she had taken action to make a difference and gain a sense of mastery over the powerlessness with regard to the repercussions of him and in that regard it was contained.

But going back to the radioactive symbol that I mentioned earlier, the impact on the meaning to her was now having gone viral. It was like a metastasis from a contained cancer to a cancer that had spread and was no longer contained.

Psychologically, that's what that meant to her. And so she—the impact on her view of men, the impact on her view of sexuality, her impact on the world being much more threatening and evil and it wasn't contained mainly to her experience with the perpetrator father, so trust, safety, security, vulnerability, powerlessness were re-

experienced and were traumatizing and continues to remain so to this day.

The same—we saw spikes as she described her narrative to me, her story, spikes in the symptoms that had started showing resolution or subsiding as a result of her father. They spiked up again in terms of night terrors, sleep insomnia disorder, reactivated panic attacks and so forth, concentration problems in school. I think she had her worst term in school right after that came out. She was a very bright young lady.

The somatic symptoms, she had migraines reactivated that were severe. She had dissociative responses reactivated in regard to kind of losing a sense of where she is at for up to 30 minutes and she described five or six episodes of that, I believe. Her relationship and the relationship vector, that has been extrapolated significantly with regard to her attitude towards males. She is very wary of them.

She had her first kind of crush just in the last, in her mind of significance this past summer. It was short-lived. It was a guy who she had known who lived in the area where she lived and so she had a sense of somewhat being known and accepted by him. That was short-lived.

She is very hyper-vigilant with regard to the attitudes of

males.  Woe be to the male who makes a wrong move

even in a dating situation.

I think she hit one guy and kneed another guy.  So her

distrust is profound.  She hasn't even gotten to my

knowledge to any attempt at an ongoing significant

relationship where there might be physical activity, sexual

issues, which will be profound.  Her tolerance I think of

behavior that won't trigger her is very narrow.  So in that

regard, she is very psychological brittle.  As long as

everything lines up just right and doesn't trigger a

reactivator that is one thing, but she is very brittle.

Q    So your observations and assessments of her, essentially

the internet circulation has aggravated and compounded

symptoms that she already had related from the primary

abuse?

A    Yes, and added some elements of fear that were not even

there because of some subsequent experiences.

Q    What, if any, events related to internet circulation of her

images have occurred in recent history that have maybe

reactivated or aggravated some of her prior symptoms?

A    By way of explanation, your Honor, the -- one of her

attempts to bring meaning and purpose out of that which I

107

have described to you in my testimony was to try to make a difference.

And so one of the things she did was set up a website for victims of sexual abuse hoping that that would be something to reach out, encourage and guide them if they sought the website out to help them.

Sadly, that just became a target for persons who had downloaded and were fixated on her pornographic material of witnessing crime scenes perpetrated against her.  And so that became one magnet that eventually had to be shut down as a means of her trying to make a difference and derive some positive out of her tragedy and the internet distribution.

Q    Was the website part of her attempted recovery?

A    Yes, it was.  I don't know that she would have framed it in that way, but certainly it was because she is trying to make a difference and bring some good of it.

She is a person of faith and one of the things she told me was that she didn't want to commit a single [act] of negligence by not taking the tragedy in her life and the experience with the downloading and not somehow bring good out of it if she could.  She also had a MySpace site and somehow that was penetrated by another downloader in

108

June and July of 2007 and this person penetrated the MySpace and  started making—through the site, making contact with her, trying to contact her.  And he was saying things like he has watched her for the last four or five-years.  He castigated her for reporting her perpetrator father.  He said that she knew—she liked it because she looked happy in the videos that he had watched.  He wanted to get together with her and make movies with her, sexual movies with her.  And so that was another aspect. There have also been other attempts by downloaders of her material who are fixated on her image and that has come to her attention.  Then another attempt she made to make a difference, she went with her mother to the restitution hearing in Fresno, California.  And I believe it was June, approximately June of 2009.  And that was a retraumatizing, going back to one of the vectors I spoke about earlier because she discovered there when attempting to have a voice and read her victim statement that one of the downloaders had in that case had made another video, taking some images of her as an adult that were available out on the internet and apparently morphed some of her facial images on the images, stuff of when she was being abused.

The title of the video was: "Where is Vicky now?"

So all of this only enhances her sense that the world continues to be a very unsafe place as she has been stalked or at least harassed and she has no idea when something may come up again as she tries to live her life as best as possible.

Q    Have you made any counseling recommendations with respect to your own observations of her current psychological condition?

A    Yes.

First of all, I will clarify, your Honor.  Though I have had intermittent contact with her, that is exclusively in the purpose of an independent psychological examination or updates given the passage of time so my testimony can be contemporary and not just a year and a half ago contact. I am not a therapist of hers and I do not have that role.  I strongly recommended that she get back into therapy.  She has had approximately four episodes of brief therapy ranging from five to thirteen times.  Probably the series of therapy that has helped the most has actually been this last summer and she continue to be in therapy over the phone. She is now attending college and has phone appointments as I understand it.

110

Recommendations; really, I am recommending therapy of a

more intense nature and then titrated out on a more

extended nature as needed really for a lifetime as I believe

that the shadow of not only the type one but the complex

trauma related to the knowledge of the downloading will be

a lifetime issue.  If she ever marries, when she has children,

even grandchildren, this could come up, frozen images of

her rapes and assaults up to the -- to her life.  So I made a

page and a half of itemized recommendations relating to

the damages that I identified earlier in terms of how to

remediate those.

THE COURT: Do you have anything further that you would add

from your knowledge and experience that might be helpful that

you haven't been asked about?

THE WITNESS: I guess, your Honor, just to say that while I can

only speak authoritatively with regard to the result of my

evaluation and contact, intermittent contact for evaluative purposes

with Vicky, there is a perception that distribution of these images

by Vicky, certainly her perception, that this is viewed as a

victimless crime.  And the avenues that she has chosen to try to

find validation in society has resulted in becoming an additional

target of persons who have downloaded.  So she has had to back

off from that.  I think she still desires to go a social work direction

111

and work with people but I would say Vicky certainly and likely

other persons and providers who work with individuals abused and

having their images out there forever, they are looking to our

system to validate the wrongfulness of that.    And I guess that

would be the final thing I would say.

Hr'g Tr. 2-37, Oct. 8, 2010.

### b.  Parents

The parents of Vicky testified about the devastating impact on their daughter, not only by

the original physical abuse, but by repeated widespread use of its video reproductions, and by

the harassment and stalking of one individual who viewed the videos.  The stepfather and

natural mother of Vicky testified as follows:

MR.  KAZEMI: Your Honor, again with the court's permission, in the
interests of anonymity, if the witness would just testify as the stepfather in
the Vicky Series.

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. KAZEMI:

Q        Good morning, sir.

A        Good morning.

Q        How old are you?

A        46 years old.

Q        Where do you currently live?

A             .  .  .  .

Q        How long have you lived there?

A         Approximately all my life.

Q         Do you work?

A      Yes, I do.

Q       What do you do?

A      I'm an export compliance officer.

Q      Are you married?

A      Yes, I am.

Q       How long have you been married?

A      17 years.

Q      What year was your stepchild born.

A      She was born on October 14, 1989.

Q      And she is your wife's biological daughter?

A      Yes.

Q      Are you familiar with a series of child pornography videos entitled the Vicky Series?

A      Yes, I am.

Q      How did you become familiar with that series?

A      I've become familiar with that series from the date of October 22, 2005 when my daughter revealed to my wife and then to me that her biological father had sexually abused her.

Having discussions with her after finding out about that, we found that it was much more heinous and that she had been raped by him a number of times over a period of time and that she had been sexually assaulted by him over a period of time.

As we began to hold him accountable by taking him to court and getting him charged with these offenses, more information and more evidence came out.

This started in October. We began the Court proceedings in January.

THE COURT: What year?

THE WITNESS: In 2005-2006.

A        Roughly in the February timeframe exactly on Valentine's Day, the victim, my stepdaughter, found evidence on her computer suggesting pornographical images.

She came to my wife and I.  We looked at the computer, were unable to pull anything up and called the police, had them come and pick it up for evidence.  They took it to a forensic expert who then found images on both hard drives within the computer.

On one of those hard drives there was roughly 30,000 images of adult pornography and on the other hard drive there was approximately 50,000 images of child pornography and 228 videos of child pornography.

We -- the police then began to move forward with that.  As time went on and as my daughter's biological father fled justice, went to China and then was captured in the midst of that, we went to America's Most Wanted to be able to catch him because we did not know what else he was doing to anyone else around the world or wherever he was at the time.

We decided -- we talked with the victim and came to the conclusion that it would be good for her to go on America's Most wanted so that he could be apprehended.

One that showed in December of 2006, I believe a number of police agencies, one being a constable detective in Canada along with a number of other officers, one from out of NCMEC realized that the person on America's Most Wanted was the person that they had been looking for over four years in a series of videos entitled the Vicky Series.

We found out later that they titled the Vicky Series in Norway which was one of the countries that had found these videos.  And so we -- when that was found out on the Monday after the Saturday viewing of America's Most Wanted, which I believe was December 2, 2006, the police officer from our local area who was in charge of the case, the detective, came to our home and revealed to my wife and daughter that these images were on the internet and that they were the most downloaded child porn series on the internet.

114

Q       To be clear, your stepdaughter is the victim in the Vicky Series?

A       Yes she is.

Q       Have you provided any victim impact statement in connection with the Vicky Series?

A       Yes, we have, and we have updated them a couple of times.

Q       How many victim impact statements have you provided?

A       Two.

Q       Why did you provide a second victim impact statement?

A       To update where my daughter and my family are at in the midst of the victimization that continues on by her videos and images being viewed on the internet.

Q       I'd like you to please read into the record for the Court your victim impact statements.

A       I'm going the read the last updated one because it takes a lot of information from the original one.

Judge and ladies and gentlemen of the Court, my family has endured five-years to date of a living hell because of the selfish perverted actions of a very sick and evil individual.   My daughter lived with this pain and trauma for six years prior, unable to tell anyone because of the fear she had for her biological father.

We thought we were dealing with one bad apple, but as time goes by, we are finding that there are more and more of these sick individuals that are viewing and sickly satisfying their awful desires.  We still have the haunting memories of the letters in the mail and the E-mails letting us know of all the individuals that are being prosecuted because they have our daughter's images, child pornographic images on their computer.  We don't receive the notices anymore.  The pain and gut-wrenching reminder of receiving enough notices to overflow a 55-gallon drum is more than my family can take.   It's also unfathomable to know there are so many perverts in this country and around the world.  It sickens

me and hurts me to the core knowing that so many perverts are viewing my little daughter as she was made to dress up like a hooker and was molested and raped time and time again.

I am heart-broken knowing that I couldn't protect my daughter.

The letters and E-mails brought that pain up again and again and I couldn't deal with that, knowing her innocence has been torn away and now how she is continuously reminded that her pictures will be there forever. This father's heart is broken. My daughter carries her shame like a scarlet letter. She knows that if a friend or acquaintance looks her up on the internet, they are going to find the ugly, horrible and awful history that eats away at herself esteem and paralyzes or inhibits her ability to function at school and as a normal young adult.

She knows that this is the challenge that she has to live with but the horrible trauma continues to take its toll on her body and [soul].

The constant reminders that her pictures are out there brings forward the guilt and shame which causes nightmares and makes her want to isolate herself from others. Each time she hears about these cases, she looks so strong on the outside but when you sit and talk with her, you see the panel. You hear the struggles and you feel the sadness, despair and the emotional drain that it causes.

My family is asking for justice with each case that is brought forward with these perverted individuals. We are hoping and praying that they can understand how wrong they are and how hurtful their actions are for each victim in the pictures and videos on their computers.

We want them to know that they have a choice to decide to view the images or not and because they have chosen to view these child important graphic images, they are victimizing each child viewed. It brings back the pain and suffering these children have already had to endure. Our justice system needs to protect these children from the preying eyes and hands of these perverts because they can't fight back or don't know how to.

116

Our justice system needs to understand that there is a victim in each one of these images. And each time a picture is downloaded, these children are victimized again and again.

Please help these perverted individuals understand the significance of what they are doing and how each child is a victim because each child has done nothing wrong.

My daughter is the strongest person that I know and I am so proud of her. It is extremely sad to see how this horrible situation continues to beat her down emotionally and physically. She still has trouble sleeping due to nightmares of the horrible trauma she went through and also of the new people finding out who she is or unknown people finding her and abusing her.

She also has severe stomach aches and headaches that incapacitate her causing her to miss school and work. I pray that she can heal from the trauma that her biological father did to her and from the constant reminders that each of sick individuals bring with each download.

I also pray for rest of my family. The crimes against my daughter have untold effects on our other children, my wife and myself. This living hell that I first mentioned is a day-to-day ordeal that can raise its ugly head at the most inopportune times. Like my daughter, we are sometime paralyzed by the trauma that comes from being the parents of a sexually abused child. The sad fact is this doesn't end because my daughter's images will be out on the internet forever, continually reminding her and us how fragile we all are.

The internet is such a powerful tool but child pornography and how it perpetuates the revictimization of children is an extreme consequence to our society as a hole but specifically to our vulnerable children.

Our society views our children as precious little gifts that we should love and protect. Some sick perverted individuals use the internet as their evil playground to share and to use their sick views in their sick

fantasy world.  They choose to do this.  They choose to push the button.
They make a decision to download and view to satisfy their sick desires.
Actions sometimes have consequences, sir, and when actions like this
happen, the consequences should be powerful and lasting.

　　　　Give my daughter her justice, sir, so that she may completely heal
someday.

Hr'g Tr. 50-73, Oct.  8, 2010.

　　BY MR.  KAZEMI:

Q　　Good morning, ma'am [biological mother of Vicky]

　　　　How old are you?

A　　46.

Q　　Where do you currently live?

A　　　.  .  .  .

Q　　How long?

A　　46 years.

Q　　Do you work?

A　　Yes, I do.

Q　　What do you do?

A　　I am a chemical technologist at .  .  .  .

Q　　What sort of work is that?

A　　I work in a lab testing radioactive material.

Q　　Are you married?

A　　Yes, I am.

Q　　How long have you been married?

A　　17 years.

Q　　Do you have any children with your current husband?

A　　Yes, I do.  I have two boys.

Q　　Were you previously married?

A　　Yes, I was.

Q　　Did you have any children with your ex-husband?

A　　Yes, I did.

118

Q      How many?

A      One; one daughter.

Q      Are you familiar with a series of child pornography videos entitled the Vicky Series?

A      Yes, I am.

Q      Is your daughter from your prior marriage the victim in the Vicky Series?

A      Yes, she is.

Q      Has your daughter provided any victim impact statements in connection with the Vicky Series?

A      Yes she has.

Q       How many?

A      2.

Q      I'm showing you what has been marked or what have been admitted as Government's Exhibit 8-1 and 8-2.

       Do you recognize those documents?

A      Yes, I do.

Q      What are they?

A      My daughter's impact statement in the Vicky Series.

Q      At this time I'd like to ask you to please read those victim impact statements into the record.

A      "To whom it may concern, my name is Vicky.  I am 19 years old and I am living every day with the horrible knowledge that someone somewhere is watching the most terrifying moments of my life and taking grotesque pleasure in them.  I am a victim of the worst kind of exploitation, child porn.  Unlike other forms of exploitation, this one is never ending.   Every day people are trading and sharing videos of me as a little girl being raped in the most sadistic ways.  They don't know me but they have seen every part of me.  They are being entertained by my shame and pain.  I had no idea the Vicky Series, the child porn series taken of

me, had been circulated at all until I was 17.   My world came crashing down that day and now two years later, not much has changed.

These past years have only shown me the enormity of the circulation of these images and added to my grief and pain.   This knowledge has given me a paranoia.  I wonder if the people I know have seen these images.  I wonder if the men I pass in the grocery store have seen them.  Because of the most intimate parts of me are being viewed by thousands of strangers and being traded around, I feel out of control. They are trading my trauma around like treats at a party, but it is far from innocent.  It feels like I am being raped by every one of them.   What are these people doing when they watch these videos anyway?  They are gaining sexual gratification from images of me at the ages of 10 and 11.  It sickens me to the core and terrifies me.   Just thinking about it now, I feel myself stiffen and I want to cry.

So many nights I have cried myself to sleep thinking of a stranger somewhere staring at their computer with images of a naked me on the screen.   I have nightmares about it.

My paranoia is not without just cause.   Some of these perverts have tried to contact me.   One tried to find me through my friends on MySpace.  Another created a slide show of me on YouTube.

I wish one day I could feel completely safe but as long as these images of me are out there, I never will.   Every time they are downloaded, I am exploited again.   My privacy is breached and my life feels less and less safe.   I will never be able to have control over who sees me raped as a child.  It's all out there for the world to see and it can never be removed from the internet.   I only ask that those who have exploited me be brought to justice to hopefully defer some others from doing the same and to lessen my shame."

That is the first one.

Dear Judge, I am the identified subject in what is known as the Vicky Series of images.   I am writing you to let you know that for each

one of the defendants you see, the fact that he has downloaded the images of what has happened to me hurts me very much.

I now suffer from flashbacks and panic attacks. I have trouble sleeping. I can't be in a group or crowd of people for more than 40 minutes or so at a time before feeling like I have to leave.

Because of this, I had to leave college because I could not participate in my classes because of the panic attacks. I have this overwhelming unidentified fear that sweeps over me. This is for the biggest part because of the men who are downloading the pictures and videos of me.

My father who did the abuse is now locked up and I have some peace in knowing that he cannot hurt me again or anyone else. I don't know about any of these other men. For each of them, it is true that I don't know him, I don't even know what he looks like. And it may seem strange but the not knowing is a big part of what causes me such problems. What is so frightening is that I could have walked past him any day on the street and not know that he would have seen me being raped as a little girl and enjoyed my pain and humiliation. Any one of them could be around me and I would not even know it.

The fact that the defendant you are sentencing has seen pictures of me makes a difference. I believe you have the impact statement that I wrote previously. All of the things that I stated there are true about each one of them. I learn about each one of them because of the victim notices. I have a right to know who has pictures of me. The notice puts the name on the fear that I already had and also adds to it. When I learn about one defendant having downloaded the pictures of me, it adds to my paranoia. It makes me feel again like I was being abused by another man who has been leering at pictures of my naked body being tortured. It gives me chills to think about it.

I live in fear that any of them may try to find me and contact me and do something to me. I have been contacted by some of them and

121

some have said terrible things to me.  The fact that each one is out there and has seen me and watched me being raped makes me sicker, makes me feel less safe, makes me feel more ashamed and more humiliated.

I hope you can understand how devastating this is to me and how this has added to my stress and troubles.

Thank you for considering my letter.  I truly want to and hope to get well and live as close to a normal life as I can.

I ask that each one do something to help make up for the harm that he has caused me by helping me pay for the counseling I need.

Sincerely, Vicky.

Q    . . . . Has your daughter been subjected to continuing harassment by individuals who have viewed the Vicky Series?

A    Yes.

Q    I'm going to play for you three videos that are contained on a compact disc that has been admitted as Government's Exhibit 6 and I'll play it for the Court with the permission of the Court.

THE COURT: I don't need to see it.

MR.  KAZEMI: Your Honor, the videos are relevant to establishing Vicky's continued harassment and the ongoing harms that are perpetuated by the distribution of child pornography, which is one of the issues that this Court has ordered briefing on.

THE COURT: There is no need for me to look at these.  I will assume it.

Q    Have you also provided two victim impact statements in connection with the Vicky Series?

A    Yes, I have.

Q    I'm directing your attention to Government's Exhibit 9 and 9-1.  Do you see those?

A    Yes, I do.

Q    Do you recognize those documents?

A    Yes, I do.

Q        I'd like for you to please read one or both of those victim impact statements, whichever you prefer?

A        Thank you.  I'm just going to read one because I updated the original one several times.

THE WITNESS: Your Honor and ladies and gentlemen of the Court, my daughter was raped and sexually abused in so many horrible ways as a child by her biological father.  He also videotaped her abuse as he ravaged, raped and pillaged her ten-year-old body.  This sick man shared these repulsive pictures and videos of her on the internet for perverts like himself to see.  This sexual abuse she suffered at the hands of her father without a doubt started her agonizing pain, but this is certainly not where her pain ends or mine.  Yes, the memories and trauma of her abuse will haunt her and our family but now there is a new abuser.  The new abusers are the sick individuals who download her pictures and enjoy watching her being sexually assaulted as a child.  This sickens me.  Every time these pictures of my daughter are looked at and passed round, the depraved people doing this are furthering my daughter's pain, shame and abuse.  They pass it around like some dirty magazine when in fact it's the footage of an abused, helpless child.

There are days when the pain from this is unbearable for me.  These vial people increase her pain and mine.  These are certainly not the hopes and dreams I had for my little girl, this life of pain and shame.  It is so terribly sad and painful to watch her struggle with this.   These awful people are raping my little girl all over again by cruelly enjoying her pain and deriving some sick sexual pleasure out of it.  The knowledge of this sends me into mourning, mourning the loss of my child's dignity and well-being and mourning the fact that she suffers such deep pain.   I have watched her suffer so much already and it kills me.

I have to watch her suffer still at the hands of people wanting to view the nightmare of her abuse as her innocence was being robbed.  She was a child and helpless and made to do disgusting things she did not want

123

to do.  Approval from her biological father came only when she carried out his every dirty command.  He posed her, insisted she say certain things, and made her force a smile as he was brutalizing her.   When I think of my daughter being groomed and posed and made to feel so dirty in these perverted and depraved pictures and videos, it hurts me to the core.

I wonder how there can be people that could actually enjoy watching my little girl getting raped and sexually abused.  I wish they knew how much it hurts and how much they are worsening our pain.  Knowing that these disturbing videos of her and her abuser are being viewed and are continuing to foster this corrupt sexual behavior brings a lot of pain, stress and shame to her.  At the cost of her dignity, modesty and innocence, people viewing those images of her are furthering the terrible addiction of child pornography for themselves and others they pass it on to.  Those images are not who my daughter is or ever wanted to be but because she was robbed of her innocence, forced to do ugly things, and it was videotaped, she is continually being viewed as someone she is not.  She is in fact the opposite.  These offenders are still victimizing and torturing her, bringing pain and shame every time they look at those images of her.

As her mother, I share in the heartbreaking pain and the sadness this brings to me is unending.  These viewers need to understand that there is a helpless little girl on the other side of these videos whose innocence and childhood were shattered and viewing these things make them a part of the abuse and unimaginable pain my daughter and our family have to face all the time.  Making, viewing and downloading child pornography is wrong and a crime.  I hope everyone can know that child pornography is not a victimless crime by the statement I've shared with you about my daughter and our family's constant pain and struggle.

Now as a young adult, my daughter's life is still very hard and she still struggles so much due to her sexual abuse and it being constantly

viewed. I also struggle. It is so devastating to know your child's life has been brutalized and to make matters worse, it has been released to the public for any deviant at the press of a button to view and continue this sickening process of enjoying my daughter's pain. Although she is making progress and growing stronger, this still has a major grip on her life, as it also does on mine. She has never had a boyfriend due to trust issues and fear of relationships. She does very well in college and is trying to open herself up more to her friends and fellow students. This is going to be a continuing process. She feels like she is marked with a scarlet letter because of her victimization and rape, marking her with shame. The pornographic images of her are out there continually being viewed and will continue to be forever.

If I could quote my daughter in something she often says in describing how she feels about these downloading her images, if you can imagine having a bad picture of yourself taken, one that you're really embarrassed about, now picture yourself naked, being raped and abused and hurt at the age of nine or 10, your pictures of abuse at the hands of someone who are now being viewed for anyone to see at the touch of a button on a computer. These viewers are even interacting with your images of abuse. This is how she feels every day, wondering who is going to see her next.

As I write this impact statement, I find myself drained because of the emotional strain and pain that comes from reliving this horrible ongoing crime that terribly affects me and my family. It's a huge sorrow every day of my life and my daughter's life knowing her images of abuse are being traded, viewed and interacted with by sick people using her nine year old body as a sexual thrill. To know these perverted people want to partake in and are excited about the horror of your child's little body being raped over and over again makes me sick. These viewers know she is a child. They can very clearly see that. It makes no difference to them. They're the reason my daughter and our family have to keep reliving this

125

horror of her abuse, because they keep it going.   They keep viewing it and passing it on to others.  She didn't have a choice.  They do.  Their choice is traumatizing my daughter and exploiting the broken pieces of her life. These viewers made the choice to descend to the lowest degree and rape her with their eyes and with their minds as she was being robbed of her innocence at nine years old.

I feel robbed every time I get notified of another case involving my daughter's images.   I feel like some part of her is being taken and used and abused every time I hear of another perpetrator.  Can you imagine how hard it is for her to regain herself esteem, dignity and well-being? It confuses me that some people in powerful positions can believe this is a victimless crime.  Not only is our daughter a victim but our family is also.

As her mother, the sadness of what has happened to her and that is still happening to her is unending.  They say time is a healer of all wounds but I have yet to feel this pain subside.

Child pornography is a crime and those viewing it are committing a crime that always hurts the child or children who are involved.  It is destructive in every way to the viewer as well.

This crime needs to have severe consequences because of the devastating pain, fear and shame it causes children.   This pain does not end for the child or their families but continues on for the rest of their lives.  I wish I could take away my daughter's pain and give her back what has been stolen from her.  I cannot but I am asking for accountability from the individuals who have hurt her and are continuing to hurt her.

For my daughter and countless others who are victims of such a terrible and painful crime, please grant us justice today.  Sincerely.
THE COURT: Thank you.

Transcript Oct. 8, 2010 at 60–73.

### c.  Punishment of Primary Abusers

126

The primary abusers of Vicky were tracked down through investigation spanning the world.   Brought to ground in Asia, the abusing biological father was sentenced to fifty years in prison.  A term of twenty-five-years' incarceration was imposed on a person actively using the video to inflict further pain on Vicky.

At the court's request, the government submitted the following information on the subject.

> Pursuant to the Court's Order during the hearing on October 12, 2010, the government submits the following information regarding two cases involving the victim depicted in the child pornography series known as "Vicky."

> [K.F.] sexually abused his minor [biological] daughter from May 2000 through July 2001, and produced numerous images and videos of this sexual abuse.   These images and videos are posted on the internet, and became commonly referred as the "Vicky" series. . . . [K.F.] fled the United States in March 2006, and became the subject of a massive international manhunt.  Due in part to the cooperation of Chinese law enforcement authorities, [K.F.] was ultimately captured in Hong Kong and extradited to the United States in October 2007. . . . [K.F.] pleaded guilty to two counts of production of child pornography and one count of interstate transportation of a minor for the purpose of engaging in unlawful sexual activity, and was sentenced to a term of fifty years' incarceration and three years' supervised release.  [K.F.] also pleaded guilty to three counts of Rape.   [K.F.] was [also] sentenced to a term of twenty years' incarceration on the state counts of conviction, which sentence runs concurrent to his fifty year federal sentence.

*See* Letter of government dated Nov. 2, 2010, 1–2.

In the Federal court for the District of Nevada one G.H. was prosecuted for using the Vicky file vindictively.  The United States Department of Justice described the G.H. case in a press release as follows:

### MAN WHO HARASSED AND STALKED VICTIM OF CHILD PORNOGRAPHY SERIES SENTENCED TO 25 YEARS IN PRISON

LAS VEGAS  - -  A former Las Vegas resident [GH] has been sentenced to 25 years in federal prison and lifetime supervised release for stalking, harassing, and sending emails to a woman whose pictures have been circulated for years over the Internet in a known series of child pornography [The Vicky series].  . . .

[G.H., 41 years old], pleaded guilty to one count of transporting child pornography and one count of stalking.

Between June 26 and July 8, 2007, [GH] sent repeated emails to a female victim and to her friend via "MySpace" accounts causing substantial emotional distress to the victim.   The female is a victim of a known child pornography [Vicky] series, who was nine and 10 years old when pornographic images of her were produced and used.   The defendant harassed the victim about why she was not writing back, asked her why she planned to testify against the person who produced the child pornography series wherein she was a victim, asked her for new pictures, and asked her to make pornographic films with him.   The defendant also sent pornographic images of the victim from the known child pornography series to the victim's friend.  . . .

The case was brought as part of Project Safe Childhood, a nationwide initiative to combat the growing epidemic of child sexual exploitation and abuse launched in May 2006 by the Department of Justice.  Led by United States Attorneys' Offices and the Criminal Division's Child Exploitation and Obscenity Section (CEOS), Project Safe Childhood marshals federal, state and local resources to better locate,

apprehend and prosecute individuals who exploit children via the Internet,
as well as to identify and rescue victims.

*Id.* (citing Press Release).

Restitution to Vicky as a victim may be available both from the two defendants sent to prison for sexually abusing and harassing her and from a defendant such as C.R. *See, e.g.*, 18 U.S.C. § 3512(b) (restitution and fines); § 3633 (Order of restitution; § 3663A (mandatory restitution); § 3663 (procedure for restitution); § 3664 (rules for issues and enforcing awards); § 3771(a)(6) (crime victim has "right to full and timely restitution as provided in law"); § 2259 (victims of child sexual exploitation shall be awarded "the full amount of [their] losses" ).

Restitution has been explored by the courts to discourage possessing images such as those involving children like Vicky. To help pay for the psychiatric and medical treatment of the abused child several courts have ordered restitution by a child pornography viewer who possessed images of an abused child. *See, e.g., United States v. Wright*, 2011 WL 1490763 (Apr. 20, 2011 5th Cir.) (recognizing known victim's right to receive restitution as a "victim" of defendant's crime of possessing images of her abuse); *In re Amy Unknown*, 636 F.3d 190 (5th Cir. 2011) (holding known victim of child pornography entitled to restitution from viewer under the Crime Victims' Rights Act; there is no requirement to show proximate causation); *United States v. Ricky Lee McDaniel*, No. 09-15038 (11th Cir. Jan. 28, 2011) (affirming district court order requiring defendant to pay $12,700 in restitution to "Vicky" the child depicted in one of the child pornography images he possessed); *United States v. Monzel*, 2011 WL 1466365 (D.C. Cir. Apr. 19, 2011) (victim has right to restitution from defendant who viewed and distributed images of her abuse but requiring government to show proximate causation); *United States v. Chow*, 2010 WL 5608794, *2 (S.D.N.Y. Nov. 22, 2010) (individuals depicted in child pornography images are "victims" within the meaning of the mandatory restitution act but government must show

defendant's conduct proximately caused victims' losses); *see also* Associated Press, *Fed Prosecutors in NY Get Child Porn Restitution*, Wall Street Journal, Jan. 17, 2011, *available at* http://online.wsj.com/article/AP493ba7ba282a4c279070ef50c0ae55cb.html (explaining federal prosecutors' efforts to obtain restitution for victims of child pornography by garnishing offenders' assets; thus an added tool supporting general deterrence).

Calculating the harm caused to a victim of abuse by a viewer of child pornography in a case such as the instant one seems nearly impossible. "We recognize. . . that determining the amount of a victim's losses attributable to the defendant will often be difficult . . . where the harm is ongoing and the number of offenders impossible to pinpoint, such a determination will inevitably involve some degree of approximation." *Monzel*, 2011 WL 1466365 at * 22. The Court of Appeals for the Second Circuit has not fully addressed the issue of the extent to which 18 U.S.C. § 2259 requires the government to establish proximate cause for all injuries to victims of possession of child pornography distributed on the internet. *See United States v. Pearson*, 570 F.3d 480, 486-87 (2d Cir. 2009) (per curiam) (holding defendants convicted of videotaping and photographing two minor females in sexually explicit positions and enticing them to engage in such conduct could be liable under § 2259 for "reasonably estimated future medical and counseling expenses"). In *Chow* the district court for the southern district of New York concluded that restitution from a child pornography viewer was not warranted because the government failed to show proximate causation. 2010 WL 5608794 at * 3-4 (noting majority of courts that have considered the issue have concluded that proximate cause cannot be established in child pornography possession cases) (collecting sources). *See also, Wright*, 2011 WL 1490763 at *5 (finding district court failed to give a "reasoned analysis of how it arrived at its award" and remanding to determination based on joint and several liability or the "fraction" of victim's losses

"attributable" to defendant); *United States v. Monzel*, 2011 WL 1466365 (remanding to district court to develop "some principled method" for determining the harm proximately caused to the victim by viewer of child pornography); *see also*, Dennis F. DiBari, *Restoring Restitution: The Role of Proximate Causation in Child Pornography Possession Cases Where Restitution in Sought* 33 Cardozo L. Rev. ___ (forthcoming 2011) (discussing split between district courts regarding ordering restitution in child pornography possession cases and arguing for a principled analysis of proximate causation in possession cases to determine appropriate amount of restitution).

In the present case, the government is not seeking restitution. Given the difficulties in determining how much would be due from this defendant and the uncertainty of the law on the point, the court accepts the government's decision. It will grant no restitution.

### G. Events while Defendant Awaited Sentence

Pre-Trial Services has been monitoring defendant since his initial release from custody on February 5, 2009. *See* Order Setting Conditions of Release and Bond, Docket No. 4. The conditions of supervision included the following: defendant must remain within the Eastern and Southern Districts of New York unless court permission allowed otherwise; avoid areas where minors under the age of 18 tend to congregate, including but not limited to, parks, playgrounds, fast food restaurants near schools and arcades; undergo mental health evaluation and treatment as needed for the specific offense charged; and refrain from using a computer or accessing the Internet unless necessary for educational purposes. *Id.*

### i.    Education, Employment, and Treatment

Defendant has been attending Westchester Community College from September 2009 to present. He also took classes at Columbia-Greene Community College. *See* Transcript of Bond

Revocation Hearing, August 24, 2010 (Bail Hr'g Tr., Aug. 24, 2010).  He goes to class four times a week and had a 3.67 grade point average for the Spring/Summer 2010 semester.  *Id.*

He is employed at Dunkin Donuts where he works four days a week.  *Id.*  From March to August 2010 he participated in substance abuse therapy at Ulster County Mental Department —once in individual and once in group therapy.  *Id.*  Since beginning a Chemical Dependency Evening Intensive Program on March 10, 2010 defendant has "maintained abstinence per breathalyzer, urine screen and self reports."  *Id.*; *see also* Defendant's Exhibit B.  He attended all scheduled substance abuse meetings in the past four months, except for two assigned meetings.  Bail Hr'g Tr., Aug. 24, 2010.  During this same time period defendant attended Alcoholics Anonymous groups four times per week.  Several times per week since April 2009, defendant was seen by Edward A. Leonhard, Ph.D. for individual psychological therapy.  He has had many psychological evaluations by different therapists.  *See* Part II.G.iii, *infra*.  By referral of Pretrial Services, defendant started seeing Dr. Shawn Levine for sex offender specific treatment.

### ii.    Bail Revocation Hearings

Between March, 2009 and August 2010 defendant had numerous bail violations.  None of these violations were for reoffending with child pornography or for committing a contact offense against a minor.

In March, 2009 a bail revocation hearing was held by a magistrate judge following the government's allegations that defendant invited minor friends to his home where they consumed

alcohol.  Electronic monitoring was then added to the bail requirements.  *See* Bail Revocation Hr'g, Docket Entry 9.

Defendant tested positive for marijuana in April 2009.  Pretrial Services was ordered to "supervise closely" C.R.  *See* Letter from Government at 2 (Aug. 11, 2009); Order, Docket Entry 17 (May 12, 2009).  In July, Pretrial Services filed a violation report detailing several alleged violations including communicating with his half-sister over the online social network Facebook and travelling to New Jersey with his father and half-sister, in violation of his release conditions. The conditions were ordered amended in accordance with a temporary order of protection issued against defendant by the Westchester Family Court, to provide that defendant may not have contact with his step-sister.  *See* Bond Revocation Hr'g, Docket Entry 22 (Aug. 2009).

Another bail revocation hearing in July, 2010 was based on contentions that defendant's father had visited him with his daughter, defendant's half-sister.  *See* Tr. of Bond Revocation Hr'g, Docket Entry 61.  At still another hearing in August, 2010, the government cited violations of release conditions including a positive test for marijuana and two missed sessions at defendant's substance abuse treatment program.  *See* Tr. of Bond Revocation Hr'g, Docket Entry 71; *see also* Government's Sentencing Memorandum, Docket Entry 138 at 4–6, May 6, 2011 (detailing defendant's violations of bail release conditions).  Increased close supervision by Probation was ordered.

C.R. now appears to be responding appropriately to court controls.  There has not been a reported violation of release conditions in the past nine months.

### iii.    Mental Health Evaluations

C.R. has been repeatedly evaluated since his arrest: at the direction of Pre-trial Services, by the New York Center for Neuropsychology & Forensic Behavioral Science; by a private

evaluator, Dr. Gabrielle Stutman; at the court's direction by the Bureau of Prisons; on order of the Probation Office, by Dr. Richard M. Hamill; by defense expert Dr. Robert Prentky; by the government's evaluating psychologist Dr. Susan J. Sachsenmaier; and on referral by the government to Dr. Barr of New York Epilepsy & Neurology. In addition, he has been treated by his private psychiatrist Dr. Edward A. Leonhard and by Dr. Shawn Levine, retained by Pre-Trial Services.

### a. New York Center for Neuropsychology & Forensic Behavioral Science Report

In March, 2009 the United States Pre-Trial Services referred the defendant to the New York Center for Neuropsychology & Forensic Behavioral Science, where he was evaluated by Dr. N.G. Berrill and Jennifer McCarthy.

The Center's report states that when he was about thirteen years old the defendant began downloading images and video clips of adult heterosexual and homosexual pornography from the internet. *Id.* at 5, 11. Beginning at age fifteen, after a friend showed him how to access pornography on Limewire, he downloaded child pornography images, specifically pictures of teenage and preteen boys. *Id* at 3, 6. He said he did not realize that downloading child pornography online was illegal because it was so easy to access. *Id.* at 3. Responding to whether he thought he was committing a crime, defendant stated, "I didn't think I was . . . it's so easy to get . . . you type one word and get millions of stuff." *Id.* When asked if he thought he was a pedophile, defendant responded, "[n]o . . . it was on the computer . . . I didn't think it was reality." *Id.* Defendant denied trading child pornography material. He stated that he "joined Gigatribe, [a file-sharing network because] . . . it allowed people to obtain the files on my computer . . . I didn't realize it could do this. . . . I joined to get files." *Id.* at 11. When

asked if he thought child pornography was a problem he stated, ". . . I was naïve. I didn't

know . . . when I was younger, I fooled around . . . it seemed normal." *Id.* at 3. He often

smoked marijuana when viewing pornography. *Id.* at 11; PSR at ¶¶ 26, 71.

Defendant reported that he reached puberty at age fifteen and that he was bisexual. New

York Forensic Report at 3. At age eighteen he had sex with an eighteen year old female, and he

had sexual encounters with males his own age, when he was sixteen and nineteen. *Id.* at 4. He

also reported that he had engaged in mutual touching with a sixteen year old girlfriend when he

was 18, and with a 15-year-old boy on one occasion. PSR at ¶ 12. In addition, he and his

younger half-sister engaged in mutual masturbation on three occasions when he was fifteen and

seventeen and she was about eight and ten. NY Forensic Report at 6. While he reports that

"currently he has homosexual desires," he denied frequenting places where homosexuals have

sex. PSR at ¶ 68. Defendant also reported that he was "extremely depressed." New York

Forensic Report at 12.

The Diagnostic Impression of Dr. Berrill was as follows:

|        |       |
|--------|-------|
| Axis I:   | Adjustment Disorder with depressed mood; Substance Abuse (marijuana, in remission by self-report); Pedophilia (attracted to males, nonexclusive type); Paraphilia, Not Otherwise Specified (Hebephilia, or sexual attraction to adolescents). |
| Axis II:  | Histrionic, dependent and paranoid personality features |
| Axis III: | None reported. |
| Axis IV:  | Legal problems. |

Axis V:        Global Assessment of Functioning of 75 to 80 (out
of 100).

In conclusion, New York Forensic found that the defendant did not
impress as antisocial and/or predatory, but instead, as confused and
grossly naive and immature.  His participation in the instant
offense seemed to be not a blatant disregard for the law, but
instead a need to satisfy his sexual interest in minor males.  He
appeared to appreciate the seriousness and consequences to the
victims due to his criminal activities.  While the defendant
expressed to the clinician that he did not need sex offender
treatment, he impressed as someone who would respond well to
treatment.  It was highly recommended that the defendant undergo
sex offender-specific treatment and clinical polygraph
examinations, that his Internet usage be monitored and he undergo
random drug testing to ensure sobriety.

PSR ¶ 68.

### b.  Stutman Report

Dr.  Gabrielle Stutman examined the defendant at the request of his counsel.   She took a
detailed history of his personal and family background, which included maternal abandonment,
significant family chaos, and sexual overstimulation at a young age.  Psychological Evaluation of
Gabrielle Stutman at 5 (July 20, 2009).

The Stutman Report sets forth defendant's social history.  When defendant was one-year-
old, his father took him and left his biological mother, who was a drug addict.  *Id*. at 1.  He did
not see her for several years, and she telephoned infrequently.  *Id*.  When defendant was three,

136

his father began living with another woman, whom he married two years later.  The defendant formed a strong maternal attachment to his stepmother.   His half-sister was born of this union two years after the marriage.  *Id.*  Discovering his step-mother's affair with another man in 2004, his relationship with his step-mother became conflicted.  Defendant's father and stepmother separated, and divorced when defendant was 16.  *Id.* at 2.

Meanwhile, defendant's biological mother recovered from her drug addiction, and in January 2008, defendant went to live with her, her husband, and their six-year-old daughter.  *Id.* During this time he and his mother had frequent conflicts.  He felt that she did not love him, and he began abusing marijuana and downloading child pornography on a file-sharing service.  Just before his computer was seized, he had begun psychotherapy, his relationship with his biological mother had begun to improve, he had not looked at pornography for three weeks, and he stated that he believed he was "growing out of it."  *Id.*

After his arrest, his stepfather insisted that he leave the house, and defendant returned to his father.  *Id.*  His former stepmother has refused to speak to him or permit him to speak to his half-sister.   Defendant is upset by his biological mother's rejection.  *Id.*

Defendant told Dr. Stutman, as he had told Dr. Berrill and the FBI, that he was primarily interested in the pictures and videos of post-pubescent boys and girls, and the depictions of some younger children were downloaded only because they were grouped with the depictions of older boys.  *Id.*  He stated, "I hated who I was when I was on the computer and just wish I never got into it in the first place."  *Id.*  His stated perception was that none of the content was violent or coercive; his fantasy was of playful sexual experimentation, different from the "real world" to which he was adapting with less and less success.  *Id.*  "He states that his use of these materials

was ego-alien, that he felt 'like a gross, unmarried 35 year old man' and rarely thought about those images when not at home." *Id.*; PSR at ¶ 71.

Dr. Stutman found that defendant's identity was poorly integrated and that his sexual orientation and self-esteem were fluid. She noted, "C.R. had limited insight and judgment and his chronically emotional reactivity and deficient frustration-tolerance compromised his executive function, social relationships, and self-regulation." *Id.* at 3. She opined that defendant's responses reflected such a level of naiveté about psychological matters and such deficient self-knowledge as to suggest a moderately severe mental disorder. *Id.* at 4.

Analyzing the New York Forensic Report, Dr. Stutman agreed with the conclusion that the defendant was neither antisocial nor predatory but rather confused, grossly naïve and immature. *Id.* at 5. She also found that the defendant's distorted thinking about the acceptability of adults having sex with minors and sexually explicit images was related to his premature access and frequent exposure to pornography as well as his history of maternal abandonment and discovery of his stepmother's illicit affair. *Id.* Dr. Stutman criticized the New York Forensic report for failing to distinguish sufficiently between an interest in young adolescents, which the defendant had, and an interest in prepubescent children, which he did not have. *Id.*

Dr. Stutman concluded that C.R.'s childhood traumas of maternal abandonment, step-mother's sexual betrayal, and early sexual overstimulation combined to delay his psychological and emotional development. *Id.* at 5. Psychological strengths were found in defendant's willing participation in this and other evaluations, his cooperation with the authorities, and his demonstrated ability to regulate his behavior when motivated. *Id.*

This doctor noted that:

> [p]remature access (13/14 years old) and frequent exposure to
> adult pornographic images (3-5 hours per week), would be
> overstimulating to virtually any boy of this age.  [The defendant],
> with his history of (biological) maternal abandonment and
> discovery of his (psychological) mother's illicit affair, a boy with
> few friends, poor social skills, histrionic, dependent and paranoid
> personality features is especially vulnerable to the psychosexually
> destructive effects of such explicit sexual images.  For this reason,
> I regard his insight and judgment as limited, rather than 'adequate'
> (as reflected in the New York Forensic Report).

*Id.*

As with the New York Forensic Report, Dr. Stutman determined that C.R. "is neither antisocial nor predatory, but rather a confused, grossly naïve and immature young man who would respond well to targeted group and individual treatment in the context of appropriate tests and safeguards."  *Id.*  This doctor recommended that the defendant receive group and individual psychological treatment for his "emotional distress and maladaptive social/sexual behavior," as well as

> [s]ocial skills training to enable the age-appropriate social and
> sexual relationships, cognitive therapy to increase frustration
> tolerance, and behavioral management of his substance abuse
> disorders should take priority.  Group treatment for sex offenders
> may aid his ability to confront and address his unacceptable sexual
> behavior.  Family therapy may also be helpful.  In accord with Dr.
> Berrill, I would also strongly recommend appropriate safeguards
> including random drug/alcohol testing, polygraph examinations,
> and internet monitoring.

*Id.* at 6.

139

In sum, defendant was diagnosed as follows by Dr. Stutman:

Axis I:   Pedophilia (Attracted to Males, Nonexclusive Type);

Paraphelia NOS (Hebephilia; Psychoactive Substance

Abuse (Marijuana, in remission by self report); Adjustment

Disorder with mixed Anxiety and Depressed Mood

Axis II:  Histrionic, dependant and paranoid personality features

Axis III:   None

Axis IV:   Severe; felony charge

Axis V:  65; Moderate difficulty with occupational and

interpersonal functioning (at time of evaluation)

*Id.*; PSR at ¶ ¶ 75.

### c.  Bureau of Prisons Evaluation

Following his failure of a marijuana drug test, defendant was ordered by the court to

surrender at the Federal Medical Center Devens on January 4, 2010 for evaluation.  *See*

Psychological Evaluation by Christine Scronce, Ph.D., Forensic Psychologist, Federal Bureau of

Prisons, Psychological Evaluation, 2 (March 1, 2010) ("BOP Report").   He was thereafter

observed and evaluated by clinical and correctional staff for a month.  *Id.*   The BOP Report

summarizes the other evaluations described above and incorporates findings based on the

defendant's behavior while in prison, as well as his responses to psychological testing.  *See id.*

After noting the defendant's difficulty adjusting to incarceration, the report concludes

that defendant "presented with immature coping skills, as well as a sense of entitlement."  *Id.* at

6.  It documents the defendant's "average to low average intelligence," as well as his

presentation of "excessive dependency, immaturity, and poor coping ability." *Id.* at 7, 8.  The

evaluator declined to diagnose the defendant as having a personality disorder because "his young

140

age makes it difficult to determine whether these are stable personality features or are limited to his stage of development." *Id.* at 8.

Finally, the BOP report acknowledged the possibility that defendant's "symptoms of depression and anxiety . . . could worse[n] with the continued stressors of confinement, so his symptoms should be monitored." *Id.* at 8-9. It includes the following: Defendant "engaged in denial and minimization of his behavior" with his half-sister. *Id.* at 4. C.R. stated: the FBI examiner "convinced me I was 18 at the time. The last time it happened I was 17." *Id.* C.R. said he believes he needs sex offender-specific treatment stating, "[i]f I watched child pornography right now, I would probably still be aroused." *Id.*

### d. Hamill Report

Upon referral from Pretrial Services on March 9, 2010, defendant submitted to a psychological evaluation by Richard M. Hamill. *See* Psychological Evaluation by Richard M. Hamill, Ph.D., Forensic Psychologist, 1 (Mar. 9, 2010). Dr. Hamill reviewed the defendant's psychological records, conducted an interview with the defendant, and administered written tests. *Id.* The results suggested that defendant has poor impulse control, acts out directly on feelings to obtain immediate gratification, and frequently lacks forethought with regard to consequences or alternative courses of action. *Id.* at 8, 13. According to the report, the defendant also suffers a true level of anxiety that is "significantly greater than what he is subjectively experiencing." *Id.* at 8.

On the Psychological Screening Inventory, all of defendant's scores fell within the normal ranges, indicating that he does not require residential psychiatric placement and is not similar to a sample of incarcerated criminals. *Id.* at 9. His score on the Abel Assessment for Sexual Interest Cognitive Distortion Scale "suggests that he did not identify himself as holding

beliefs supportive of child molestation." *Id.* at 11. However, he scored in the "high" range on the Social Desirability scale indicating that "he may have difficulty in responding truthfully to questions about his sexual interests and activities." *Id.* The Abel Assessment includes a "viewing time" portion along with the self-report. This portion showed that C.R. had "strong deviant sexual interests to both underage (prepubescent and post-pubertal) boys, and to post-pubertal girls and women." *Id.*

The Hamill Report evaluates the defendant by hypothesizing how the defendant would perform if analyzed according to the Static-99 rubric for predicting risk of sexual recidivism by convicted sex offenders. *Id.* The Static-99 rubric, however, only permits scoring of individuals who have been arrested or convicted of child molestation. Because defendant does not fall into those categories, he may not be appropriately evaluated using that instrument. Nevertheless, without actually applying the Static-99 methodology, the report assumes a conclusion that might be drawn from utilization of the test, namely, because the defendant lacks skills for forming and maintaining healthy intimate relationships and is relatively young, he poses a moderate to high degree of risk for committing another sex offense. *Id.*

### e.  Barr Report

Upon referral by the government, defendant was evaluated by Dr. William Barr of New York Epilepsy & Neurology in October, 2010. *See* Neuropsychological Consultation Report of Dr. William Barr, October 25, 2010. The purpose of the evaluation was "to obtain a comprehensive profile of his current cognitive functioning." *Id.* Dr. Barr interviewed C.R. for ninety minutes and performed 4.5 hours of neuropsychological testing. Dr. Barr observed that he was "somewhat younger than expected, given his chronological age." *Id.* at 5.

> [H]e exhibited a moderate level of impulsivity and carelessness throughout the day.  Often, he seemed to rush through tasks, and attempt to provide a response as quickly as possible. . . . Overall, in spite of what appeared to be some immature behavior, [C.R's] effort throughout testing was deemed to be well within expected limits, and thus the current results are considered to be a valid indication of his current cognitive functioning.

*Id.*

Dr. Barr's clinical impression was as follows:

> The current test results indicate that [C.R's] level of intellectual functioning is in the "high-average" range. Scores obtained on academic achievement indices indicated that his reading, spelling, and arithmetic skills were all at expected levels. Scores obtained on a wide-range of neuropsychological tests were well within normal limits in comparison to age- and education matched peers. There was no test evidence of a particular weakness in any specific cognitive domain, including executive functions. Information obtained from the current interview and from [C.R's] responses to self-report inventories was consistent with a mild level of depressive affect.

> The results of this examination indicate that [C.R.] functions from a cognitive and intellectual perspective just like any other 21-year-old male.  While he might appear immature from a physical and, in some instances, behavioral perspective, there is no evidence that he lags behind others in his age group in any specific cognitive domain. While he currently exhibits lower scores on some higher-order verbal tasks, there is no evidence from school records of any underlying learning disability or attentional disorder that exerted any tangible effect on his school performance across his lifespan.  There is also no evidence from the current testing or

143

past records to indicate that, at the time of the alleged offenses, [C.R] differed from any other males from his age group in terms of his decision making capacity or in his ability to control impulses. Among the records reviewed, there were notations that [C.R's] mother had ingested cocaine during her pregnancy. However, the current findings indicate none of the cognitive deficits in sustained attention or behavioral regulation that have been documented in studies of individuals that had received prenatal exposure to cocaine. While his father has a reported history of ADHD, there is no evidence that the defendant has ever exhibited any signs of that condition, either currently or in the past. Information obtained from the current interview and a review of records indicate that [C.R] was exposed to [a] number of personal and family related factors that had a negative effect on his psychosocial development, but there is no evidence indicating that any of these factors affected his cognitive or intellectual development in any significant way.

There is an emerging research literature indicating that pedophiles, studied as a group, exhibit a range of cognitive impairments in response inhibition, working memory, and cognitive flexibility. The current findings indicate that [C.R] has no signs of impairment in any of these domains.  Findings from this evaluation, in fact, indicate that he actually exhibits strengths in some of these skills. Findings from other studies have indicated that individuals with a range of psychiatric diagnoses such as antisocial or borderline personality disorder exhibit cognitive deficits underlying behavioral features of poor impulse control. There is no evidence from this examination or the records to indicate that [C.R] has any form of personality disorder and, again, there is no evidence

144

indicating any cognitive impairment associated with poor impulse control.

The actions, for which [C.R] is charged reportedly began while he was an adolescent and continued into early adulthood. There are a number of research findings indicating that weaknesses in response inhibition, planning, and decision-making that can potentially affect behavior through mid-adolescence. The results from a comprehensive battery of tests administered to [C.R] indicate that, as a 21-year-old, he exhibits no objective evidence of impairment in any of these particular skills. While we have no direct evidence of his behavior as an adolescent, there is no evidence from school records or any others source to indicate that his functioning at that time differed significantly from his peers.

In summary, the results of this examination are not indicative of any diagnosis of cognitive impairment or learning disability. From a psychological perspective, [C.R.] exhibits signs of an Adjustment Disorder with Depressed Mood on Axis I, as defined by the DSM-IV, which is not unexpected given his current legal situation. From the available history and records, he meets criteria for additional diagnoses of Pedophilia, Paraphilia, and Cannabis Abuse on Axis 1. The current findings indicate that he does not meet criteria for the presence of any personality disorder on Axis II. There is no evidence of any identifiable cognitive impairment secondary to prenatal cocaine exposure, head injury, or substance abuse.

OPINION:

The current test results indicate that [C.R's] level of intelligence is in the high-average range. His scores on a range of neuropsychological measures, including those assessing higher-order judgment and executive functions are at the level expected

145

for his age group. The current profile of test findings, taken together with information available in school records, does not indicate the presence or history of any underlying learning disability or attention-deficit hyperactivity disorder. There is no evidence from objective testing or available records to indicate any underlying neuropsychological deficit or weakness in impulse control, decision-making, or planning relative to others in [C.R's] age group that would have affected his behavior at the time of the alleged sexual offenses. There is also no evidence of any neuropsychological impairment that would make him necessarily predisposed to committing another sexual offense in the future.

*Id.* at 8-9.

Dr. Barr's testimony at the evidentiary hearing held on January 25, 2011 corroborated his evaluation and report of C.R. *See* Hr'g Tr., Jan. 25, 2011. He confirmed that neural imaging scans of C.R. such as a magnetic resonance imaging (MRI), which shows the anatomical development of the brain and specifically the pre-frontal cortex, were not performed. *Id.* at 47-48. In addition, he stated that "from a hard-wiring stand point, there is no inherent defect inhibiting him from success in a community setting. . . ." *Id.* at 49-50. Dr. Barr also confirmed that nothing in his testing would suggest that C.R. is not amenable to treatment at Federal Medical Center Devens. *Id.* at 50.

### f.  Prentky Report

Defendant's evaluating psychologist examined the defendant in July and October 2010. Psychological Evaluation by Robert Prentky, Ph.D., Forensic Psychologist, (Oct. 15, 2010) ("Prentky Report"). Dr. Prentky's report synthesizes psychological records, an extensive interview with the defendant, and conversations with the defendant's father and paternal

146

grandmother.  *Id.* at 1.  It characterizes the dominant theme in the defendant's life as "loss, sadness, and depression."  *Id.* at 10.

Much of defendant's angst, emotional complications, and already described sexual experience are attributed to early childhood neglect and mistreatment by his biological mother. *Id.* at 3; *see also id.* at 10 (describing defendant's biological mother as "an irresponsible absentee figure, neglectful and drug-addicted, who, it appears, exposed him to sexuality at a young age."). According to an interview with the defendant's paternal grandmother, defendant's biological mother was using cocaine while pregnant with the defendant.  *Id.* at 1.  The report reveals that at the age of seven or eight, defendant learned of his mother's employment as a stripper as well as of her sexual partners; at one point he came across one of his mother's photo albums filled with pictures of strippers.  *Id.* at 2.  When defendant's mother did spend time with him, "she introduced [him] to small mischief things, like sneaking into movie theaters."  *Id.*

The report also traces defendant's academic history, attributing a sudden and dramatic drop in grades at the beginning of adolescence to the major events taking place in his life at that critical time.  *Id.* at 3, 10.  Specifically, after the defendant moved from Manhattan to Scarsdale at age thirteen, he (1) never saw his biological mother, who had begun to recover from her drug addiction, (2) discovered his step-mother had been cheating on his father, and began to drink; and (3) had no social life and no friends for three years.  *Id.* at 10.  The report summarizes: "[b]y his mid to late adolescence, [the defendant] was a youngster with poor self-esteem, deficits in his social skills, and marked psychosocial immaturity."  *Id.*

Relying upon data collected through the Abel Assessment of Sexual Interest psychological examination administered by Dr.  Hamill, the Prentky Report emphasizes that the defendant appears to lack a clear sexual preference with respect to both gender and age.  *Id.* at 8.

147

Moreover, because "there is *no* basis for concluding that [the defendant] has *serious difficulty* in refraining from sexually violent conduct or child molestation," the report concludes that the defendant "does *not* meet the legal standard to be considered a sexually dangerous person under 18 U.S.C. § 4247." *Id.* at 11 (emphasis in original).

### g.  Sachsenmaier Report

Dr. Susan J. Sachsenmaier, a qualified expert on risk assessment and recidivism with sex offenders, examined C.R. between September and December 2010.  *See* Child Pornography and Contact Sexual Offense Risk Assessment and Evaluation Report or Dr. Susan J. Sachsenmaier, Ph.D. (Jan. 8, 2011).   She administered numerous psychological tests and screening tools and interviewed the defendant and his biological parents.  Several of the tests Dr. Sachsenmaier utilized were developed for hands-on offenders and were not intended to be used or do not have a scale for child pornography.  *See* Report at 8 (Multiphasic Sex Inventory Profile) ("Although it was developed for use with both hands on and hands off sexual offenders, it does not include a scale for child pornography.  To my knowledge it has not been used in any studies with internet child sexual exploitation crimes, so results here must be interpreted with caution . . . ."); *Id.* at 10 ("The Static-99 was developed using mostly hands-on sexual offenders.  Rules indicate that if an offender's only sexual crimes involve pornography, the tool should not be used."); *Id.* at 12 (Sexual Violence Risk-20) (The SVR-20's use has not been studied specifically with child pornography offenders.").

Because C.R. acknowledged sexual contact with his half-sister, Dr. Sachsenmaier considered him a "hands-on offender" and indicated that the results of these tests apply to him. *Id.* at 9, 10, 12.  From other evidence in the case, the court concludes that this was an error,

throwing serious doubt on the validity of the doctor's conclusions of risk of future sex offenses. *See* Part II.H, *infra*.

The Risk Assessment for Juvenile-Only Sexual Offenders, an assessment tool "developed to assess risk for recidivism for hands on sexual offenses in adolescent offenders who offended as juveniles but not as adults" was not used "because [C.R.] was 18 when he sexually assaulted his sister . . . . This sexual assault was clearly adult in nature, in that it involved penetrating a child's mouth with an adult penis." *Id.* at 12.

Based on these materials her report provides:

> [C.R] appears physically younger than his age and has been described as socially and immature as well, with this being offered in some psychiatric and psychological evaluations as a mitigating factor. While it may evoke sympathy, it is not actually mitigating, as immaturity is found in many repeat sexual offenders throughout their lifespan. It can easily become a justification for seeking out sex with children and young adolescents. It is also important to note that the Personality Assessment Inventory found that [C.R.'s] interpersonal style is similar to normal adults, as determined by [C.R.'s] self-report to test items. He was also able to 'nail' his college interviews without being perceived as abnormally immature. [C.R.] has a broad, undifferentiated sexuality. He is sexually attracted to and aroused by male and female children, adolescents, and adults, acquaintances and strangers, and his own sister. He engages in risky sexual practices with strangers.

*Id.* at 28.

The risk assessment tests administered indicate that C.R.

> meets many of the risk factors identified in the research to date for
>
> risk for recidivism to return to child pornography and to contact

149

offending.  The three main factors that encompass the other are 1) sexual deviance, 2) antisocial behavior, and 3) problems with intimacy.  [C.R] has problems in all three areas.  [C.R] is in the moderate-high to high risk range for reoffense for both online and offline offending.

*Id.* at 29.  Dr. Sachsenmaier's treatment recommendation is as follows:

[C.R's] treatment needs would best be met in a residential setting. His numerous bail violations are ample evidence that he does not take rules of community supervision seriously.  He has been out on bail for about two years and he has attended only one sex offender treatment session in all that time.  [C.R.] is not forthcoming with information about his sexual history.  What information has become available was gained mostly though polygraph examination, with further elaboration from [C.R] as time went on. [C.R] poses risk to himself and others due to indiscriminate sexual behavior.  I am also concerned that any loosening of restrictions will result in an immediate return to marijuana or other drug use. [C.R's] need for treatment is high, in terms of dosage, due to multiple issues he must address, including family dysfunction, pedophilia, hebephilia, child pornography addiction, incest, drug dependence and abuse, and personality disorder.  This degree of intensive treatment is unlikely to be found in a community setting, where treatment is likely to be only once per week.  He is also unlikely to get the degree of specialized treatment he needs in a community setting.

*Id.*

### h.  Leonhard Treatment

150

While on bail defendant has been attending weekly one-on-one sessions with his psychiatrist, Edward A. Leonhard, PhD.  This continuing course of treatment was described as follows:

> Dr. Leonhard wrote the Court in June 2009, noting that the defendant was an "unusually insightful and reflective young man who has been always highly motivated to work on all of his problems.  Moreover, he has worked very hard and successfully to establish a trusting relationship with me, his therapist.  I am pleased right off to state that he has made remarkable progress in not only gaining important insights in regard to his sexual addition issues but has likewise been enormously effective in gaining amazing control over these impulses through behavioral modification and in depth psychodynamic therapy.  His impulses have not only dramatically lessened in their frequency and intensity in his fantasy life but also they have lost any control in his actions.  He has come to see the inappropriateness of these sexual impulses and has gained more and more a sense of his responsibilities and the accountability of any of his actions.  He has done so on a level of maturity and serious motivation that is rarely seen in someone of his age.  Indeed he is one of those rare clients who have the innate ability to know how to work effectively on these sexual issues.  He does so from an intense motivation to grow and take more control of the accountability of his actions towards others in society.  Therefore, since he is this ideal kind of client who can bring about effective changes in his life I most strongly recommend that Corey not be sentenced to prison but rather required to continue intense and continuing successful psychotherapy with me."

More recently, Dr. Leonhard advised that the defendant continued to meet his weekly appointments on time through December 2009, he was engaged in sessions and showed a commitment to psycho-dynamic treatment. Dr. Leonhard found that the defendant's main issues in recent months [were] severe depression, and the sexual dysfunction was a secondary problem. While Dr. Leonhard had recommended throughout that the defendant seek psychiatric intervention and medications, the defendant did not, which Dr. Leonhard attributed to problems beyond the defendant's control. It was recommended that the defendant be housed at a medical-type facility where his mental health status could be closely watched. The defendant advised that he enjoyed his sessions with Dr. Leonhard greatly, and while at first they just discussed sexual issues, the bulk of their sessions focused on how the defendant was "just a kid going to jail" and how he would cope with this problem. The defendant reflected that he does not understand why he has to go to jail for the offense.

PSR at ¶ 76-77.

**H. Hearings on Protection of Public and Treatment of Defendant.**

On June 3, 2010 an evidentiary hearing was ordered to address the following issues:

1. The harm to children from involvement in child pornography and from the defendant's actions in particular, to wit: distribution of child pornography;

2. The risk that the defendant will act out to harm others if he is or is not incarcerated;

3. The risk that the defendant will be raped or otherwise abused in prison if he is incarcerated;

4.  The nature of treatment available in federal prison and defendant's suitability for such treatment; and

5.  The neurological and psychiatric condition of the defendant, including his developmental maturity, at the time of the offense and presently.

*See* Memorandum and Order, Docket Entry 48, June 3, 2010.  Extensive testimony from highly qualified experts on dangers to the community and preferable treatment of defendant was proffered.  It supports the conclusion that the punishment imposed protects the public and prevents further criminality of defendant.

### i.    Probation

The Probation Department of the federal district court for the Eastern District of New York supervises sex offenders in a specialized Sex Offender Unit.  *See* Appendix E (Memorandum from Chief Probation Officer).  The offenders in the unit include individuals with child pornography offenses, such as possession and distribution, and contact offenses.  *Id.* Specialized training in supervising sex offenders is provided to officers in the unit.  It follows the "containment" model, which involves the Probation Officer, treatment provider, and polygrapher all working together to ensure compliance with treatment.  *Id.*  Treatment is provided primarily by New York Forensic, which has a contract with the Probation Department.  *Id.*  Great success has been achieved by the Unit in monitoring sex offenders.  The Unit has supervised 280 registered and non-registered sex offenders since 1999.  Of those offenders, 108 were child pornography offenders.  *Id.*  "[O]nly one known offender convicted of a child pornography offense . . . committed a new sexual contact offense while under the supervision of this department. . . ."  *Id.* at 3.

153

Defendant's Supervisory Probation Officer testified at the evidentiary hearing about the treatment and supervision provided by the Probation Department.  His testimony supported the findings of the written memorandum submitted to the court.  *See* Appendix E.  He had no objection to a sentence that involved treatment at the Federal Medical Center Devens followed by supervision in the sex offender unit.

### ii. Dr. Meg Kaplan

Dr. Meg Kaplan is the Director of the Sexual Behavior Clinic at the New York State Psychiatric Institute; an associate clinical professor of psychology at Columbia University's College of Physicians and Surgeons; the Chairperson of the Special Classification Review Board for Sex Offenders of the Department of Corrections, New Jersey; and a therapist in private practice.  She testified, as a qualified expert, about the characteristics and treatment of late adolescent sex offenders and how they differ from adults as follows:

> Q       Dr. Kaplan, based on the thousands of sex offenders who you have evaluated and treated, over the last 25 years, in your opinion are sex offenders who commit offenses under the age of 21, in terms of the risks and treatability from people who commit sex offenses in their 30s and 40's?
>
> A       Well, I think, in general sex offenders are very heterogeneous, if we're going by age, in general they are very different.
>
> Q       How do the younger offenders, commit offenses under the age of 21 different?
>
> A       I think, as individuals mature their sexual patterns become more and more set into a pattern, whether offenders or normative sexuality, interests become more set, before 21 they are less set.
>
> Q       Why is that significant in terms of risk of recidivism and treatability?

154

A       I think, if someone has a set interest pattern and needs to be changed, it's much easier to change the least set it is the easier it is, in terms of someone's interest.

Q       Just to make sure I understand. For example, if someone had an interest in prepubescent males and they were under the age of 21, are you saying it would be easier to switch that to an interest in a peer --

THE COURT: Switch or add something on.

Q --    so that they could have a legal sexual relationship where it's harder for an older person?

A       Yes.

Q       Because the sexual preference is more set?

A       Yes, more experience, it's more set. They sexual patterns are set.

Q       Do you see a difference in terms of what tends to cause sex offenders for the younger offenders versus the older offenders?

A       I think, there are a lot of pathways that people start with, you know, there is a lot that is unknown, but I mean there are different pathways, some young offenders start with curiosity or experimentation, those offenders could more easily be moved into, you know, consenting sex with peers, than those that have a specific interest in young children and it depends if they have a -- also have interest in peers.

Q       You said earlier in your testimony that in the 80's when you really pioneered this supervision of sex offenders and steering sex offenders into treatment, that Dr. Able had the initial setting that showed a relatively strong correlation between juvenile sex offenders and adult sex offenders, from your experience and knowledge from the research, is there still shown to be such a strong correlation or has that data shifted?

155

> A      I think, the idea is if people -- puberty is a time when
> people -- we men and women or boys and girls start to be
> interested in sexuality and when they go through puberty, things
> are not set, so the earlier you begin treatment the earlier these
> patterns are not ingrained and the earlier you could shift them over,
> move them or concentrate on consenting sex with peers.
>
>                    . . . .
>
> If someone is heterosexual and married they may see a woman that
> looks good to them and maybe interested and arousing, it's whether
> they act on it is crucial, not the interest.
>
>                    . . . .
>
> [That's] really what makes a difference and it's the same for
> adolescents. An adolescent or an adult might have an interest in a
> young boy and might look at that young boy and say, it's
> interesting, but it's the control over that, and whether he has
> choices or she to be with someone their own age in a consensual
> relationship that is always very important.

*See* Hr'g Tr. 167-71, Jan. 25, 2011.

After reviewing eight reports on previously conducted evaluations of C.R., Dr. Kaplan

provided her clinical impressions of the defendant and her view of the most appropriate

treatment plan.  She conducted an interview with the defendant in a private setting in the

courthouse and relied on both the reports and her interview to support her conclusions.   Dr.

Kaplan's clinical impressions and treatment recommendations were as follows:

> Q      Returning to the question, based on the forensic evaluations
> that you reviewed here, including those of the government's
> experts, that they submitted into evidence, what are the
> characteristics of CR that are significant to you in terms of
> recidivism or success in treatment?

156

A       One thing I would say he's been in the community for a period of time without recidivating --

Q       Without sexually offending again?

A       He has been walking outside and not offended as far as we know.

Q       Why is that significant?

A       Because if he couldn't control his impulses towards children, he would probably would have reoffended if he's in contact with children.

        . . . .

Q       And are there other factors in addition to his time in the community without sexual reoffenses that are significant to you?

A       Just even in general, if someone has a drug or alcohol problem, whether they are addressing that.

Q       In this case, from the evaluation, he had had a prior drug problem, he's now been sober for nine months after having completed six months of substance abuse treatment, is that a significant --

A       That would lower his risk.

Q       And --

A       If he continues to be sober.

Q       How does that factor into in terms of treatability?

A       It would be difficult to treat him if he was in drug and alcohol abuse, that is a large factor, especially with younger individual.

Q       And I know you have seen some of the evaluations that they bring out that he has since, the timing of the offense, had sexual relations-- consensual relations with other college age persons, including casual sex and meeting people online. How does that factor in?

157

A        For that is a very good sign. Not just looking at interest in children, looking at it in terms of a-- I know you can't write down a scale-- if it's higher, let's say it's high for children and low for consensual sex with peers-- we're all sexual human beings-- if we take something away it has to be replaced with something, especially in younger people. They are interested in sex. Their hormones are high and they want to have sex. If they have already have an interest in peers, that helps in therapy a great deal, because then we can tip the scale towards consenting sex with peers.

Q        And does it concern you that he's primarily been having casual sex, rather than a single monogamous relationship?

A        No, I think --

Q        At his age?

A        Young ages from puberty to early 20's is when individuals experiment with sexuality.

Q        So the fact that he's not in one long term relationship at the age of 21, doesn't indicate to you he's a greater risk of sexual reoffending?

A        No, not to me.

Q        Some of the forensic evaluators characterized him as having preoccupation with sex.

Is that normal at his age?

A        I mean, you know, I would key how preoccupied, but I think it is normative to think about sex when you are 21 years old, a lot.  Would be nice [if] that continued for life, but it's only true for 21 year olds.

Q        As you may know he only recently has been placed in sex offenders specific treatment and he has done that through pretrial services and started to attend sex offender treatment, but that was in the last couple of months, prior to that he was serving substance abuse treatment and general mental health treatment, but not

158

specifically sex offender treatment, but that was in a period when he was out in the community for two years.  Is that significant to you?

A        I think, it is a good sign. If he only recently started sex offender specific treatment and he hasn't reoffended he has a good chance with sex offender specific treatment if he's motivated in not reoffending.

Q        One of the factors that you indicated earlier was important, motivation to change. Do you see that in these evaluations of CR?

A        It appears from the evaluation that he's motivated.

Q        And you will have read in the report that he had incestuous conduct with his younger half-sister.  How does that effect your assessment of his risks versus his treatability?

A        He had a hands on offense as well as looking at child pornography, so that adds to his risk clearly, but he has not had any sex with his sister in a long time, it's my understanding, and I don't know whether he has had contact with his sister.  From what I read there were three instances of sex, he needs treatment for that.

Q        The nature of incestuous nature that does have significance to risk?

A        Incest offenders are of lower risks than non-familiar offenders.

Q        Why is that?

A        Because especially for younger individuals, it's usually for younger individuals, it's access rather than picking a particular target.

Q        Incest is about access?

A        To the victim and it may be curiosity or experimentation, rather than a sexual interest pattern.

                        . . . .

159

THE COURT: Before you get to that. The substantial period between the last contact with his half-sister and the present, would that be a positive factor?

THE WITNESS: If he had access to his sister and didn't molest his sister that would be very positive. Any time that he had access to his sister, either chose or was unable to control myself, would be negative. It's positive there is access and he chooses not to or he doesn't molest his sister. One of the things I'm looking at is not just the molestation, but the number of times when there is access.

. . . .

Q    In this case, the defendant and his half-sister lived in the same household or were frequently sleeping or being in the same household for a period of about ten years --

. . . .

[T]he defendant's half-sister were either living in the same household or frequently sleeping in the same household for a period of about ten years and there were three incidents in that ten period, does that frequency have significance?

A    Yes, if he had access means—I haven't evaluated him and asked him these questions—but if he chose not to or was able not to molest his sister and had access, that is positive. It's negative that he molested her; the number of times that he did. On the other side it's positive that he was able not to molest her if she was there.

Q    There is, approximately, a one year period from the time of the [last] incident, until his access to her was cut-off by his arrest and the revelations in this case. Is that significant?

A    Yes, I would say that is positive.

THE COURT: The first incident as I recall was with respect to the father putting the younger girl and the defendant in the same bed. . . . I'm directing you to this particular incident. How would you

160

evaluate that situation in connection with your evaluation of the entire incest period?

THE WITNESS: Well, I would say he didn't – he didn't act sort of a predator, he didn't go to another room and seek out his sister, the sister was -- he had access right there and that is different.

THE COURT: Less of indication of danger.

THE WITNESS: Predator behavior.

Q        The three incidents are spaced out, one when he is 15, one 16 and then a third one when he's 18.  Do the intervals have any significance?

A        It speaks to his interest or control in not molesting

Q        Does the fact that there are no known offenses while under bail control, but still in the community impact?

A        It's positive since . . . Especially since he hasn't had sex offenders' treatment that is positive.

*Id.* at 173-81.

After reviewing Dr. Barr's report and his conclusions that C.R. had no cognitive impairments, Dr. Kaplan concluded that this information was positive for the defendant.  "[T]he fact that he has the ability to be able to go through treatment and has the cognitive function to do so, is very positive."  *Id*. at 181.  Dr. Kaplan confirmed that other factors such as defendant's employment, current college attendance, relationship with his grandmother, and other community ties are positive factors for the defendant.  *Id.* at 182-83.  Considering his numerous bail violations for breaking curfew, drug use, and non-sexual contact with his half-sister, Dr. Kaplan explained that "[a]lthough these are not positive things, this is part for a lot of people of growing up. He's testing boundaries, testing rules, experimenting, acting out.  Up until I think the age of 23 this is expected with younger people."  *Id*. at 184.  She concluded that these violations did not indicate a high-risk of sexual offense recidivism.  *Id*.

Dr. Kaplan described what she believes, in her expert opinion, is the most effective treatment for sex offenders as follows:

A       The current treatment that is acceptable, according to ACESS, Association for the Treatment of Sexual Abuses Cognitive Behavior Treatment.

Q       What does that consist of?

A       It's different modules of treatment that are used usually in group settings, but can be used individually or in conjunction with individual treatment.

Q       What is the basic premise of that type of therapy?

A       People can—even though sexual interest patterns might be specific, people can learn to control their behavior on one hand and can learn to have successful consensual relationships with peers.

Q       Speaking in concrete terms, how does that cognitive behavior therapy function, how is this achieved?

A       There are two different components: One are more social, social components one or more behavioral. The behavioral component targets sexual fantasies, what people are fantasizing about sexually

Q       How do they do so?

A       You want me to go through the treatment?

Q       Yes.

A       One is convert sensation, individuals make tapes for
treatment providers and usually when someone is about to molest
somebody, they rationalize the behavior and say, "I'm not going to
get caught. This is okay."  We all rationalize, if we speed in a car,
we don't say "we will get killed, this is wrong, we say there are no
cars around, the speed limit is stupid," we rationalize behavior, and
so do sex offenders.  What we do, we have them make a tapes of
instead of rationalizing the behavior, their emotions leading up to
the behavior. For instance, then we put negative subsequences, the
offense leading up to the behavior with negative consequences,
instead of no consequences, and they make these tapes and so if
they are in the situation then, they can use that tape in their head,
play that tape, which changes what they would normally do
without the tapes.

Q       What is the role of the therapist in that?

A       The therapist has to listen to the tapes and make
recommendations how to change these tapes.  Would you like me
to give you an example of a tape quickly.

THE COURT: Are these physical tapes.

THE WITNESS: Like a tape recorder.

Because they go home, it's homework assignments.

THE COURT: And they do would what.

THE WITNESS: Make the tape and replay it for the therapist.

163

THE COURT: Give me an example of the tape?

THE WITNESS: Let's say for adolescents, I come home from school, nobody is here, I look in the refrigerator, I'm hungry there is no food, I'm feeling really lonely and sad, I look out the window and I see a kid playing downstairs in the park, and I think, I would really like to go be close to the little boy, I go downstairs, I'm thinking no one is around, looking, I start to play ball with the boy, which I throw the ball into the bushes and know he's going to run into the bushes and I'll have an opportunity to be with him and no one is looking. So I do that. I'm with the boy, I'm about to touch him, stop, the police are coming up and a woman is screaming, the boy took my son into the bushes, and I see my mother in the window crying and screaming oh, no, the police are arresting me and so on and so forth. You are paring these two things together -- negative consequences with the act.

THE COURT: I see.

THE WITNESS: That is one behavior treatment.

The second is masturbatory, done with masturbation.

Actually there are different things done with masturbation. You send people home to make tapes and then the therapist has to listen to the tape when the person comes back.

THE COURT: While he's masturbating?

THE WITNESS: He makes a type while masturbating.

164

He has to speak out the fantasy while masturbating and the therapist listens to it. It gives the therapist insight into the current domain of his fantasies for offenders that have interest in peers they start out by masturbating to a picture, if they are heterosexual of a woman, they describe what they are doing with the woman, you are teaching them socially, what to do. It's partly sex therapy. The therapist is encouraging the offender to masturbate and fantasize -- consenting sex with a peer. I'm kissing this woman, she really likes it, she's kissing me back, she's 21 years old. He would be describing her as an adult. You are really teaching them what to do sexually while they masturbate. Then when they ejaculate, they spend 50 minutes talking about a child, still masturbating. . . .

THE COURT: I don't understand.

THE WITNESS: They keep masturbating for an hour, even when they want to stop, so it lasts. 50 minutes of the tape is talking about masturbating with the child and it becomes disgusting and painful.

Q       How does that work?

A       It's satiation. If you took your favorite desert, if you are looking at your favorite desert, and you had to eat it all day longer, day after, after a week you would not want to look at the desert, you might want to look at it again in a month, if you did it again, it's not a occur, although for some people, but some people have to

keeping doing it, you are satiating them by giving them to much of it when they don't want it. That's the second technique.

. . . .

The other are fading and . . . desensation.  When someone masturbates they-- let's say they are only interested in children-- they would start the tape masturbating, thinking about children, but add in adults to it and then go back to children and then add in adults, consenting sex with adults and back to children.

You are fading in and out, you are teaching someone to fantasize about something else.

Q      The therapist guides them through in counseling sessions?

A      Yes.  This is not a pleasant treatment for the therapist or for the patient, but it's effective.

Q      Was there a fourth technique?

A      The forth technique at the very end when one is about to ejaculate, adding looking at a picture of the adult and taking it backwards.  Those are not cures, there is no cure for sexual interest, it's just helping people add on alternatives.

Q      When you say it's not a cure, has this kind of cognitive behavior therapy been found to be effective?

A      Yes.  Again it's not a cure, it's helping people control themselves and helping people add in different scripts.

166

Q       Just to make sure I understand what you mean by it's not a cure --

A       In someone has a sexual interest whatever that sexual interest is, then that's an interest that they have.

Q       It remains, but there is no behavior or the behavior is altered so there is not the conduct where there may still be the interest?

A       Might see something and be interested in it, but you have control over it.

Q       The behavior part, there is also a social part?

A       There is social skills training assertiveness training, empathy training, working with rationalization or cognitive distortions and relapse prevention.

THE COURT: Go through those again.

A       Social skills training, someone might be shy and unable to approach girls or boys or men or women their own age, they approach younger people, not necessarily because of sexual interest, it may be because of poor social skills, not having the skills.  We teach social skills.  We give assignments to go out and talk -- go to the subway and go up to an attractive woman, for instance if the person is heterosexual, if that is the F train, get them in the community talking and progressing socializing with people their own age in a consenting manner.

167

Q      What is the therapist's role in the assisting?

A      Gives assignments, social skills, actual training, go into the community and do this, go to the corner of my office and sit at a coffee shop, sit next to an attractive person and talk to that person.

Q      Is the therapist process the experience with the patient?

A      Yes. I mean it's teaching people that they have to fail and take risks and they are going to fail, not everyone they approach will talk to them or find them attractive, being rejected is part of social skill training as well as being successful.

Q      That was the first item on your list?

A      Assertiveness training is another.  Being able to speak up and communicate and talk about with someone else.  Anger control, which I didn't mention, but that is also part of assertiveness, somebody has trouble with anger, dealing with anger, expressing their emotions, empathy. It is very difficult to do, but trying to create empathy, talking about victims and impact on victims.

Q      Then you mentioned relapse?

A      Relapse prevention, going through what might put someone at risk, having them really think about, okay, if you walk out the door, what would put you at risk and how would you handle it, so an example of that would be if you go to a party for somebody's birthday day, there is six year old boy and you are interested in six

year old boys, and that boy runs up and sits on your lap, how would you handle that. Preparing for situations that might come up in real life to prevent relapse.

Q    Now, both portions of what you described seem to rely on the patient being able to be exposed to stimuli, being able to be put in situations that would allow for the possibility of failure and reacting to those possibilities and processing them with a therapist, is that a fair statement?

A    Yes. I mean these treatments are used in -- with people incarcerated. It's different to be able to go out in the street and socialize, it's not exactly the same treatment.

*Id.* at 185-193.

Dr. Kaplan explained that many of the therapies she described are not available in an incarceratory setting since inmates are typically not allowed access to pornography and are not able to leave the facility to practice social skills and responses to stimuli within society. *Id.* at 193-194.

After conducting an hour-long interview of C.R. in a private room in the courthouse, Dr. Kaplan testified about her impressions. She stated:

A    . . . . He's seeing Sean Levine who's an associate of Ken Lau. He met Ken Lau and that's the program.

Q    To be clear for the Court, Ken Lau is the person you referred to this morning that has a Westchester sex offender treatment program?

A    Yes. And during your interview with C.R., you learned that the therapist that he has recently been referred to for sex

169

offender treatment by Pretrial, in fact, works in Ken Lau's program?

A        Yes.

Q        So, C.R. has, within the last couple of months, actually begun treatment in the exact program you would recommend?

A        Yes; I think he's had five sessions or more.  Approximately five sessions.

Q        And did it sound to you, from what you were able to determine, that he is beginning to form a successful therapeutic relationship?

A        Yes, it does.

Q        Were there other factors of significance that you learned?

A        Yes. I'd like to go through just different things that we touched upon.

Q        That you and C.R. touched upon?

A        Yes. One of those has to do with his current sexual fantasy. So, that of the last five sexual fantasies that he's had, two of the five were about his ex-girlfriend who is a peer, you know, same-age peer. One of the five was of a male-aged peer his age that he's met, had met previously.  And two of the five were about child porn that he'd looked at and mainly 12-year-old boys.

Q        And why is this set of current fantasies significant?

A        Well, for several reasons. One is that the child pornography that he's reporting, he is now, even though it's arousing, it's disturbing and he wants it out of his head.  He doesn't know how to get it out his head, that's what he's reporting. And I quote, "That's hard to get the images out my head." So, that's going to be an important factor for his treatment.

Q        And why is that?

A        Because he needs to get those fantasies out of his head.

Q        He's indicating that he wants to move away from them?

170

A    He wants that and that's one of the goals of the therapy: To have him not fantasizing about 12-year-old boys.

Q    So, you would characterize him in this discussion about being motivated for treatment?

A    Yes, I think so, because, in my opinion, he didn't have to tell me he's having fantasies about 12-year-old boys. He could have said no fantasies.

Q    You felt he was forthcoming?

A    Definitely.

Q    You described, I'm sorry, you described a set of fantasies, some of them with . . . peers?

A    The other thing that I think is significant is that less than 50 percent, actually two out five, are about children. Most of his fantasies are about adults, peer-age adults.

Q    That may be obvious but why is that significant?

A    That's significant because it's a very good prognosis for treatment that he's already sexually interested in peers. And I question about pedophilia, he's also questioning about pedophilia. From the history that I just took, he started looking at 12-year-old males when he was 15.  But, before he was in puberty so that he was looking at boys that looked the same as him.

Q    Physically the same?

A    Right. So, he started out looking at someone, "Oh, that looks like me. So, I'm interested in boys my age and so that's like looking at someone exactly the same as me."  And it seems as he stayed with these 12-year-old boys, he sort of got stuck there, right?  He reports that if he sees 12-year-old boys in the street or walking around, he's not interested in them.  He doesn't want to talk to them, he's interested in boys his— or young men— his own age.

171

Q       His own age currently? A Yeah. It seems as if in somehow in the child porn he got stuck in that pre-pubertal age of where he was at that same age.

Q       And is that phenomenon that you've been able to successfully treat in the past?

A       Yes.

Q       How is that treatment done?

A       With satiation, with a masturbatory satiation. Working with fantasies, having him change the fantasies.

Q       And we can touch more on this topic in a little bit but is that, to your knowledge, is that masturbatory satiation treatment for this fantasies that are available in a prison setting?

A       Not to my knowledge.

Q       Why?

A       I think you're not allowed to masturbate in prison.  You're not allowed to masturbate to images, to pornographic images.

Q       So that he wouldn't be able to use that technique to shift his fantasy onto the adults?

A       Not to my knowledge.

Q       Were there other observations from your interview with him that --

A       Again, he stated that he's never wanted to actually, in real life, touch a young boy. He's never had that desire. It's not that he has that desire and he's controlling it, he's never had that desire. I asked him what the biggest risk would be in the community and he said it would be viewing child porn. But out in the community, there's no desire to molest children.

Q       To have contact with children?

A       To molest children.

Q       Okay.  And did you also discuss his incest?

172

A        Yes, I did. Regarding his sister, he said that he had sexual contact with her three times which consisted of masturbation and oral sex. He states that he's never had any fantasies about his sister, past or current, in terms of sexual fantasy. He said that he's had many opportunities where they were alone together where he did not molest his sister.  He would put her to bed and read her bedtime stories. They would be alone and he would have no desire to molest her.  So, the molestation occurred on three separate occasions and I can't really answer why but there were many occasions where it did not occur where there was opportunity.

Q        I know you've read at least in one of the forensic reports a characterization that his offending, his sex offending, had escalated in frequency and severity.  Is that your analysis based both on the forensic evaluation and now having an opportunity to have a factual interview with him.  Is that an appropriate characterization?

A        No. To me, escalation would be starting and doing something more and more with more intensity and more frequency. There were three occasions, two with masturbation and one with oral. So yes, there was escalation from touching to oral sex on one occasion. I don't know if I would characterize that as in the long – in a long period of time as escalation.

Q        Was there escalation in frequency in your view?

A        No. There were three separate occasions.

Q        And the last occasion was when he was 18?

A        Yes. And, again, he is admitting to fantasizing about young boys but he's saying he doesn't have any fantasy of his sister and never had.

Q        And, in your opinion, based on your experience talking with people who may not wish to fully reveal their sexual fantasies and sexual conduct, was he being honest?

173

A       In my opinion, he was.  I mean, a lot of individuals 21 and younger say they never masturbate. A large number, upon meeting someone for the first time in an interview. But a lot of people also say they just have consenting sex with peers in terms of their fantasy.

Q       So, he was more forthcoming than many people you deal with?

A       Yes.

Q       Okay.  And going back for a second to the fantasies.  You had said that you had doubts just based on his own description about the pedophilia, you may know one forensic psychologist has diagnosed him with hebephilia. Is that a diagnosis you would agree with?

A       I don't believe in hebephilia.

Q       What do you mean?

A       Hebephilia is not currently a psychiatric diagnosis, although a lot of people use the term. And it's the current DSM that has it on the table of whether they want to use that or not but it's not a current diagnosis.

Q       So, it's not currently a part of the DSM?

A       No.

Q       And why don't you believe that it should be?

A       Hebephilia is an interest in adolescent or teenage boys or girls and studies have shown that normal men, I'm saying mainly men because it's mainly men that studies are on.  Normal men are aroused by teenage girls.

Q       And so, it [is not] a pathology or a psychological abnormality?

A       No.

Q       And you're not the only one to critique hebephilia? A Right.

174

Q        Is that right?

A        Right.

Q        And, at the moment, it's not an accepted diagnosis?

A No, but there's a lot of controversy because a lot of people do believe in that diagnosis.

Q        Now, I don't want to cut you off.  Were there other observations from your interview with him that you found significant?

A        One thing is that while out in the community he expressed -- I was asking about relationships and he said that he was actually in love with one woman that he had an eight-month relationship with. So, I see that a positive thing was he was having an intense emotional attachment to someone his own age in a sexual relationship.

Q        Why is that positive sign?

A        I think it's a very good prognosis for him to be in a healthy sexual and emotional relationship with someone.

Q        And that was over the last two years while out on bail in this case?

A        Yes.

Q        And was there anything in terms of the substance abuse or that portion you learned during your interview that would be significant?

A        Yes. When he looked at child pornography, he was always smoking marijuana.

Q        And why is that significant?

A        So, I think that raises his risk of looking at child pornography.

Q        And is that risk ameliorated to the extent he's able to?

A        Yes, he's been drug free. He's been in AA and a drug program. . . .

175

Q       And is that part of the treatment that you think is important that he continue at least with substance abuse monitoring?

A       Yes, I do and I would encourage him to go to AA, too.

*See* Hr'g Tr. 204-213, Jan. 26, 2011.

The witness addressed the utility of community treatment. She also addressed a problem of concern—the question of sexual predation in prison by others on youngsters such as C.R.

Q       Now, turning to something else that I think you touched on in your interview with him.  If we could return briefly to the topic of why you're recommending community treatment for this particular person rather than incarceration, Are there things you learned in your interview that were made that would modify or expand on your earlier answer about why you believe why community treatment is preferable in this particular case?

A       There's two sides of this.  One is that I think he can be treated in the community, and if he can be treated in the community safely and with safety to the community, then I would choose community treatment versus incarceration treatment.  But the second thing is the harm that it would do to him.  And I was talking about being sort of hit on by older men in Devens. And I asked him if, when he was in Devens -- he was there for a month -- and he said that while he was in the Forensic Evaluation Unit, several things happened.  One is there was a 45-year-old man whose first name was Dwayne who was in that Evaluation Unit. And on his way into the treatment program, and was there for young boys, and he constantly offered him stamps, which I understand is a currency at Devins, to give C.R. oral sex.  He would make him dinner, cook for him, offer him other things as well to give him oral sex.

176

Q        And why is that?

A        This upset -- I mean, he felt his pressure and was upset by this.  Also, he gave me an example that getting to the gym would be a problem. In the gym would be one man in particular who would hang around him and he put it as creepy, smiling guys. Older men that were, like, lurking around him.  So, he tried to go to the gym with someone else.

Q        To go with company?

A        Yes.

Q        And is this report consistent with your knowledge of typical or frequent behavior in an incarcerative setting?

A        Yes. I mean, there is also men that are incarcerated that believe that having sex with 12-year-old boys is a healthy, positive thing to do.  So, he's going to be with men such as that, that are going to be counteracting the treatment that are saying there's nothing wrong with having sex with 12-year-old boys, join our organization.

Q        So, he will be getting messages from these older sex offenders?

A        And any impression that he's young and impressionable and he's going to be getting conflicting messages about arousal that he already has to 12-year-old boys.  In the community, he's going to be getting one message which is: Stop doing this and stop fantasizing about this.

Q        And are there things particular to C.R., whether to his physicality or his personality from your hour-long interview that you think would make him a particular target of older, more experienced pedophiles?

A        I think he looks young but even if he looked older, he's 21, so compared to the men that are there, he's young.  But, yes, he looks even younger than his stated age.

Q      And that would tend to make him more attractive to a pedophile?

A      Yes, more vulnerable, more attractive.

Q      And in terms of the therapy that you believe he needs and the therapy that, to your understanding, is available in the narrative setting, and I know that he spoke to you a little bit about it, but obviously you're familiar with narrative settings from Avenel and Mid-Hudson, are there aspects of the therapy that would not be available in a narrative setting that you believe he needs?

A      Yes, there are.  The behavioral treatment clearly, and I think it's outpatient treatment, would be the least restrictive, least harmful to him.

Q      And from a therapeutic point of view, does it matter if he doesn't get the appropriate treatment for three or five-years?  Is there a deleterious effect to that?

A      He could spend three or five-years fantasizing about 12-year-old boys and being reinforced by pedophiles, if that's fine and that's okay, and come out with more of an interest in young boys.

Q      Which would make him harder to treat?

A      Yes, on one hand.  On the other hand, boys, you know, in a relationship where he was in love with somebody and that's a positive, healthy sexuality that he could be building with his whether it's a young man or young woman in the community which he's not going to be doing when he's incarcerated.

Q      Is there anything else, I think we're basically done, is there anything else that you want to tell the Court?

A      No. Clearly, he can be treated and should be treated as an outpatient. This would be detrimental for him to be incarcerated in terms of his development.

*Id.* at 204-217.

178

In an exchange the court had with the witness, she strongly supported therapy without incarceration as possibly more protective to society and certainly more effective at preventing harm to the defendant and reducing the chances of sexual re-offending and other antisocial behavior in the future. She recognized that the court, in addition to therapeutic goals, needed to consider the congressional directives stated in the statute and other sentencing objectives such as punishment and general deterrence in determining an appropriate course of action in this case. *Id.* at 252-259.

### iii. Dr. Susan Sachsenmaier

Dr. Sachsenmaier is a distinguished, respected expert in the field of sex crimes, risk assessment and recidivism. Her evaluation and report on C.R. are discussed in greater detail in Part II.G.iii.g, *supra*. Her testimony regarding C.R. was consistent with the positions she espoused in her report, much of which the court found untenable. *See id.*

Dr. Sachsenmaier testified that typically she would administer a full sexual history questionnaire and then have a polygraph taken to assist in her evaluation. Due to her mistaken belief that she was not allowed to conduct such an examination, none was given. *See* Tr. Hr'g. Tr. 320-21, Jan. 27, 2011.

As indicated in her report and through testimony, Dr. Sachsenmaier—based in part on risks of future sexual misconduct—strongly recommended treatment in a "secure setting" for a period of 3-4 years where he would receive "the current evidence-based treatment for sex offenders, which is not masturbation satiation." Hr'g. Tr. 279, Jan. 27, 2011. *See also* Sachsenmaier Report at 28–29; Hr'g Tr. 380–82, Jan. 27, 2011.

She stated that the treatment of sex offenders through masturbatory satiation had long been rejected by knowledgeable experts. Hr'g Tr. 379–80, Jan. 27, 2011. Her view on this

179

therapy is, however, subject to debate by experts in the field.  Both Dr. Kaplan and Dr. Prentky, two leading experts on treatment with sex offenders believe in the efficacy of such behavioral therapies.  Hr'g Tr 185–93, Jan. 26, 2011; Hr'g Tr 582–85, 624, Jan. 28, 2011.

Dr. Sachsenmaier used a number of assessment tools that were not utilized by the other evaluating professionals in this case including the Static-99, Stable 2007 and the Sexual Violence Risk-20.  Sachsenmaier Report at 9-12; Transcript, Jan. 27, 2011 at 449–452.  As discussed below, use of these tests on an individual who has never been charged or convicted of a hand-on sexual offense is highly controversial; the court finds their use unacceptable because it is contrary to acceptable scientific usage in the present case.  Federal Rules of Evidence, Rule 702 (Testimony by Experts) (testimony by qualified experts is only admissible if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case"); *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993); *see also* Part II.I, *infra*.

Apart from the debate about whether or not it is appropriate to use such assessment tools on an individual in C.R.'s factual circumstances, Dr. Sachsenmaier's scoring of the tests showed a bias towards finding of greater risk.  This was in part due to a serious error of the witness that affected her judgment and impartiality.  In her testing of the defendant as well as her scoring and evaluation she seemed to be strongly influenced by her belief that the defendant had frequented and utilized "glory holes."   This practice involves a male placing his penis into a hole in a wall; an individual unknown to him, behind the wall, then manipulates the penis by mouth and other means.  The witness's voice and body language during her testimony on this subject showed her (understandable) disgust with this form of sexual conduct.  As set forth in the testimony below,

the witness apparently relied heavily on her belief that C.R. frequented "glory holes" in her

scoring and coding of the Static-99, the main assessment tool she used to determine his

recidivism risk.

> Well, for example, he frequented what's called glory holes. I didn't write about that either. That's where you go to a men's bathroom somewhere, they drill a hole in the wall, men go in there and they stick their penis through it and other men come up and suck it.  So he did that too.  So he has a broad range of sexually deviant behavior. We're not talking about somebody who only committed incest and so we have this one little thing.  This is one facet of a broadly deviant person and I don't believe incest only characterizes this person's deviance.

> . . . .

> Q      So, just to make sure again that I understand, you're including the child pornography victims when you have multiple sex offense type of victims?

> A      Yes. And I'm including having -- you know, compelling the 11-year-old sister to put -- to allow him to penetrate her mouth with his penis. I'm including him putting her legs apart and putting his mouth and sucking on her vagina. I am including those as two different offenses.  I am including Jimmy as an offense. I am including the violent pornography as an offense. I am including uploading that pornography and offering it to the world as an offense. I am including storing it on a flash drive that his sister or someone else found and could then look at, that is also an offense type.

> . . . .

> A      I am including him putting his penis in a hole in a wall and letting strangers suck on it.  I am including Craig's List and going

181

out and trolling for older men.  There is a lot.  I am including sex
that's unprotected with numerous people who are drug addicts and
unknown sexual perverts without even using a condom and going
from person to person.

       . . . .

Q     Now, the glory hole, that's an act of sexual violence?

A     It's an offense type.

Q     So an offense type are acts of sexual violence that vary in
terms of nature and victim selection?

A     Correct. . . . .[H]e doesn't know the age of the person on the
other side of the wall sucking on his penis, does he?

Q     So having another man, another person using --

A     How about an eight-year-old?

Q     -- oral sex is an act of sexual violence?

A     If it was a child it would be if it was a developmentally
delayed person, it would be.

Q     Do you have any evidence of that, Doctor?

A     No, I don't, and I don't have evidence that it wasn't.

*See* Hr'g Tr. 433, 452, 485-86, Jan. 27, 2011.

    In fact, there was no such conduct by defendant.  Both the Presentence Report and the
New York Forensics Report indicate that the defendant denied ever visiting glory holes.  *See* NY
Forensic Report, *supra*, at 4.  After this point was brought to the witness's attention, she retracted
her previous testimony with regards to "glory holes."

Q     Now just returning briefly to the glory-holes questions, I'll
give you a copy of the New York Forensic report which I'll mark
as Defense Exhibit F.  I'm sorry, that's what you would call the
Berrill and McCarthy report.

       . . . .

A     All right.

    . . . .

A      It says denied, and I did not see that word denied. I see that.
I acknowledge that.

Q      So in fact there is no evidence of his frequenting glory
holes and having deviant or illegal sexual conduct?

A      That is correct.  The glory-holes I retract.

Hr'g Tr. 495, Jan. 27, 2011.

Dr. Sachsenmaier also gave considerable weight to broad "sexual deviance" in which she believed the defendant was involved including legal and illegal acts.  She stated, "I am including sex that's unprotected with numerous people who are drug addicts and unknown sexual perverts without even using a condom and going from person to person."  *Id.* at 485.  The court is not aware of any evidence that the defendant's sexual partners were "drug addicts and unknown sexual perverts" or that C.R. was "going from person to person" when engaging in sexual activity, or that condoms were or were not used.  In contrast, Dr. Prentky's report indicates that C.R. reported having seven sexual partners, which he found unremarkable given today's mores.  *See* Prentky Report at 4; Part II.I, *infra*, (Testimony of Dr. Prentky).

The result of these mistakes and over-scoring suggests why the witness recommended -- apart from the required five-year mandatory minimum -- what amounts to three to four years' incarceration for the defendant before release for treatment in a free community setting.  Hr'g Tr. 378-83, Jan. 27, 2011.  The court gives weight to the expertise of this witness, but in evaluating the evidence as a whole, concludes that her recommended term of three to four years in prison is overstated.  As indicated below in Part IV, the court is imposing a thirty month sentence during which the defendant will receive full scale treatment at the Federal Medical Center Devens program before release for strictly supervised outpatient treatment.

Based upon the court's evaluation of this witness's testimony and, as demonstrated by the other expert witnesses, problems with treatment in a prison setting suggest that a much shorter initial incarceration term than thirty months would provide a sufficient term of incarceration. But, as explained in Part IV, *infra*, requirements of the basic criminal sentencing statute for general deterrence and a strong indication from Congress that it ardently condemns the conduct at issue, require a longer term than that necessary for therapeutic purposes.

### iv.    Dr. Robert Prentky

Dr. Prenty is a qualified expert in sexual criminal behavior, forensic psychology, and the treatment of sex offenders. *See* Hr'g Tr. 522-31, Jan. 28, 2011. The testimony regarding his evaluation of and treatment recommendation for C.R. corroborated his report, discussed, in Part II.G.iii.f, *supra*. *See id.* at 575-586. Dr. Prentky elaborated on several factors he found significant in C.R.'s history with respect to his low risk for reoffending.

> Q      Was the fact that CR had been at large, so to speak, in public for a long period of time one of the factors that you considered in arriving at your opinion?
>
> A      It has to be.
>
> Q      What do you mean by that?
>
> A      It's one of those centrally truisms of the field that the more time that you spend in the community offense free, the lower your risk.
>
> . . . .
>
> Q      Staying on CR's period of time in the community, what does it mean to you that he has not re-offended, what does that tell you as a clinician?
>
> A      I think, it's extraordinary important and weighty piece of evidence for me, particularly . . . given the fact that he has done a lot of other things he shouldn't be doing.

Q        Like what?

A        His various bail violations, a lot of stupid things.

Q        Talking about smoking marijuana?

A        Smoking marijuana, just not complying with his bail violations. Now, obviously if he is going to violate those conditions, he could also violate other conditions as well, far more serious ones, like committing another offense. The fact that he has not done so for.  I guess in March it I will be two years, it is in my estimation quite significant.  In fact, if we go back to the time of his arrest, I believe, he was 18, the time he was arrested, and this April, I believe, his birthday is in mid-April, he turns 22, so it's now four years since his last hands on offense, against his half sister, four years –

Q        Is it significant to you that during that four years, now clearly and we will talk about bail conditions in a minute, while he was on bail since his arrest in this case, he did not have as much as opportunity to be with the sister because as you know from what you read a bail condition was to stay away from her.  What about the period before that, what significance does that have to you?

A        He had substantial liberty in the community during the time that he lived with his dad, he was going to school, he was working, he was in therapy, he was in the community a lot.  The mere fact that he doesn't have access to his half sister, which obviously he shouldn't have, and hence has not, not re-offended against her is not the least of my concern.  I'm concerned about any subsequent offense involving a child and he certainly had access, ample opportunity, to commit another offense during that time period that he was in the community.

Q        And the fact that, as you know, he was on bail conditions some very strict, does the fact that he was on bail conditions, that

he was on GPS, he had home detention, does that in any way alter what you just told the Court?

A        I mean it certainly didn't alter his willingness to occasionally violate conditions of bail.  It certainly didn't seem to impact him, the occasion he decided to go to Walmart, decided—the occasion he decided to go to a birthday party with a friend that had a one year old, I recall.

Q        What did it impact—In other words, what does it tell you that there hasn't been a re-offense during that period of time as to a sexual offense?

A        I'm not exactly sure what you are asking. His father made it abundantly clear that this has been an extraordinary stressful time period for CR.  That he has been alternately very depressed, and very anxious.  That he obviously is moving day-to-day, never knowing from week to week, from month to month, what his future holds in store.  He is afraid in some sense of the larger picture of being found in violation, obviously that has not kept him from doing other things, which I would ascribe more to poor judgment.  So, I would say that under rather severe circumstances, he still hasn't re-offended -- obviously this is not a good way to integrate into the community when you feel that you are effectively on house arrest, although he wasn't, that when he left school, left work, he had to immediately return to the house.  I believe, there was a comment that I seem to recall from either CR or his father about the swimming pool he wouldn't go to because it was out of range in the yard.

Q        Now, on the same topic of reoffending, is that time—is there any significance to you about the fact of— that reoffending doesn't happen right after the arrest or as time goes by, is there any significance scientifically as of the first period of reintegration into the community—let me ask the question again?

186

A       I'm not sure that I'm understanding.

Q       From your research and study of the examination of individuals, sex offenders, is there any significance attached in that research, within the data to the first period of release into the community as opposed to five-years down the road, ten years down the road, is any period more important when you are looking at risk and recidivism?

A       There is an effect with respect to the recidivism rate, that the bulk of people that tend to re-offend, re-offend within the first 24 months and recidivate, the accumulative recidivism rate continues to go up.  If one person out of 25 continues to recidivate, the recidivism will go up by one person.  Most people that continued to re-offend re-offend.

Q       The study that you that you are talking about, that within the 24 month, are those people under supervision usually?

A       It's highly, highly variable. We're talking, of course, now about sex offenders. All sex offenders who are discharged will be registered, not all of them obvious will be on probation.  Those who are registered will probably not be under surveillance, but it's a very, very mixed bag.

Q       Now, looking at another—was the victim of the hands on offense another factor you looked at making your risk assessment as to CR?

A       Yes.

Q       And what about the victim and the relationship between CR and the victim, affect your decision in this case or your opinion?

A       I mentioned before that there are certain constructs related to risk that are of such weight that they're rarely even questioned any longer.  And one of them has to do with the relationship of the child molester, who his victim is, and the second has to do with the gender of the victim.  Since the early 1970's, many studies have

been published that support a conclusion that familial child molesters, those that are victims outside their family, are at higher risk to re-offend then in familial and among familial offenders, those who target opposite sex victims are at significantly lower risk than shown, then those who are targets of same sex victims, so we have two issues that come up here, one is gender, to wit, a boy victim, that's why boy victims re on the Static-99, it's a risk factor on the Static-99 for that very reason. The second is the unrelated victim, an item on the Static-99, and that's why that one is there. If you are making a distinction very simply children of intra and extra familial victims, that is the distinction that the Static-99 makes, extra familial child molesters are at a much higher risk than intra familial child molesters.

*Id.* at 538-544.

Dr. Prentky administered two assessment tools, the Juvenile Sexual Offender Assessment Protocol (J-SOAP) and the Estimate of Risk of Adolescent Sexual Offense Recidivism (ERASOR). *Id.* at 533-534. When questioned about the appropriateness of using tools designed for juvenile offenders between the ages of twelve to eighteen on a twenty year old (at the time of interview) C.R., Dr. Prentky stated:

A    Two reasons: One, exclusionary and one inclusionary. The exclusionary reason is that in my opinion it is inappropriate to use the adult risk scales with C.R. The inclusionary reason is that in my opinion the best choice for this young man are those juvenile instruments and I say that in part because his child pornography use as far as his teenage years, it's starts roughly at age 15 and it goes until age 19. His first offense against his half-sister was at age 15, and the third and last offense occurs somewhere around the age of perhaps 18, perhaps he was 17. It was never clear to me. It's immaterial. My colleague Dr. Righthand and I are frequently

188

asked about whether the J-SAOP can be used with 19 year olds. Sometimes 20 year olds. These are kids not unlike C.R., who have committed their crimes as teenagers, but unlike C.R. they have been sent to prison and they age out. By the time they age out they already reached 19, 20 years of age.  And the question then comes up, can I use this instrument on an individual who is no longer 18, but who committed their offenses as teenager, and we've also said, yes, we recommended that this is an appropriate use of the J-SAOP. But I think beyond that practical issue is C.R.'s emotional and physical maturity.-- emotional maturity not to mention his physical maturity are years behind is chronological age.  He is markedly an immature young man and in my professional opinion, having conducted hundreds of evaluations of both juveniles and adults, C.R. present much more as a juvenile than as adult.  The choice of those two juvenile scales was far more risk relevant than the adult actuarial scales.

Q      What do you mean by risk relevant?

A      I try to keep a laser focus on the issue of risk. In C.R.'s case, risk to commit another hands on battery offense against another child.  That to me was pivotal, that was my highest concern, my greatest concern in conducting this evaluation. When I referred to risk relevant, I am talking about what is relevant to that risk, the risk of assaulting another child.

*Id*. at 534-36.

Dr. Prentky explained the methodology and specific scaling with respect to C.R. of the J-SOAP and ERASOR as follows:

A      The J-SAOP and the ERASOR are quite similar. They, unlike the Adult Risk Assessment Scales, are not actuarial, there are no life tables associated with them, and unlike the adult scales they provide no risk ranges. There are no categories into which you

189

can fit someone with an arbitrary label of low, moderate or high risk.  They are generally referred to as structured professional judgment, sometimes structure clinical judgment.  They both use empirical derived and empirical supported risk factors known to be related to a risk of re-offense among juveniles.

. . . .

The methodology is rather simple, as I said, I mean one has the manual in front of you and you have sufficient discovery to code the variables on the two scales and simply coding.

Q       And can you walk the Court through how you scaled CR for the J-SOAP and the ERASOR?

A       With the J-SOAP what we recommend is that users present the proportion of risk observed to be present so that on any given scale you simply divide the score that you gave the individual by the total possible and report that proportion.  It doesn't say whether the individual is high, moderate or low, it simply says that this is the proportion of total risk observed to be present and coded for this individual at this point in time.  On scale, there are four scales on the J-SOAP. The proportion won't necessarily mean anything, but they are point 375 on scale one and point 250 on scale two. Those are both static scales. The over scale subcoded point 31. Scales three and four are more dynamic. Scales 3 point 286 an Scale four was point 20 on. The dynamic subtotal is point two five and the total scale proportion observed present for CR point 286. Now, if we look at the first two scales on the J-SOAP, it's not surprising at all that what we see is an individual whose risk on scales one is noticeably higher than his risk to scale two.  Scale two is antisocial behavior. This is not something which characterizes CR. Characterizes the scales, sexual deviation, sexual preoccupation and sexual abuse history.

190

Q        You took that 286 finding and you factored it into your opinion in this case along with the ERASOR evaluation, correct?

A        Yes.  On the ERASOR the ERASOR is somewhat different. Each of the individual items are coded.  The same way that the J-SAOP items are coded. There are differ areas of the ERASOR, though there are no formal scales, as they are on the J-SAOP.  What I found on the ERASOR is a total of 8 present, that was the score, and two possibly present and 15 not present.  Now, as I said before, the ERASOR unlike the J-SAOP, suggests that you could still classify the individual as low, moderate or high, but that is essentially a clinical opinion, based on what you observe on the ERASOR and presumably everything else that you know about the individual.  I did not do that effectively. What we'd be talking about here are 25 items, which if all were scored present, that is all were given a two, the total score would be 50, 25 times two, and the score that I gave him was ten, so that would be ten out of 50. Whatever that means, certainly doesn't suggest to me that it implies high risk.

. . . .

Q        But considering the ERASOR as one factor alone, what did it mean to you?

A        It seemed consistent with what I saw on the J-SOAP and the only reference point that I can make here is that the various predictive validity studies that have been done on the J-SOAP have consistently indicated that individuals whose proportion of risk present rises to as much as .5 seemed particularly at high risk to re-offend.  I say that somewhat cautiously because I don't want .5 to become some arbitrary threshold by which everyone in the field now identifies everyone as high risk because there is far more to it than that as I said before. However, keeping that in the back of my mind, that is what the data says; this is what the studies have said.

191

It was evident that with an overall score of roughly 2.8, 2.9, it doesn't reach that kind of a benchmark and it also seems to me that that is fairly consistent with what the ERASOR is saying; that it doesn't reach a threshold that I would consider high risk.

Q        Now, you've said that you take these two factors, these two tests or scales, as part of your decision or opinion in this case. After taking those items into account, the -- what we talked about -- the fact that incest is -- recidivism is scientifically, and through studies, proven to be there's less recidivism among that type of a hands-on offense.  Taking into account the two years that he was out on supervision, and taking into account everything else you studied in this case, were you able to formulate an opinion as to risk of re-offense as to C.R.?

A        Yes.

Q        And what was that?

A        I concluded that he clearly, in my professional opinion, could not be considered to be a high-risk individual. And by "high risk," as I said before, I'm talking about some probability of committing another hands-on sexual offense.

                . . . .

Q        Please tell the Court what it means to you.

A        It's a standard by which I would not feel comfortable recommending that that individual remain in society because they posed an intolerable level of potential harm for another victim and that absolutely is not the case with C.R.

*Id.* at 534; 544-49.

Because these tests do not allow an evaluator to simply score the individual and then assign a risk category the results are used in conjunction with other evaluation materials to achieve a complete assessment of the individual.  As the witness explained, "[i]t's one piece of a

comprehensive assessment and when we train in this area we also focus on a pivotal issue that is only one piece of evidence, it's part and parcel of a comprehensive assessment." *Id*. at 537.

Dr. Prentky elaborated on his preference for outpatient treatment or treatment in a non-custodial setting for individuals such as C.R. whom he does not consider "high risk." *Id*. at 577-78. The main issues that he believes are the pitfalls of treatment in a prison facility were set forth as follows:

> We have recently written a chapter in which we have explored the relatively simple straightforward question, what do we know about what works with the general population of clients who seek therapy, what is the best practice for therapy that is applied to clients in general, whatever we know about what works with therapy is that what goes on in treatment programs in custodial institutions and the answer clearly is not, it isn't.
>
> Q      Before you go further, you just identified what is better -- what is more effective treatment? Could you please tell us some of those items, what it is that is better treatment?
>
> A      Perhaps there are three, of the more obvious considerations that I will point out.  One, is voluntariness. Patients usually knock on the therapist door and say, I'm in distress, I need help, can you help me? They're electing to be in therapy. They are not ordered to be in therapy. We know very, very little about what it means when people are armed twisted and they saying go to the treatment group or else. So there is a voluntariness that we assume in treatment that doesn't happen in prison. The prison treatment program is not truly elective.  Sure, no one is going to go into the hole as it were, if they refused to be in treatment, but they understand that if they are non-compliant and don't go to treatment, that it may have some very material impact on whether they ever get out.  So voluntariness is an essential issue. Perhaps the single most

193

important issue for me, is one word, confidentiality. It's such profound importance. We take it for granted in normal therapy that the client holds privilege, that means if I go into therapy, it's a negotiations between the therapist and myself as to what the therapist can or cannot disclose or reveal and ultimately it's I who makes that decision. I hold privilege. I get to say to the therapist, no, I really would prefer that you not tell my wife or my daughter or my husband or anyone for that matter, about these issues. You can talk about these issues, but not these issues. That is up to me. There is essentially no confidentiality with prison based sex offender treatment.

Q    Now, I just want to take a brief aside, which is specific to this case. Are you familiar what the federal sex offender program that was at Butner and now at Devens?

A    I am more familiar with FMC Butner. It's to my understanding that the program at FMC Devens is the same

Q    What are the confidentiality issues at those programs?

A    Again, let me say this is not unique to the Federal Bureau of Prisons. We see the same in all of the state SVP programs as well, that civilly committed inmates in the state prisons and the men in treatment in the federal Bureau of Prisons are required to sign, a statement of informed consent in which they read, digest, understand and a sentence to the notion that whatever they disclose in the course of treatment can and will be used in a legal proceeding involving their discharge. It's very clear and in a context like that we only ask how treatment evolves, who is it that does best in treatment under that kind of rather unusual circumstances, where on the one hand you are told you best participate or else, but on the other hand you are told when you do participate what you say may be used against you for purposes in

194

this case it's civil commitment or for your purposes for those who are—already civilly committed, for release.

Q      What you are saying among other things, when someone is in the BOP and analogous treatment, they're aware that what they provide to the therapist can be used against them at a civil commitment proceeding?

A      They have to be aware to the extent that they understand English or to the extent that they have actually read this statement of informed consent.

Q      As you said "confidentiality" is important to therapy.  I mean, obviously, that would have a tremendously negatively effect on the effectiveness of therapy?

A      It as enormous impact on the relationship that you develop with your therapist. If you know that your therapist could be asked, as is not infrequently the case, to even go into court and testify as to your progress, and it's inevitable somewhat what therapist will say may not be encouraging from your standpoint, then what does that say about your relationship, your therapeutic relationship with that individual.  Does that engender trust? I don't think so. So what you end up having, I believe, are very different kinds of responses to that kind of treatment condition.

*Id.* at 578-84.

Dr. Prentky explained the benefits of non-high-risk offenders receiving treatment in the community.

A      The problem with confidentiality does not immediately disappear.

Q      Is that because some of these individuals are under supervision, on probation?

A      Absolutely, the assumption is clearly, it's an appropriate— appropriate that the therapist report back to the probation officer,

but what I believe looms over the head of the individual is not nearly as oppressive, that the individual already returned to the community, and there is far more latitude of what the individual can disclose and describe and talk about in therapy. For the most part, the therapist reports back to the PO that the individual is compliant, and attending all session, working in therapy and making progress. Those are the important touch stones that the therapist would need to disclose or report back and what the therapist generally says, look, generally what goes on, is confidential unless you tell me that you are engaging in violative behavior, in that instance I have to tell your PO. There is a contract ahead of time.

Q       Putting the confidentiality issue aside, for the individual, the patient, is it more effective for them to begin their treatment while . . . in the community or . . . in a group of individuals that are . . . co-offenders of sexual crimes?

A       . . . . [C]learly there is a potential deleterious effect of treatment in a prison context for some individuals.

        . . . .

A       Obviously, you are in the company of, constantly exposed to other sex offenders, other child molesters, some of whom are vastly more dangerous than you are.

Q       Is that true in the case of CR?

A       I don't know the population at FMC Devens, but I would certainly imagine that in most medium security prisons for sex offenders, that most of the people there are going to be far, far more dangerous than CR, but what does that mean? I don't think it applies [at places] like FMC Devens or Butner he'll not be at risk being assaulted, but certainly what it means he'll be exposed to a wide range of behaviors and attitudes, crinogenics, cognitive distortions, around offending that he never contemplated before.

196

There is one individual—ne of the individuals that I'm now evaluating tells me that when he went to prison for the first time, it was like going to college, he learned all manner of things that he didn't know existed outside in the real world.  He found out all about the internet, found out all about the ways of navigating through the internet and finding a panoply of images to his heart's content and so forth, all the child pornography that you could ever desire.  And in fact, he decided that was the best way to keep from offending, all he has to do is watch child pornography and he wouldn't offend again, so he thought.  What I'm saying is not unusual. You expect that those are the kinds of individuals that he would encounter and I would imagine that you would want for someone like CR to slowly mature and blossom in the company of substantially healthier people rather than this intense protracted exposure to child molesters.

Q       From a therapeutic point of view, is it better for an individual to navigate the difficulties of the decision making of responding to stimuli in the community or from a therapeutic point of view, is it better to navigate the stimuli that you just described in jail?

A       Stimuli

Q       The problems that you say the education of the individual that he would encounter in prison?

A       I guess the core issue is what needs to happen to CR to move him to a point where he can actually begin to develop into a healthy, effective member of the community.   That's obviously I would think what we all want, we all want it to happen in a safe way. But we also want it to happen in a productive way, so it really goes to the question what does he need?  We're not talking about offenders in general or even 20 year olds in general, we're talking about this one individual. What does he need?  To begin to mature

197

and to move to the next level of growth and in my humble opinion he'll do a hell of lot better as an outpatient in treatment in the community working with people that I can be assured are excellent in what they do. I know you haven't asked me directly, but I would have enormous confidence in someone like Dr. Kaplan. I have known her for 25 years. We sat on the same review board together at the Adult Diagnostic Treatment Center in AVINIL, New Jersey and she has a long and rich exposure to sex offenders as I do, the only difference she has a lot more experience treating them than I do, hands on treating them, she has the dividend of having been a probation officer herself, she brings both to bear. I would, if this was my child, vastly prefer that someone like CR be treated by her than what I would guess would be the kind of therapist that I typically see most often in prison based treatment programs.

*Id*. at 582-85.

In an exchange with the court, Dr. Prentky expressed concern that treatment in an incarceratory setting might create a risk of future recidivism or cause unnecessary harm to C.R.

THE WITNESS: As I think that you can probably determine from my earlier comments, I don't hold a particularly positive view of the efficacy of treatment provided in most sex offender prison-based treatment programs. In truth, the studies that have been done reveal at the best, the very best, a five percent treatment effect which means that if you treat large numbers of men in prison and you don't treat others. And you let them all out and you follow them, you find that at best those who were treated have a reduction in sexual recidivism of about five percent. The whole picture is very cloudy. The single most important study that has ever been

done in my estimation is the SOTP.  The SOTP study that was done in California by Dr. Marcus. In that study, she randomly assigned offenders to one of three groups: Those who volunteered for treatment and, in fact, were given treatment; those who volunteered for treatment and were not treated; and those who never volunteered.

THE COURT: Treated where? In prison.

THE WITNESS: In prison.

THE COURT: All right.

THE WITNESS: Atascadero Hospital in California.  At the end of the study which went on for ten years, after the last wave of data collection, when everyone had been discharged, the two groups that were not treated had a slightly not significantly lower recidivism rate than the ones that were treated.  The importance of that particular study, your Honor, is that is an RCT.  It's a Randomized Clinical Trial and it's essentially for most people the gold standard for treatment evaluation.  It's the only RCT that's ever been done with treatment of sex offenders in prison and it probably will never be replicated because it's so expensive.  But the bottom line is that, thus far, the results of treatment in prison have been underwhelming.  I would like to report much better news. The reason that we wrote this chapter is because of our desire to try to understand what it was that seemed to be keeping this rather low ceiling on treatment efficacy in a prison environment.  The treatment that occurs in the community, I'm personally convinced, is potentially far, far more effective for a wide range of reasons.  I mentioned only before the issue of confidentiality which I regard as a very serious matter. But, there are many other reasons as well including the dual role of the therapist including the issue of voluntariness; including the issue of the maintaining the fidelity and the integrity of the treatment itself;

that is, prisons have a primary custodial mission. Their primary mission is not rehabilitation, it's custody, making sure that nobody leaves when they're not supposed to. And it's very, very difficult in a penal environment, unless the program happens to be run entirely by the Department of Mental Health or its equivalent. It's very difficult for there to be a good-faith acknowledgement of the high priority of treatment in an environment where the highest priority is custody. Unfortunately, that I believe is where we're at. At least that's my opinion.

THE COURT: Well, do you have any equivalent, statistical support for your opinion with respect to non-incaceratory treatment?

THE WITNESS: The re-offense rates for sex offenders tend to be substantially lower than is generally believed to begin with. To begin with, in the meta-analysis that I alluded to with a very, very large sample, the recidivism sexual recidivism rate for that entire sample was about 13 percent. 13 percent, it's very, very low, so one of the problems with treatment is that you're trying to drive down an already low recidivism rate. If you can expect that only 13 percent of men are going to re-offend on average, untreated, then the treatment intervention has to be pretty powerful to drive that 13 percent down enough, say, to 8 or 9 percent so that it's statistically significant. I doubt that we'll ever be able to drive sexual recidivism rates below 8, 9, 10 percent but that's one of the problems we face -- that re-offense rates are already low. So, when you look at people that are already in the community, that's what you were asking, I believe, we're starting with a low base rate. The people that are already in the community have been discharged, presumably the more dangerous people are still in prison; so, it's reasonable to conclude that those people in the community have an even lower base rate for recidivism.

. . . .

I have many studies here and I can go through them if you like.

. . . .

THE COURT: These are adult studies.

THE WITNESS: Those are adult studies.

THE COURT: What age group?

THE WITNESS: This is a separate page with studies of juveniles.

THE COURT: Court Exhibit 2.

. . . .

THE WITNESS: Roughly, they're different for the different studies, roughly [ages] 12 to 18.

THE COURT: In your opinion, are they applicable to C.R.'s case?

THE WITNESS: In my opinion, yes.

. . . .

THE WITNESS: The meta-analyses are there, your Honor.

THE COURT: 20 studies, 15 percent below, 14 were below 15 percent and 19 were below 21 percent.

THE WITNESS: I'm sorry, there is something indicated there as Hanson and Bussiere and Hanson and Morton-Bourgon that are meta-analyses that collapse across roughly 30,000 offenders.

THE COURT: And what's the recidivism rate?  . . . . Thank you. That's 12.7 but that's for the adults.

THE WITNESS: Correct. There's no meta-analysis that I know of there may be for the juveniles. I don't know of one.

THE COURT: . . . So, Court Exhibit 1 supports your 13-percent rough estimate but doesn't help us with respect to a juvenile or somebody in adolescence.

THE WITNESS: The re-offense rates for, as I said, for juveniles have, in the past, been even lower than the re-offense rates for adults.

201

THE COURT: I understand that but I'm talking about the effect of treatment in and outside of prison.

THE WITNESS: Yes.

THE COURT: Or the equivalent of prison which is my problem. Now, did these studies differentiate between child pornographic offenses and other offenses?

THE WITNESS: No, no. By and large, all the studies that you're looking at involve battery offenses.

. . . .

THE COURT: So, accepting your general view that treatment outside of incarceration will reduce or has a tendency to reduce recidivism with respect to hands-on offenses, you have nothing, unless you're willing to give us your conclusion with respect to the effective treatment on child pornography offenses.

THE WITNESS: We can only speculate at this point what the underlying motives were for child pornography and I'm not sure that it will advance the cause here. Clearly, treatment across the board will have an effect on both of these problematic behaviors. It is far easier, however, far easier to re-offend with respect to CP [child pornography] than to re-offend with a battery offense. So, if I were pressed, I would say that risk of re-offending with respect to child pornography would have to be higher than re-offending with respect to another sexual assault of a child.

THE COURT: A basic recidivism rate. But I'm talking about the recidivism rate after treatment.

THE WITNESS: I know of no studies that focused, treatment studies, that focused just on CP. I'm not suggesting they do.

THE COURT: I assume there's none. I'm asking you what your opinion is of the effect of treatment in prison and outside of prison assuming fairly decent treatment for that kind of setting on a child pornography violator what the expected recidivism rate would be:

202

No treatment; treatment outside of prison; and treatment inside of prison.

. . . .

THE WITNESS: I would hazard a guess that his risk of re-offending with a battery offense, assaulting another child, is already very, very low. With treatment, it will be vanishingly low.

. . . .

THE COURT: Treatment inside of prison or outside or both?

THE WITNESS: Frankly, I would say probably both because we already know that he hasn't.

THE COURT: You're talking now about C.R. himself?

THE WITNESS: C.R., yes, we already know that he hasn't re-offended outside and have no reason to believe that if he was sent to prison that his risk would increase.

THE COURT: Now, what about child pornography?  No treatment, treatment in prison, and treatment outside.

THE WITNESS: I guess I would worry, your Honor, that the risk of child pornography, returning to child pornography, might actually go up in prison.

Simply based on my own personal experience of evaluating men who have talked to me about how they wallow in thoughts and fantasies about child pornography when they're in prison. They talk about it all the time, about how best to access it, about what the best sites are.  It's like a college environment for child porn at this point, so I would worry that he might get mixed messages in a prison environment and the risk might actually go up.  I wouldn't be as afraid about the risk going up of committing another battery offense.  I would worry about that with respect to the child pornography.

THE COURT: In prison?

THE WITNESS: In prison.

203

THE COURT: What about non-prison treatment, child pornography.

THE WITNESS: If properly managed in the community, I would think that the risk would be pretty low. What is pretty low? Between low and moderate risk if you want to actually want me to fix words to it. There are a range of resources that we have in the community that we simply don't have in prison. If he is struggling with negative emotions, the kind of emotions that seem to drive him to child pornography to begin with, then, we can . . . send him for proper medication. If he seems to be unduly preoccupied with sexual thoughts and fantasies then we have an option perhaps of even giving him an anti-androgen to reduce his sexual drive. These options don't really exist in a prison environment.

Of course, in a prison, we don't need to worry about it, but there are certainly things that we can do outside that we simply can't do inside.

THE COURT: Just to sum up this part, I don't have testimony. Then based on your review of the literature and your experience as a professional, it's your view that treatment outside of prison of reasonable quality, and we have here the testimony of Dr. Kaplan which you have averted to, and generally approved, will have a greater impact; or, . . . there is a substantial probability that it will have a greater impact in reducing hands-on recidivism than treatment in prison.

THE WITNESS: Absolutely.

THE COURT: Now, with respect to child pornography. Based on your training, review of the literature, and your own experience, is it your view that treatment outside of, prison as compared to treatment inside of prison, will reduce the probability of recidivism as to child pornography.

THE WITNESS: Again, this is only based on my opinion, not based on data. I believe that treating men for child pornography offenses, assuming that they're not at high risk to commit a child battery offense, can be accomplished much more productively in the community.

THE COURT: Resulting in a lower projected rate of recidivism?

THE WITNESS: Correct.

THE COURT: And does that apply to this defendant, C.R.?

THE WITNESS: Yes, I believe so.

THE COURT: Now, you understand that we've been talking thus far about treatment for medical purposes primarily and the Court has a different additional function.  As required under the federal statutes, both the specific and general statutes, it must consider general deterrence and what impact various modes of treatment will have on deterring others as well as expressing the general community's view of the offensiveness from a criminal point of view of this type of conduct.

THE WITNESS: Correct.

THE COURT: So, this Court's problem is slightly different.

THE WITNESS: Right.

THE COURT: And you understand that the defendant faces a five-year minimum and a 20-year maximum?

THE WITNESS: Yes.

THE COURT: Now, let's assume that weighing the treatment problems that you're primarily responsible for, as well as the legislature's signals to the judiciary, the Court were to provide for a mixed sentence, not probation to outside treatment solely as you prefer; not incarceration, whether with treatment or in the general population as you denigrate, but a sentence which would require 30 months in prison in order to permit Devens, the federal treatment facility, . . . to put the defendant through its program

205

which takes from 18 months to 24 months but requires some initial
scheduling and other factors.  I'm told, at least by the warden and
others at the facility, that it would require a 30-month sentence
with a volunteer agreement by the defendant to participate in order
for him to be admitted to the program.

You understand that?

THE WITNESS: Yes.

THE COURT: What is your view with respect to a sentence of 30
months incarceration to permit the Devens program to be
completed and, in the Court's opinion, to meet the signals in the
statute without violating the "Cruel and Unusual Punishment
Clause" of the Constitution . . . followed by a long term of
supervised release with private in community treatment.  Among
the questions is this one: Would the initial assignment to prison in
the Devens program, followed by the civilian-type program
enhance or reduce recidivism with respect to child pornography?

. . . .

THE WITNESS: I guess, from my vantage point, putting
punishment aside, since that is not something that I comment on, I
don't, since I don't see him as high risk, I don't see that it's
necessary from a risk standpoint to do this, so then it boils down to
the question of treatment.  Would I send him to FMC Devins? If I
was of the belief that this young man really needed treatment, and
could most benefit from it, if I looked at that in its own isolation I
would say, gosh, it seems to me if we're focused on the issue of
treatment, then I could think of alternatives that I would prefer, but
I understand having said that, this is a rather narrow perspective on
my part, that there are other considerations.  As for the impact that
30 months, two and a half years will have at Devens, I would hope
dearly, that it would be very productive time and by that I mean,
not just psychotherapy.  One of my concerns is that CR needs to

206

return to college, he needs to complete a Bachelor's degree, he needs to do it for a variety of reasons, not of least his own self-esteem, and that is part of the treatment for me, and I would require that of him if he was in the community. I hope that would be an option.

        . . . .

THE COURT: During the 30 months, it's not possible, there is some mail and video courses, but it's not the equivalent of the kind of college he attended.

THE WITNESS: I would, since for me the beginning of treatment, for someone like CR, requires an in-depth evaluation, focused on treatment needs, not the kind of evaluation that I did. This evaluation may turn up certain requirements, that may or may not be available there, I don't know, because I don't know the program. But for instance he requires not just cognitive behavior therapy, which I assume is available there, but behavior therapy along the lines of covert sensitization, aversion therapy, and so forth.  Again, I have no idea whether that type of therapy is offered there. So again, I'm speaking in ignorance on two levels:

One, I don't know if they provide it, and Two, I don't know if he needs it. I believe that among other things he very much needs to develop social interpersonal skills, that he improved but simply a long way to go, to reach the appropriate level of interpersonal function that most of his peers, chronological peers would be at, and once again there are certain outlets for that, that would be available to him in the community.  I don't know what outlets would be available again in this program.  So, it is a complex answer to your question.

*Id*. at 605-25.

## I. Risk Assessment

"Risk assessment may be defined as predicting who will or will not behave criminally in the future." Model Penal Code: Sentencing § 6B.09 cmt. A (Preliminary Draft No. 5, 2007) at 56 (citing Stephen D. Gottfredson & Laura J. Moriarty, *Statistical Risk Assessment: Old Problems and New Applications*, 52 Crime & Delinq. 178, 192 (2006)).

> Risk assessment tools help users sort individuals into low-, medium-, and high-risk groups. They are designed to gauge the likelihood that an individual will come in contact with the criminal justice system, either through a new arrest and conviction or reincarceration for violating the terms of supervision. They usually consist of ten to thirty questions designed to ascertain an individual's history of criminal behavior, attitudes and personality, and life circumstances. Risk assessments can be (and are) administered at any point in the criminal justice system—from first appearance through presentencing, placement on probation, admission to a correctional facility, the period prior to release, and post-release supervision. They are similar to tools used by an insurance company to rate risk: they predict the likelihood of future outcomes based on an analysis of past activities (e.g., criminal history) and present conditions (such as behavioral health or addiction). Objective risk assessments have been shown to be generally more reliable than any individual professional's judgment. More recent risk assessment instruments, including third- and fourth- generation risk assessment tools, incorporate professional judgment, while giving priority to questions that are weighed objectively.

Marshall Clement, Matthew Schwarzfeld & Michael Thompson, *The National Summit on Justice Reinvestment and Public Safety* 13 (Jan. 2011) ("*National Summit*"), *available at* http://justicereinvestment.org/summit/report (click on "Download the Report").

Based primarily on scored tests, risk assessment can be useful, but it may lead to dubious projections and cause inappropriate sentencing decisions.  As indicated below, bias in scoring and misuse of at least one of the tests applied in assessing risks make the prosecutor's arguments on scientific proof of C.R.'s high risk of recidivism unreliable.

### i.    Use of Static-99

Testimony from Dr. Sachsenmaier and Dr. Prentky regarding risk assessment and recidivism for sexual offenders was instructive.  Dr. Sachsenmaier found a high risk of recidivism.  Dr. Prentky and other experts on the point strongly disagreed.

Dr. Sachsenmaier and her colleagues have developed and are seeking to perfect a series of tests designed to quantify risks of future sex crimes after a perpetrator has been apprehended for a wide range of crimes such as rape, pedophilia, incest, and other forms of violence and deviance.  *See* Hr'g Tr. 328-60, Jan. 27, 2011  (discussing Static 99-R, Stable 2007, and Sexual Violence Risk-20 (SVR-20)).

As a matter of fact and law, these tests cannot be approved in this case for a young offender solely of online child pornography crimes including possession, receipt, and distribution.  Rejected is Dr. Sachsenmaier's conclusion that the coding manual for the Static-99 approves of the conditional use of such tests in cases such as the instant one.  *See id.* at 328-29.

> Q    Was a Static-99 developed for persons with hands-on sexual offenses?
>
> A    Yes.

Q      Do the coding rules indicate that if someone's only sexual crime involves pornography, the tool should not be used?

A      Correct.

Q      Why did you then use this tool on the defendant?

A      Because he has at least three hands-on offenses against his sister. And then the 15-year-old boy, when he was 18 or 19, counts as a hands-on offense for the purpose of scoring this instrument.

Q      And do the coding rules essentially—well, do they state that where there's a reason to believe that there is an actual sex offense that's occurred with an identified victim, even if the offender has not been convicted of the offense, you can still use Static-99?

A      Yes. The coding manual revised in 2003 does indicate that if there is a known hands-on victim with credible evidence, then this method can be used.  There's also a book out on *Best Practices In Forensic Psychology*, authored by Phillip Witt and Mary Alice Conroy, in which they say that, for example, if you're doing an evaluation of an alleged offender where he is not admitting and there has not yet been a charge or a conviction to base the scoring on, that you can use this method in a conditional way where you would say, If he was charged for this alleged crime, then his score would be this.   So you report the conditional use of it and make that clear and then move forward.

                    . . . .

THE COURT: Excuse me. So this was hypothetically treated, these three incidents as convictions because he admitted them? . . . He's never been convicted.

THE WITNESS: He has not been convicted of that and he has not at this point been charged.

THE COURT: Correct.

210

> THE WITNESS: So the conditional aspect to this is this: If when he admitted that he had offended against her he had been charged, then this is the way his score would look.
>
> THE COURT: So it's a hypothetical approach to the situation?
>
> THE WITNESS: It's not really . . .
>
> THE COURT: It's anti-factual because he has not been convicted.
>
> THE WITNESS: It's not hypothetical because we know he committed the offense.
>
> THE COURT: But it's anti-factual if the methodology requires a conviction, isn't it? I'm not criticizing.
>
> THE WITNESS: That's okay.
>
> THE COURT: It seems -- it seems perfectly reasonable. I just want to understand --
>
> THE WITNESS: Yes.
>
> THE COURT: -- the situation.
>
> THE WITNESS: The coding manual allows for using the instrument in this way, so long as we make clear that that's what we did.
>
> THE COURT: I see. . . .

See Hr'g Tr. 328-29, Jan. 27, 2011.

Later, more credible expert testimony concluded that, on principle, the 2003 coding manual represents that the Static 99 should not be used on child pornography offenders whose hands-on offenses are solely the result of self-report. *See id.* at 549-567 (Testimony of Dr. Prentky). Dr. Prentky provided two main reasons for why the use of the Static-99 test and scoring by Dr. Sachsenmaier was inappropriate—one technical and one conceptual:

> A        The first and foremost reason is that the Static-99 is very clear in requiring what the Static-99 manual calls a Criterion A Offense, a battery offense. The individual must have been adjudicated for a hands-on offense. One of the offenses listed in

211

under Criterion A, child pornography, is listed as a Criterion B Offense.  Static-99 is very clear about that, but the Static-99 is not unique in this respect.

Q    Let me stop you there for one second.  But we also, as you said in your report, we are also talking about a self-reported hands-on offense.  Taking into account that we have a self-reported hands-on offense which you knew when you prepared your report, and you made your clinical decisions about which scales to apply, why, taking that into account, didn't you use the Static-99?

A    Well, the main reason is that, again, the Static-99 2003 coding rules seem to state rather clearly to me that self-report is not acceptable for coding the five criminal history variables.  You can pull out the static -- we can pull out the manual and take a look but that language seems rather clear to me.

Q    Now, you're familiar, though, with the language on Page 5 where it talks about if you have an offense which occurred with an identifiable victim that it can be used, meaning, that meaning the Static-99.

A    On top of Page 5, the section, the question that refers to, "Who can use the Static-99 on?" Or, "Who may you use the Static-99 on?"  Is that what you're referring to?

.  .  .  .

The first reference to this issue appears to be at the bottom of Page 4 under "Criminal History Questions" where it states, "For the five (5) items that assess criminal history (Items 3, 4, 5, 6, & 7) an official criminal history is required to score these items and self-report is not acceptable."  Then it goes on to say, "This being said, there may be certain cases (immigrants, refugees from third world countries) where self-report of crimes may be accepted if it is reasonable to assume that no records exist or that existing records are truly unretrievable."  That's the bottom of Page 4.  Then on the

212

top of Page 5, the question is posed, "Who can you use the Static-99 on?" And that first sentence states, "Static-99 is an actuarial risk prediction instrument designed to estimate the probability of sexual and violent reconviction for adult males who have already been charged with or convicted of at least one sexual offense against a child or non-consenting adult." The instrument may be used with first time sexual offenders. I understand that there is this rather ambiguous statement in the third paragraph where there is some discussion about NGRI participants. There may have been NGRI.

Q       What's NGRI?

A       Not Guilty by Reason of Insanity . . . . However, there is a statement there in that paragraph that the offender need not have been convicted of the offense. Well, that's true, but the Static-99 allows for that. The Static-99 says you can be charged or arrested; conviction is not required, that's true. But there has to be some kind of adjudication for a sexual offense. And as I was commenting before, that's not unique to the Static-99. It's the same with **. . .** the SVR-20, and it's the same with the SORAG, the four principal risk assessment scales that are used in the community for adult sex offenders.

Q       Now, Doctor, I just want to be clear here. What we have here is, which you just said, that it has to be a charged or convicted offense. What we've been dealing with . . . [is] a hands-on offense that's self-reported. Practically, before we talk about statistically, but practically, as far as using the Static-99, what difference does it make whether or not it's actually legally adjudicated as opposed to self-reported where there is some confidence that it actually took place?

A       There are two ways that I can try to answer that question. Perhaps the single most important is that it is imperative that, as

213

users, we are faithful to the manual. It doesn't matter what I think . . . . It doesn't matter whatever any luminary in the field thinks. There is an existing scale with a manual, the intention of the manual is to preserve standardization of use to guarantee inter-reliability or increase inter-reliability. That's the whole purpose of providing a detailed manual to increase the standardization of the use of the instrument. If, as a user, I made my own personal decision in using something like the Static-99 manual or perhaps an even more extreme example would be the DSM, the Diagnostic and Statistics Manual of the APA for classifying and diagnosing individuals. And if I decided that there were certain criteria that I took exception to and decided not to use them, to ignore them or perhaps to add criteria that weren't there, I could throw a proverbial monkey wrench into the reliability with which diagnoses are rendered on the DSM. Now, if we transport that back to the Static-99, what we're going to end up with is a high degree of unreliability with respect to the ratings because we have one user that's using it simply different from other users. It is incumbent upon us to adhere faithfully to it. I'm more sensitive to this issue because I have my own instrument.

. . . .

Q    Now, okay, you said there was a second reason.

A    The second reason is a conceptual one: Why do we care if the individual has an adjudicated offense? Again, the Static-99 speaks to that very clearly. If we look at the item called "Prior Sexual Offense," the Static-99 is very clear, once again, in asserting that the basic concept is whether the offender has already been detected and/or sanctioned for a sexual offense and then continue to re-offend. That's the risk relevance of that particular item according to the Static-99 and not just the Static-99. Again, it's a basic principle that if someone is caught, if their wrist is

214

slapped and they ignore that and continue to do whatever it was
that they were doing, then that speaks to their willful lack of
compliance.  It speaks to the risk that they clearly pose that would
be greater than the risk posed by some individual who had never
been sanctioned and that clearly is the case with C.R.

Q       Just clarify what you mean by, "That's clearly the case with
C.R.?"

A       Well, I mean, he is disclosing or self-reporting the crime
involving his half-sister and he perhaps, as he sits through this long
process, we can call this a sanction of one sort or another.  He
realizes at this point the gravity of it but he certainly has never
been officially sanctioned by the courts.  He has never been
charged or arrested for that crime and we have no idea what impact
that would have had had he been arrested a long time ago and
sanctioned for that offense, we simply don't know that.

Hr'g Tr. 549-56., Jan. 28, 2011..

Extrapolating risk of recidivism for sexual offense for the defendant from the results of
these tests is unacceptable as a matter of scientific principle.  *See, e.g.*, Rule 702 of Fed. R. Evid.
(testimony of expert must be "the product of reliable principles and methods and . . . the witness
[must have] applied the principles and methods reliably to the facts of the case.").  None of the
other seven evaluators in the case used the Static 99, Stable 2007, or SVR-20 in the way the
prosecution's witness did.  Dr. Prentky testified that use of these tests on an individual who had
not been charged and convicted of a hands-on sexual offense would not be appropriate.  His
testimony is accepted as credible and will be followed.  That of Dr. Sachsenmaier on the point is
rejected.  *See also* the discussion of Dr. Sachsenmaier's misconception of C.R.'s conduct in Part
II.H.iii, *supra.*

### ii.    Universe for risk assessment and bias

It is essential in using risk assessment tools to consider the appropriateness of the population used to create the base for assessment.  The question here is whether it would be appropriate to treat C.R. as if he were a member of the universe for which the test was designed. This point was discussed with Dr. Sachsenmaier and Dr. Prentky.

Dr. Sachsenmaier's testimony was as follows:

> THE COURT: Now, in evaluating answers to these tests or indices, however you want to characterize them, the people who make the test up and the scoring up, use them on a large population and then use that, the results from that large population or universe . . . in the particular case, in providing a scoring technique. Correct?
>
> THE WITNESS: Yes.
>
> THE COURT: Now, do you know what population was used in providing the scoring technique under this?
>
> THE WITNESS: Yes.
>
> THE COURT: What?
>
> THE WITNESS:  We have the Static-99, the original instrument; and that was developed in 1999, published in 2000 on 1,086 offenders.  The Static-99 revised came out in the fall of 2009. There are over 8,000, I don't remember the exact number, but well over 8,000 subjects in that, 28 different studies from different countries.  And they looked at those.  And based upon the base rates of real offense in these studies, they grouped those studies into four different groups.  So whereas with the first Static-99 you only had one set of norms to look at, with the revised version you can offer more information because it's more fine-tuned.  You look

216

at your individual offender and look at the characteristics of the four different groups that you choose from, you match on the most important characteristics, choose the group, and then use that table.

THE COURT: Well, is it grouped by ethnicity?  By age?  By general background?  By country?  There may be differences, might there not?

THE WITNESS: I will explain that.  The first, the first group is called the routine group.  That group of offenders, several different studies had no information about the offender other than it was a known offender.

THE COURT: And that would include all kinds of sex offenders?

THE WITNESS: All kinds.

THE COURT: Rape?

THE WITNESS: Rapists.  Child molesters.  Different ethnicities.  Different countries.

THE COURT: Including child pornography?

THE WITNESS: No child -- well, some of them also had child pornography, but it was not developed to look at child pornography.

THE COURT: But in the universe --

THE WITNESS: Yes.

THE COURT: -- there was some child pornography?

THE WITNESS: Correct.

THE COURT: And what about the age, did it include juvenile?

THE WITNESS: It goes down to age 18 and up.

THE COURT: But not below 18?

THE WITNESS: Not below 18.  There is a coding guideline that says, If the offender was 16 or 17 when he committed the offense and it was adult-like in nature—meaning, showing child preference or forcible rape—then you should move into the adult-like scoring methods.

217

But if it was, for example, a 16 or 17 year old with a statutory offense against a similar-aged person, that would not move a person into that adult-like crime.

THE COURT: Again, you're using kind of a, "as if" kind of factual to get essentially what seems to me a satisfactory result; that it's not based on the actual universe.

THE WITNESS: I'm—see what —where they get that from is that in many jurisdictions 16 and 17 year olds who commit a serious sex offense can be waived into adult court.

THE COURT: Yes. Now what about other criteria? How many in that universe were, for example, between the ages of 18 and 25, which one witness, as you've heard, characterized as adolescence?

THE WITNESS: I would like to finish answering a question you asked me that I didn't finish yet.

THE COURT: I'm sorry.

THE WITNESS: Okay. Okay. So the first—I mentioned four groups to match to. So the first, what they call routine, is if you know nothing about the offender other than now. And then the others they call non-routine. You have some information about them that you can start to sort that person out. So within the non-routine, that's broken down into treatment needs. The treatment needs samples two thirds of that group of subjects were outpatients who were not involved in serious legal proceedings; they were simply going to a clinic to get treatment. The other group is called the high-risk, high-need group. Half of those offenders had been referred for a sexually-violent-person evaluation. The outcome of it was not the issue, it was the fact that something had happened to get them referred for that. And then another quarter of that sample was a mixed group of forensic offenders who had been referred for a forensic evaluation either because they appeared high risk or they

218

appeared NGRI or they appeared incompetent; but they were referred for a forensic evaluation.

                    . . . .

 So we have the high-risk, high-need group.  And then they had three studies that were, extreme and they did not put in a probability table because they thought they were so extreme they could skew the results.  One group was sexual homicides, for example.  So those are the four groups.  And then for age, I don't recall that.  But I have the information on my computer, and I could get it for you. I don't recall exactly how many were on each age group, but a lot.  The older you get—I mean, the older the groups get, the more the number fell.  Like, we're very interested in people who are 60 plus.  And it's very difficult to get subjects who are in that age range.  But the younger group, 18 to 24, ample subjects.  They're one of the most highest. Just by age, they're one of the highest risk groups.

THE COURT: For your evaluation of this defendant's answers, which group did you use in indexing his answers?

THE WITNESS: The high-risk, high-need group because of the multiple referrals for forensic evaluations, and one referral specifically for a sexually-violent-person evaluation under the federal statutes.

THE COURT: The high-risk group?

THE WITNESS: Correct.  High risk, high need.  Now, within that group everybody—okay, so within each of those groups you have the full range of Static-99 scores.  So even if you're in one of the lower, lower-risk groups, you could end up having a high-risk score.  And even in the high-risk, high-need group, you could end up having a low-risk score.  You see, the label is descriptive of the population of offenders.  And then within that group, I mean, every

. . . you could end up being low risk even though you have characteristics of a high-risk group.

THE COURT: But in scoring his answers, you would score him based on the universe in the high-risk group?

THE WITNESS: That's right.  The probability tables would come from that group.

THE COURT: Which would tend to provide a high risk?

THE WITNESS: They provide higher—the probabilities are higher than the other groups.

THE COURT: It's not quite circular reasoning, but that's the bias. And I don't use the word "bias" in any sense of criticism.  I use it just as a statistical term.

THE WITNESS: Yes.

THE COURT: The bias when you use that group is in favor of a higher risk of sexual predation.  Correct?

THE WITNESS: Yes, it is.  Based upon characteristics of the group.

THE COURT: Right.  But he, he had most of these incidents with the sister, half-sister?

THE WITNESS: Correct.

THE COURT: Before he was 18.

THE WITNESS: That doesn't matter.

THE COURT: And you're putting him in the same group as the universe for statistical purposes of the ultimate predator who would grab a kid off the street and rape and kill?

THE WITNESS: 94 percent of molestation of children under age 12 occur in the home.

THE COURT: Yes.

THE WITNESS: By family members or acquaintances. So, it's -- although the media makes it seem frequently occurring, most

220

offenders against children are not the predator who grabs the kid off the street.

THE COURT: Yes, I understand. . . . But the bias of the selection of the universe shifts towards that end?

THE WITNESS: No, it doesn't.

*See* Hr'g Tr. 330-37, Jan. 27, 2011.

Dr. Prentky's testimony revealed appropriate concerns about the universe that the Static-99 is based on. He stated:

The concern would be somewhat different, with the Static-99 . . . I would be very concerned about the accuracy of any numbers that are taken from those life tables, those are actuarial tools.They all have these experience tables or life tables.

With those instruments I would be concerned about the numbers that you took from them.

Q    When you say "would be very concerned", about what?

A    The accuracy, after all the offender, the individual rather, the client, the defendant, is not someone who is similar to all of the individuals that made up the reference groups that were used to develop the scale and were used in particular to create those life tables, so you are extracting an estimate based on an individual that may look very different from CR. If there is one thing that we know, that can share about those life tables, the accuracy of the numbers that you take from those life tables is absolutely a function of the similarity --

Q    You were saying -- you were explaining what the concern was of using these actuarial tables?

A    The accuracy of those estimates, that you take from those tables, is a function of the similarity of your client, to the large reference group that was used to make up those numbers, and your

client is completely different, then obviously those numbers are not going to be accurate.

Q       And again we're talking about completely different or differences, are you saying that CR and his particular facts, based on what you know from this case is different?

A       To begin with, of course, we're talking now again about the SVR-2 or the Static-99, which are adult instruments, and, I guess, to my way of thinking CR is much more of a -- presents many more for juvenile sex offenders than an adult, but the key issue here is that he doesn't have anything even remotely like the kind of criminal record that most of the people in these development sample have.  On average, they are between 30 and 35 years old, and I don't remember the exact average, say 33 years old, many of them have lengthy criminal histories, both sexual and non-sexual, these people who have been incarcerated in state civil commitment programs, are likely to have many priors.  At the treatment center the average number of prior sexual offenses was three.  We're talking about a fairly weighty criminal history in an older offender. I think, it's fairly clear that CR doesn't look like that sample.

Hr'g Tr. 573-76, Jan. 28, 2011.

### iii.   Coding

When coding C.R. on the Static-99, Dr. Sachsenmaier and Dr. Prentky came to starkly different results.  Dr. Sachsenmaier's coding decision is described by her as follows:

THE WITNESS: Here are the factors that go into this test:  One, is age.  Age in and of itself can predict risk to a degree.  Up to age -- from ages 18 up to age 35 a person gets an extra point on the test and that's no matter what -- which group you're in.

THE COURT: That's adverse to him?

222

THE WITNESS: Correct.  Because younger people recidivate much more often.

THE COURT: Right.

THE WITNESS: From age 35 through age 39, it's zero points for age.  There's a plateau there.  At age 40 -- and of course you have to use some judgment because everybody, you know, they don't change overnight because they have a birthday.  But at age 40, overall, they get one -- minus one point.  Because by the time a person hits middle-age, they usually are a lower risk. Okay?

THE COURT: Yes.

THE WITNESS: And then by the time they're 60, you take away three points. Because even though some 60 year olds are still high risk, most of them aren't.

THE COURT: Well, that's generally true the way we evaluate people for sentencing.

THE WITNESS: Correct.  So there's age --

THE COURT: Their drive and their testosterone and so on?

THE WITNESS: Correct.

THE COURT: And physical ability to abuse --

THE WITNESS: Correct.

THE COURT: -- is reduced as they age?

THE WITNESS: Mm-hmm.  So then there's the number of prior offenses, whether you have a male victim, a stranger victim, an unrelated victim; whether you've ever been in an intimate marriage-type relationship for at least two years; whether there was violence with the index crime, physical violence; whether there are previous violence; whether there is a noncontact offense; and whether there is a male victim.

. . . .

THE COURT: M-a-l-e?

223

THE WITNESS: Yes. Male victims, across a variety of research studies, show higher risk and deviants. So those are the -- I don't know if I hit all ten.

THE COURT: But anyway, you give him extra points [and]; lesser points depending on those criteria?

THE WITNESS: Correct.

THE COURT: Which ones did you give him extra points for?

THE WITNESS: Let me tell you that. The first item is age; he gets one point because he's between ages 13 and 35. The second item is, Ever lived with a lover for at least two years? And he has not; so there is one point there.

THE COURT: That's against; counting against him?

THE WITNESS: Correct.

THE COURT: Right.

THE WITNESS: The third item is, Was there nonsexual violence in the index offense? There was not; so that's a zero. The next item: Prior nonsexual violence? This was not; so that's a zero. The next item is, Prior sexual offenses? Now this item he gets a zero there because he got charged with child pornography. And during that investigation he revealed the hands-on offenses, so that ends up being grouped together as indexed. What that item -- what that item looks at is if you're charged and negatively sanctioned in some way and then you go out and repeat the crime. You're at much higher risk then, than if, Okay, I got caught. I'm never doing that again.

THE COURT: I understand.

THE WITNESS: Okay? The sixth item --

THE COURT: He got a zero for that.

THE WITNESS: Zero. Prior sentencing date? Zero, because these are grouped into three or less, four or more. He has no prior sentencing dates. The next item, Any convictions for noncontact

224

sex offenses?  And that's a yes based on his guilty plea to the Magistrate for one count of distributing child pornography.

THE COURT: You know technically he hasn't been convicted?

THE WITNESS: Technically, I know that, but I didn't know that when I did this.  And so we could -- I know he pled guilty, and so, technically, the manual -- we could -- you can do what you want with that.

THE COURT: I don't want you to do anything.  You're the expert; I'm just listening.

THE WITNESS: I put down "yes" because that's the intent of that item.

THE COURT: Okay. I -- I can understand that. What's the next one?

THE WITNESS: Any unrelated item?  Any unrelated  victims? So here –

THE COURT: What does that "unrelated victim" mean?

THE WITNESS: That means someone who, who isn't basically someone you could marry -- not your sister or niece or brother.  I mean, someone who is far enough removed that it's not a close familial relationship.

THE COURT: Outside the kissing-cousin range?

THE WITNESS: Yes. Yes.

THE COURT: I see.

THE WITNESS: So here there are, there are two issues.  I count, I count Jimmy, the 15 year old. I don't count 16 year olds when he's 18. Sixteen year olds are at a different level and there's only a two-year difference.  But a 15 year old, a 15 year old is at a different level. That's usually the freshman year in high school. The 18, 19 -- it's a different developmental level; those are peers.

THE COURT: Well, his actions with the sister . . . occurred when he was under 18.  Right?

225

THE WITNESS: The final act he was 18.

THE COURT: He was just 18?

THE WITNESS: Yes.  Yes.  And then also under that item --

THE COURT: So does he have -- do you treat him as having had a prior contact as an adult?

THE WITNESS: I did not.  He had scored that way by Dr. Prentky on the instruments he used.

THE COURT: But you didn't?

THE WITNESS: I did not.  For this -- on this instrument it doesn't count that.  And then on the unrelated items, Michael Seto, who is the top researcher right now in child pornography and how it relates to pedophilia and contact versus noncontact offenses, argues successfully that child pornography victims, when the ratio of victims shows a clear preference, that that should be included as a victim-type.  So we have Jimmy, who I count; and then I have a "no" about porn victims.

THE COURT: I don't follow.  What does that mean?  He gets a point or doesn't?

THE WITNESS: Yes, he gets a point on that one, for unrelated victims, for two reasons.

THE COURT: Because these children who are shown on these things are being hurt and the whole industry is being encouraged. Correct?

THE WITNESS: Correct.  The next item is, Any stranger victims? On this item I count that based on Seto's work showing that child pornography images are better indicators of pedophilia than actual hands-on offenses.  And because we have the images in this case and then searching for the incest materials and then the invasive sexual assault, I count that.  I count the child pornography in this case and give him a point for that.  The last item is: Any male victims?  I give him one point for that based on Jimmy, the 15 year

226

old, and the proportion of male victims in the pornography collection.

THE COURT: Okay.

THE WITNESS: That gives us six points.

THE COURT: And what is the effect of those six points?

THE WITNESS: In the groups that were followed for ten years, people with a score of six had detected sexual recidivism of 42 percent, 41.9.  When you look at the larger body of research that compares detected recidivism, using arrest and conviction, to undetected -- and I've got charts I can give you – the undetected recidivism is counted by looking at offenders who go into a treatment program and you look at their official known victims and then you can give them a polygraph and see how many they report when they know they're going to be polygraphed, or you can give them confidentiality because they're in treatment.  So those two methods are used to get estimates of real recidivism.  So you can -- you can look at those studies and form a weighted average across those studies and that brings a real recidivism risk of ten years up to 50 percent.  Then we have -- I found two studies that took other studies and grouped them together and looked at the risk of sexual offenders going out to 31 years. I used 20 years plus at that. Because the farther out you get the fewer people you're looking at and the more you might not trust those results; but out to 20 years. And so you can get a weighted average with those studies. One study came up with 1.4 . . . . And, again, I've got a paper you can have. And another study came up with 1.34 or 1.35.  So when you weigh those averages you get 1.4 for going from what we know at ten years to what's projected at 20 years. So that brings a detected projection of 59 percent at 20 years, which is a reasonable projection when you're looking at a young person.  And then the real recidivism at 20 years comes up to 71 percent.  So -- and

227

again, there's a paper that goes through step by step by step, and there's other people who have done similar papers with slightly more complicated methodology and come up very close to what I've come up with.

THE COURT: That's all very interesting, but these -- what I'll call generic studies, which certainly are not unusual in the social sciences -- relate to a general universe --

THE WITNESS: Yes.

THE COURT: -- selected without any bias within whatever the universe parameters are?

THE WITNESS: Correct.

THE COURT: And by the very nature of these studies to any individual?

THE WITNESS: Yes.

THE COURT: It may not be appropriate to say that that individual has a 70 percent recidivism rate.  What you're saying is an individual with that characterization as you described it, would in the general population come up as a recidivist 71 out of 100 times?

THE WITNESS: Yes.  Two clarification points.  One is that the overall predictive validity of this particular instrument and others like it is around 70 to 75 percent.  So it takes into account a lot more than flipping a coin, but it's not complete. The second point --

THE COURT: Seventy-five --

THE WITNESS: Seventy-one.

THE COURT: -- percent validity.

THE WITNESS: Oh, between 70 and 75 percent.

THE COURT: How many standard deviations is that?

THE WITNESS: That method is called -- is used -- it's called a receiving operator characteristic; that does not have standard deviations.  It forms a graph where it, along the graph it balances

out false negatives and false positives and then attempts to average those into a curve you can use that gives you the best balance between coming up with false positives or false negatives. So this one -- this particular statistical technique doesn't give a standard deviation, it --

THE COURT: It doesn't use a bell curve?

THE WITNESS: No. Correct.

Hr'g Tr. 337-47, Jan. 27, 2011.

Based on this analysis Dr. Sachsenmaier concluded that C.R. was in the category for prediction purposes of a moderate-high to high risk for hands-on sexual contact with a minor. In contrast, Dr. Prentky testified that he would code C.R. on the Static-99 as follows leading to a low risk conclusion:

[H]e's clearly codable as a 1 on item No. 1. His age, it's pretty obvious, and --

Q       Okay.

A       And two is pretty obvious as well, that he's never cohabited with anyone for two years or longer. So, obviously, that's a 1. Now, the only other item is a conviction for non-contact offense. It's my understanding that he's already pled guilty to the child pornography. I mean, that clearly would qualify him for a coding of 1 on that item.

Q       So, when you say, "The only other," that's the only other on the whole list you would have given him points out of the ten?

A       The only other item which is somewhat debatable is how you define in the unrelated item whether a half-sister is related to him. I mean, clearly a stepsister is according to the rules but it doesn't mention half-sister. I mean, I guess, in my opinion, a half-sister would be qualify as being related but I could see that that might be debatable.

229

Q      Okay. Now, you seem to have concentrated on -- well, let me back up for a second.

What you're looking at there is the scoring that was given by Dr. Sachsenmaier which was part of her report.  Have you looked at Dr. Sachsenmaier's scoring?

A      I did, days ago.  I don't have it in front of me.

Q      That's okay.  Are you aware that she did give points for the categories of unrelated stranger and male; correct?

A      Yes.

Q      As the victim?

A      That's right.  Her, I guess, my score would have been a three.  As I recall, her score would have been a 6.

Q      Now, was C.R.'s half-sister, with the proviso that you talked just talk about how whether she was related or not.  Was she unrelated? . . . .

A      I don't think that I would have coded her as unrelated.

Q      And clearly --

A      I think that a half-sister is close enough to stepsister to qualify as related.

Q      And it's easier to say you certainly wouldn't have coded her as a stranger?

A      She's obviously not a stranger.  She certainly doesn't qualify as a stranger.

Q      And just as obvious, she's not a male?

A      She -- I don't think she qualified as a boy . . . .

Q      Now, Dr. Sachsenmaier relied upon, in giving those scores, different victims than the sister, the half-sister.  Do you see from all that you've read and learned in this case any other victims?

A      The question, I think, is not -- I think it's how we conceptualize victim to the Static-99.  Clearly, all of those children in the child pornography are, in their own ways, victims.  The

230

question is whether they qualify as a victim for the Static-99. The Static-99, once again, is clear in saying that child pornography doesn't constitute or qualify for the victim variable.

Q        Okay. So, the fact that Dr. Sachsenmaier gave a score, do you agree with the point that she gave, for the child pornography, individuals being victims in the Static-99?

A        I thought I just said I didn't simply because the Static-99 is clear, the manual is clear, once again, that if you look under those victim variables I believe it says that child pornography does not.

Q        And the same logic would be clear for the stranger and the male because, obviously, if she relied upon the child pornography to satisfy those requirements you wouldn't do so because the manual tells you not to do that?

A        The principal, again, Counsel, is that all of the literature that undergirds these risk items is based on contact offenses. There's an overwhelming amount of literature that talks about the high risk posed by these child molesters who only like little boys and they have a much higher re-offense level than child molesters who only offend against little girls, and the mixed are somewhere in between. That's what you see study after study after study. The child pornography is a different -- it's sufficiently different from a risk standpoint that we can't assume that it has coding significance here and that's apparently what the manual tells us: That it's a whole different issue to sit in front of a computer and watch pornography no matter how horrifically those children are victimized to make the pornography, that's different. Sitting there and watching it then leaving the computer as a traveler and meeting someone and assaulting them.

Q        And that's what's taken into account in that scale?

A        As far as I understand, yes.

231

Q        Okay.  Now, I just want to bring one other fact into your consideration in scaling the Static-99.  You're aware of this relationship with an individual named "Jimmy"?

A        The 15-year-old?

Q        Yes.

A        Yes.

Q        Would you consider the consensual sexual encounter between C.R. and "Jimmy" as a sexual offense?

A        Sexual offense?

Q        Yes. That's my question to you?

A        It's not legally a sexual offense.

Q        Is there any other realm you would consider it a sexual offense in professionally?

A        When you say "sexual offense," I assume you mean in a legal sense, committing an offense.

Q        Yes.

A        Obviously, it's not an offense.

Q        Outside of the legal realm, but inside your professional realm, where individuals in your profession look at the relationship between individuals of different ages, is the fact that a 15-year-old and a 19-year-old had consensual sex, is that, A, deviant; and, B, would that represent some type of sexual misconduct even if not legal?

A        If something honestly, if something like that is to be regarded as deviant, then a disturbingly high proportion of high school kids today would have to be coded as deviant or classified as deviant.  I understand at 19 he was no longer in high school but we're essentially talking about the same kind of peer age between a 15-year-old and a 19-year-old. Now, if he was 30 years old or 40 years old, that would be perhaps an entirely different question and indeed if he was that would be a criminal offense.

232

Q    Right. When you're saying "he," you're meaning the --

A    C.R.

Q    C.R., okay.

A    Right. But, no, no, you know, there's an entire area of the literature that has exploded around hebephilia. It's a very, very, very controversial and hot area right now because the DSM, the various subcommittees of the DSM, have been meeting to revise the DSM and the question whether or not something like hebephilia should now be included, whether or not it's part of pedophilia, whether there's this category that Ray Blanchard refers to as pedo-hebephilia.

And because he has proposed that the large sector of the professional community has sort of attacked him and said this is ridiculous.

Q    Why, though, they're attacking and saying it's ridiculous, what's the basis of that?

A    To his defense, he defines a hebephile as someone who has a sexual preference for victims in the age range of 11 or 12 to 14. They are pubescent but just over the age, just barely pubescent, he's not talking about 15 or 16-year-olds. But I believe the response from some members of the professional community focus on the larger issue about what is normative sexual behavior today for adolescents and that we simply are not keeping up with the changes in normative sex among teenagers.  It's simply not what it was in the '50s that some of us remember.  It's certainly not the Kinsey notion of normative sexual behavior.  Now, I hasten to add normative justify means it's a statistical issue, it doesn't mean it's healthy.  Perhaps it's an important distinction to make. It doesn't mean it's a good thing for 19-year-olds and 15, 16, 17-year-olds to be having sex.  It just simply means that an awful lot of them are doing it.  And because they're doing it, statistically, it becomes

233

normal or normative.  So, it's more of a statistical issue than it is a psychological or emotional issue.

Q        But, in your professional opinion, when you're deciding recidivism, isn't the statistical aspect very important to you?

A        The most, yes, of course, the most important thing is that he never again in life ever commits another sexual offense against a child, against anyone, be it a child or adult.  That, to me, is of paramount importance.  And if having a sexual liaison with a consenting 15-year-old is a red flag for, me I would have said so long ago, but it didn't even occur to me that that was an issue.

                              . . . .

A        Then, there are again touchstones, there are flags, there are things that are very, very important.  If he was engaging in a range of paraphilic behaviors, if he was a voyeur or an exhibitionist, then clearly that would be concerning to me and it would be something that he would obviously need treatment for but that in and of itself would not suggest to me that he was at elevated risk for committing a battery offense against a child or adult for that matter.

*See* Hr'g Tr. 560-67, Jan. 28, 2011.  Dr. Prentky concluded that C.R. was not at high risk of sexual re-offending.  *See id.* at 548.

Debate among the leading experts in the field about the use of these tools in the child pornography offender population is ongoing.  They have attempted, so far as practicable to date, to provide quantification of risks based on objective criteria.  Scoring of these tests does however, as already suggested, require considerable subjective evaluation.

After evaluating the testimony of witnesses on this subject the court finds Dr. Prentky's testimony to be more credible.  The explanation provided by Dr. Prentky for not relying on the

234

Static-99 in testing this defendant was based on sound reasoning, research, and experience.  He cited both the protocol for use of the instrument in the 2003 manual and the conceptual or practical reasoning that an expert will bring to bear on properly interpreting the results of the coding on an individual in C.R.'s circumstances.  He concluded, reasonably, that there was no way of knowing how an arrest or conviction for a hands-on sexual offense would have impacted C.R.'s viewing of child pornography.  *See* Andrew Harris, Amy Phenix, R. Karl Hanson, & David Thornton, *Static-99 Coding Rules Revised – 2003* (2003), *available at* http://www.fd.org/pdf_lib/Static-99%20Coding%20Rules.pdf.

Dr. Prentky's emphasis on the need for some form of adjudication in scoring for prior crimes is supported by the Sentencing Commission's Guidelines.  They consider a defendant's criminal history in determining the appropriate guidelines range.  *See* U.S.S.G. § 5H1.8 (Criminal History Policy Statement) ("A defendant's criminal history is relevant in determining the applicable criminal history category.").  The Guidelines Manual provides points to a defendant for prior criminal convictions but no points if the defendant has not been adjudicated guilty.  *See* USSG § 4A1.1("(a) add 3 points for each *prior sentence* of imprisonment exceeding one year and one month, (b) add 2 points for each *prior sentence* of imprisonment of at least sixty days not counted in (a), (c) add 1 point for each *prior sentence* not counted in (a) or (b), up to a total of 4 points. . . , (d) add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status, (e) add 1 point for each *prior sentence* resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above because such sentence was counted as a single sentence, up to a total of 3 points for this subsection") (emphasis added).

235

While uncharged crimes that are not considered "relevant conduct" within U.S.S.G. § 1B1.3 may be considered as part of the history and characteristics of the defendant at sentencing, they are not be used to add points in the determination of a defendant's criminal history category. *Compare* U.S.S.G. § 1B1.3 (Relevant Conduct (Factors that Determine the Guideline Range)) *with* § 1B1.4 (Information to be Used in Imposing Sentence) ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.") *and* Commentary, (citing 18 U.S.C. § 3661);  *see* also U.S.S.G. § 4A1.2 (Definitions and Instructions for Computing Criminal History) ("prior sentence means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*, for conduct not part of the instant offense").

Dr. Prentky followed the essence of the federal guidelines policy when he took into consideration the totality of C.R.'s background and history in providing a comprehensive assessment.  He noted, however, that it would be improper to count uncharged conduct in the coding process on the Static-99.


### iv.    Development of Risk Assessment in Sentencing Generally

Risk assessment materials were considered in the development of the American Law Institute's (ALI) Model Penal Code of 1962.  They have been taken up again in present discussions of sentencing by the ALI.  *See, e.g.*, Model Penal Code: Sentencing § 6B.09(2) (Council Draft No. 2, 2008) (sentencing commissions should develop "offender risk-assessment instruments or processes supported by current and ongoing recidivism research of felons in the

state, that will estimate the relative risks that individual felons pose to public safety through future criminal conduct"); Model Penal Code: Sentencing § 6B.09 cmt. A (Preliminary Draft No. 5, 2007) ("Actuarial—or statistical—predications of risk, derived from objective criteria, have been found superior to clinical predictions built on professional training, experience, and judgment of the persons making predictions."); Transcript of Model Penal Code Discussion Sessions (by membership) at 28 (2010) (expressing concern that risk assessment tools may inappropriately allocate greater risk to individuals based on their socioeconomic status, geographic location, and housing); *Id.* at 31 ("[O]ur concern is that it is not clear what is meant by actuarial assessment and we need to be clear about that and careful, because these are adolescents who are changing, that we don't rely on a potentially misleading assessment simply because it is actuarial. Not all of the even evidence-based programs apply equally across demographics and so we need to be very careful about that.") (Testimony of Liane Rozzel). *See also* Report of the Proceedings of the Judicial Conference of the United States 74-75 (1977), *available at* http:ww.uscourts.gov/FederalCourts/JudicialConference/Proceedings.aspx (endorsing computerized probation information system that would "[p]rovide up-to-date information to guide sentencing courts in selecting sentences for convicted defendants"); *National Summit*, *supra*, at v ("Leading researchers and experts in law enforcement, courts, corrections, reentry, and other community-based services were brought together to present the latest science, statistics, and innovations on reducing recidivism and corrections costs.").

Reliance on actuarial risk assessment tools in sentencing has raised serious concern about forward-looking predictions of future behavior rather than backward-looking punishment for past behavior. *See, e.g.*, J.C. Oleson, *Blowing Out All the Candles: A Few Thoughts on the Twenty-Fifth Birthday of the Sentencing Reform Act of 1984*, 45 U. Rich. L. Rev 693 (2010).

237

> Merely automating an unscientific system will not make it sound, but a philosophical shift toward the use of outcome measures would be profound, and computers could make this effort much easier. Given recent developments in the field of risk/needs instruments, and drawing upon sentencing information systems developed by other jurisdictions, a new approach to sentencing is not an impossible goal.

*Id.* at 744. Statistical sentencing software envisaged (perhaps with tongue in cheek) would allow a sentencing judge to have case specific data that would indicate which defendants would be better deterred by a monetary fine and community service or probation; and which by incarceration, and for how long. *Id.* at 748.

> These are the same considerations that judges must consider when sentencing under 3553(a) [Title 18 of United States Code], but today judges are forced to guess about how much retribution and how much rehabilitation should go into a sentence. They must guess whether an offender needs to be incarcerated to protect the public and whether an offender will successfully turn his life around.

*Id.* at 749.

Concerns about excessive reliance on actuarial sentencing are serious. "Of course, even the most zealous proponents of actuarial sentencing do not pretend that it is a panacea, or that a scatter plot of data can adequately substitute for the exercise of human judgment. It is well understood that merely 'incanting the word information is not a magical solution.'" *Id.* at 751 (citing Douglas A. Berman & Steven L. Chanenson, *Can and Will Information Spur Post-Modern Sentencing Reports?*, 19 Fed. Sent'g Rep. 219, 220 (2007). Such tools must be used vigilantly to avoid mischaracterization and over-incarceration of offenders.

There are compelling reasons for an attitude of caution in the use of high-risk assessments at sentencing.  Most importantly, error rates when projecting that a particular person will engage in serious criminality are notoriously high.  Although there have been important advances in the predictive sciences in recent decades, particularly when applied to mentally ill offender populations, most projections of future violence are wrong at least twice as often as they are right.  In other words, two-thirds of those who appear to present a high risk of future violence will in fact refrain from violent behavior.  The unavoidable mis-sorting of 'false positives'—those predicted to be dangerous who are in fact harmless—presents compound ethical problems.  It is difficult for some to countenance the extended incarceration of any human being in anticipation of crimes they have not yet committed, even 'true positives' who would in fact commit the predicted criminal acts if released.  With false positives, the case is harder still: extended incarceration is imposed for crimes they will *never* commit.

Model Penal Code: Sentencing § 6B.09(2) (Council Draft No. 2, 2008); *see also* Hennessey D. Hayes & Michael R. Geerken, *The Idea of Selective Release*, 14 Just. Q. 353, 368-69 (1977) ("prediction scales used in the past to predict high-rate offenders' offense behavior actually perform better at predicting the offense behavior of low-rate offenders"); *cf.* Jennifer L. Skeem and John Monahan, *Current Directions in Violence Risk Assessment*, (Univ. of Va. Sch. of L. Pub. L. and Legal Theory Research Paper Series No. 2011-13, Mar. 2011) (recognizing utility of group-based instruments for assessing an individual's risk but suggesting "[t]he time is ripe to shift attention from predicting violence to understanding its causes and preventing its (re)occurrence") *available at* http://ssrn.com/abstract=1793193.

The potential for unwarranted and invidious sentencing disparity exists.

> Under a system of evidence-based sentencing, two first-time
> offenders of the same crime might get very different sentences. . . .
> But, people must be careful about fetishizing parity in sentencing,
> for infatuation with equality, although meant well, can lead to
> unintended consequences.  In reality, each human being is unique.
> The notion of 'like' sentences for 'like' offenders is a legal fiction
> maintained by excluding those characteristics deemed irrelevant
> for purposes of punishment.

Oleson*, supra*, at 754-55.

Evidence-based sentencing that utilizes risk assessment tools is a serious and often useful enterprise, but it must be handled gingerly.

> A sentencing information system that informs judges about the
> actuarial risks for recidivism and that identifies retributive
> considerations (such as proportionality and desert) would be
> extraordinarily helpful.  Without such a system, judges will be
> swinging blindly at the metaphorical piñata of sentencing, sending
> defendants to prison based upon nothing more than the qualitative
> information in the presentence report and the rudimentary
> quantitative information mandated by the advisory Guidelines. . . .

*Id.* at 757.  The issue is how to "provide judges with reliable data . . . ." *Id.*  The design of the assessment tool, the universe in which the individual is measured against, and the biases of the evaluator may skew results.  "The uncritical acceptance of science and related risk technologies can jeopardize due process, produce disparities and discrimination, undercut proportionality, escalate the severity of sentences, and punish individuals for crimes they have not committed."

Kelly Hannah-Moffat, *Actuarial Sentencing: An "Unsettled" Proposition*, Univ. of Albany

Symposium on Sentencing 30 (Sept. 2010), *available at*

http://www.albany.edu/scj/documents/Hannah-Moffatt_RiskAssessment_000.pdf.

Reasonable minds may differ about which characteristics to include and exclude from the calculus of punishment. Historically, judges considered a wide range of characteristics in their sentencing decisions. . . . Congress directed the [Sentencing] Commission to 'maintain sufficient flexibility to permit individualized sentences when warranted,' to ensure the Guidelines were 'entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders,' and to take into account (though only to the extent that they are relevant to sentencing) eleven offender characteristics:

> (1) age; (2) education; (3) vocational skills; (4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant; (5) physical condition, including drug dependence; (6) previous employment record; (7) family ties and responsibilities; (8) community ties; (9) role in the offense; (10) criminal history; and (11) degree of dependence upon criminal activity for a livelihood.

The Commission seized upon criminal history as highly relevant, but concluded . . . that . . . a defendant's education and vocational skills, employment record, family ties and responsibilities, and mental and emotional conditions are not ordinarily relevant. Two offenders, who seem equivalent when only relevant conduct, criminal history and substantial assistance are considered, suddenly appear very different when judges include discouraged characteristics in their sentencing decision. Suddenly, identical

sentences imposed on these two offenders, with very different educational experiences, career paths, and family responsibilities, appear inequitable and unfair. Thus, changes in the permitted categories of sentencing variables (such as risk-related variables) will produce changes in what appear to be equitable sentences.

*Id.* at 755-56 (citing 28 U.S.C. § 991(b)(1)(B) (2006); USSG Manual § 5H1.2 (2008)).

Dynamic risk factors used to predict recidivism include:

1. Anti-social personality pattern (e.g., antagonism, impulsivity, risk-taking), 2. Pro-criminal attitude (e.g., negative expressions about the law), 3. Anti-social associates, 4. Poor use of leisure/recreational time, 5. Substance use, 6. Problematic circumstances at home (e.g., neglect or abuse, homelessness), 7. Problematic circumstances at school or work (e.g., limited education, unemployment). Risk assessments gauge the degree to which these dynamic dimensions influence whether the individual will recidivate by committing a new offense or violating the terms of his or her supervision. Studies show that a history of criminal behavior (particularly number of prior convictions) is one of the most predictive static risk factors in anticipating future criminal behavior. Other static predictive criteria are the individual's current age and his or her age at first arrest. Although substance abuse, lack of housing and unemployment are relatively less predictive, as dynamic risk factors they can be affected by treatment and social service supports.

*National Summit*, *supra*, at 14-15.

Experience in the federal court in the Eastern District of New York appears to show a high correlation between certain types of crime, such as those involving drugs, and a dysfunctional home, particularly one with a single non-male parent. *See generally*, *e.g.*, Tr. of

Sent'g, *United States v. Bannister*, 2011 WL 1361539, No. 10-CR-0053, (E.D.N.Y. Apr. 8, 2011); *see also* Kenneth W. Griffin, et al., *Parenting Practices as Predictors of Substance Abuse, Delinquency, and Aggression among Urban Minority Youth: Moderating Effects of Family Structure and Gender*, 14 Psych. of Addictive Beh. 174, 174 (2000) ("[Y]outh from single-parent families often have higher rates of problem behaviors including substance abuse, aggression, school dropout, and teenage pregnancy.") (citations omitted). Yet our judges would hesitate to visit the sins of the parents on their children without a great deal of close, specific analysis of the defendant himself and the restraints and help the court can provide in reducing future risks.

Studies of risk of future criminality based upon the backgrounds and prior actions of people do have three general utilities: first, to help reduce crime by eliminating, so far as practicable, the causative factors, such as lack of a father figure, lack of education, and lack of treatment for mental problems; second, to suggest how much danger of future crime the defendant presents, third, to assist in deciding the specific sentences of offenders, through, e.g., a long prison term for incapacitation, supervised probation or treatment of mental and addiction problems.

Projections of future criminality based on general research should be encouraged as providing information needed for those providing facilities as in the first, e.g., access to mental health treatment programs and education where a lack of such services is causative of risk, or, as in the second and third, in deciding on specific sentences. Yet, misuse of the data -- even if it is appropriately collected and analyzed in accordance with statistical and other scientific principles -- can be dangerous.

As demonstrated in the present case, placing a relatively passive online child pornography "receiver," "viewer," or "distributer" who has never before committed any crime, in the same category as a group of individuals with histories of contact sexual offending, who have been arrested or convicted of such crimes, may lead to unnecessarily harsh, unreliable, and self-fulfilling predictions. Mechanical reliance on some risk data adds to the hazards of a person from a broken family living in public housing projects or a dysfunctional middle class family, who might well avoid his statistical fate, as many do, if treated for rehabilitation rather than by severe punishment and incapacitation. *Cf., e.g.*, Alex Kotlowitz, *There Are No Children Here* 299-309 (1991) (escape from bad environment of some).

Moreover, such data, again as revealed in the instant case, may be misused to justify a harsh result based on hidden biases and prejudices as well as mechanical mistakes. *See* Part H.iii, *supra* (pointing out Dr. Sachsenmaier's reliance on the unfounded belief that C.R. had frequented "glory holes" to conclude that he was sexually deviant), and discussion of different scoring of the same test, above.

"An assessment tool that's effective for one population might not be well-geared for another. For example, because a group of probationers is generally less likely to reoffend than a group of parolees who have served time in prison and have more extensive criminal histories, different tools and cut-off scores for who is considered low, medium, or high risk must be used. Each risk assessment tool may need to be tailored for the target population." *National Summit, supra*, at 15. "Who comes out on top, in any ranking system, is really about who is doing the ranking." Malcolm Gladwell, *The Order of Things*, The New Yorker, Feb. 14, 2011 at 75.

Even if the calculated risk of further crimes by the defendant is low, the very word "risk" may lead some judges to shy away from non-incarceratory sentences. When the risk of

244

recidivism is as low as 1 percent, when thousands are being sentenced, a score or more will probably recidivate -- some spectacularly. Self- protection of a judge's future may cause him or her to impose a sentence of incapacitation that will avoid the possibility of a future crime, and the ensuing embarrassing criticism from press, voters, and those responsible for appointments and promotions. This is also a factor that may provide comfort to some judges in utilizing various forms of guidelines sentencing as safe harbors. *Cf.* Oleson, *supra*, at 749 ("Strangely, though, in consigning people to prison, judges impose their sentences based on less information about what works and what is cost-effective than physicians who prescribe medicine."); Joel Cohen, *Judges' Quandary: Truth and Sentencing*, New York Law Journal, Feb. 8, 2011 ("Surely, no judge should make sentencing decisions based on personal biases, but yet it happens undoubtedly around the country every day."); Monica Gerber & Jonathan Jackson, *The Ideological Basis of Punitive Sentiment: Beyond Instrumental and Relational Perspectives, available at* http://ssrn.com/abstract=1800481 (suggesting desire for tougher sentencing of criminal offenders is motivated by fear of crime and experience of victimization and concluding that the "punitive mindset" is "related not just to widespread beliefs that the world is dangerous and lacks cohesion, but also to the endorsement of retributive institutional responses to those who threaten collective security").

Communities strapped for resources -- as nearly all are today -- are ill-equipped to accurately identify and then help individuals most in need of services and at the greatest risk of recidivating.

> Most jurisdictions do not have the information they need to make a
> judgment regarding on whom to focus resourced to make the
> greatest investment in public safety and successful community
> reintegration. Their systems are not identifying or prioritizing

individuals deemed likely to reoffend.  Without the use of
objective and validated risk assessments and policies to focus
supervision and treatment resources on the group of individuals
identified as posing the greatest risk for committing new crimes,
the criminal justice system can end up dedicating the most
intensive and expensive sanctions or programs to the people who
need it least and are not likely to reoffend in any case.

*Id*. at 12; *see also*, Christopher T. Lowenkamp & Edward J. Latessa, *Understanding the Risk Principle: How and Why Correctional Interventions Can Harm Low-Risk Offenders, in* Nat'l Inst. Of Corrections, U.S. Dep't of Justice, Topics in Community Corrections 3-8 (2004), http://nicic.gov/library/period265 (noting that providing unnecessary services to low-risk offenders wastes resources that could be devoted to more serious offenders and affirmatively *increases* the risk that low-risk offenders will reoffend).

An examination of the testimony and research in the present case and in the National Summit Report explains some of the reasons why, as indicated in Part IV, *infra*, the court is imposing a thirty month sentencing during which the defendant will receive full scale medical treatment in the Bureau of Prisons, Federal Medical Center Devens program before being released into the community for strictly supervised outpatient treatment.  Any term of incarceration greater than thirty months would be counter-productive both in protection of the public and in treatment of this defendant.  As the witnesses properly indicated in C.R.'s sentencing hearings, the risk to the defendant of being harmed in the general prison population by older inmates who may be sexual predators is significant.  A more lengthy separation from college education, employment, current treatment, and family support would also be detrimental. *See* Part IV, *infra* (discussing reasons for sentence).

**J.  Bureau of Prisons Program For Sex Offenders**

   **i.        Description**

The Bureau of Prisons (BOP) has treatment programs for sex offenders at the Federal

Medical Center, Devens, Massachusetts.   Based on testimony set out below, a description of the

programs issued by the BOP (Appendix A, attached), and a visit by the court to the institution

(Appendix B, attached), a sentence of 30 months incarceration will provide all necessary prison

for the defendant.  A longer term would not improve public security, but would have an

unnecessarily seriously adverse impact on defendant.

The testimony on operation of the prison program available to defendant was as follows:

MR.  KAZEMI:  The government calls [D]octor Cheryl Renaud.

Q        By whom are you employed?

A        I work for the Bureau of Prisons.

Q        And what facility in the Bureau of Prisons do you work

for?

A        I work at the federal medical center at Devens,

Massachusetts.

Q        What are your title or what are your titles at Devens?

A        I am the coordinator of the sex offender management

program and the coordinator of the sex offender treatment program

at Devens.

Q        Approximately how long have you held each of those

positions?

A        I became the coordinator of the sex offender management

program in November of 203 and of the sex offender treatment

program in September 2006.

Q        What are your duties in each of those positions?

247

A        I coordinate the programs, which means that I supervise a number of clinicians who work within the programs.   I deal daily with the offenders in those programs as well as carry a number of psychology duties within the institution.

Q        Where were you working before Devens?

A        At the federal correctional institution in Butner, North Carolina.

Q        How long were you working at Butner?

A        Approximately three years.

Q        What titles did you have at Butner?

A        My primary responsibilities were as a psychologist within the sex offender treatment program at Butner.   I also was the associate director of clinical training.

Q        What where your duties in those two positions?

A        Within the treatment program I provided a range of psychosexual assessments, evaluations for sex offenders…….Within the treatment program I provided a number of psychosexual evaluation services as well as a broad range of treatment services for offenders who are in the treatment program.

Q        What is your educational background?

A        I have a doctorate in clinical psychology from the University of New Brunswick in Canada as well as a Masters Degree in Clinical Psychology as well from Miller's Village University in Pennsylvania.

MR.  KAZEMI:  .  .  .  .

The government would like to offer Dr.  Renaud as an expert regarding Bureau of Prisons sex offender treatment programs as well as Bureau of Prisons security measures available for sex offenders.

. . . .

Q      Dr. Renaud, I'd like to begin by first asking you about the Bureau of Prisons treatment programs available to sex offenders. Then I'd like to ask you about Bureau of Prisons security measures available to protect sex offenders.

Now beginning the treatment, what is the relationship with a sex offender management program and a sex offender treatment program?

A      The bureau has sex offender management programs for individuals who are sentenced for sex crimes or who have a history of sex offenses.   Those programs offer a variety of services including primarily evaluation of the sex offenders as well as correctional management of the sex offenders which means that we pay attention to their exposure to certain things that we call sexual risk factors, collection of stimulus materials, attempts to contact individuals in the community who may be vulnerable to pervasion as well as providing an environment conducive for rehabilitation amongst sex offenders.

So generally within the sec offender management programs they are at institutions that have on average a minimum of 40 percent of the inmates in those institutions being classified as sex offenders which allows –

So the Bureau of Prisons in each of the six regions has one institution designed to be a sex offender management program institution.   Those institutions are designed to manage sex offenders in a safe way so that rather than have few sex offenders spread in various institutions, large numbers of sex offenders are brought into specific institutions so that they experience less harassment potentially from general population inmates, so that they have access to staff who have expertise in managing and in

249

treating sex offenders so that they can function safely on an open compound and avail themselves to education services, religious services, treatments services and so on.

Q       How many sex offender treatment programs are offered?

THE COURT:  What about this 40 percent?  I didn't understand.

A       So generally at a sex offender management program institution there would be a minimum of 40 percent of the inmate population would be comprised of individuals who have some form of sex offending in their history.

So within an institution – with an institution that had a thousand inmates, 40 percent of those inmates would be individuals who had sex offender history.

THE COURT:  What are they called, what kind of institutions?

THE WITNESS:   Sex offender management program sites.

THE COURT:  …..What about the other 60 percent?

THE WITNESS:  The other 60 percent generally would be inmates who were serving sentences for offenses other than sex offenses.

THE COURT:  Are they chosen with any purpose in mind such as to avoid predation on the sex offenders?

THE WITNESS:  Not generally.   That is not my understanding.   My understanding is that they are typically individuals who are assigned to that institution because it meets their security needs, their medical needs and their proximity to home needs.

THE COURT:  Could they be violent offenders in some cases?

THE WITNESS:  They may.   They would be housed in an institution that is commensurate with their security level.   So for instance at low security institutions, there would be relatively few violent offenders, at higher security institutions, there would be more.

THE COURT: Are these sex offender management program sites high security, low security what are they?

THE WITNESS:  They have been at all security levels.   So there is one institution specifically for high security sex offenders. That would be USP Tucson in Arizona.  We have three for medium security sex offenders.   One would be at USP - - USP Marion in Illinois.   FCI Petersburg in Virginia, FCI Mariana in Florida.   We have one specifically for low security sex offenders at FCI Segerville in Texas.  And then finally we have FMC Devens that has all security levels.

THE COURT:  Are they kept segregated at security levels?

THE WITNESS:  Within the institution, so the inmates at a high security institution would all be high security inmates.   And the sex offenders within the institution are fully integrated within the institution.   So they would not be segregated.

THE COURT:  They would not be segregated?

THE WITNESS:  No.

THE COURT:  Now, in Devens you have all security levels.   Are they segregated by security levels?

THE WITNESS:  No, generally Devens has low and medium security offenders generally.   We have high security offenders there if they are there generally for mental health or medical evaluation and treatment.   So they may be in a different housing unit because of their medical status or mental status but

generally not segregated.   They may go to the same dining facility at the same time for instance.

THE COURT:  No, this defendant was observed at where?

THE WITNESS:  My understanding is that he was at FMC Devens as a forensic study case.

Q       Do you have any idea, if he were incarcerated, where he would go?

THE WITNESS:  I don't know specifically where he would go, however, as a sex offender, if he had a judicial recommendation for a sex offender management program and/or sex offender treatment program, the designators would review that and designate him to the appropriate facility with those services.

.  .  .  .

THE COURT:  Now, for example, if the Court said that it recommended that he go to a low security facility and the bureau accepted that and concurred, he would go to Texas?

THE WITNESS:  Not necessarily.   Generally, the bureau will review the offender's history and background to make a determination about the appropriate security level.

If there was a judicial recommendation for sex offender management or sex offender treatment, then they would try to honor that recommendation and place the offender at the institution that is appropriate for his security level that will also meet his sex offender needs.

THE COURT:  What if the Court recommended a low security institution, would that be given weight by the bureau?

THE WITNESS:  I don't know, your Honor, but generally speaking, the bureau does have to place offenders in institutions that will be able to keep them contained and also safe.

MR.  KAZEMI:

Q      How many sex offender treatment programs are offered by the Bureau of Prisons?

A      There are currently six sex offender treatment programs. They are not all the same however.   FMC Devens is the only institution that offers residential sex offender treatment.   The other five institutions offer non-residential sex offender treatment.

Q      Would it be fair to say that the residential treatment at Devens is a high intensity treatment program and the non-residential treatment programs are moderate intensity treatment programs?

A      That would be accurate.

Q      Would you please explain to the Court what is meant by a residential versus non-residential?

A      I'll start with non-residential treatment. Non-residential treatment within the correctional environment means that the offender would be living in a general population housing unit within a sex offender management program institution.

They would then come to psychology services for appointments, generally a minimum of twice per week where they would participate in treatment services, psychotherapy process groups, for instance, but they would be fully integrated within the institution and live in a general population.

Within the residential treatment program, the offenders who are participating in the treatment program all live in one housing unit.

That housing unit holds individuals who are participating in treatment, who have completed treatment or who have volunteered for treatment and are waiting to actually start the treatment process.

253

So it's a pure unit.

They participate in treatment activities, groups a minimum of three times per week.   They are also expected to live by the values of the program and to follow the guidelines of the program 24 hours per day, seven days a week.

THE COURT:  So they would not be integrated into the general population?

THE WITNESS:  Not in terms of their housing.   In terms of their housing, they would be in a pure unit of individuals who are there for treatment purposes, however, they would still go to recreation, education, food services, so on with the general population inmates.  .  .  .

THE COURT:  .  .  .  .  [T]he three times per week, is that individual or group?

THE WITNESS:  That would be groups.   In addition to that, the individual would have a primary clinician who would be working with him individually developing treatment plans, dealing with day-to-day issues that could come up for him as well as supplementing the group work.

THE COURT:  How many people do these primary clinicians supervise?

THE WITNESS:  On average, between 10 and 14.

THE COURT:   These are psychologists or psychiatrists or what?

THE WITNESS:  We have a staff of four psychologists in addition to myself as well as five masters level clinicians within the treatment program.

THE COURT: .  .  .  .  Do you do work with the individuals or do you just supervise?

254

THE WITNESS:  I don't carry a case load but I do meet with the offenders if they have occasion to want to see me or speak with me.

THE COURT:  Who are the masters?

THE WITNESS:  They are clinicians who have either master's degrees in psychology or social work or counseling.

THE COURT:  Do you have a psychiatrist?

THE WITNESS:  There are psychiatry staff at Devens. They don't work specifically in the sex offender treatment program but they work closely with us.   We have several offenders in the program who do require some degree of psychiatric care for depression for instance and they receive medications and we work closely with psychiatry to monitor their medications and needs.

THE COURT:   Is there a written program description?

THE WITNESS:  There is. . . .  [See Appendix A]

THE COURT:  You say the offender has to agree to be part of the program?

THE WITNESS:  The treatment components are voluntary within the sex offender management programs.

So the individual must volunteer for treatment, be determined eligible for treatment services.   Once he starts treatments, he can also withdraw at any point without penalty.

THE COURT:  Of those eligible, what percentage participate?

THE WITNESS:  I don't have the statistics regarding the level of participation in terms of how many actually volunteer who would be eligible.

Typically the individual volunteers.   Based on his volunteerism, we determine eligibility.

255

THE COURT:  He volunteers before he is determined eligible?

THE WITNESS:  Yes, he is assessed for his interest first.

THE COURT:  So you wouldn't have the reverse statistics, those eligible who volunteer?

THE WITNESS:   Correct.

THE COURT:  Of those who volunteer and participate, how many withdraw?

THE WITNESS:  Pardon me?

THE COURT:  Of those who are eligible and participate, how many withdraw?

THE WITNESS:  I'm not sure that I keep accurate statistics with regard to that.   I would say that probably in the ballpark of 20 percent withdraw or otherwise don't complete the program, which means that they could also be dismissed from the program or terminated from the program for reasons other than their choice.

THE COURT:  How long does the program continue?

THE WITNESS:  For the average participant, the residential treatment program takes 18 months.   The literature says 12 to 18 months, however, we have never completed anybody in the treatment program in less than or anywhere near 12 months.   It typically takes 18 months.

THE COURT:  Does it go over 18 months?

THE WITNESS:  Sometimes if individuals do not progress adequately or we believe they need continued intense treatment, we will keep them in longer.

THE COURT:  Are they discharged as cured or what is the discharge decision?

THE WITNESS:  Typically it's based on the individual's progress in treatment.   We would as a treatment team evaluate the progress regularly.   If they are considered to have met the requirements of the treatment program, made adequate progress, we would discharge them as a treatment completion.

Subsequent to that, if they had time left of their sentence, then they would participate in sex offender maintenance treatment which is less intensive but it can continue up until the individual's release from incarceration.

Subsequently, if they are placed in a halfway house, if they participate in sex offender treatment, they generally would continue in sex offender treatment in the community while they are in halfway house.

THE COURT:  What do you mean by in the community, is that supplied by private agencies?

THE WITNESS:  They are contract services and typically at most sites the Bureau of Prisons uses the same contract at U.S. probation would use, typically not always but most often.

MR.  KAZEMI:  ……

Q      How does the Bureau of Prisons determine the appropriate level of treatment intensity for a defendant?

A      Generally speaking, the designators who are in Texas Grand Prairie, Texas, would review the presentence investigation report, the judgment and commitment order and any other documents.   They would do a brief screening of risk to determine the offender's general risk of recidivism.   Based on that level of risk, they would then determine which treatment program would be most appropriate for him.

Q      And at the point, the inmate would be designated to be particular facility?

257

A      Yes.

Q      Upon designation to a particular facility, does Bureau of Prisons staff provide an additional screening of that inmate upon his arrival at that facility?

A      They do.   Generally all inmates who come to an institution are seen by psychology services for an intake screening.   At a sex offender management program site, if the individual was coming for treatment he would then undergo a more comprehensive psychosexual evaluation and risk assessment to determine whether that intensity of treatment was appropriate for him.

Q      Might that screening include an initial risk assessment and discharge report?

A      An initial risk assessment - - the discharge report actually comes at the end prior to his release - - prior to his release from prison or upon completion of the program.

Q      What about the initial risk assessment?

A      The initial risk assessment would occur at the front end prior to his actually embarking on the actual treatment services to determine whether or not the risk that he poses in combination with his treatment needs can be met in that specific program.

Q      What is a correctional management plan?

A      Individuals who are in sex offender management programs who do not volunteer for treatment generally would be monitored for their exposure to risk factors and potential problematic behaviors in relation to the public.   For instance, contacting children via the telephone or via the U.S. mail to give you an example.

So as an institution, we monitor those types of behaviors. If an individual participates in those types of behaviors or is identified as to having engaged in those behaviors, the clinical staff

258

will develop a correctional management plan which informs the offender of those behaviors that are prohibited for him given his past behaviors.

One of our missions, of course, is to insure or try to insure the safety of the public.   So we want to make sure that the offenders in prison are not continuing to offend.

We also want to reduce the offenders exposure to sexual risk factors so that he does not continue to reinforce a deviant sexual arousal to children for instance.

Q       You had testified earlier that Devens offers a residential sex offender treatment program and there are five other institutions within the Bureau of Prisons that offer non-residential sex offender treatment programs.

Would you please just explain to the Court the difference between a residential and non-residential sex offender treatment program?

A       The residential programs are those that are  - -  or the residential is one where all the offenders are housed in what we call a therapeutic community.   The staff offices are all on the treatment unit.   The inmates interact on a daily basis and participate in treatment groups on that treatment unit.

One of the things that we strive to do within the treatment program is to help the offender develop skills to manage his own behavior.

So for instance, with regard to their exposure to sexual stimulus materials so that they manage those behaviors, including for instance what they read, what they view, what they watch on television and so on.

So in addition to structured treatment activities, they live in an environment that promotes positive self-management.

259

Q        What about a non-residential treatment program?

A        Within the non-residential treatment programs the offenders are not living in a therapeutic unit so it is less intensive.

So the offenders are participating in treatment groups in the psychology services department but they are living in an environment that is monitored by institutional staff for exposure to risk factors because it is as a sex offender management program institution, but they don't live in an environment in their day-to-day housing unit that is so closing monitored and structured.

Q        How many beds are available at the Devens residential treatment program facility?

A        Treatment beds, was that the question?

Q        Yes.   Feel free to answer in any way you want.

A        In the treatment unit, there are 112 beds.  96 of those beds are reserved for active program participants.   Within the institution, however, at any given time they may have up to 400 sex offenders at the institution.   The others who are not in the treatment program are managed in the sex offender management program.

Q        In your experience at Devens, has Devens ever turned away any inmate who sought sex offender treatment at the facility?

A        To date, we have not turned anybody away who volunteered for treatment and met the basic eligibility requirement. We have a national waiting list so inmates at any institution can volunteer.   If they are determined to be most appropriate for residential treatment, they would be put on a waiting list.   We prioritize that waiting list based on projected release dates so that we don't have to turn anybody away.

So that someone who volunteers for treatment and has three years remaining on his sentence would come into the program

260

before someone who volunteered for treatment and had 10 years remaining.

Q        And you testified earlier in response to the Court's questions - -

        THE COURT:  Excuse me.

        So let's assume hypothetically somebody is sentenced to two years, would that be time enough to complete the average program after he was assigned?

        THE WITNESS:  Typically that would not be enough for the residential treatment program.

        THE COURT:  What would the minimum for the residential treatment program be?

        THE WITNESS:  *Generally, individuals at this point in time should have anywhere from 27 to 30 months* [Emphasis added].   One of the things that we have to take into account is their good conduct time.   We also have to consider in most cases time for transport from one institution to another if the individual is not already at Devens.   And then we also factor into that halfway house time because we don't want an individual to not be able to benefit from halfway house in order to do the treatment program.

        THE COURT:  That would be within the 27 to 30 months?

        THE WITNESS:  Yes.  .  .  .

Q        So you testified earlier that Devens is the only residential treatment program facility?

A        Currently, yes.

Q        Are there are five non-residential treatment program facilities?

A        Yes.

261

Q      And you had testified, just to be clear for the record, that those five are Tucson, Mariana, Marion, Petersburg and Segerville?

A      Yes

Q      What happens to inmates who complete either the non-residential or residential treatment programs and still have time to serve under their sentence?

A      They would typically participate in maintenance treatment at that institution unless there was compelling reason to transfer them somewhere else.

So for instance, if an offender was far from home, given that we have the only residential treatment program, it may be most beneficial to him to move close to home so he can reestablish family ties and so on.  .  .  .

THE COURT:  What is the typical maintenance program?

THE WITNESS:  Typically maintenance for the offenders who have completed the residential treatment program would be  - - they could continue to participate in the community treatment activities.   We have community meetings that they could still come to  - -  could still attend.   They would participate in psychotherapy process groups generally at a minimum of generally once every two weeks.

They may also elect to continue their active involvement in the treatment community by attending some of the psycho education classes.   Sometimes they come in because they can be very useful in helping individuals who are new to the program to understand the concepts in the treatment program and so on.   And it's beneficial for the individuals in the maintenance treatment program.

Q       How would uncharged but disclosed contact sex offenses against a minor by an individual convicted of a child pornography offense factor into that defendant's placement and treatment?

A       If that information is included in the presentence investigation report or other official documents, it would be considered in his assessment of risk.

So, for instance, an individual who is a first time child pornography offender and there is nothing in his history to suggest that he has engaged in any inappropriate sexual behaviors and there are no additional dynamic risk factors which are factors that can be changed in treatment, he would generally be considered most appropriate for non-residential treatment, however, if there are additional behaviors in his history, if there were documented contact offenses in his history that were never adjudicated, they would still be considered in the determination of risk.   And those individuals would most likely be considered appropriate for residential treatment.

Q       By residential treatment, you mean a designation at Devens?

A       Currently  Devens, yes.

Q       If the Court at sentencing made a recommendation or expressed concern regarding an individual's safety, how if at all would that be factored into the individual's designation?

A       I don't make the decisions with regard to designations, however, I do believe that the designations would take that into account, particularly if there were questions about the individual's vulnerability within the prison environment.   Sex offender management programs are largely designed to provide and environment that is generally safe for sex offenders in addition to the general Safety of BOP institutions.   So that may be one of the

263

factors that is considered for placement at a sex offender management program site.

Q      . . . .  What sort of safety measure do the BOP institutions take to protect sex offenders from potential inmate on inmate violence?

A      Well, largely all inmates who come into bureau custody are informed of the rules and are informed that there is no tolerance for any type of harassment, any type of threats, violence and so on. And inmates are informed of the procedures that they should follow in the event they feel threatened, harassed or otherwise uncomfortable with regard to how other inmates interact with them.  And one of the primary means of prevention is open communication between staff and inmates.   At SOMP institutions, sex offender management program institutions, certainly at Devens I can attest to the fact that every day inmates do talk to us if they are feeling uncomfortable.

Typically staff would follow up by determining whether or not there is any degree of threat to that individual.

Sometimes it means putting someone in a more secure environment so we can determine whether or not there is a threat. Sometimes it means if a threat is verified, that an individual might be transferred.   They need to separate the inmates involved.

So there are a number of procedures that we have in place.

Q      Are there certain housing units that are designated for inmates who may be more susceptible to inmate on inmate violence?

A      Each institution has housing units that are designed to increase or to optimize I guess supervision for the inmates, however, for instance, we have special housing units.   Placement in those environments is not ideal.   We want inmates to be able to

function on an open compound.   So what we do is we - -  if there were allegations, we may potentially be in a position where we have to pending investigation place inmates in a special housing unit to determine if there is a threat.

In the event that no threat is found or the inmates do not have any issues with one another and so on, then they could be released to the general population; or if they are in the treatment unit, certainly they have access to staff on a daily basis who have very good open communication with the inmates in that program.

Q       So that would be a temporary relocation until a threat assessment could be made?

A       Yes.

Q       Then the inmate would be released back into the prior housing unit, is that fair to say?

A       It depends on the circumstances.

It maybe that a different housing unit is the recommended option because two inmates were living in the same housing unit may not be able to get along but if they don't see each other on a daily basis 24 hours a day, they may be better able to get along.

So it actually depends on the actual scenario.

Q       Is that sort of situation something that is commonly dealt with at Devens?

A       We deal with inmate issues on a daily basis.   How common it is that we have to separate inmates?  I don't know the answer to that.   I could say that generally it's not that common and I know - -  I can say that we have not had anybody in the sex offender management program who has requested protective custody for instance for his sex offender related status.

Q       What has Devens' record been with respect to incidents of inmate on inmate violence?

265

A       I would say that our record is very good.   We have had few instances that I can recall of actual inmate on inmate physical violence and those that I do recall were not related to sex offender status but other things; gambling debts for instance, something like that.

And I think generally at sex offender management program institutions sex offenders are able to function on an open compound.   That is largely why these programs have been designed.

Q       Do sex offender management programs ever accommodate referrals of inmates who are unable to remain in the general inmate population due to inmate on inmate violence?

A       Yes, that is one of the services that are provided by the sex offender management programs.   If an inmate is at a general population institution and feels harassed or is harassed because other inmates have found out about his sex offender status, at a general institution they may request protective custody and be placed in a special housing unit for their safety.   Those inmates can be referred to sex offender management programs so that they can be in a environment that is more conducive to their ability to function on an open compound.

Q       .  .  .  .   In order to participate in a sex offender management or treatment program at Devens or the other institutions that you mentioned, is it incumbent upon the inmate to volunteer for the treatment?

A       Not for the management programs.   The management programs are not voluntary in nature.   So the bureau will determine if an offender can benefit from sex offender specific management, either if he needs an environment where he feels safe, safer than other BOP institutions or because he has engaged

266

in behaviors that require specialized monitoring.   And so the bureau will determine if someone needs specialized sex offender management.

Q       How about for the treatment programs?

A       The treatment programs are voluntary.

Hr'g Tr. 4-31, October 12, 2010.

### ii.       Trip of Court to Inspect Programs

The trip of the court to the prison at Federal Medical Center Devens is summarized in Appendix B, attached.   It confirmed the testimony of Dr. Renaud.   After observing all aspects of the prison environment, interviewing patients in the sex treatment portions of the institution, and engaging in a discussion with the warden, medical, and other staff, the court is satisfied that defendant would benefit from no more than a thirty month prison sentence to be served at Federal Medical Center Devens, with intensive sex offender treatment there and afterwards. Close supervision after release by the court's Probation Department will protect the public and defendant from further harm.

## III.   Law

### A. Statutory History

#### i. Federal Sentencing Scheme

The contemporary federal sentencing scheme can be traced to the passage of the Sentencing Reform Act of 1984 ("SRA").   *See* Pub.  L.  No.  98-473, Chapter II, § 3553(a)(2), 98 Stat.  1987 (1984) (codified as amended at 18 U.S.C.  §§ 3551-3742, 28 U.S.C.  §§ 991-98). The SRA was motivated by "a desire on the part of Congress to establish a rational sentencing system to provide for certainty, uniformity, and proportionality in criminal sentencing." U.S. Sentencing Commission, *The History of the Child Pornography Guidelines* 2 (2009), *available* at

http://ftp.ussc.gov/general/20091030_History_Child_Pornography_Guidelines.pdf (report prepared at the request of Congress discussing nine revisions to possession and trafficking in child pornography guidelines).

Created by SRA was the United States Sentencing Commission as an independent agency within the judicial branch to "establish sentencing policies and practices for the Federal criminal justice system," consistent with the purposes of sentencing set forth in section 3553(a) of title 18 of the United States Code. *Id.* at 1. In the name of consistency, uniformity, transparency, and fairness, the Act removed much of judges' historical sentencing discretion, mandating a somewhat robotic application of relatively rigid, highly complex rules. *See United States v. Polouizzi* ("*Polouizzi V*"), 687 F. Supp. 2d at 167-86 (discussing wide sentencing discretion afforded to judges and juries at the founding of our Republic). A key goal of the SRA was ensuring that

> [s]entences available for different crimes reflected the seriousness of these crimes because sentences that are disproportionate to the seriousness of the offense create disrespect for the law. Sentences that are too severe create unnecessary tensions among inmates and add to disciplinary problems in the prisons.

*See* History of Child Pornography Guidelines, *supra*, at 2 n. 8 (quoting S. Rep. No. 98-225, at 45-46 (1983)).

The Sentencing Commission was instructed to "periodically . . . review and revise, in consideration of comments and data . . . the guidelines . . . ." (internal quotations and citation omitted). *Id.* at 4. Consulting with numerous diverse bodies such as the United States Probation System, the Bureau of Prisons, the Judicial Conference of the United States, the Criminal Division of the United States Department of Justice and a representative of the Federal Public

Defenders, and based as well as its own studies and hearings, the Commission promulgates federal sentencing guidelines and policy statements.  *Id.*  Though the Commission has broad powers it is limited by the "specific directives of Congress."  *Id.* at 6 (quoting *United States v. LaBonte*, 520 U.S. 751, 757 (1997)).

In 2005, the Supreme Court restored broad judicial discretion to the judge and jury in *United States v. Booker*, 543 U.S. 220 (2005), declaring the federal Sentencing Guidelines unconstitutional if viewed as mandatory rather than advisory and implementing appellate review for reasonableness.  Emphasized was the sentencing court's obligation to follow general federal sentencing policy under Section 3553(a) of title 18 of the United States Code that sets out the federal sentencing policy.  *See Booker*, 543 U.S. at 259-60.

Section 3553(a) provides:

> The court, shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider—
>
> > (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> >
> > (2) the need for sentence imposed—
> >
> > > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > >
> > > (B) to afford adequate deterrence to criminal conduct;
> > >
> > > (C) to protect the public from further crimes of the defendant;
> > >
> > > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

269

(3) the kinds of sentences available;

(4) the kinds of sentences and sentencing range established . . . .

(5) any pertinent policy statement

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*See*, *infra*, Part IV, for the detailed application of this provision to the instant case.

Subsequent decisions reaffirmed the sentencing court's wide discretion to be reasonable and to deviate from the guidelines. *See, e.g.*, *Kimbrough v. United States,* 522 U.S. 85, 101 (2007) (sentencing courts may depart from the advisory guideline range based solely on policy considerations, including disagreement with the policy underlying the guidelines in a case); *Rita v. United States,* 551 U.S. 338, 351 (2007) (district court may consider arguments that "the Guidelines sentence itself fails to properly reflect [18 U.S.C.] 3553(a) considerations"); *Gall v. United States*, 128 S. Ct. 586, 602 (2007) (upholding a sentence outside the advisory guideline range as reasonable); *see also U.S. v. Pauley*, 511 F.3d 468, 469 (4th Cir. 2007) (varying from child pornography guidelines because of individual circumstances); *United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008) (varying from guidelines because they were not a product of empirical data, national experience, or independent expertise, and therefore failed to satisfy section 3553(a)'s objectives).

### ii.  Mandatory Minimums

Mandatory minimum sentencing requirements—though proliferating recently—have long had a role in our sentencing system. *See generally Polizzi*, 549 F. Supp. 2d at 398 (discussing mandatory minimums historically and today) and *Polizzi*, 549 F. Supp. 2d at 488, Appendix C,

(listing federal statutory provisions with mandatory minimums); *see also* Christopher Wimmer,

et. al, *Sentencing in the United States*, *in Current Trends in Criminal Procedure and Evidence: A*

*Collection of Essays in Honor of Professor Eliahu Harnon*, 453, 458-477 (eds., Horovitz &

Kremnitzer 2009) (providing relevant history of sentencing in the United States); *United States v.*

*O'Brien*, 130 S. Ct. 2169, 2181 (2010) (Stevens, J., concurring), at 1 (discussing "national effort

to enact tougher sentences" in the 1970s and 1980); *id.* at n.1. ("[M]ost of the current mandatory

enhancement laws did not appear until the 1970s") (citing Lowenthal, *Mandatory Sentencing*

*Laws: Undermining the Effectiveness of Determinate Sentencing Reform*, 81 Cal. L. Rev. 61, 64-

69 (1993)); Alan Vinegrad & Jason Levine, *The Future of Mandatory Minimums in Sentencing*,

New York Law Journal, Feb. 16, 2011 at 3 (discussing history of mandatory minimums and

questioning future validity of such sentences).

### iii.  Child Pornography Legislation and Guidelines

Over the past thirty years, Congress expanded the category of activities constituting child

pornography offenses and established new mandatory minimums for them.  *See History of Child*

*Pornography Guidelines*, *supra*, at 6.  "Congress has specifically expressed an intent to raise

penalties associated with certain child pornography offenses several times through directives to

the Commission and statutory changes aimed at increasing the guideline penalties and reducing

the incidence of downward departures for such offenses."  *Id.*  Much of these decisions have

failed to give weight to empirical data from the Sentencing Commission on the appropriate

guidelines and punishments for the wide range of child pornography crimes.  *See* Troy

Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of*

*the Child Pornography Guidelines* 3 (2009), *available at*

http://www.fd.org/pdf_lib/child%20porn%20july%20revision.pdf.

The original 1987 sentencing guidelines for child pornography covered only the crimes of transporting, receiving and trafficking offenses.  *See* U.S.S.G. §2G2.2.; *see also* Stabenow, *supra*, at 4; *History of Child Pornography Guidelines*, *supra*, at 8-9 (discussion pre-guidelines criminalization of child pornography).  Three years later, in 1990, Congress criminalized possession, and in response the Commission created a separate guideline, § 2G2.4, covering possession.  Stabenow, *supra*, at 4-5; *see also* Pub.  L. No. 101-647, Title III, 323(a), (b), Nov. 29, 1990, 104 Stat. 4818, 4819 ("[T]he United States Sentencing Commission shall amend existing guidelines for sentences involving sexual crimes against children, including offenses contained in chapter 109A of title 18, so that more substantial penalties may be imposed if the Commission determines current penalties are inadequate." ).

In response, the Commission created a new offense level of 10 for simple possession under §2G2.4.  Stabenow, *supra*, at 5.  Section 2G2.2 was reserved for crimes of selling or possession with intent to sell child pornography. *Id.*  Enhancements were added for portrayals of sadistic or masochistic images and images of violence.  *Id.*  Finally, the Commission encouraged an "upward departure" where there was evidence that the defendant sexually abused a minor. *Id.*; *see also History of Child Pornography Guidelines*, *supra*, at 13-14 (discussing 1990 guideline changes).

Congress, concluding that the Commission had lightened sentences for "peddlers and pedophiles," stiffened penalties for child pornography.  *Id.* at 6.  It instructed the Commission to include receipt and transportation offenses in §2G2.2 and to expand enhancements to both §2G2.2 and §2G2.4.  *Id.* at 7.  The amendment, labeled a "morality earmark," was apparently

272

based on letters from religious organizations and was passed without any Senate debate.  *Id.*  at

6-7 (referring to Amendment 780, which became Section 632 of Public Law 102-141); *see also*

Exhibit 2, 137 Cong. Rec. S10322-04 (letters from the Religious Alliance Against Pornography

and Morality in the Media).  Ignored was the Commission's opposition based on its belief that

the amendment would "negate the commission's carefully structured efforts to treat similar

conduct similarly and to provide proportionality among different grades of seriousness of these

offenses."  Stabenow, *supra*, at 7-8 (quoting *Letter from the Commission* (opposing increased

penalties) (Aug. 7, 1991)).

     Driven by a "general moral sense that the penalties for 'smut peddlers' should always,

and regularly, be made stricter," rather than by any empirical study on child pornography

sentencing, in 1995 Congress instructed the Commission to increase penalties for child

pornography and sex crimes against children.  *Id.* at 8–12.   The Sex Crimes Against Children

Prevention Act of 1995 ("SCACPA") required a two-level increase in the base level for simple

possession and a two-level enhancement for use of a computer.  *Id.* at 12; *see also History of*

*Child Pornography Guidelines* at 26–32.   Critics noted that neither of the changes targeted the

serious offenders about whom Congress seemed most concerned.  *Id.* at 13–14; *see also* U.S.

Sent'g Comm'n, *Report to Congress, Sex Offenses Against Children*, 29 (1996) ("Report"),

*available at*

http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Se

x_Offense_Topics/199606_RtC_Sex_Crimes_Against_Children/SCAC_Executive_Summary.ht

m (questioning computer enhancement) ("[A] person's culpability depends on *how* they use a

computer . . .").   Recognizing that computer use varies, the Report recommended that

utilization of a computer to view child pornography should be evaluated by how widely the

images are distributed and how likely it is that children will be exposed to the images.  Report at 28–29.

Raising penalties in 2003, Congress increased the statutory maximum for simple possession from five-years to ten and added a five-year mandatory minimum sentence for trafficking and receipt offenses.  *See* Protect Act, Pub. L. No. 108-21 (2003).  These changes were made apparently without notice to, or consultation with, the Commission.  *See* Stabenow, *supra*, at 19; *see also*, *United States v. Phinney*, 599 F. Supp. 2d 1037, 1042-43 (E.D. Wisc. 2009) (considering history of guidelines).   Singled out for criticism was the "Feeney Amendment," an unrelated addition to the Bill that would prohibit downward departures not sponsored by the government.  *See* Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion into Judicial Independence*, 12 J. L. & Pol'y 947, 990-992, n. 215 (quoting 149 Cong. Rec. S5137-01, 5145) (daily ed. Apr. 10, 2003) (statement by Sen. Leahy) ("This far-reaching proposal will undermine the federal sentencing system and prevent judges from imposing just and responsible sentences."); Alan Vinegrad, *The New Federal Sentencing Law*, 15 Fed. Sent'g Rep. 310, 314-15 (June 2003) ("The Feeney Amendment was introduced without input from the federal judiciary, the organized bar, academics, criminal justice experts, probation officers or prison officials.").

Responding to the Protect Act, the Commission made changes to § 2G2.2 and § 2G2.4 to address issues of double counting and raise base offense levels for trafficking, receipt and distribution.  *See* Amendment 649, U.S.S.G. App. C; *see also* Stabenow, *supra*, at 24-25.   In its Fifteen Year report in 2004, the Commission recognized the problem in providing a rational and proportional scheme of sentences because of increased "direct congressional control over sentencing policy for sex offenses."  *See* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines*

274

*Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 72 (2004), *available at* http://www.ussc.gov/Research/Research_Projects/Miscellaneous/15_Year_Study/15_year_study_full.pdf ("The frequent mandatory minimum legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress."). *Id.* at 73.

In 2008, Congress passed additional legislation punishing child pornography. The Protect Our Children Act created a new offense for knowingly producing with intent to distribute or knowingly distributing "child pornography that is an adapted or modified depiction of an identifiable minor" ("morphed image"). *See* Pub. L. No. 110-401, § 304 (2008). "Although touting victim-centered reforms serves prosecutors' and policymakers' interests, it is another question altogether whether such reforms actually improve victims' lives." Gruber, *supra*, at 73.

Child pornography prosecutions are growing exponentially. *See* FBI, Online Child Pornography/Child Sexual Exploitation Investigations (explaining that prosecutions are growing at a rate of more than 2,500 percent), http://www.fbi.gov/stats-services/publications/innocent-images-1/innocent-images-national-initiative (last visited April 27, 2011). Referrals for child pornography prosecutions to the Department of Justice have risen 82 percent between 1994 and 2006. *See* Mark Motivans, Ph.D., & Tracey Kyckelhahn, Bureau of Justice Statistics, *Federal Prosecutions of Child Sex Exploitation Offenders, 2006* (December 2007), http://bjs.ojp.usdoj.gov/content/pub/pdf/fpcseo06.pdf. "The U.S. Department of Justice says prosecutions are up 40 percent since 2006 resulting in roughly 9,000 cases. In 2009, 2,315

suspects were indicted." *See* Paul Elias, Associated Press, *FBI: Child porn prosecutions soar by 2,500%*, February 5, 2011.

### iv. Judicial Interpretations

Most federal *nisi prius* judges apparently believe the mandatory minimum sentences for possession or receipt of child pornography are unreasonably high in some cases. *See* U.S. Sent'g Comm'n, *United States Sentencing Commission Survey of Federal Judges January 2010-March 2010* Question 1 (2010) ("*Survey of Federal Judges*"), *available at* http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf. Seventy-one percent of judges responding to the survey thought mandatory minimums were too high for receipt of child pornography. *Id.* Thirty-seven percent of judges thought the mandatory minimum sentence was too stringent for distribution of child pornography and twenty-three percent found it too high for production. *Id.* A substantial majority, seventy-one percent, strongly agreed or somewhat agreed that the "safety valve" exception to drug mandatory minimums should be expanded to apply to receipt of child pornography crimes. *Id.* at Question 2. Nearly half (44 percent) of judges responding to the survey indicated that this exception should also extend to distribution crimes and a third (34 percent) said the safety valve should apply to production of child pornography crimes. *Id.*

A large proportion of federal judges view the sentencing guidelines for possession and receipt of child pornography as unreasonably harsh. Only 28 percent of judges believe the guidelines range for receipt of child pornography is appropriate, and 26 percent view the range for possession offenses as appropriate. *Id.* at Question 8. Accordingly, judges have sentenced defendants to below-guideline prison terms or to probation in more than 40 percent of federal child pornography cases in the last fiscal year. *See* U.S. Sent'g Comm'n, United States

Sentencing Commission 2009 Annual Report,

http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2009/ar09toc.htm

(last visited April 27, 2011); *see also* Charles Patrick Ewing, *Justice Perverted*: *Sex Offender*

*Law, Psychology, Public Policy* 151- 167 (2011) (discussing numerous judges who have

expressed concerns about child pornography sentencing guidelines).

      As a result of the expressed frustration by federal judges with both the mandatory

minimums and the high guidelines ranges for various child pornography crimes, the Sentencing

Commission has included child pornography offenses in its "final priorities" for the current

amendment cycle ending May 1, 2011.   *See* FedCure News: USSC Action: Notice of final

priorities [for the amendment cycle ending May 1, 2011] (the Commission plans a

"[c]ontinuation of its review of child pornography offenses and possible report to Congress as a

result of such review.   It is anticipated that any such report would include (A) a review of the

incidence of, and reasons for, departures and variances from the guideline sentence; (B) a

compilation of studies on, and analysis of, recidivism by child pornography offenders; and (C)

possible recommendations to Congress on any statutory changes that may be appropriate.").

      The Court of Appeals for the Second Circuit has considered several sentencing issues in

child pornography cases, indicating disquiet at the length of some long terms of incarceration.

*See e.g.*, *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010); *United States v. Tutty*, 612 F.3d

128 (2d Cir. 2010).  In *Dorvee*, the court found that the imposition of a within guideline sentence

(of 233-months) in a case involving distribution of child pornography via peer-to-peer file

sharing programs both procedurally and substantively unreasonable.  The court expressly

critiqued the sentencing guidelines as not based upon rational factors, but instead upon arbitrary

assumptions—noting that deference to such guidelines may not be appropriate in individual

cases in light of the fact that the range was not based on any empirical or rational calculus. *Dorvee*, 616 F.3d at 186; *see also Recent Cases  Criminal Law – Sentencing Guidelines – Second Circuit Holds Within-Guidelines Child Pornography Sentence Procedurally and Substantively Unreasonable*. -- United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010), 124 Harv. L. Rev. 1082, 1082-1089 (2011).

Mandatory minimums suffer from the same defect of lack of justification.  Dealing with such a complex crime with its wide range of culpability, a sentencing court must pay heightened attention to context.  The five-year mandatory minimum is a blunderbuss that does not hit targets it aimed at or address the precise situations in child pornography crimes that require severe incarceration.

In *Dorvee* the sentence seemed unreasonably high even though the defendant was engaged in active distribution and was conversing with and soliciting a person he believed to be a fourteen-year-old boy to participate in distribution of child pornography.  *Id*. at 176.  On the spectrum of culpability he was well along in his criminal behavior and readiness to act out.

In *Tutty*, the defendant pleaded guilty to online receipt of pictures of young boys engaged in sex acts.  612 F.3d at 129.  The court found procedural error in the district court's imposition of a within guidelines range of imprisonment of 168 months.   Citing *Dorvee*, the panel noted the harshness of the guidelines as applied in child pornography cases and reiterated its view that these guidelines are not entitled to the usual deference because of the lack of empirical basis underpinning them.  *Id*. at 132.  Emphasized was the fact that the district court may depart downward from the guidelines based on *policy* disagreements with the guidelines.  The sentencing court was in error precisely because (according to the Court of Appeals), it failed to recognize the importance of policy considerations, particularly in the context of child

pornography—where unreasoned application of the guidelines may result in particularly unjust, harsh sentences.   It stated:

> On remand, and after hearing from the parties, the district court should take note of these policy considerations, which do apply to a wide class of defendants or offenses, and bear in mind the "eccentric" child pornography *Guidelines*, with their "highly unusual provenance," "*can easily generate unreasonable results.*"

*Id.* (citing *Dorvee*, 616 F.3d 174) (emphasis added); *see also United States v. Henderson*, No. 09-50544, 2011 WL 1613411, *7 (April 29, 2011 9th Cir.) ("district courts may vary from child pornography guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"); *cf. United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (noting that the Court of Appeals "will view as inherently suspect a non-Guidelines sentence that rests primarily on factors that are not unique or personal to a particular defendant, but instead reflects attributes common to all defendants.").

More recently, *United States v. DeSilva*, 613 F.3d 352, 54 (2d Cir. 2010), involved a defendant who pleaded guilty to one count of distributing child pornography; he had a prior history of sexually abusing over a period of two years a friend's son for whom he "babysat." The court imposed a below-guideline sentence of 132 months, followed by a life-time of supervised release. *Id.* at 356.   In doing so, it relied in part on a conclusion by an evaluating doctor.   The Court of Appeals held that the district court's reliance on the evaluation was clearly erroneous because it "entirely removed [the doctor's] opinion from the context in which it was rendered."   *Id.*   The deficiency, according to the Court of Appeals, was that the evaluation was

prepared in advance of trial, not sentencing: it was error to rely on the report because it

considered the risk of the defendant's acting out if he was released to his parent's custody

pending trial, not whether he would pose a danger to society once he had served his sentence and

was released from prison. *Id.* at 356-59.

The analysis in *DeSilva* is instructive. The court employed careful consideration of

mental and other factors at sentencing, relying—but not without independent weighing—on

psychosexual evaluations:

> Although a psychologist's report may provide mitigating evidence
> for the court's consideration during sentencing, the court must still
> conduct an independent evaluation of the defendant in light of the
> factors set forth in 18 U.S.C.
> § 3553(a). If the psychologist's report cannot be squared with the
> court's own judgment of the defendant's culpability and the danger
> he poses to society, the court is free, in its discretion, to decide to
> rely on the psychologist's findings, so long as the court explains its
> basis for doing so.
>
> . . . .
>
> [N]othing in *Dorvee* compels a district court to accept a
> psychologist's conclusions at face value. It is possible, of course,
> that such a psychologist's report may be accurate. But district
> courts should scrutinize such reports with the same diligence
> required during any fact-finding at sentencing, especially if the
> report's conclusion is at odds with the defendant's conduct.

*Id.* at 356-58. *See also United States v. Cossey*, 632 F.3d 82, 86-89 (2d Cir. 2011) (sentencing

vacated because of trial court's assumption about genetic basis for viewing child pornography).

Circuit Courts of Appeals have upheld a number of guidelines sentences when the circumstances

of the crimes justified the long sentences set forth in the Guidelines. *See United States v. Mantanes*, 632 F.3d 372 (7th Cir. 2011) (affirming within-guideline 210-month sentence when defendant's own expert concluded that he was a pedophile with ongoing fantasies); *United States v. Douglas*, 626 F.3d 161 (2d Cir. 2010) (affirming conviction for one count of criminal enticement of a minor and one count of knowingly transporting child pornography in interstate commerce for defendant who professed to be a "sex slave trainer" and admitted history of grooming and assaulting young girls); *United States v. Davis*, 624 F.3d 508 (2d Cir. 2010) (affirming 120-year sentence for sexual exploitation of a minor for defendant with three prior convictions for sexual assaults upon children); *United States v. Adhers*, 622 F.3d 115 (2d. Cir. 2010) (district court's consideration of defendant's three assault victims was procedurally appropriate in calculating 580 month sentence for one count of producing child pornography).

There is also some judicial concern about the excessive control of sex offenders after rehabilitation has been achieved. One New York administrative judge publicly complained about failure of the State Office of Mental Health to provide some hope for release of sex offenders who should no longer be kept in secure facilities. *See* Joel Stashenko, *Confined Sex Offenders Missing Path To Release, Court Complains*, N.Y.L.J., Jan. 3, 2011, at 1. In *Matter of Application of New York v. Douglas S.*, 2008-002297 (N.Y. Sup. Ct. 5th Jud. Dist. 2009), an administrative judge analyzing the cases of 145 sex offenders in his district wrote:

> There needs to be a light at the end of the tunnel for each of
> these patients who cooperate, accept, acknowledge and show
> their willingness to work with the system to correct their
> behaviors as such so that they are no longer a substantial
> threat to society. . . . The Office of Mental Health is not
> completing its medical treatment obligation . . . by denying any
> efforts of the individual to be released.

281

*Id.* at 1 (citing *Matter of Application of New York v. Douglas S.,* 2008-002297 (N.Y. Sup. Ct. 5th Jud. Dist. 2009)); *see also* Bill Sizemore, *Cost of Sex Offender Program Shocks Lawmakers*, The Virginian-Pilot, Jan. 15, 2011, *available at*, http://hamptonroads.com/2011/01/cost-virginia-sex-offender-program-shocks-lawmakers (discussing lawmakers concern over rising cost of Virginia's Sexually Violent Predator Program that keeps certain sex offenders in locked facilities after their criminal sentences have ended).

### v.  Public Policy Concerns

Judges, legal scholars, and community activists, among others, have expressed increasing concern over rigid application of, and expanded use of, mandatory minimums. *See* Part III.B.v, *supra*.  In a recent survey of judges conducted by the United States Sentencing Commission, of judges that responded sixty-two percent said the required sentences were generally too high across all cases involving mandatory minimums.  *See Survey of Federal Judges* at 5 (Table 1); *see also* Erik Luna & Paul G. Cassell, *Mandatory Minimalism,* 32 Cardozo L.  Rev.  1 (2010) (citing numerous instances of federal judges' "voicing dismay at the excessive sentences they were required to pronounce and affirm").  As already noted, child pornography was no exception.  Over seventy-five percent of judges found the five-year minimum for receiving child pornography to be unduly severe in the circumstances of their cases.  *See Survey of Federal Judges*, *supra*, at Question 1.  This sentiment was shared by over a fifth of judges with respect to the ten-year mandatory minimum for producing child pornography, and over a third of judges with respect to the five-year minimum for distribution.  *Id.*

Based on their daily experience on the bench, they deplored the unnecessary cruelty in the rigid imposition of the mandatory minimums.  *See e.g.*, the *Dorvee*, *Tutty*, *DeSilva* Second Circuit cases discussed *supra*; *United States v.  Santa*, No.  05-CR-649, 2008 WL 2065560

(E.D.N.Y. May 14, 2008) (referred to in Wimmer, et al., *supra*, at 467 n.63) ("Because the legislative abrogation of judicial discretion . . . the defendant's sentence was chosen not by the court, but by the prosecution, and was in the court's opinion much harsher than it should have been."; *United States v. Vasquez*, No. 09-CR-259, 2010 WL 1257359, *1-5 (E.D.N.Y. Mar. 30, 2010) (Gleeson, J.) (discussing injustice of imposing five-year minimum in narcotics case and concluding, "[i]n sum, though I am obligated by law to provide a statement of 'reasons' for each sentence I impose, *see* 18 U.S.C. § 3553(c), in this case there was but one: I was forced by a law that should not have been invoked to impose a five-year prison term"); *United States v. Phinney*, 599 F. Supp. 2d 1037 (E.D. Wis. 2009) (discussing imposition of sentencing guidelines). *See also generally* Mark Hansen, *A Reluctant Rebellion*, ABA Journal, June 1, 2009, *available at* http://www.abajournal.com/magazine/article/a_reluctant_Rebellion (noting judicial opposition among judges); Editorial, *Rethinking Criminal Sentences*, N.Y. Times, July 28, 2010, at A20 (discussing mandatory minimums, noting that instead of a five-to-seven year child pornography sentence, "many judges instead are imposing probation or one year for first offenses"); Lauren Garrison, *Child Porn Cases Trigger New Debate: Judges Lack Discretion with Mandatory Sentencing*, New Haven Register, Aug. 15, 2010 (discussing view of sentencing judge, expressed to defendant: "You're being sentenced by the legislature."); A.G. Sulzberger, *Defiant Judge Takes on Child Pornography Law*, N.Y. Times, May 21, 2010, at A1 (discussing critical view of mandatory minimums).

Recently, the Sentencing Commission held a public hearing on mandatory minimums. *See* Mandatory Minimum Sentencing Provisions under Federal Law, Hearing before the United States Sentencing Commission (May 27, 2010), *available at* http://www.ussc.gov/ Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20100527/Hearing_Transcript.

pdf (last visited April 28, 2011).  Highlighted at this hearing were the inequity, injustice, and inefficacy of mandatory minimum sentences.  *See* in particular, the testimony on behalf of the American Bar Association describing mandatory minimums as the "anti-thesis of rational sentencing policy," *id.* at 13(Statement of Sally Quillan Yates, Assistant United States Attorney for Northern District of Georgia, testifying on behalf of DOJ, noting inequities in imposition of mandatory minimum sentences).

A common theme in the testimony and literature on minimum sentences generally relates to concern arising from the unlimited discretion afforded to the executive branch through its charging power.  Because prosecutors decide when and under what statute to charge an offense, mandatory minimums shift sentencing discretion from the judge to the prosecutor.  The jury is likely to be unaware of the minimum sentence applicable to any of the counts of which it may find the defendant guilty.  *See id.* at 77 (Statement of Michael Nachmanoff, Federal Public Defender for the Eastern District of Virginia) ("Mandatory minimums . . .  in hands of prosecutors, not judges , . . .  are used to punish or threaten to punish defendants . . .  for exercising the right to trial."); *id.* at 90 (Statement of Jeffrey B. Steinback on behalf of the Practitioner's Advisory Group) (describing inequitable use of mandatory minimums by prosecutors in pressuring defendants to plead); *id.* at 102 (Statement of James E. Felman on behalf of the ABA) ("To give prosecutors . . .  unchecked authority . . .  deprives defendants of access to impartial decision-maker in . . .  sentencing.").

The deleterious effects of the mandatory minimums are exacerbated by the Department of Justice's announced policy of generally treating cases as harshly as possible, thus triggering changes that require high minimum sentences beyond the court's power to ameliorate.  *See* United States Attorneys' Manual § 9-27.300.A (2010) ("[T]he attorney for the government

284

should charge . . . the most serious offense. . . . [which] is generally that which yields the highest range under the sentencing guidelines."). There is evidence that this policy may be in a mellowing phase, as the DOJ and executive recognize unfairness in the current system. *Compare* Memo from Atty Gen. Holder Setting Forth Department Policy on charging and Sentencing (May 19, 2010), *available at* http://www.sentencing.typepad.com/files/holder-charging-memo.pdf ("[F]ederal prosecutors *should ordinarily* charge the most serious offense that is consistent with the defendant's conduct.") (emphasis added) (internal quotation omitted) *with* Memo. from Atty. Gen. John Ashcroft Setting Forth Justice Department's Charging and Plea Policies (Sept. 22, 2003), *reprinted in* 16 Fed. Sent'g Rep. 129, 130 (2003) ("[F]ederal prosecutors *must* charge and pursue the most serious offense. . . .") (emphasis added). *See also*, *e.g.*, Mark Hamblett, *Use of Current Sentencing Rules Barred for 2003 Porn Confession* N.Y.L.J., June 8, 2010, at 1 (implying, apparently, that at least some prosecutors are showing some discretion in their charging decisions).

The legislative branch is now beginning to be seriously concerned over injustices created by mandatory minimums. *See* The Fair Sentencing Act of 2010, Public Law No. 111-220 (signed into law on August 3, 2010). It eliminates the five-year mandatory minimum sentence for simple possession (without intent to distribute) crack cocaine. This law marks the first time since 1970 that Congress has repealed a mandatory minimum sentence. Also expressing discontent with mandatory minimums is the Justice Department. *See, e.g.*, Robert C. "Bobby" Scott, *Congressional Activities Affecting Federal Sentencing Policy*, 23 Fed. Sent'g Rep. 106, 106-107 (Dec. 2010) ("The current de facto moratorium on additional . . . mandatory minimum sentence statutes is a major step toward rational federal sentencing policy. . . . Mandatory minimum sentences have . . . been studied extensively and have been shown to distort rational

sentencing, discriminate against minorities, waste money, and violate common sense."); Ryan J. Reilly, *DOJ: Little Support for Federal Sentencing Overahaul*, Main Justice (May 27, 2010, 4:24 PM), http://www.mainjustice.com/2010/05/27/doj-little-support-for-federal-sentencing-overhaul/ (discussing testimony of U.S. Attorney Sally Quillian Yates on Behalf of DOJ at May 27, 2010 hearing) ("The Justice Department thinks that mandatory minimum sentencing laws have placed a strain on the federal penitentiary system, disparately impact demographic groups and result in undue leniency for white collar crimes and some child exploitation offenses."). *Accord*, Alan Vinegrad, *Justice Department's New Charging, Plea Bargaining and Sentencing Policy*, N.Y.L.J. June 10, 2010. *See generally* Letter from Jonathan J. Wroblewski, Office of Policy and Legislation, U.S. Department of Justice to U.S. Sent'g Comm'n, June 28, 2010 (criticizing child pornography Guidelines and also discussing mandatory minimums generally).

### ix.    Statute: Distribution of Child Pornography

As discussed in Part II.D, *supra*, defendant pled guilty to violating 18 U.S.C. § 2252(a)(2) which prohibits the distribution of child pornography.   The statute provides:

> (a) Any person who:

>> (2) knowingly receives, or distributes, any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if--

> (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct

Proof of distribution requires action by the defendant.  Material elements include: 1) an intent of the defendant to have some person receive a child pornography image; and 2) the transmission by the defendant of the image to a person.  *See* Part II.D.i, *supra*, Interpretation of the Statute – 18 U.S.C. 2252(a)(2).

Violation of this statute is punishable by the mandatory five-year sentence, established by the Congress in 2003.  Pub. L. No. 108-21, § 103 (b)(1)(C)(i) (2003), *codified as amended* at 18 U.S.C.  § 2252(b)(1)) (enacting five-year minimum for distribution).  *See also* Pub. L. No. 99-500, 100 Stat. 1783-75 (1986); Pub. L. No. 99-591, 100 Stat 3341-75 (1986).  In addition, the Guidelines call for a term of imprisonment of 168 to 210 months based on a total offense level of 35 and a criminal history category of category I based on Probation's calculation.  *See* Part IV, *supra* (discussing Court's findings with respect to offense level, enhancements, and guideline range).

The constitutionality of the minimum as applied has been challenged by defendant, the issue to which this memorandum now turns.

### B.  Constitutional Issues

### i.  Separation of Powers

While separation of powers is not an independent ground for declaring the five-year mandatory minimum inapplicable on its face or as applied, the legislative requirement constitutes an anomalous departure from Madisonian doctrine.  This discontinuity with general theory lends color to the more serious constitutional challenge based upon the cruel and unusual punishment issue described below.  *See infra*, Part III.B.v.  *See generally Polizzi*, 549 F. Supp. 2d at 397–98

for a full discussion of the constitutional argument that mandatory minimum sentences violate the separation of powers.

This argument for declaring unconstitutional the five-year minimum sentence in the instant case is not in and of itself persuasive. Congress has broad power to decide what is criminal and how to punish violations.

### ii. First Amendment Exceptions

Another rationale for finding the mandatory minimum sentence unconstitutional is violation of First Amendment, free speech. *See generally Polizzi*, 549 F. Supp. 2d at 378-86 (reviewing the history of First Amendment with respect to pornography, obscenity and sexually oriented speech).

While the matter is debatable, considering the ongoing concern respecting the appropriate balance between the private rights to view pornography or engage in other First Amendment activities and the need to protect children, the instant case does not provide an appropriate vehicle for declaring defendant's conviction or the applicable mandatory minimum penalty unconstitutional on First Amendment grounds. *Cf. United States v. Hotaling*, 634 F.3d 725 (2d Cir. 2011) (holding "morphed" child pornography, which uses faces of known minors and bodies of adult females, is not protected expressive speech under the First Amendment). It does lend some color to the cruel and unusual punishment claim.

### iii. Fourth Amendment

Challenges on Fourth Amendment grounds to the government's investigations through internet tracking in child pornography cases have been rejected. *See Polizzi*, 549 F. Supp. 2d at 387-96 (discussing search, seizure, and reasonable expectation of privacy issues raised in the government's investigation; citing cases); *but cf.* Christopher Slobogin, *Is the Fourth Amendment*

*Relevant in a Technological Age* (Vanderbilt Univ. L. Sch. Pub. L. & Legal Theory, Working Paper No. 10-64, 2010) (criticizing failures of Supreme Court to reinterpret the Fourth Amendment in view of technological changes), *available at* http://ssrn.com/abstract=1734755. There is no Fourth Amendment basis here for challenging the government's investigation of C.R.

### iv.    Irrationality

Despite the serious criticism of mandatory minimum sentences on policy grounds, there is no denying that Congress has the power to adopt policy that some critics think illogical.  *See, eg.*, *The Mostly Unintended Effects of Mandatory Penalties*, 38 Crime & Just. 65 (2009) (arguing that although there is no credible evidence that the enactment or implementation of mandatory minimum sentences has significant deterrent effects, there is massive evidence that mandatory minimums foster circumvention by judges, juries, and prosecutors; reduce accountability and transparency; produce injustices in many cases; and results in wide unwarranted disparities in the handling of similar cases).  Although the mandatory minimum, particularly in the context of child pornography, may be irrational in the case of some child pornography defendants, "drawing lines of statutory inclusion and exclusion is 'peculiarly a legislative task' for which 'perfection is neither possible nor necessary.'" John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2451 (2003) (internal citations omitted).

In order to pass constitutional muster congressional sentencing schemes, including mandatory minimum sentences, must satisfy constitutional standards of rationality grounded in the Due Process Clause of the Fifth Amendment.  *See, e.g., Polizzi I*, 549 F. Supp. 2d at 372 (analyzing constitutional validity of child pornography sentences under rationality standard). "[A] person who has been . . .  convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, *so long as that penalty is not cruel and*

*unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment*." *Chapman v. United States,* 500 U.S. 453, 465 (1991) (emphasis added) (citations and original emphasis omitted) (analyzing sentences prescribed for possession of LSD). "Penal distinctions based on differences in voluntary conduct" are subject only to "rational-basis scrutiny." *United States v. Coleman*, 166 F.3d 428, 431 (2d Cir.1999). In the sentencing context, equal protection and due process analyses are identical. *Chapman v. United States,* 500 U.S. 453, 465 (1991) ("[A]n argument based on equal protection essentially duplicates an argument based on due process.") (citing *Jones v. United States,* 463 U.S. 354, 362, n. 10 (1983)); *cf. Bolling v. Sharpe*, 347 U.S. 497 (1954) (holding that equal protection principles are binding on the federal government through the Fifth Amendment's Due Process Clause).

A low rational-basis hurdle has been consistently applied by courts addressing due process or equal protection challenges to congressionally prescribed sentences. *See, e.g.*, *United States v. Byrd*, 379 Fed. App'x. 84 (2d Cir. 2010) (upholding mandatory minimum sentence for use of a firearm in furtherance of a crime of violence); *United States v. Sampson*, 486 F.3d 13, 28-29 (1st Cir. 2007) (upholding capital sentence); *United States v. MacEwan*, 445 F.3d 237, 252-53 (3d Cir. 2006) (upholding mandatory minimum sentence for child pornography offense, despite lack of "individualized sentence"); *United States v. Valencia-Gonzales*, 172 F.3d 344, 345-46 (5th Cir. 1999) (upholding sentence based upon drug defendant was carrying, rather than drug he thought he was carrying); *United States v. Coleman*, 166 F.3d at 431 (holding that sentencing disparities between powder cocaine and crack cocaine are subject only to rationality review under the equal protection principles because "[t]he Supreme Court has rejected the notion that a classification is suspect when 'entry into th[e] class . . . is the product of voluntary

290

action.'" (quoting *Plyler v. Doe*, 457 U.S. 202, 219 n. 19 (1982)); *In re Kemmler,* 136 U.S. 436, 448-49 (1890) ("Undoubtedly the [fourteenth] amendment forbids any arbitrary deprivation of life, liberty, or property, and secures equal protection to all under like circumstances in the enjoyment of their rights; and, in the administration of criminal justice, requires that no different or higher punishment shall be imposed upon one than is imposed upon all for like offenses.   But it was not designed to interfere with the power of the state to protect the lives, liberties, and property of its citizens, and to promote their health, peace, morals, education, and good order.").

Mandatory minimum sentences have been held not to violate constitutional standards of rationality, despite depriving defendants of "individualized sentencing."  *See, e.g.*, *United States v. MacEwan*, 445 F.3d at 252-53; *United States v. Walker*, 473 F.3d 71, 76 (3d Cir. 2007) (considering mandatory minimum sentence for firearms offenses, and generalizing holding of *MacEwan* to reject all "challenges to mandatory sentencing schemes on the ground that there is no due process right to individualized sentencing").

In a rare decision striking down a punishment for failure to meet constitutional rationality requirements, the Court of Appeals for the Ninth Circuit invalidated a $25 processing fee that was administered in connection with a traffic violation on a United States military base.  *See United States v. Trimble*, 487 F.3d 752, 754, 757 (9th Cir. 2007).   In that case, the defendant complained that she had been assessed the fee because she had been ticketed using a new ticket form which disclosed the fee, even though others penalized for the same offense on the same day had not been required to pay the fee because they were ticketed by officers who were still using the old form that did not disclose the fee.   The court analyzed the governing rationality standard, and explained that the imposed penalty must stand "if we can imagine any rational reason for the judge to treat [the defendant] differently because she received a traffic ticket on a new form as

291

opposed to an old one." *Trimble*, 487 F.3d at 754.   It found that the new form did not clearly

apply, even by its terms, to the defendant, and held that assessing the $25 processing fee for

some violators but not others for the same offense was arbitrary and irrational:

> [T]here is *no* rational, non-arbitrary reason for the new
> form/old form distinction as applied to petty offenders.   As
> applied to Trimble, new form/old form is no better a
> distinction than that between Wednesday/Friday or
> odd/even.   We conclude, consequently, that the magistrate
> judge violated Trimble's constitutional rights by charging
> her more than other petty offenders for offenses covering
> the same time period.

*Trimble*, 487 F.3d at 757.

Courts that have considered rationality challenges to the mandatory minimum sentences

for child pornography offenses have rejected them.   *See, e.g., Polizzi*, 549 F. Supp. 2d at 372-77

(collecting cases).   In *MacEwan*, 445 F.3d 237, the Court of Appeals for the Third Circuit

applied the lenient *Chapman* standard in finding that the failure to provide "individualized

sentences" was not arbitrary or irrational for purposes of the due process clause:

> [Defendant] argues that the mandatory minimum
> sentencing provision of § 2252A(b)(1) is unconstitutional
> because "the Due Process Clause dictates that [he] should
> have been the recipient of individualized sentencing in
> connection with the sentence to be imposed."   We need not
> dwell upon this argument, however, because this Court has
> repeatedly held that there is no due process right to
> individualized sentences.   Rather, "[a] sentencing scheme
> providing for 'individualized sentences rests not on
> constitutional commands, but on public policy enacted into
> statutes.'"   *Chapman,* 500 U.S.  at 467, 111 S.Ct.  1919.

> Accordingly, we determine that the 15-year minimum
> sentence mandated by § 2252A(b)(1) does not offend the
> Due Process Clause of the Fifth Amendment.

445 F.3d at 252-53 (some citations omitted).

The Eastern District of Tennessee, in *United States v. McElheney*, held that the disparity between possession and receipt of child pornography, in that only the latter carries a five-year mandatory minimum, was not a due process violation. 524 F. Supp. 2d 983, 1000-01 (E.D. Tenn. 2007). Remarking that rationality review involved a "highly deferential standard," the court explained that the rational basis for the mandatory minimum associated with receipt lay in the need to eliminate the market for child pornography:

> There is a rational basis for the distinction between receiving child pornography and possessing it. Possession is passive and receiving is more active. It is rational for Congress to seek to eliminate the market for child pornography, that is, to stop trafficking in it. Someone who merely possesses child pornography is not as active in the market as someone who receives child pornography, so there is a rational basis for Congress's decision to impose different sentences for those offenses. In addition, Congress is permitted to impose different sentences without violating the Fifth Amendment's Equal Protection Component of the Due Process Clause.

524 F. Supp. 2d at 1000–01. *Cf. United States v. Christie*, 570 F. Supp .2d 657, 692 (D. N.J. 2008) ("[I]t is clear that imposing a mandatory fifteen-year minimum sentence for someone who traffics, or attempts to traffic, in child pornography, as Mr. Christie is charged with doing, serves the congressional intent of attempting to eliminate that insidious market.").

Irrationality for lack of due process is not a basis for declaring the five-year minimum unconstitutional on its face.  As demonstrated in the next section, however, the minimum is invalid as applied to C.R. because it is cruel and unusual.  *See Chapman*, 500 U.S. at 465 (recognizing wide power of Congress to impose penalties "so long as that penalty is not cruel and unusual").

### v.    Cruel and Unusual Punishment

To determine whether a punishment is constitutionally cruel and unusual, "courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a mature society.'"  *Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).  The relatively swift change in American sensibilities on the subject is illustrated by the opinion in *Stanford v. Kentucky*, 492 U.S. 361 (1989), where the Court rejected the proposition that the Constitution bars capital punishment for offenders younger than 18, and the case of *Roper v. Simmons*, 543 U.S. 551 (2005), where it adopted that statement as a rule of constitutional law.  Significantly, the defendant in *Roper* was the "instigator," of a "chilling, callous" premeditator of a killing which he embarked upon because he thought he could get away with it as a minor.  *Id.* at 556.  Yet, these negative factors did not override the constitutional protections for the immature.

### a.  Proportionality

The Eighth Amendment requires proportionality in the sentence imposed for a crime. Application of this principle to immature youngsters has been of increasing concern.

The Supreme Court's analysis of sentence proportionality falls within two general classifications: 1) challenges to the length of term-of-years sentences given all the circumstances in a particular case and 2) categorical rules to define Eighth Amendment standards.  *Graham*,

130 S.Ct. at 2021-23.  In the former the Court applies a "narrow proportionality principle" that "does not require strict proportionality between crime and sentence," but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (upholding life sentence without the possibility of parole for defendant convicted of possessing more than 650 grams of cocaine); *see also Ewing v. California*, 538 U.S. 11 (2003) (rejecting Eighth Amendment challenge to prison term of twenty-five-years to life under California's "three strikes law" for a recidivist who was convicted of stealing golf clubs worth $1,200).

While it was previously unclear to lower courts whether proportionality requirements were applicable outside the capital context, it is now established that they do govern non-capital sentences.  *Compare United States v. Polizzi*, 549 F. Supp. 2d 308, 362 (2008) ("Whether proportionality analysis applies in non-capital cases such as those involving mandatory minimum sentences is unclear.") *with Graham*, 130 S. Ct. 2011 (2010) (applying proportionality analysis to invalidate sentence of life without parole for individuals who committed non-homicide offense before age eighteen).

The Court has traditionally held that "death is different."  *See Harmelin*, 501 U.S. at 994 ("Proportionality review is one of several respects in which we have held that 'death is different,' and have imposed protections that the Constitution nowhere else provides.") (citations omitted). "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*, 445 U.S.  263, 272 (1980) (Rehnquist, J.) (holding that a sentence of life in prison with the possibility of parole as applied to a three-time offender is constitutional).  For non-capital cases, it is only an "extraordinary case" where "the gross disproportionality principle reserves a constitutional violation." *Lockyer*

*v. Andrade*, 538 U.S.  63, 76 (2003); *see, e.g.*, *Solem v. Helm*, 463 U.S. 277 (1983) (holding unconstitutional a sentence of life imprisonment for the passing of a bad check by a convicted felon); *Weems v. United States*, 217 U.S. 349 (1910) (invalidating a sentence of twelve years' imprisonment in chains and at hard labor for the crime of falsifying a public document); *Humphrey v. Wilson*, 652 S.E.2d 501 (Ga. 2007) (finding cruel and unusual a ten-year sentence for a 17-year-old having consensual oral sex with a fifteen-year-old).

The Supreme Court has "not established a clear or consistent path for courts to follow" in applying proportionality analysis. *United States v. Cunningham*, 191 F. App'x 670 (10th Cir. 2006) (quoting *Lockyer*, 538 U.S. at 72).  In 1983, *Solem* established a three-part test for determining whether a sentence is unconstitutionally disproportionate:

> The court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Solem*, 463 U.S. at 292.

Eight years after *Solem*, the Court refined its approach to proportionality in *Harmelin,* 501 U.S. 957.  Although there was no majority decision, seven Justices agreed that the Eighth Amendment's cruel and unusual language included a proportionality principle.   Since *Harmelin*, courts have generally applied Justice Kennedy's analysis in his concurrence.   *See, e.g.*, *United States v. Angelos*, 433 F.3d 738, 753 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 723 (2006) ("Justice Kennedy's opinion in *Harmelin . . . sets forth the applicable Eighth Amendment proportionality test*.") (quoting *Hawkins v. Haget*, 200 F.3d 1279, 1282 (10th Cir. 1999)

(emphasis added).  Justice Kennedy first identified "common principles that give content to the uses and limits of proportionality review":

> All of these principles - - [1] the primacy of the legislature, [2] the variety of legitimate penological schemes, [3] the nature of our federal system, and [4] the requirement that proportionality review be guided by objective factors - - inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence.   Rather, it forbids [5] only extreme sentences that are "grossly disproportionate" to the crime.

*Harmelin*, 501 U.S. at 1001.   Subsequently, Justice Kennedy applied a modified *Solem* test: A court must initially consider the nature of the crime and its relation to the punishment imposed. Only if that analysis gives rise to an inference of disproportionality should a court then consider the punishment for other offenses in its jurisdiction and the punishment for similar offenses in other jurisdictions.   *See, e.g.*, *id.* at 1005 (declining to perform any comparative jurisdictional analysis because the gravity of the adult prisoner's offense - - possessing more than 650 grams of cocaine - - was not grossly disproportionate to his sentence of mandatory life in prison without possibility of parole).

Courts are reluctant to invalidate sentencing schemes under the disproportionality principle; an overly aggressive approach is not consistent with our scheme of federalism or of division of powers within the federal government.  *See id.* at 999-1000.   Both states and the federal government must have considerable freedom to experiment in matters of criminal policy. *See id.*   Holding a sentencing law unconstitutional involves a rejection of the judgment of a legislature, which may entail rejecting the moral judgment of the community it represents.  *See id.* at 1006; *see also Arizona v. Berger*, 134 P.3d 378, 385 (Ariz. 2006) (en banc), *cert. denied*,

127 S. Ct. 1370 (noting that *Solem*, in which the Supreme Court invalidated a judicially-imposed sentence, did not involve the "traditional deference" that courts must afford legislative policy choices).   Courts must show restraint when wielding the powerful disproportionality sword.

In cases involving categorical rules the court adopts a different approach, first considering "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against the sentencing practice at issue.   *Roper*, 543 U.S. at 564, 567 (invalidating death penalty for defendants who committed their crimes before age 18); *see also Atkins v. Virginia*, 536 U.S. 304 (2002) (invalidating death penalty for individuals with low range intellectual functioning).   Next, guided by "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," *Kennedy v.  Louisiana*, 554 U.S. 407, 421 (2008), the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution.   *Roper*, 543 U.S. at 563.

In *Graham*, the Court examined a categorical challenge to the period of imprisonment -- the application of life without parole to all juveniles under age 18 for non-homicide offenses. Because the sentencing practice itself was at issue, the Court stated "a threshold comparison between the severity of the penalty and the gravity of the crime does not advance the analysis.

Addressing the question presented in the instant case, the appropriate analysis is the one used in cases that involved the categorical approach, specifically *Atkins*, *Roper*, and *Kennedy*." 130 S. Ct. at 2023.   *See also* Alison Siegler & Barry Sullivan, *"Death is Different' No Longer":* Graham v. Florida *and the Future of Eighth Amendment Challenges to Noncapital Sentences*, available at http://ssrn.com/abstract=1748645, 17-21.

To begin its proportionality analysis the *Graham* court looked to "objective indicia of national consensus," *id.* at 2023; and only then did it consider the "culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Id* at 2026. Finally, proportionality requires an analysis of "whether the challenged sentencing practice serves legitimate penological goals." *Id.* "The age of the offender and the nature of the crime each bear on the analysis." *Graham*, 130 S. Ct. at 2027.

Legislation has long been considered the "clearest and most reliable evidence of contemporary values," *Atkins*, 536 U.S. at 312 (quoting *Penry v. Linaugh*, 492 U.S. 302, 331 (1989)). All but two states, Louisiana and Vermont, allow a juvenile to be charged as an adult for distribution of child pornography. *See* Appendix D, State Statutes on Juvenile Transfer to Adult Court and Sentencing for Distribution of Child Pornography. Many of the states allow for discretion in determination of a transfer from juvenile to adult category, while a small number make transfer to adult court for juveniles accused of distributing child pornography mandatory. *Id.* The possible sentences range from one year (California) to up to thirty years (Idaho). *Id.*; *cf.* Neelum Arya, *State Trends: Legislative Changes from 2005–2010 Removing Youth from the Adult Criminal Justice System*, (March 2011), http://www.campaignforyouthjustice.org/ documents/CFYJ_State_Trends_Report.pdf (noting in past five-years four states have changed their mandatory minimum sentencing laws to take into account developmental differences between youth and adults).

Sentencing ranges for possession and distribution of child pornography vary among states, but on average are far less severe than the federal sentencing guidelines. *See, e.g.*, Terrie Morgan, *Feds, Pa. differ on kid porn*, The Times Leader, Jan. 16, 2011, *available at* http://www.timesleader.com/news/Feds__Pa__differ_on_kid_porn_01-16-2011.html (noting the

average sentence imposed in federal court in 2009 for possessing or distributing child pornography was seven years, while in Pennsylvania state court 47 percent of defendants convicted of the same crime were sentenced to probation. Of defendants sentenced to state prison, the range was from thirty-three months to ninety-eight months and for those sentenced to county prison the range was from five months to twenty-two months); *cf.* Anna Campoy, *States Resist Federal Sex-Offender Registry,* Wall Street Journal, April 9, 2011, *available at* http://online.wsj.com/article/SB10001424052748704587004576245451255268570.html (discussing several states' objections to implementing federal sex-offender registry because of high-cost, inclusion of juvenile offenders, and system that results in an "increase in the number of offenders that law enforcement has to monitor, rather than focusing on the most dangerous risks").

The existence of federal and state legislation that penalizes child pornography offenses is not, standing alone, a sufficient indicia of national consensus regarding such crimes to outlaw or to sustain a five-year minimum under the Constitution. Nevertheless, neither "retribution," "deterrence," nor "rehabilitation," *Graham*, 130 S. Ct. at 2028-29, justifies a five-year mandated prison sentence for an adolescent, plus what could constitute lifelong strict supervised release. A case-by-case analysis considering more nuanced terms of incarceration for such young people is possible, unlike a term of life without parole, which is not subject to adjustment -- it ends only with death. *Cf. id.* at 2030-32 (discussing categorical approaches).

### b. Excessive Child Pornography Incarceration Terms

An important inquiry in determining excessiveness of a statutorily mandated term of imprisonment is "actual sentencing practices." *Graham*, 130 S. Ct. at 2026 (citing *Enmund v.*

*Florida*, 458 U.S. 782, 794-96); *Thompson v. Oklahoma*, 487 U.S. 815, 831-32 (1988); *Roper*, 543 U.S. at 564-65; *Kennedy*, 554 U.S. at 433-435.  Statistics from the Federal Justice Statistics Resource Center show that in 2006, 97 percent of child pornography offenders received a prison sentence.  *See* Mark Motivans & Tracey Kyckelhahn, Bureau of Justice Statistics, *Federal Prosecution of Child Sex Exploitation Offenders, 2006*, at 5 (2007), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/fpcseo06.pdf.  The mean sentence for offenders convicted of possession, receipt, or distribution of child pornography has risen from 20.59 months in 1997 to 91.82 months in 2008.  *See* Melissa Hamilton, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric*, 22 Stanford L. & Pol'y Rev (forthcoming 2011) (manuscript at 13) (citing the Federal Justice Statistics Resource Center, http:fjsrc.urban.org/tsec/cfm).  Federal sentencing statistics indicate that the number of child pornography offenders -- not including those based on production -- being sentenced in the federal system has sharply increased over the past twelve years.   In 1997 there were 238 sentencings for child pornography offenses (excluding production) and in 2009 there were 1,606, almost all incarceratory.  *See* U.S. Sent'g Comm'n, *2009 Sourcebook of Federal Sentencing Statistics*, table 28 (2009), *available at* http://ftp.ussc.gov/ANNRPT/2009/Table28.pdf.

    More than half of non-producer child pornography offenders received below-guidelines range sentences in 2009.  *Id.*  This determination was based on trial court determinations that the guidelines range was excessive.  *Id.*  The average sentence has increased largely because of the application of mandatory minimums, not because most federal judges thought there was a need for this harshness.  *See* Hamilton, *supra*, (manuscript at 14, n. 90) ("[t]he mean sentence likely would have been lower if mandatory minimums were not applied.  Many judges sentencing to the mandatory minimum implied they would have preferred lesser sentences.") *Id.*  (citing

*United States v. Gellatly*, No. 8:08CR50, 2009 U.S. Dist. LEXIS 2693 at *35 (D. Neb. Jan 5, 2009)); *United States v. Ontiveros*, No. 07-CR-333, 2008 U.S. Dist. LEXIS 58774, at *8 (E.D. Wisc. July 24, 2008); *United States v. Grober*, 595 F. Supp. 2d. 382, 412 (D.N.J. 2008); *United States v. Szymanski*, No. 3:08 CR 417, 2009 U.S. Dist. LEXIS 37156, at *14 (N.D. Oh. Apr. 30, 2009).

Judicial concern over the excessively high sentencing guidelines for child pornography offenses as applied to young adults and frustration with mandatory minimums generally are powerful indicia of a shift in consensus. Yet, community or judicial consensus, while "entitled to great weight," is not solely determinative of whether a punishment is cruel and unusual. *Graham*, 130 S. Ct. at 2026, (citing *Kennedy*, 554 U.S. at 434). A court must exercise "independent judgment" when interpreting the Eighth Amendment. *See Graham*, 130 S. Ct. at 2026. "The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Id.*; *see also Roper*, 543 U.S. at 568; *Kennedy*, 554 U.S. at 437–38; *cf. Solem*, 463 U.S. at 292. "In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals." *Graham*, 130 S. Ct. at 2026; *Kennedy*, 554 U.S. at 441–42; *Roper*, 543 U.S. at 571–72; *Atkins*, 536 U.S. at 318–20.

Mere severity of sentences in child pornography cases generally is not sufficient to make the mandatory minimum inapplicable in the present case. As the section below indicates, however, as applied to C.R., an adolescent, it is unconstitutional because it is cruel and unusual.

### c. Juvenile Limits

In *Roper* the Supreme Court integrated into its analysis of juvenile sentencing limits general consensus, common sense and science.  It recognized that "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18."  543 U.S. at 574.

> Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders.  First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decision.'  *Johnson, supra*, at 367, 113, S. Ct. 2658; *see also Eddings, supra*, at 115-116, 102 S. Ct. 869 ("Even the normal 16-year-old customarily lacks the maturity of an adult").  It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior."  Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339 (1992).  In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving juries, or marrying without parental consent.  *See* Appendixes B-D, *infra*.
> The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.  *Eddings, supra*, at 115, 102 S. Ct. 869 (*"[Y]outh is more than a chronological fact*.  It is a time and condition of life when a person may be most susceptible to influence and to psychological damage").  This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment.  *See* Steinberg & Scott, *Less Guilty by Reason of Adolescence:*

> *Developmental Immaturity, Diminished Responsibility, and the*
> *Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014 (2003)
> (hereinafter Steinberg & Scott) ("[A]s legal minors, [juveniles]
> lack the freedom that adults have to extricate themselves from a
> criminogenic setting").  The third broad difference is that the
> character of a juvenile is not as well formed as that of an adult.
> The personality traits of juveniles are more transitory, less fixed.
> *See* generally E. Erikson, *Identity: Youth and Crisis* (1968).

*Roper,* 543 U.S. at 569-70. (emphasis added).

*Roper* recognized that juveniles have diminished culpability due to their lack of maturity
and therefore are less deserving of the most severe punishments.  "[A]s compared to adults,
juveniles have a lack of maturity and an underdeveloped sense of responsibility . . .  they are
more vulnerable or susceptible to outside pressures, including peer pressure . . .  and their
characters are not well formed."  *Graham*, 130 S. Ct. at 2026 (citing *Roper*, 543 U.S. at 569-70)
(internal quotations omitted).  "It is difficult even for expert psychologists to differentiate
between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the
rare juvenile offender whose crime reflects irreparable corruption."  *Roper*, 543 U.S. at 573.
Accordingly, "juvenile offenders cannot with reliability be classified among the worst
offenders."  *Id.*, at 569.  The *Graham* court went on to explain that "[a] juvenile is not absolved
of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of
an adult.'"  *Graham*, 130 S. Ct. at 2026 (quoting *Thompson*, 487 U.S. at 835) (plurality opinion).
"No recent data provide reason to reconsider the Court's observations in *Roper* about the nature
of juveniles."  *See Graham*, 130 S. Ct. at 2026.

*Roper-Graham* holdings are not limited to death cases.  *Graham* involved a term of imprisonment of life without parole for an attempted robbery and a serious assault.  The term for a juvenile of life without parole was ruled cruel and unusual, and therefore unconstitutional. While a five-year minimum term of incarceration may be is less cruel than life in prison, as applied to C.R. it is "cruel and unusual punishment" under the Constitution.

### d.  Science Supporting Immaturity Exception

#### 1.  Studies

Psychology and brain imaging studies demonstrate fundamental differences between adolescent and adult minds.  Critical "parts of the brain involved in behavior control continue to mature through late adolescence."  *Graham*, 130 S. Ct. at 2026 (citing Brief for The American Medical Association, et al. as Amici Curiae Supporting Neither Party 16–24 (No. 08-7412), 2009 WL 2247127 at *16-24 (hereinafter *Graham* AMA Brief); Brief for The American Psychological Association et al. as Amici Curiae Supporting Petitioners at 22–27 (No. 08-7412), 2009 WL 2236778 at *22–28 (hereinafter *Graham* APA Brief)).

 "Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults."  *Graham*, 130 S. Ct. at 2026 (quoting *Roper*, 543 U.S. at 570).   "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper*, 543 U.S. at 570.

"Drawing the line at 18 years of age is subject . . . to the objections . . . against categorical rules."  *Id*. at 574.  "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id.*  While 18 may be the "point where society draws the line for many purposes between childhood and adulthood," scientific developments conclude that

305

full adulthood is not biologically achieved until much later in life than age 18.  *Id.*   The

American Psychological Association explains that differences between adolescents and adults

with respect to "risk-taking, planning, inhibiting impulses, and generating alternatives" is

connected to "adolescent behavioral immaturity: the human brain does not settle into its mature,

adult form until after the adolescent years have passed and a person has entered young

adulthood."  Brief for the American Psychological Association and the Missouri Psychological

Association as Amici Curiae Supporting Respondent at 9, *Roper v. Simmons*, 543 U.S. 551

(2005) (No. 03-633), 2004 WL 1636447  at *9 (hereinafter *Roper* APA Brief).

> Deciding where to draw the chronological age boundary between
> adolescence and adulthood for purposes of justice policy is a more
> complex challenge than setting the minimum age of juvenile court
> jurisdiction because several concerns are important but may not point
> in the same direction.  The first is psychological development; the line
> should be drawn with attention to the process of maturation, ideally
> shielding immature youths from adult prosecution and punishment
> while holding mature individuals fully accountable.  This factor turns
> out to be somewhat complex, however, because, as we have explained,
> the relevant psychological abilities and capacities do not develop in
> lockstep fashion, but progress at different rates.  Thus, logical
> reasoning and information processing capacities that are most relevant
> to competence to stand trial mature through pre-adolescence and early
> adolescence, reaching adult levels around age fifteen or sixteen.  In
> contrast, psychosocial capacities that influence involvement in
> criminal activity, such as impulse control, future orientation, or
> resistance to peer influence (as well as the regions of the brain that
> regulate these phenomenon), mature primarily in middle adolescence,
> continuing into late adolescence, and even into early adulthood. . . .
> Thus a jurisdictional boundary separating minors from adults based on

306

> studies of logical reasoning and basic cognitive abilities would classify
> adolescents as adults at a younger age than a boundary based on
> research on psychosocial development or brain maturation.  Beyond
> this, there is a great deal of individual variation in maturation rates;
> some youths are adultlike at age 15, while others are still immature in
> early adulthood.  Adolescence and adulthood are not tidy
> developmental categories; the transition to adulthood is a gradual
> process.  The upshot is that science does not dictate any specific age as
> the appropriate threshold for adult adjudication and punishment.

Elizabeth S. Scott & Laurence Steinberg, Rethinking Juvenile Justice 236, (2008); *see also*

Emily Buss, *What the Law Should (and Should Not) Learn from Child Development Research*,

38 Hofstra L. Rev. 13, 39 (2009) ("Much of the developmental research suggests that the

qualities highlighted by the Court [in *Roper v. Simmons*], described together as psycho-social

immaturity, continue to apply to individuals into their twenties, even mid-twenties or beyond.").

Scott and Steinberg acknowledge that while the marker for adult adjudication is age

eighteen, this line drawing is based on policy—about which the authors claim no expertise—

rather than science.  "Although studies of brain development indicate that continued maturation

takes place until at least age twenty-five or so, policy makers would not likely endorse treating

individuals who offend in their early twenties as juveniles. . . ." *Id.* at 238.

Scientific studies on adolescent behavior conclude that adolescents are less able than

adults to voluntarily control their behavior.  "Relative to individuals at other ages, . . .

adolescents . . . exhibit a disproportionate amount of reckless behavior, sensation seeking and

risk taking."  Linda Patia Spear, *The Adolescent Brain and Age-Related Behavioral*

*Manifestation*s, 24 Neuroscience & Biobehavioral Reviews 417, 421 (2000).  Sensation seeking

is a normal part of adolescent development, so much so that "it is statistically aberrant to refrain from such [risk-taking] behavior during adolescence." *Id.* at 421.

These differences between adolescent and adult behavior are a result of "psychosocial limitations in [adolescents'] ability to consistently and reliably control their behavior." *Graham* AMA Brief at 6, (citing Elizabeth Cauffman & Laurence Steinberg, *(Im)Maturity of Judgment in Adolescences: Why Adolescents May be Less Culpable Than Adults*, 18 Behav. Sci. & L. 741, 742 (2000)); William Gardner, *A Life-Span Rational-Choice Theory of Risk Taking, in Adolescent and Adult Risk Taking: The Eighth Texas Tech Symposium on Interfaces in Psychology* 66, 67 (N. Bell & R. Bell eds., 1993).

One of the principle ways this reduced capacity to control behavior is expressed is by adolescents' difficulty with impulse control. "A cornerstone of cognitive development is the ability to suppress inappropriate thoughts and actions in favor of goal-directed ones, especially in the presence of compelling incentives." B.J. Casey et al., *The Adolescent Brain*, 28 Developmental Rev. 62, 64 (2008). Numerous studies document the limitations on adolescents' limited ability to control their impulses. *See, e.g.*, Casey, *supra*, at 64 ("A number of classic developmental studies have shown that this ability develops throughout childhood and adolescence."); Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 2009 Ann. Rev. Clinical Psychol. 47, 58 (2009) ("[I]ndividuals become more resistant to peer influence and oriented to the future, and less drawn to immediate rewards and impulsive, as they mature from adolescence to adulthood."); Laurence Steinberg et. al., *Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model*, 44 Developmental Psych. 1764 (2008) (self-report and performance measures on tests show "a linear decline in impulsivity between the ages of 10 and 30").

308

Structural differences between adolescent and adult brains, confirmed by recently developed brain imagery technology, demonstrate that critical regions of the brain responsible for controlling thoughts, emotions, impulsivity, and actions continue to develop through age 25. *See Graham* AMA Brief at 13-31.  "Developmental neuroscience has now gathered extensive evidence that both the structure of the adolescent brain, and the way it functions, are immature compared to the adult brain." *Id.* at 13.  Brain imaging has allowed scientists to better understand the relationship between "the dramatic maturation of cognitive, emotion, and social functions with the brain structures that ultimately underlie them."  Elizabeth R. Sowell et al., *Mapping Cortical Change Across the Human Life Span,* 6 Nature Neurosci. 309 (2003).  These studies have revealed two complementary observations.  "First, the parts of the brain that work together to support the control of behavior, including the prefrontal cortex (which comprises roughly the front third of the human brain), continue to mature even through late adolescence. Second, in making behavioral choices, adolescents rely more heavily than adults on systems and areas of the brain that promote risk-taking and sensation-seeking behavior."  *Graham* AMA Brief at 15 (citing Casey, *supra*, at 68).

Magnetic Resonance Imaging (MRI) technology allows for "mapping of brain anatomy and observations of brain functioning while an individual performs tasks involving speech, perception, reasoning, and decision-making."  *Roper* APA Brief at *9.  The frontal lobes of the brain, and in particular the pre-frontal cortex, "play a critical role in the executive or 'CEO' functions of the brain which are considered high functions of the brain."  *Id.* at *9-10 (citing Elkhonon Goldberg, *The Executive Brain: Frontal Lobes and the Civilized Mind* 23 (2001)). The prefrontal cortex is responsible for a variety of "executive functions" such as "response inhibition, emotional regulation, planning and organization."  *See* Elizabeth R. Sowell et al.*, In*

*Vivo Evidence for Post-Adolescent Brain Maturation in Frontal and Striatal Regions*, 2 Nature Neurosci. 859, 860 (1999); *see also Graham* AMA Brief at 16, n. 39, citing numerous studies. This region of the brain is also responsible for several cognitive abilities including "risk assessment," "evaluation of reward and punishment," and "impulse control." *See Graham* AMA Brief at 16-17 & n. 40-44. Other functions of the prefrontal cortex include "decision-making," "the ability to judge and evaluate future consequences," "recognizing deception," "responses to positive and negative feedback," "working memory," and "making moral judgments." *See Graham* AMA Brief at 17 and n. 45-50.

"The brain's frontal lobes are still structurally immature well into late adolescence." *Graham* AMA Brief at 18 (citing Nitin Gogtay, et al., *Dynamic Mapping of Human Cortical Development During Childhood through Early Adulthood*, 101 Proc. of the Nat'l Acad. of Sci. 8174 (2004) (studying subjects aged 4-21)). "[O]ne of the last brain regions to mature" is the prefrontal cortex, the area of the brain responsible for a variety of cognitive and executive functions. *See* B.J. Casey et al., *Structural and Functional Brain Development and its Relation to Cognitive Development*, 54 Biological Psychol. 241, 243 (2000); *see also* Gogtay, *supra*, at 8177 ("parts of the brain associated with more basic functions matured early. . . .  Later to mature were areas involved in executive function, attention, and motor coordination (frontal lobes).").

Immaturity can be analogized to dysfunction or disruption.  "Disruption of functions associated with the frontal lobes may lead to impairments of foresight, strategic thinking, and risk management." *See Roper* APA Brief at *10, (citing M. Marsel Mesulam, *Behavioral Neuroanatomy*, *in* Principles of Behavioral and Cognitive Neurology 1, 47-48) (M. Marsel Mesulam ed. 2d ed. 2000).  One "hallmark of frontal lobe dysfunction is difficulty in making decisions that are in the long-term best interests of the patient." *See* Antonio R.  Damasio &

Steven W. Anderson, *The Frontal Lobes, in Clinical Neuropsychology* 404, 434 (Kenneth M. Heilman & Edward Valenstein eds., 4th ed. 2003). "Neurodevelopmental MRI studies indicate this executive area of the brain is one of the last parts of the brain to reach maturity." *See* Gogtay, *supra*, at 8177; *see also* Steinberg, *You and Your Adolescent: The Essential Guide for Ages 10-25*, 116 (Rev. ed. 2011) ("Imaging studies show that the brain is still maturing well into the mid-20s, especially in regions responsible for regulating emotions, controlling impulses, and balancing risk and reward.").

There are two ways in which the adolescent's prefrontal cortex is physically underdeveloped, affecting brain functioning: pruning and myelination. *See Graham AMA* Brief at 18-19. Pruning refers to the process of decreasing gray matter in the brain as it matures. *Id.* at 19 ("[P]runing of excess neurons and connections which make up the gray matter leads to greater efficiency of neural processing and strengthens the brain's ability to reason and consistently exercise good judgment. Thus, pruning establishes some pathways and extinguishes others, enhancing overall brain functions."). MRI technology has allowed for a better understanding of the pruning process and its impact on brain maturation.

> Gray matter volumes peak during the ages from 10-20 years, and the prefrontal cortex is one of the places where gray matter increases—before adolescence—and then gets pruned over time, beyond adolescence. The prefrontal cortex is also one of the last regions where pruning is complete and this region continues to thin past adolescence.

*Graham* AMA Brief at 20-21. Pruning is one measure of brain maturity. One of the last regions of the brain to reach full maturity in the pruning process in the pre-frontal cortex -- "the region

311

most closely associated with risk assessment, impulse control, emotional regulation, decision-making, and planning. . . ." *Id.* at 21.

During adolescence, "white matter" in the brain increases by a process called "myelination." *See Roper* APA Brief at *11. "The presence of myelin makes communication between different parts of the brain faster and more reliable." *See* Elkhonon Goldberg, The Executive Brain: Frontal Lobes and the Civilized Mind 144 (2001). The increase in "white matter" or myelination "continues through adolescence into adulthood." *See Graham* AMA Brief at 22, n.68. "A longitudinal MRI study at the National Institute of Mental Health documented an increase in white matter continuing through the teenage years to at least age 22." *Roper* APA Brief at 11 (citing Jay N. Giedd et al., *Brain Development During Childhood and Adolescence: A Longitudinal MRI Study,* 2 Nature Neurosci. 861, 861–62 (1999)).

"Late maturation of the frontal lobes is also consistent with electroencephalogram (EEG) research showing that the frontal executive region matures from ages 17-21 – after maturation appears to cease in other brain regions." *Roper* APA Brief at *12, (citing William J. Hudspeth & Karl H. Pribram, *Psychophysiological Indices of Cerebral Maturation,* 21 Int'l J. Psychophysiology 19, 26-27 (1992)); *see also,* Mark Hanson, *What's the Matter with Kids Today,* ABA Journal, July 2010, at 50 (discussing scientific research that suggests psychosocial development continues into early adulthood resulting in shortsighted decisions, poor impulse control, and increased vulnerability to peer pressure during adolescence); Richard Knox, *The Teen Brain: It's Just Not grown Up Yet,* Nat'l Pub. Radio (March 1, 2010), http://www.npr.org/templates/story/story.php?storyID=124119468 (interview of Harvard University scientists and expert on epilepsy, Frances Jensen) ("Recent studies show that neural insulation [which connects the frontal lobes to the rest of the brain] isn't complete until the mid-

20's."); *but cf.* Michael S. Gazzaniga, *Neuroscience in the Courtroom*, Sci. Amer. 54, 59 (Apr. 2011) (noting one study using "a technology called diffusion tensor imaging to examine the tracts of white matter that connect different control regions of the cortex in 91 teenage subjects" finding that "juveniles who engaged in risky behavior had tracts that looked *more adult* than did those of their more risk-averse peers") (emphasis in original).

In addition to structural immaturities, developmental neuroimaging studies show a relationship between the maturation of regions of the brain associated with "voluntary behavior control" and changes in how the brain functions. *See Graham* AMA Brief at 25 (citing Amy L. Krain et al., *An fMRI Examination of Developmental Differences in the Neural Correlates of Uncertainty and Decision Making*, 47:10 J. Child Psychol. & Psychiatry 1023, 1024 (2006)). "Studies show that the socioemotional system, which is responsible for motivating risky and reward-based behavior, develops earlier than the cognitive control system, which regulates such behavior. . . . The result is that adolescents experience increasing motivation for risky and reward-seeking behavior without a corresponding increase in the ability to self-regulate behavior." *Graham* AMA Brief at 26. Several parts of the brain including the amygdala and nucleus accumbens reveal this early development of the socioemotional system in adolescents. *Id.* at 26-27.

Adolescence is a period marked by great change, both physiologically and emotionally. The adolescent brain is structurally immature and continues to develop well into the twenties. In addition, adolescents' socioemotional system develops earlier than the system responsible for cognitive control and executive functions creating a conflict between reward-seeking behavior and self-regulating behavior.

313

> [A]dolescent behavior is characterized by a hyperactive reward-
> driven system (involving the nucleus accumbens), a limited harm-
> avoidant system (involving the amygdala), and an immature
> cognitive control system (involving the prefrontal cortex). As a
> result, adolescent behavior is more likely to be impulsive and
> motivated by the possibility of reward, with less self-regulation
> and effective risk assessment.

*See Graham* AMA Brief at 30.

Recognized research demonstrates that adolescents as a group are less capable of controlling their impulses, regulating their behavior, and managing influences such as peer pressure than adults. As a result they are less capable of making rational and informed decisions in their own interest than are adults. This distinction must be part of the proportionality calculus. *See* Part III.B.v.a, *supra*. Self-regulating behavior and control continue to develop throughout adolescence and early adulthood. It would not be appropriate to impose a mandatory five-year sentence of incarceration upon a "grossly naïve and immature" young adult.

### 2. Testimony

Expert testimony presented at the sentencing hearing strongly supports application of general scientific principles of adolescent brain development to C.R.'s situation.

Dr. Laurence Steinberg was the "the lead scientist for the American Psychological Association in assisting the Association's counsel in preparing the amicus brief in [*Roper v. Simmons*, and *Graham v. Florida*]". His testimony summarizes the scientific studies discussed, in subsection 1, *supra*, which find that the bright line cut–off of age eighteen does not accurately reflect the realities of adolescent brain development:

Q       Dr. Steinberg, what is the difference between chronological age and developmental age?

A       Chronological age is simply a count of the number of years that somebody has been alive. But developmental age can be measured by looking at the person's intellectual functioning or social functioning or emotional functioning, and within any given chronological age there will be a range in terms of individual's developmental functioning.

Q       So, one's chronological age and one's developmental age don't necessarily match up?

A       Correct.

Q       And at what age does a person's brain fully develop?

A       It really depends on what aspects of the brain and what brain systems one is talking about. But I think the consensus among developmental neuroscientists scientists now would be some time during the mid-20s probably.

Q       And what kind of research is that conclusion based on?

A       It's based on both structural and functional MRI. Structural MRI would be exams that would look at the brain's anatomy whereas functional MRI would be exams that look at the brain's functioning.

Q       And those tools, when given to large groups of people over time, show development continues until the mid-20s in most people?

A       Correct.

Q       Now, is there any developmental significance from a brain development perspective as to whether chronologically someone is 17 and 364 days or 18 years old?

A       No, there isn't.

Q       There's no shift in the brain because one turns 18?

A       No.

315

Q      And from a developmental perspective, how do you define adolescence?

A      Well, that's hard to do because it really depends on what aspects of development you're speaking about.  If you were doing it in terms of brain development, I would say probably from about 10 to 24 or so in the sense that we can see that there is still brain development going on during that time period.  If you were talking about psychological development, I would say maybe from 10 to 20, 10 to 21, around there.

Q      And does the term adolescence itself indicate that a person is still developing?

A      Yes. I think that we use it commonly to refer to somebody who is not yet an adult.

Q      And I know you were present for the testimony of Dr. Barr and you heard him say that the cutoff is 18 for adolescence.

Do you agree with that from a brain development point of view?

A      Certainly not.

Q      Do you agree with that from a psychosocial point of view?

A      No.

Q      And why do you disagree with the idea that adolescence cuts off at 18 from a brain development point of view?

A      Well, we know that there's structural brain change after the age of 18 both in gray matter and in white matter, and we also know that there's function in the brain after 18 in terms of differences in patterns of brain activity that you see among people of different ages.

Q      And from a psychosocial point of view, why do you disagree with the idea that adolescence is cut off at 18?

316

> A      Well, on certain measures, we, in our own research and
> others, find that there's continued maturation of certain
> psychosocial capabilities after 18.
>
>        . . . .
>
> Q      When you're saying that, grossly speaking, people's brains
> continue to develop until age 25 you're talking about normal or
> typical persons, not a developmentally delayed group?
>
> A      Yes.
>
> Q      So, a normal 19-year-old's brain is not fully developed?
>
> A      On average, right.
>
> Q      On average.

Hr'g Tr. 63-67, Jan. 25, 2011..

Dr. Steinberg also testified about the import of the continued adolescent brain development on "executive functions" such as decision-making, impulse control, balancing risk and reward in young adulthood.  He explained:

> Q      Are there neurobiological changes occurring at age 19 that
> might influence of a person's decision-making processes?
>
> A      Yes, because regions of the brain that are important for
> things like thinking ahead and planning and impulse control and
> weighing risks and rewards, those regions and systems of the brain
> are still developing after age 19.  And to the extent that those
> capacities affect judgment and decision making, we can link the
> two together and argue that what we know about adolescent brain
> development would suggest that some aspects of judgment and
> decision making are probably still immature at that age.
>
> Q      And, again, you're saying this as to the typical person not as
> to someone outside the norm?
>
> A      That's correct.

Q        I think you also heard Dr. Barr testify that C.R., our
defendant here, as an average, based on his tests, has an average
executive function for his age group. Do you recall that testimony?

A        Yes, I do.

Q        Now, based on your research, am I correct, that this age
group is still developing in its executive functioning?

A        Yes.

Q        So, to say that C.R. falls within that average group also
says that his executive function is still developing?

A        Probably, yes.

Q        Now, what are the characteristics of executive function
that, from your research and your knowledge of this field, are still
developing in this group? And I'm talking now specifically say
from age 17 to 21.

A        Impulse control as I mentioned.  Planning and thinking
ahead probably although there's less research on this.  The way that
people balance risk and reward when they make decisions about
engaging in a potentially risky behavior.

Q        When you say "impulse control," can you tell us more
about what you mean by that?

A        Well, the ability to stop yourself from acting by thinking
through the potential consequences, let's say, of the action.

Q        And how does that differ for the normal, the cognitively
normal 19-year-old from a fully-matured adult?

A        Well, a cognitively normal 19-year-old would be more apt
to behave impulsively than a typical 25-year-old, let's say, as a
point of comparison.

*Id.* at 67-69.

Professor Steinberg went on to explain the scientific evidence regarding anatomical brain
development that supports the conclusions about executive functions.  His testimony fully

318

corroborated the research and studies relied upon by the Supreme Court in *Roper v. Simmons*, and *Graham v. Florida* previously discussed. *Id.* at 69–71. Also discussed was the relationship between adolescent "sensation-seeking" behavior and brain development. His testimony was as follows:

> Q     You talked about this processing of emotions and social information. Is that connected with what's called "sensation-seeking behavior"?
>
> A     A little bit. Sensation seeking is regulated by parts of the brain that are also important in processing emotion and social information but I wouldn't say that they're the same thing.
>
> Q     Okay. And when do individuals develop sensation-seeking behavior?
>
> A     Well, sensation seeking which is also sometimes discussed under the heading of novelty seeking or reward seeking. Sensation seeking is known to increase fairly dramatically between preadolescence and mid-adolescence and then starts to decline, let's say, after age 16 or 17 gradually as people mature into adulthood and that's what we now understand a little bit about the biological underpinnings of that change.
>
> Q     And is there a part of the brain that regulates this sensation-seeking behavior so that it decreases as one matures?
>
> A     Well, sensation seeking decreases for two different reasons. The first is that the part of the brain may lead to an event striatum which is part of the limbic system which is that part of the brain that part impels us to seek rewards. It's the part that's responsible for our experience of pleasure and for reward. That part of the brain becomes very much more aroused during the first part of adolescence and that arousal is particularly high during the mid-adolescent years, 16 or so. That declines as individuals move into

319

adulthood, so one reason that sensation seeking declines is that that reward system, if you will, becomes less easily aroused.  But a second reason is that the part of the system that puts the brakes on things which is the prefrontal cortex is, as I've discussed, continuing to mature during late adolescence and into early adulthood.

And if we think of middle adolescence as the metaphor is the accelerator is pressed down to the floor but the braking system is still not mature; and as the accelerator becomes lifted a little bit, and as the braking system matures, sensation seeking declines.

Q     And at what age does the braking system or what we might call the regulatory mechanisms, at what age are those fully developed?

A     Probably, again, in the mid-20s or so.

Q     And is that also data that's available from these two forms of MRIs or from other types of research?

A     Well, if we're talking about -- yes, yes.  Because particularly, I mentioned before the third type of structural change that's going on, the connectivity that psychiatrists believe that plays a very important role in emotion regulation because it's the -- it refers to the connection between the part of the brain that is processing emotions and the part of the brain that is important in self-regulation.  And because that connection becomes stronger and more well-developed during late adolescence and early adulthood, the capacity to regulate one's emotions also becomes more mature.

Q     And to put it in a concrete context such as the one we face here, can you give an example of how the same choice such as whether to commit what might be pleasurable but still be criminal conduct might be handled differently by a still developing 19-year-old versus a fully-developed adult?

A        Let me put this in context because I think it's important to know that psychologists and sociologists refer to that as what's called the Age Crime Curve. . . . [The] Age Crime Curve, which shows that misbehavior of almost every sort increases from age 10 or so on and peaks around 17 or 18 and then declines.  And it's likely to be the case that that decline is related to improvements in self-regulation and in the maturation of self-control.

So, to go back to your question, I think that a 19-year-old would be less likely than a fully-mature individual to stop and think about a misdeed before engaging in it.

Q        And, to your knowledge, is that Age Crime Curve similar for sexual offenses versus nonsexual offenses?

A        It pretty much applies to all kinds of offenses.

Q        Now, again, with all this, you're talking about normal development, not abnormal; is that correct?

A        Correct.

Q        Now, turning now to the psychosocial context which we've touched on a little bit.  From your research and the data available in your field, are normal adolescent psychosocial capacities comparable to those of adults?

A        No.

Q        How do they differ?

A        Well, compared to adults, adolescents are more susceptible to peer pressure.  They are more impulsive, they are less likely to plan ahead, and they are more reward sensitive, meaning, that in evaluating a situation in which there are both risks and rewards present, they're going to pay relatively more attention than an adult would to the potential rewards and relatively less attention to the potential risks or costs.

Q        And is that true for someone at the age of 18 and 19?

321

A        It's true for most of that . Not so much reward

sensitivity because that pretty much sort of hits an

asymptote for a while around the age 16, 17, but the ones having to

do around regulation.  So, impulse control, susceptibility to

influence, thinking ahead, considering the future consequences of

one's actions, those are all still immature at age 18.

Q        You've spoken about this a little bit, but are there biological

rationales or evidence that support these psychosocial

observations?

A        Yes, they would have to do with maturation of the

prefrontal lobe both in synaptic pruning and myelination and the

development of stronger connections between cortical and

subcortical regions.

*Id.* at 71-75.

Discussed by Professor Steinberg was the adverse impact of incarceration on adolescent

development.  He explained, "I don't think there's enough research, you know, on that to draw

conclusions. What we do know is that individuals coming out of correctional environments are

much less likely to become reintegrated into the community, be gainfully employed, and so forth

than other what we might call at-risk groups."  *Id*. at 83-84.  In a colloquy with the court

Professor Steinberg confirmed that these conclusions are controlled for a variety of factors such

as education, race, and parents' occupation.  *Id*. at 84.  Protective factors that would reduce the

likelihood of sexual re-offending were also examined.  The professor explained,

[B]eing in school is a protective factor against future offending.

Having parents who monitor your whereabouts and provide

structure and guidance is a protective factor against offending.

Being gainfully employed is a protective factor against future

offending.  And not associating with antisocial peers as a

protective factor against future offending. Being in – successfully

322

completing an evidence-based intervention or treatment is a
protective factor against future offending.  Yes, it's always in
individual cases it's very hard to make predictions; but on average,
we can say that young people who are, you know, in school and/or
working and have a good home environment and are treated for a
mental problem, if present, are going to be less likely to re-offend
than individuals who, you know, are not attending school, who
don't have good parents, who hang out with deviant peers, and who
have a problem like a substance abuse problem that's untreated."

*Id.* at 86-87.

### e. Unconstitutionality as Applied

Testimony and other evidence at C.R.'s sentencing hearing as well as consensus and
other ruling criteria supports the conclusion that at the time of the crime he was, and should be
characterized for sentencing as, a developmentally immature young adult with limited ability to
appreciate legal limits on contacts with child pornography and to control his viewing of easily
accessible internet programs.  "[O]ur society views juveniles … as 'categorically less culpable
than the average criminal.'"  *Roper*, 543 U.S. at 567 (internal citations omitted)*.* As the studies
detailed in Part III.B.iv.d indicate, there is no magic age at which young people become adults,
and, for most, the developmental process extends far beyond the 18th year.

The government argues that *Graham*, 130 S.Ct. 2011,  is inapplicable to this case and that
a sentence of sixty months is not "grossly disproportionate" to the crime of distribution of child
pornography.  *See* Government's Sentencing Letter, Docket Entry 138, May 6, 2011 at 17-20;
14-17.  It relies on several cases that have denied Eighth Amendment challenges to sentences
imposed for various child pornography grounds. *See e.g.*, *United States v. Martin*, 2006 WL
1359945 (2d Cir. 2006) (holding that imposition of five-year mandatory minimum sentence for

transmitting child pornography in interstate commerce is not unconstitutionally disproportionate to the crime committed, even considering defendant's physical disability as a paraplegic); *United States v. Soule*, 2007 WL 2962373 (10th Cir. 2007) (sentence above the mandatory statutory minimum of 120 months for second conviction for possession of child pornography did not violate the Eighth Amendment); *United States v. Meiners*, 485 F.3d 1211 (9th Cir. 2007 (per curiam) (fifteen-year mandatory minimum sentence for advertising child pornography under § 2251(d) did not amount to cruel and unusual punishment in violation of the Eighth Amendment); *United States v. Green*, 2007 WL 4403148 (11th Cir. 2007) (ninety-month sentence for violations of § 2252 (a)(2) and (a)(4) does not violate Eighth Amendment); *United States v. Bledsoe*, 2006 WL 1083353 (4th Cir. 2006) (mandatory minimum of fifteen years pursuant to § 2251(d) for advertising willingness to trade child pornography does not violate the Eighth Amendment; proportionately review not available for any sentence less than like imprisonment without the possibility of parole); *United States v. Wilder*, 2006 WL 572699 (D. Mass 2006) (mandatory minimums for recidivist defendants established by § 2252 (b)(1) and (2) "are not grossly disproportionate to the serious offenses that they are meant to punish.").

All of the cases relied on by the government were decided before *Graham*, 130 S.Ct. 2011. *Graham* opened the door for analyzing a term of year sentence under the proportionality test employed for capital cases. 130 S.Ct. at 2022–25. Rather than simply assessing whether the sentence was "grossly disproportionate" to the crime committed, *Graham* confirms a proportionately requirement in its non-capital cases. *Id.* It also cements an analysis of crimes committed by adolescents based on their relative immaturity compared with adults. *Id* at 2026–33. In view of the Supreme Court's consideration of differences between adolescents and adults in terms of culpability and the government's position is not persuasive.

Defendant viewed and downloaded child pornography between the ages of fifteen and nineteen, well within the bounds of the adolescent studies discussed above, demonstrating lack of maturity during his continued adolescence. And, as indicated in Part II, *supra*, lack of parental control and a turbulent, sexually over-stimulating ménage denied C.R. external controls not yet available to him internally. *See*, *e.g.*, "The Basic Principles of Good Parents," in Laurence Steinberg, Ph.D., *You and Your Adolescent, the Essential Guide for Ages 10-25*, 14–29 (Simon & Schuster 2011); *id.* 98-101 (noting the negative impact of hard core pornography on adolescent sexual development), 110, 163–164, 177–78 (discussing methods of promoting adolescent's responsible use of internet). His offense conduct occurred during a state of adolescent development that neuropsychological research has found to have significant implications for insight, decision making, judgment, risk taking behavior, and, ultimately, culpability. *See* Part III.B, *supra*. This research weighs heavily in the court's determination that the five-year mandatory minimum sentence is unconstitutional. Such considerations relate to the "status of the offenders in question," but the court must still consider the "nature of the offenses to which this harsh penalty might apply." *Graham*, 130 S. Ct. at 2027.

As is apparent from this memorandum, *see* Part II, *supra*, the instant offense is serious. There is, however, a range of culpability involved in child pornography offenses. C.R., though technically he might be a "distributer" in the submission of the government, played an exceedingly limited role in the overall child pornography market. His conduct is distinguishable from that of a commercial distributer and from an adult viewer.

In *Roper*, the Court emphasized three significant areas of difference between younger offenders and adults that justified the conclusion that juveniles have diminished culpability: lack of maturity and an underdeveloped sense of responsibility; a high susceptibility to negative

325

influences; and an unformed character.  543 U.S. at 569-70.  Numerous psychological

evaluations demonstrated that C.R. exhibited identical characteristics.

The *Roper* Court pointed out that the defendant was "very immature," "very impulsive,"

and "very susceptible to being manipulated or influenced."  543 U.S. at 559.  Similarly, C.R.'s

mental health evaluations revealed that he was "grossly naïve and immature."  *See* New York

Forensic Report, *supra*, Part II.G.iii.a.  The record is replete with examples of C.R.'s tense home

environment, over-sexualized upbringing, and lack of family stability, which contributed to his

substance abuse and other unacceptable behavior during adolescence.  *Cf. Roper*, 543 U.S. at 559

(considering testimony of experts about defendant's "background including a difficult home

environment and dramatic changes in behavior, accompanied by poor school performance in

adolescence.").

The Bureau of Prisons Report, *see* Part II.G.iii.c, *supra*, acknowledged that C.R., even at

the age of twenty, "appear[ed] to have some features of excessive dependency, immaturity, and

poor coping ability" although "his young age ma[de] it difficult to determine whether  these are

stable personality features or are limited to his stage of development."  BOP Report at 10.  A

recurring theme throughout C.R.'s evaluations is that his "emotional maturity…[and] physical

maturity are years behind his chronological age."  Hr'g Tr. 535, Jan. 27, 2011.

C.R.'s actions and limited comprehension of potential repercussions from his actions

reflect susceptibility to peer pressure and an underdeveloped sense of responsibility,

characteristics that the *Roper* Court found decisive.  543 U.S. at 569–70.  In explaining his

involvement with child pornography, C.R. stated that "[i]t started with a friend that showed me

'Limewire' . . . you can get pornography easily," PSR ¶ at 68.  C.R. stated that at the time of his

offenses, he "didn't think" that his behavior was illegal; "It was on the computer . . . I didn't

think it was reality." PSR ¶ at 68; New York Forensic Report at 4. His lack of understanding of the origins of the images he was viewing demonstrates a similar short-sightedness. He said, "I recently learned that kids are slaves . . . I had no idea . . . so watching encourages this . . . I was naïve. I didn't know . . . when I was younger, I fooled around…it seemed normal." *Id.* The Stutman Report noted that C.R.'s "insight and judgment are limited; he did not fully understand the ramifications of his unlawful actions." Stutman Report at 3.

C.R. "has had a miserable family situation," marked by maternal drug abuse, and highly antagonistic relationships between his biological mother and father, and his father and his stepmother. Hr'g Tr. 496, Jan. 26, 2011(Testimony of Dr. Sachsenmaier); PSR ¶¶ at 45–53. He began looking at adult pornography regularly at the age of thirteen. While such exposure "would be overstimulating to virtually any boy of this age," C.R., "with his history of maternal abandonment, and discovery of his mother's illicit affair, a boy with few friends, poor social skills . . . is especially vulnerable to the psychosexually destructive effects of such explicit images." Stutman Report at 5.

Given his developmental maturity, C.R.'s personality and habits were and are not yet fixed. While appropriate treatment should enable C.R. to become a responsible and productive member of society, a lengthy term of incarceration amongst more serious criminals and sexual offenders is likely to have the opposite effect. *See, e.g.*, Hr'g Tr. 582, Jan. 28, 2011 (Testimony of Dr. Prentky) ("There is a potential deleterious effect of treatment in a prison context for some individuals . . . most of the people there are going to be far, far more dangerous than CR, but what does that mean? [I]t means he'll be exposed to a wide range of behaviors and attitudes, crinogenics, cognitive distortions, around offending that he never contemplated before."); Hr'g Tr. 169, Jan. 26, 2011 (Testimony of Dr. Kaplan) ("[T]he earlier you begin treatment the earlier

these patterns are not ingrained and the earlier you could shift them over, move them or concentrate on consenting sex with peers.").

A lengthy prison sentence for C.R. risks a number of such deleterious effects, including normalization of criminal behavior and validation of inappropriate feelings towards children. "[T]he risk of . . . returning to child pornography might actually go up in prison . . . men . . . talked to me about how they wallow in thoughts and fantasies about child pornography when they're in prison. They talk about it all the time, about how best to access it, about what the best sites are." *See* Hr'g Tr. 314, Jan. 28, 2011 (Testimony of Dr. Prentky).

Since his initial arrest, C.R. has not reoffended, either by viewing child pornography or attempting to harm a child. While he has violated other requirements of supervised release, C.R. has demonstrated discipline and improvement on this central concern and on his education and work, which are highly positive sign for his long term rehabilitation. *See* Part II.G, *supra*; Prentky Report at 12 ("The most critical determinant of desistence is lawful time spent in the community. He has spent close to two years in the community under arguably the worst conditions of conditions in terms of stress, and he has not re-engaged in any sexual misconduct.").

C.R. is amenable to treatment. He has willingly participated in numerous psychological evaluations and is currently undergoing sex offender specific psychiatric treatment at Pre-trial services referral. *See* Part II.G, *supra*. Of note, he was forthcoming about his sexual fantasies when interviewed by Dr. Kaplan. Dr. Kaplan identified C.R.'s honesty as a positive sign. *See* Part II.H.ii., *supra*.

The "as-applied" doctrine of unconstitutionality has been summarized as follows:

> In an as-applied challenge, the question is whether the statute
> would be unconstitutional if applied literally to the facts of the
> case. *Cf. Field Day LLC v. County of Suffolk*, 463 F.3d 167, 174
> (2d Cir. 2006). Factual context and defendant's circumstances are
> critical. *See, e.g., Arzberger*, 592 F. Supp. 2d at 599. A sequential
> analysis, putting off facial challenges, permits the courts to protect
> the constitutional rights of individual defendants in particular
> situations, while avoiding the unnecessary striking down of a
> congressional enactment. *See Washington State Grange v.*
> *Washington State Republican Party*, 552 U.S. 442, 450, 128 S.Ct,
> 1184, 170 L.Ed.2d 151 (2008) (noting that facial invalidation
> contravenes the "fundamental principle . . . that courts . . . should
> [not] formulate a rule of constitutional law broader than is required
> by the precise facts to which it is applied").

*United States v. Polouizzi*, 697 F. Supp. 2d 381, 387 (E.D.N.Y. 2010).

The law described in this section, as well as the science and particulars of defendant's

background, leads to the conclusion that, as applied to this defendant, a five-year term of

imprisonment would be cruel and unusual. Requiring five-years of incarceration, most of it

without effective treatment, would constitute a violation of the Constitution.

Mere peer-to-peer file sharing of pornography by teenage boys, even if it includes

pictures of minors, does not signify the sort of social deviance which would support long

minimum prison terms for such immature persons. A teenager confused about his developing

sexuality in a splintered and dysfunctional family, who uses easily available Internet facilities to

look at lewd pictures of children, is not fully responsible. The defendant was fifteen and had just

entered puberty when he began viewing these pictures. And, even at nineteen, he was

emotionally much younger than his chronological age.

Courts have recognized these developmental factors in cases involving teenagers and child pornography. Interest in lewd images of minors by one who is emotionally a minor himself does not manifest the same kind of sexual perversion as would a mature adult's focus on the same pictures. In *United States v. Stern*, 590 F. Supp. 2d 945, 953 (N.D. Ohio 2008) the district court emphasized the peer-level nature of the sexual interest when imposing a sentence far below the guideline range for a college student who had begun viewing child pornography at age fourteen. In addition to citing the scientific literature on "the unformed nature of the adolescent brain," *id.* at 953 n.6, it recognized that "the 14-year-old is acting on normal impulses in an unacceptable manner (and may well be unaware of the impact of his crime), whereas the forty-year-old is acting on deviant impulses and is expected to understand the terror that this crime inflicts upon its victims." *Id. See also*, *United States v. Wachowiak*, 412 F. Supp. 2d 958 (E.D. Wis. 2006) (substantial downward departure for twenty-four year-old student whose obsession with pornography began at a young age, watching his father's videos); *United States v. Polito*, 215 F. App'x. 354 (5th Cir. 2007) (affirming a downward departure to probation including one year on house arrest based in part on the fact that the defendant was only eighteen and immature when he committed the offense); *United States v. Strayer*, No. 8-CR-482, 2010 WL 2560466 (D. Neb. June 24, 2010) (granting a below Guidelines sentence for a twenty-five-year-old whose psychological evaluation concluded that he was emotionally close to an adolescent and also had other mental health problems); *United States v. Larson*, 558 F. Supp. 2d 1103 (D. Mon. June 5, 2008) (five-year mandatory minimum sentence for receipt of child pornography was unconstitutional as applied to a mentally retarded twenty-one-year-old), *vacated*, 346 F. App'x. 166, 168 (9th Cir. 2009): Amy F. Kimpel, *Using Laws Designed to Protect as a Weapon: Prosecuting Minors Under Child Pornography Laws*, 34 N.Y.U. Rev. L. & Soc. Change 299,

320 (2010) ("Arguably, there is a qualitative difference when a sexually provocative image of a child is viewed by an adult than when such an image is viewed by another child. Adolescents have a certain curiosity about the sexual activity of their peers. This curiosity is distinguishable from the inclination of a pedophile. Even prosecutors have noted that teen viewers might not have the same motives or present the same dangers as adults seeking child pornography.") (citations omitted).

A five-year minimum sentence as applied to this defendant serves no legitimate penological goal. "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense" and therefore, unconstitutional under the Eighth Amendment. *Graham*, 130 S. Ct. at *2028. Neither "retribution," "deterrence," nor "rehabilitation," *Id.* at 2028-2029, justifies a five-year mandated prison sentence for an adolescent, plus what could constitute lifelong strict supervised release. Excessive and unnecessary imposition of suffering and destruction of opportunity for a constructive life as a youngster constitutes cruel and unusual punishment. *See* David Gray, *Punishment as Suffering*, 63 Vand. L. Rev. 1619, 1692-93 (2010) (discussing relationship between suffering and punishment and arguing that "excessive suffering requires remediation").

One the one hand, treatment and supervision within the community are necessary for C.R. to mature into a responsible, productive, law-abiding individual. Requiring the defendant to spend the formative years of his young adulthood in a sex offender penal treatment unit, on the other hand, presents significant risks. Hr'g Tr. 216, Jan. 26, 2011 (Testimony of Dr. Kaplan) ("He could spend three or five-years fantasizing about 12-year-old boys and being reinforced by pedophiles . . . and come out with more of an interest in young boys."). While the treatment program at FMC Devens will provide the defendant an opportunity for focused therapy, a

sentence of five years in such an environment for an immature and impressionable defendant is counterproductive.

## IV.    Application of Law to Facts

Probation calculated defendant's Guideline offense level at 35 with a criminal history category of I, yielding a sentence range of 168-210 months.    *See* PSR at ¶ 10.  The government agreed with this determination.  The calculation included a two-point enhancement because some of the viewed images involved minors under the age of twelve, a two-point increase because defendant distributed the material in the peer-to-peer Gigatribe network, a five-point addition for having sexual interaction with his half-sister, a two-point increase because the defendant used a computer to possess the child pornography, and a five-point addition for possessing more than six hundred images.    *Id.*  A three-point deduction was assessed for defendant's timely acceptance of responsibility.    *Id.*

C.R. objects to each of the enhancements.  *See* Defendant's Sentencing Letter, May 6, 2011.  He contends that the increases for use of a computer, distribution on Gigatribe, possessing more than 600 images, and having images containing minors under age twelve are not sufficiently particularized to the facts of this case and result in double counting.  *See* Defendant's Sentencing Letter, May 6, 2011.  In addition he argues that the five-point enhancement for having sexual contact with his half-sister should not apply because only one of the incidents occurred after C.R. turned eighteen years old.  Because the other two incidents occurred when he was a juvenile, C.R. asserts that the conduct is not "as morally reprehensible as that of an adult." *Id.* (quoting *Graham v. Florida*, 130 S.Ct. 2011, 2026 (2010)).  C.R. calculates his total offense level to be 19 with a criminal history category I, yielding a guidelines range of 30-37 months.

The two-point enhancement for distribution does not apply because the defendant's actions did not constitution distribution under the statute.  *See* Part II.D.i, *supra*.

Because the defendant's inappropriate sexual conduct with his half-sister was on three occasions over a period of five-years the court does not find a "pattern of sexual abuse."  Two of these incidents occurred when the defendant was under eighteen years and in the care and supervision of his father.  The five-point enhancement for that charge is not applied.

The two-point enhancement for use of a computer is not applied.  Virtually all of child pornography crimes involve the use of a computer.  Adding two points results in double counting and is not sufficiently particularized to the facts of the case.  *See Stabenow*, *supra* at 16 ("In 2006, 97% of the 1,012 child pornography defendants had used a computer.  Today, forensic computer technology and monitoring facilitates, not thwarts, the investigation of child pornography offenses.  So, if a client today used a computer, but did not widely disseminate the images, did not use them to entice or coerce a child, and did not show them to a child, then their conduct is completely outside the scope of the fear that prompted Congress to require the enhancement, and therefore a variance should be considered.").

After making these adjustments, C.R.'s total offense level is 26, with a criminal history category of I, yielding a guideline range of 68-73 months.  The calculation includes a 5-point enhancement for possession of more than 600 images, a 2-point enhancement for possessing images of minors under age 12, and a 3-point deduction for acceptance of responsibility.

The guideline range is excessive under the circumstances of the case.  Even a minimum of sixty-eight months in prison would go far towards destroying the defendant as a potential useful member of society.  *See Dorvee*, 616 F.3d at 188 (In child pornography cases "[d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences

under § 2G2.2 . . . bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results."). The question is what is required below the guidelines.  *See, e.g.*, *United States v. Booker*, 543 U.S.  220, 245 (2005) (making guidelines "advisory"); *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006) (sentencing court must still adhere to requirements set forth in 18 U.S.C.  § 3553(c)(2)); *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006) (statement of reasons need only be "a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)").

Once the five-year minimum sentence is found inapplicable as applied—as it has been in the instant case—the controlling statute is section 3553(a) of title 18 of the United States Code. *See* the provision set out in Part III.A.i, *supra*.   It provides: "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of sentencing."  18 U.S.C. § 3553(a)(1).   The purposes of section 3553(a) and the reasons the sentence imposed satisfies the section are as follows (the numbers and underlined material refer to the subdivisions of the section) set out as a whole in Part III.A.i, *supra*.

(a)(1) "nature and circumstances of the offense"

C.R.'s crimes are serious and warrant punishment.   Children were abused to produce the material he collected.   They will experience continued -- often heightened -- harm from knowledge of the widely accessible visualization of their abuse on video.

There is a range of culpability involved in child pornography offenses.   As discussed above, *see* Part III.B.v (discussing judicial interpretations of child pornography sentencing guidelines), courts have recognized that possessing and distributing the material is not usually as

heinous as producing child pornography, engaging in sex acts with children or travelling to another state to engage in a sex act with a child.   Use of a computer, which enhances a defendant's sentence, fails to distinguish dangerous commercial distributors of online pornography from more passive users.  *See Dorvee*, 604 F.3d at 95–96.  No evidence presented in this case suggests that use of a computer by adolescents like C.R. to view and share child pornography has increased its creation or utilization by people who act out against children. The testimony of computer forensic specialist Jonathon Bridbord explained that "I think that people are focusing more so on prosecuting these crimes and just because you see more prosecutions doesn't necessarily [mean] things have increased.  Hr'g Tr. 104, Oct. 7, 2010.

Defendant's "distribution" in this case involved creating a screen name on two peer-to-peer file sharing programs, Gigatribe and Limewire, using known child pornography search terms with his user name to advertise his interest in child pornography, and creating an electronic folder on his computer's hard drive where he saved one image of child pornography and 100 child pornography videos that he downloaded from the programs.  The forensic analysis of the two Dell computers C.R. utilized to view and distribute child pornography revealed 100 images and 200 videos of child pornography.   While even a relatively small participation in the viewing of child pornography may help fuel the market for this material, a distinction must be made between a minor sharer at C.R.'s level and an extensive commercial distributer.

Defendant used Gigatribe for only 30 days and Limewire for an unknown period of time. *See* Hr'g Tr. 17, Oct. 7, 2010.  Defendant had a marginal role in the overall child exploitation market as a passive viewer because his "distribution" was not widespread and he did not engage in frequent online chats with individuals to share child pornography.  *See, e.g., Grober*, 595 F. Supp. 2d at 394, 396 (finding guidelines do not deserve deference in a "typical downloading

335

case"); *United States v. Hanson*, 561 F. Supp. 2d. 1004, 1011 (E.D. Wis. 2008) (finding guidelines did not deserve deference as applied to typical first-time offender who shared child-pornography files on the Internet but produced none directly); *Baird*, 580 F. Supp. at 895 (reducing sentence after finding recent changes to guidelines "served to muddy the qualitative distinctions between 'mere possession' and 'distribution of child pornography,'" and that "[t]he Guidelines at issue do not adequately reflect those important distinctions in levels of culpability"); *but cf. United States v. Irey,* 612 F.3d 1160, 1211 (11th Cir. 2010) ("imposing a lighter sentence on one convicted of a child pornography offense tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market. The problem . . . is compounded when the crime involves not just possession but also distribution of child pornography."); *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (same); *United States v. Goldberg*, 491 F.3d 68, 672 (7th Cir. 2007) ("The greater the customer demand for child pornography, the more that will be produced. . . . The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) (same); *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010) (same); *United States v. Goff*, 501 F.3d 230, 261 (3d Cir. 2007) (same).

Another weighty consideration is the nature of the images depicted on defendant's computer. As discussed in Part II.D.i, *supra*, the majority of images on defendant's computers involved boys between the ages of ten and twelve. *See* Hr'g Tr. 21, Oct. 7, 2010. These files, while seriously troubling, were not of the brutal type found on the computers of many other defendants the courts have encountered in such cases. *Cf. United States v. Reiner*, 468 F. Supp. 2d 393, 398

(E.D.N.Y. 2006) (cataloging violent images, movies and stories found on defendant's computer). C.R. did not have images of bondage, sadism, or violence. *See* PSR at ¶ 16 ("There appeared to be no child pornography material involving either very young (under age 5 or 6) children, or scenes of bondage, sadism or violence."). The government disputes this contention arguing "all child pornography is inherently violent, in that it depicts the rape of non-consenting children. Indeed, every image of child pornography represents a victim who has been abused, exploited and raped." Government's Sentencing Letter, Docket Entry 138, 8 (May 5, 2011). Any sexual assault of a child is a violent act that causes tremendous harm to the victim. The Sentencing Commission has chosen to distinguish between sexual content and sexual content involving violent conduct.

In this case, C.R., appropriately and with the government's concurrence, did not receive a four-point enhancement for possessing images containing "sadistic or masochistic conduct or other depictions of violence." *See* § 2G2.2(b)(4). The absence of such images is significant because it probably decreases (the court assumes in the absence of good scientific studies) the likelihood that C.R. would act out to harm a child. "Though the empirical evidence of a correlation between pornography and sexual assault is equivocal . . . studies relatively consistently indicate that any aggressive behavior that may be observed is not because the violent images contained a sexual theme, but that it is the violence that is relevant." Hamilton, *supra* (manuscript at 32) (discussing study showing a correlation between sexually aggressive behavior and sexually violent pornography, but not with nonviolent pornography).

(a)(1) "history and characteristics of defendant"

There are several mitigating factors when considering the individual characteristics of this defendant. C.R. began viewing pornographic images when he was about 15 years old – well

below the 18 year statutory "juvenile" line.   The majority of the images he viewed involved young boys between the ages of 10 and 12, not far from his own age group when he started viewing the material.  The Supreme Court has authorized consideration of a defendant's age and maturity in two recent decisions.  *See* Part III.B.v, *supra; see also Roper*, 543 U.S. 551 (relying on scientific research documenting lack of maturity in young people and continued brain development to find death penalty unconstitutional when imposed on an individual whose crime was committed before age 18) and *Graham*, 130 S. Ct.  (relying on research to find imposition of life without parole for non-homicide crimes unconstitutional when applied to individuals under 18).

Federal courts have emphasized the fundamental difference between the conduct of an immature defendant whose child pornography habit began in adolescence and others whose conduct began as an adult.  *See United States v. Polito*, 215 Fed. Appx. 354, 357 (5th Cir. 2007) (per curiam) (upholding a sentence of probation when use began during adolescence) *contra United States v. McElheney*, 524 F. Supp. 2d 983, 997 (E.D. Tenn. 2007) (affirming guideline sentence for adult offender) ("Typically, defendants in [child pornography] cases are first offenders, highly educated, middle aged, with solid work histories.").  "[Y]outh is more than a chronological fact.  It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Gall v. United States*, 552 U.S. 38, 58 (2007) (internal citation omitted) (below guidelines sentence for college student who withdrew from drug conspiracy and reformed behavior).

> The need to protect this crime's victims is not lessened by the perpetrator's age.  That being said, the courts have a radically different statutory scheme in place to punish 14 year olds who are looking at pictures of other 14-year olds, as this behavior is

338

> fundamentally different in kind than a 40-year old who looks at 14-
> year olds.   The 14-year old is acting on normal impulses in an
> unacceptable manner (and may well be unaware of the impact of
> his crime), whereas the 40-year old is acting on deviant impulses
> and is expected to understand the terror that this crime inflicts
> upon its victims.

*United States v. Stern*, 590 F. Supp. 2d 945, 954, n.6 (N.D. Oh. 2006) (below guidelines sentence for young man who began looking at child pornography at the age of 14 but stopped following his arrest at age 22).

Because C.R. was only 15 when he started viewing child pornography and the entirety of his offense conduct occurred during his teenage years, consideration must be given to the defendant's impressionable age, sexual exploration, and potential lack of awareness regarding the potential harms of his crime.   Defendant's continued use of child pornography until his arrest at age nineteen, four years after his conduct first began, must be considered; as C.R. matured chronologically, his activities did not cease.   C.R. had continued difficulty controlling his behavior and was not receiving any treatment to address his inappropriate sexual desires. His continued viewing of child pornography on file sharing networks during his teenage years must be balanced against mental health evaluations that indicate C.R. is "grossly naïve and immature;" scientific research explaining that pre-frontal lobe development, the part of his brain that manages impulse control, judgment, and decision making, persists until the mid-twenties; lack of any effective steps by his parents to control or have C.R. treated for his emotional problems; and creation by his adult custodians of an unhealthy sexual atmosphere bound to exacerbate the sexual problems of this adolescent.

Post-arrest conduct is also relevant.  C.R.'s actions since his arrest weigh heavily in favor of a sentence below the Guidelines range.  *See* Part II.G, *supra*, detailing defendant's education, employment, and mental health treatment since his arrest.  It is noteworthy that defendant has remained committed to rehabilitating himself despite the prospect of a lengthy prison term and continuing public shaming.  Though after his conduct was revealed, he was ostracized by his step-mother with whom he had built a close bond, he has strived to maintain relationships with his particularly supportive grandmother, his father and a handful of friends.  His ability to have some healthy social interactions as well as to work, study, and respond to treatment bodes well for the prospect of his being a lawful and productive member of society.

The defendant is immature, but is bright and capable of a useful productive life, and a future without violation of sexual offense laws, given adequate treatment, supervision and control.   This will be provided under the sentence imposed.

(a)(2)(A) "to reflect the seriousness of the offense, to promote respect for the law"

The punishment imposed is substantial, reflecting the seriousness of the offense.   It will promote respect for the law.

General deterrence is satisfied.   The sentence will send a clear message that child pornography is condemned and that even a defendant with compelling personal characteristics such as youth, mental immaturity, motivation for treatment, and positive educational and employment history should not be excused.

Sharing child pornography through a computer network program is not a victim-less crime.   Recognition of the harm this crime causes to innocent children who are abused to produce this heinous material is necessary.

340

The sentence, however, must be proportional to the defendant's crime.  "A sentence that is disproportionately long in relation to the offense is unjust and . . . fails to promote respect [for the law]." *United States v. Ontiveros*, 07-CR-333, 2008 WL 2937539, at *3 (E.D. Wisc.  July 24, 2008).  "There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist." *United States v. Stern*, 590 F. Supp. 2d 945, 957 (N.D. Ohio 2008). A sentence of 30 months will afford protection of the public from further crimes by the defendant.   During his prison term defendant will receive intensive treatment to prevent a further offense.

(a)(2)(A) "to provide just punishment for the offense"

As already noted the punishment imposed is substantial and just.

(a)(2)(B) "to afford adequate deterrence to criminal conduct"

No rational person would commit this crime were he aware of the likelihood of the punishment imposed.   General deterrence is sufficient.

A thirty month prison sentence is a significant amount of time for a defendant such as C.R., who has no criminal history and never has had any prior contact with the court system. The conviction and sentence will have an adverse impact on defendant's employability.  He will be subject to serious restrictions and reporting requirements for many years under federal and state law. *See* 42 U.S. C. §§ 16911, 16915(a)(1) (fifteen years for lowest risk federal offenders); § 16915(b) (possibility of early termination for federal offenders after ten years); N.Y.  Corr. Law § 168-h(1) (twenty years for lowest risk offender).

(a)(2)(C) "to protect the public from further crimes of the defendant"

Determining the most effective means of reducing recidivism is a primary goal of federal and state courts and communities.

> These strategies include improving probation and parole
> supervision practices; delivering effective substance abuse and
> mental health treatment; providing education, job training, and
> connections to employment; and ensuring appropriate housing.
> The desire to continue state and local investments in these
> initiatives—which complement recent federal support—is strong,
> but fiscal pressures make it difficult to achieve.

National Summit, *supra*, at 3.

In a recent conference,

> [A] broad cross-section of leaders in government and criminal
> justice identified four principles –the focus of informative expert
> panel discussions—that are critical to any effort intended to
> increase public safety, lower recidivism, and reduce spending on
> corrections:
> A. Focus on Individuals Most Likely to Reoffend
> B. Base Programs on Science and Ensure Quality
> C. Implement Effective Community Supervision Policies and
>    Practices
> D. Apply Place-Based Strategies

*Id*. at 11.

The defendant will be under constant supervision in and out of prison.  He has already been under treatment and close supervision while on bail.  There is little fear of further criminal conduct by this defendant.   Sufficient specific deterrence is provided.

It is unlikely that C.R. will engage in further criminal activity in light of his desire to remain free from incarceration, his relationship with his family, in particular his grandmother, and his educational goals.   The sentence imposed will provide C.R. with continued educational training and necessary treatment to address and control inappropriate activities.   Studies suggest that youth are more amenable to treatment than adults and that recidivism is low for youthful sex offenders.  *See* Stephanie Holmes, An Empirical Analysis of Registration and Notification Laws for Juvenile Sex Offenders *9 (May 1, 2009), *available at* http://ssrn.com/abstratct=1710745 ("Psychological and behavioral research has found that there are significant differences between juvenile and adult sex offending, all of which might make juvenile sex offenders more amenable to treatment than adults.").

A lengthy prison stay may have a severely negative impact on defendant's rehabilitation.  *See, e.g., United States v. Moreland*, 568 F. Supp. 2d 674, 687 (S.D. W.Va. 2008) ("[The defendant] has made both good and bad decisions in his life.   He has not, however, demonstrated the pattern of recidivism or violence that would justify disposal to prison for [such a lengthy period].").  Defendant has evidenced a high likelihood that he will turn his life around.

Rape and other abuse is widespread in prisons, even though it appears to be under control at Federal Medical Center Devens.  Youths and individuals who appear immature are particularly vulnerable.  *See* David Kaiser and Lovisa Stannow, *The Way to Stop Prison Rape*,   New York Review of Books (March 25, 2010) (prisoners are frequent victims of sexual abuse, often at the hands of correctional staff); *see also* T.J.  Parcell, *Fish: A Memoir of a Boy in a Man's Prison*

(2006) (documenting abuse in prison of 17 year old boy sentenced to four and a half years in adult state facility). Inmates who are known to be sex offenders are often viciously preyed upon by other inmates. C.R. is a relatively immature appearing twenty-two year old with no criminal history or substantial experience navigating the prison system. His youthful appearance, coupled with his diagnosed immaturity and child pornography offense would make him a target for predators in the general prison population. The sex offender program at Federal Medical Center Devens will best meet the goals of sentencing and protect the public and defendant.

(a)(2)(D) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"

For a correctional program to be effective it cannot be based on close supervision alone.

> Intensive supervision with treatment is effective at reducing recidivism, while intensive supervision without treatment is not. Treatment-oriented supervision programs yielded a 17.9 percent reduction in recidivism rates, whereas intensive supervision with an emphasis on surveillance without treatment resulted in no net decrease in recidivism. Drug treatment in the community is more effective than drug treatment in prison. Community-based treatment yields an 8.3 percent reduction in recidivism rates, whereas prison-based treatment (either therapeutic communities or outpatient) also reduces recidivism, but by a lesser 6.4 percent. Prison education programs work. Basic or postsecondary education programs reduce recidivism rates by 8.3 percent. So do correctional industries programs, which reduce recidivism rates by 6.4 percent. In general, community-based programs have a greater impact on recidivism rates than those based in prisons. According to the [Washington State Institute of Public Policy] study, the latter

344

> reduced recidivism rates by an average of 5 to 10 percent, whereas
> intensive supervision with community-based services reduced
> recidivism rates by 18 percent.

*Id.* at 25-26.

Appropriate medical treatment is being provided, and will be available in prison and upon defendant's release.   He has been ordered to obtain further college training during the presentence period.  Graduate courses are available by mail in prison.  *Cf.* Gregory A Knott, *Cost and Punishment: Reassessing Incarceration Costs and the Value of College-in-Prison Programs*, Northern Ill. Univ. L. Rev. (forthcoming 2011) (the first study to exam college-in-prison programs, discussing role such programs may have in reducing recidivism and incarceration costs).

The court Probation Department will require that while under supervised release defendant attended classes leading to a degree or that he take vocational training.

(a)(3) "the kinds of sentences available"

All the kinds of sentences available have been considered.   The balanced incarceration, supervised release, sex offender limitations and medical treatment imposed is best calculated to protect the public and defendant.

There are three sentencing options available: 1) a long prison term without treatment, 2) a prison term required for full treatment and completion of a program for control of sex offenders at a facility such as Federal Medical Center Devens with a recommendation for treatment in the

345

residential Sex Offender Treatment Program, and continued strict control and treatment outside of prison, and 3) a non-incarceratory probation sentence with outpatient mental health and sex offender treatment. The intermediary sentence 2) is most appropriate in this case.

(a)(4), (5) "guidelines," "policy" and other criteria of the Sentencing Commission

The court has given serious consideration and weight to Sentencing Commission materials. Imposed is a substantial term of imprisonment and long term of closely supervised release after considering them. As already noted, *see* Part III.A.iii, *supra*, the Commission itself has reservations about the long sentences required in child pornography cases.

(a)(6) "the need to avoid unwarranted sentence disparities among defendants with similar records when they have been found guilty of similar conduct"

Comparable sentences have been analyzed. The present sentence is slightly lower than those for adults using the internet the way this defendant did. But it is somewhat higher (based upon conversations with judges in this court and surveys of the literature) than would be expected if defendant had been charged with possession only, a substantial possibility apparently seriously considered by the prosecuting authorities.

(a)(7) "the need to provide restitution to any victim of the offense"

Restitution is not sought by the government and is not desirable in this case. *Cf.* Part II.F, *supra*.

(B)(2)(A) "Child crimes and sexual offenses" "aggravating" and "mitigating" circumstances need to be considered to the extent not considered by the Sentencing Commission.

346

The court has given serious consideration to the sexual relationship between the defendant and his half-sister.  Incest can be evidence of a serious sexual depravity requiring severe punishment.  *See United States v. Gilmore*, 599 F.3d 160 (2d Cir. 2010) (affirming thirty-year sentencing for defendant who pled guilty to producing child pornography of a minor under his custody and control, to wit, his eight year old daughter); *United States v. Gilmore*, 470 F. Supp. 2d 233 (E.D.N.Y. Jan 19, 2007) (sentencing defendant to thirty years).  In this case, a continuing relationship with the half-sister will be limited and is not likely to lead to further objectionable conduct by the defendant.

## V.    Conclusion

Were there no five-year mandatory minimum sentence the court would have imposed a probationary sentence with supervised release and outpatient treatment such as that discussed by Dr. Kaplan and Dr. Prentky.  *See* Part II.F.  The testimony strongly supported the therapeutic value of an intensive outpatient course of treatment for this defendant.  Given the strong public policy support for some incarceration to deter future like conduct, the punishment imposed is appropriate.

Following a full analysis of the constitutional issues and statutory criteria for sentencing defendant under 18 U.S.C. § 2252 (a)(2) for distribution of child pornography; and a careful consideration of the need to protect the public and to avoid unnecessary harm to the defendant, a sentence of thirty months incarceration is imposed.  Credit is to be given for the time spent at FMC Devens while defendant was being evaluated on order of the court.  *See* Henry J. Sadowski, *Basics of Federal Sentence Computations* (2011) ("§ 3585(b) -- Credit for prior custody -- A defendant shall be given credit towards the sentence of a term of imprisonment for

any time spent in official detention prior to the date the sentence commences – (1) as a result of the offense for which the sentence was imposed . . .") *available at* http://paw.fd.org/pdf/bop-basic-sentence-computations.pdf.  Five-years of supervised release and a special assessment of $100 is mandated.  No fine is assessed since defendant has no substantial monetary assets and is unlikely to have any in the foreseeable future.

The recommendation of Probation and the policy statement at U.S.S.G § 5D1.2(c) that the maximum sentence of lifetime supervised release be imposed, PSR ¶ 106 at 37, is rejected as too severe and inhibitory of the total rehabilitation possible while defendant is still in his early twenties.  *See also United States v. Apodaca*, No. 09-50372, 2011 WL 1365794, *7-10 (April 12, 2011 9th Cir.) (Fletcher, J concurring) (critiquing application of U.S.S.G. § 5D1.2(c) on Internet-only child pornography offenders because it "grossly overestimate[s] the risk that [such defendants] will commit contact sex offenses against children"); *United States v. Albertson*, No. 09-1049 2011 WL 1662786, *7 (May 4, 2011) (considering appropriate computer-related supervised release conditions for child pornography offenders and concluding "in a time where the daily necessities of life and work demand not only internet access but internet fluency, sentencing courts need to select the least restrictive alternative for achieving their sentencing purposes").  Defendant will, in any event, be subject to long-time supervision under the state and federal sex offender registration and notification laws.  *See* 42 U.S. C. §§ 16911, 16915(a)(1); § 16915(b); N.Y.  Corr.  Law § 168-h(1) (twenty years for lowest risk offender).

Forfeited to the government shall be all equipment, photos, videos, and any other material used by defendant in obtaining, viewing, collecting or distributing child or adult pornography.  Forfeiture to the government of this material is ordered.

A part, and condition, of the sentence is service of the term of imprisonment at the Federal Medical Center Devens with treatment in the residential Sex Offender Treatment Program. The defendant has requested, is prepared for, and intends to cooperate in this program. Conversations with officials at Devens have assured the court that this treatment will be available to C.R.

Defendant shall self-surrender at Devens as soon as he is directed to do so by the Bureau of Prisons or the United States Attorney. Until then, bail is continued. *See United States v. Polouiizzi. See* 2011 WL 118217, *3, No. 06-CR-22 (E.D.N.Y January 14, 2011); *United States v. Polouizzi*, 697 F.Supp.2d 381 (E.D.N.Y. 2010) (unconstitutionality of limits on bail in sex cases).

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

May 16, 2011
Brooklyn, New York

349

**A.  Appendix A: Bureau of Prisons Sex Offender Programs.**

See attached documents.

**B.  Appendix B: Tour of Federal Medical Center Devens**

On December 17, 2010 Judge Weinstein and his two law clerks, including myself, visited the Federal Medical Center (FMC) Devens, Bureau of Prisons (BOP) facility.  Also present during the tour was Deputy Federal Defender Deirdre VonDornum, and Assistant U.S. Attorneys Ali Kazemi and Allen Bode.

We were greeted by the following prison staff who took us on the tour: Warden Jeffrey Grondolsky, Associate Warden over Medical S. Spaulding, Case Management Coordinator and Public Information Officer John D. Colautti, and Acting Associate Warden of Programs Nelson Alias.

### I.      Morning Greeting and Census

The tour began with a brief meeting with FMC Devens' officials.  The current census at the facility is 1120 inmates.  There are 120 inmates housed on work detail.  *See* Attached Demographic Characteristics (Nov. 2010) (Only 4% (39 inmates) of the total population is between the ages of 18-25).  At the time of the visit there were 20 inmates housed in the Sex Offender Treatment Program (SOTP) (in a separate unit from the general population with greater access to staff) and 240 inmates in the Sex Offender Management Program (SOMP).  *See* section X, *infra*, for descriptions of these programs

FMC Devens has 500 staff and 200 contractors.  Staffing is high in comparison to other BOP prisons due to the medical needs of the inmates.

### II.      Receiving, Intake, and Screening

When inmates enter the facility whether by self-surrender or airlift or other prison transport they all go through this department.  The inmates are screened for medical, psychiatric, and social work needs.  This is the point at which an inmate who has been recommended for the

351

SOTP by a sentencing judge will be screened for suitability with that program.  As discussed in Section X, *infra*, an inmate must voluntarily agree to participate in the SOTP.

The Warden explained that a self-surrender is advantageous to an inmate for obvious reasons of being able to prepare for incarceration but also because it tends to give the inmate a lower custody classification.

### III.    Recreation

FMC Devens has a large outdoor recreation space and indoor gymnasium.  There are no set hours allotted for recreation, and inmates have access to the facility during controlled movement times when they obtain a pass.  Due to the medical needs of the vast majority of inmates, this recreation space is not used by many inmates.

### IV.    J Unit

The J Unit is a general population unit mostly used to house "stable" inmates.  The cells are standard rooms with bunk beds for two people.  Each room has a toilet and sink.  There is a centralized area with televisions.  Headphones are used to control noise.

### V.    Education/Legal/Parenting Program

The law library has several computers with access to Lexis and Westlaw.  It also has a limited collection of case law books.  There is a good general library, and FMC Devens participates in the inter-library loan program with the local public library.  Post-secondary education programming is provided through correspondence courses with several different colleges.  The career resource center includes a computer training program that approximately 60 inmates participate in each day.  Other work programs include a barber shop, HVAC (heating, ventilating and air conditioning), and culinary arts (discussed below).

The parenting program provides services to assist inmates in connecting with their children during visits. The program does not provide transportation for family visitors.

**VI.**     **Food Service/Culinary Arts Program**

We ate lunch at the Culinary Arts Program. Inmates are taught the basics in cooking, serving, and other restaurant essentials so they can leave the facility and obtain a job in the restaurant/hotel industry. The participants prepare meals each day that staff members eat. The director of the program is a culinary school graduate and former chef.

**VII.**     **Commissary**

Inmates earn 12-47 cents or more per hour at jobs in the prison depending upon the skills rendered. Inmates may use their funds to purchase commissary items. *See* attached FMC Devens Commissary List. All items at the commissary are marked up approximately 10-15%. Indigent inmates are provided with over the counter medical items as needed.

**VIII.**     **Medical Services**

Devens is one of six major Bureau of Prisons medical facilities. Medical services include dialysis, pharmacy, pill and insulin lines, a clinic, dental services, ancillary services, physical therapy, and a long-term care clinic.

**IX.**     **Mental Health Units**

We observed the M-3 unit which is referred to as a "transitional unit." This unit has 30 cells with one bed per cell. Inmates are free to walk about the unit but may not leave the unit. Inmates are housed in M-3 for pre-sentence and pre-trial forensic studies, as well as when a mental health issue arises making the inmate a safety risk to himself or others if he remains in the general population. Inmates on this unit have more limited access to the resources of the facility, and they are provided with their medications rather than visiting the pill line. They may stay for

a short period of time and then return to the general population or stay for years depending on their mental health condition.

C.R. was housed on M-3 for 15 days during his forensic study ordered by the court.

The M-1 unit is a 24 hour locked mental health unit for inmates with severe mental health problems. The unit has its own pharmacy. We did not visit this unit.

### X.     G-Unit and Sex Offender Treatment Program

The G-Unit has a total of 250 inmates. It is divided into upstairs and downstairs sections. The upstairs section houses non-treatment, "hold over" inmates. These inmates may be awaiting treatment or may have just finished treatment and are awaiting transition back into the general population.

The downstairs section houses the Sex Offender Treatment Program (SOTP). Inmates must volunteer for this program.

At present there are twenty inmates in the program. The unit looks like most other general population units except that staff offices run along the side of the unit, providing inmates with greater access to staff. It was brightly decorated for the holidays, and several inmates were observed at tables in the center of the unit reading, making decorations, and conversing. The population in the SOTP is diverse in age, educational background, and professional careers. We are awaiting more detailed statistical information from FMC Devens on the types of offenses for which inmates in SOTP were convicted and the precise age range of inmates in the program. The SOTP community we observed was largely white.

There is a common room that is used for SOTP treatment sessions. Half the inmates participate in treatment during the morning and half are in treatment in the afternoons. Treatment consists of group and individual sessions 3.5 hours per day, 5 days per week. Each

354

participant is assigned a primary clinician.  Most of the treatment consists of group sessions within a cognitive behavioral treatment modality.  The amount of individual treatment sessions varies based on each inmate's needs.

There is a maximum ratio of 14 inmates assigned to one staff member in the SOTP program.  Most of the ratios are about 12 to 1.  There are five doctoral level psychologists and five treatment specialists who have master's degrees.  There is psychiatrist available for consultation when needed.

Inmates in SOTP have chairs that they bring in for treatment or when watching television or reading in the common space.  Television is not allowed during the day.  When inmates watch television they vote on the programming and discuss whether an inmate has selected an inappropriate program.

The judge spoke with several of the inmates to get their perspective on the treatment program.  Some of the inmates he spoke with were convicted of possession of child pornography while others were convicted of travelling to have sex with a minor and hand-on contact with a minor.  Their sentences varied.  They stated that the program was helpful.  Some of the inmates with whom the judge spoke that did not have contact offenses with minors said they were concerned that without treatment their conduct may have progressed from looking to acting.  Others said that they were not sure if their viewing behavior would have led to acting out against a child.

In general, SOTP inmates appeared to be relaxed and cooperative.  Most were reading newspapers, magazines or books at the time of the visit.

a.   **Discussion with Dr. Cheryl Renaud and other FMC Devens Officials**

Dr. Renaud explained the difference between the Sex Offender Management Program (SOMP) and the SOTP.  The SOMP is "a way of managing sex offenders in the general population."  Participation in the SOMP is non-voluntary.  It provides an alternative to placing these individuals in the "special housing" unit, which is a locked unit.  Inmates in the SOMP have access to general psychology services and are monitored in a "specialized way" by staff.  They are encouraged to join treatment and may be moved into the SOTP if they volunteer for treatment.  Dr. Renaud did not know what percentage of participants in SOMP volunteer for treatment.  Approximately 10% of those inmates offered treatment volunteer to participate.

The SOTP is a voluntary intensive treatment program.  Participants reside in segregated housing.  The program takes approximately 27 months to complete from the point of referral.  An average inmate goes through the treatment program in 18 months if no additional psychological services are needed.

Dr. Renaud stated that "a 30 month sentence is reasonable to get treatment in the program," if the defendant wishes to volunteer.  Currently, there is a waitlist of about 188 inmates, but many have long prison sentences.  The waitlist is adjusted based on the length of time of the inmate's sentence so that, for example, a prisoner who has a 10 year sentence participates in the SOTP during the last 3 months of his term.  A prisoner who has a shorter sentence, for example 30 to 60 months, will be moved to the top of the list so that he does not run out of time to complete treatment.

About 30% of inmates either drop out of the SOTP or are expelled, leaving about 70% who successfully complete the program.  Dr. Renaud was not able to provide any comparisons on the successfulness between the SOTP at FMC Devens and outpatient sex offender treatment

programs.  SOTP was started in September, 2007.  Dr. Renaud indicated there are "not enough inmates yet for a recidivism study."

When asked if there was a risk of physical harm to sex offenders who are in treatment in the prison, Warden Grondolsky explained that there have been situations where other inmates have alleged that sex offenders "propositioned" them or tried to get magazines that are only available in the general population.   There is a concern that general population inmates make false accusations because they do not like the sex offender treatment inmates.  When there is a concern for safety, a sex offender inmate may be housed in the K-Unit ("Special Housing"), which is the solitary confinement unit while an investigation is conducted into any allegations. None of the officials indicated that there was a substantial probability of abuse of the sex offenders either while in the program or when in the general population.

Treatment is not "offense based" so there is no differentiation between contact offenders and those who have only viewed child pornography.  Inmates are not intentionally exposed to stimuli as treatment concludes.  They stay on the unit for a period of time after treatment, the intensity of services is reduced, and then they are transitioned to the general population.  After discharge from the program, past participants still have access to maintenance services such as group sessions and community meetings.

Dr. Renaud explained the process for getting a defendant into the SOTP at FMC Devens as follows:

1)  The sentencing judge must sentence the defendant to at least 30 months.

2)  The sentencing judge must recommend incarceration at FMC Devens with treatment in the SOTP.

3)  Upon self-surrender or transport to the facility, the prisoner must volunteer for treatment.

357

4) At intake, psychology services will meet with the inmate, describe the services available, and ask if he would like to participate. If the inmate volunteers, he will be moved into the treatment unit.

## XI.    General Observations

FMC Devens is a low-security facility with a relatively large staff. Its population is generally aging, with serious medical needs. The general population vocational and training programs, though extensive, do not appear appropriate for a young offender with no prior criminal record who has a high school diploma and some college education.

The SOTP unit provided a much different atmosphere. As discussed above, the population in the unit was diverse. Many of the inmates were well educated and some were trained professionals. Some of the participants were observed reading the Wall Street Journal and New York Times. The unit was brightly decorated, well-lit, and the presence of staff offices on the unit allows for close monitoring. The unit appeared more like an inpatient treatment program than a prison. College graduates courses could be taken by electronic means.

### C.  Appendix C: Internet Technologies Providing Access to Child Pornography

| Technology | Characteristics |
|---|---|
| World Wide Web | Web sites that provide on-line access to text and multimedia materials identified and accessed through the uniform resource locator (URL). |
| Usenet | A distributed electronic bulletin system, Usenet offers over 80,000 newsgroups, with many newsgroups dedicated to sharing of digital images. |
| Peer-to peer file-sharing programs | Internet applications operating over peer-to-peer networks enable direct communication between users.  Used largely for sharing of digital music, images, and video, peer-to-peer applications include GigaTribe, LimeWire, KaZaA, BearShare, and Gnuetella. |
| Email | Email allows the transmission of messages over a network or the internet.  Users can send email to a single receipting or broadcast it to multiple users.  Email supports the delivery of attached files, including image files. |
| Chat and Internet Relay Chat | Chat technologies allow computer conferencing using the keyboard over the internet between two or more people. |
| Social Networking Sites | Websites that allow users to create personal profiles and share information, including images and videos, with others. One social networking site targeted by law enforcement and prosecutors is Tagged.com. Other popular social networking sites, which take efforts to police against child pornography, include Facebook and MySpace. |

Source: Adapted from U.S. Gov't Accountability Office, *File –Sharing Programs: Peer-to-Peer Networks Provide Ready Access to Child Pornography* 11 (2003); *see also* U.S. Dep't of Justice, the National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress 11 (Aug. 2010) (listing internet distribution channels); David Pogue, *State of the Art: For Those Facebook Left Behind*, N.Y. Times, Jul. 8, 2010, at B1 (describing features of social networking and similar social media).

D.  **Appendix D: State Statutes on Juvenile Sentencing for Child Pornography**

| State | Can a juvenile be charged as an adult for distribution of child pornography? | Distribution of Child Pornography State Code Section/Description of Crime | Prescribed Term of Incarceration | Juvenile Transfer Statute |
|---|---|---|---|---|
| Alabama | Yes; Discretionary if 14 years or older | Ala. Code § 13A-12-191<br><br>Any person who shall knowingly disseminate or display publicly any obscene matter containing a visual depiction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a  Class B felony | 10-20 Years Class B Felony<br><br>*See* Ala. Code 13A-5-6 | **Ala. Code § 12-15-203**<br><br>a) A prosecutor, before a hearing on a delinquency petition on its merits and after notifying, verbally or in writing, the juvenile probation officer, may file a motion requesting the juvenile court judge to transfer a child for criminal prosecution to the circuit or district court, if the child was 14 or more years of age at the time of the conduct charged and is alleged to have committed an act which would constitute a criminal offense as defined by this code if committed by an adult. |
| **Alaska** | Yes; Discretionary if finding that child is unamenable to treatment by age 20. | **Alaska Stat. § 11.61.125**<br><br>(a) A person commits the crime of distribution of child pornography if the person distributes in this state or advertises, promotes, solicits, or offers to distribute in this state any material that is proscribed under Alaska Stat. § 11.61.127 | 5-15 Years Class B Felony if First Conviction<br><br>*See* Alaska Stat. § 12.55.125(i)(3) | **AS § 47.12.100**<br><br>(a) If the court finds at a hearing on a petition that there is probable cause for believing that a minor is delinquent and finds that the minor is not amenable to treatment under this chapter, it shall order the case closed. After a case is closed under this subsection, the minor |

| | | | | |
|---|---|---|---|---|
| | | | | may be prosecuted as an adult.<br><br>(b) A minor is unamenable to treatment under this chapter if the minor probably cannot be rehabilitated by treatment under this chapter before reaching 20 years of age . . . . |
| **Arizona** | Yes; Discretionary if 14 years or older | **Ariz. Rev. State. Ann. § 13-3553**<br><br>(a)  A person commits sexual exploitation of a minor by knowingly:<br><br>1. Recording, filming, photographing, developing or duplicating any visual depiction in which a minor is engaged in exploitive exhibition or other sexual conduct.<br><br>2. Distributing, transporting, exhibiting, receiving, selling, purchasing, electronically transmitting, possessing or exchanging any visual depiction in which a minor is engaged in exploitive exhibition or other sexual conduct. | 4-10 years Presumption of 5 years Class 2 Felony *See* A.R.S. § 13-702<br><br>10-24 Years Presumption of 17 Years (Applies if child is under 15 years of age)<br><br>*See* A.R.S. § 13-604.01(d) | **Ariz. Rev. Stat. § 13-501**<br><br>B. Except as provided in subsection A of this section, the county attorney may bring a criminal prosecution against a juvenile in the same manner as an adult if the juvenile is at least fourteen years of age and is accused of any of the following offenses: . . . .<br>2. A class 2 felony. . . . . |
| **Arkansas** | Yes; Discretionary if 16 years or older | **Ark. Code Ann. § 5-27-603**<br><br>(a) A person commits computer child pornography if the person knowingly:<br><br>(1) Compiles, enters into, or transmits by means of computer, makes, prints, publishes, or reproduces by other computerized means, knowingly causes or allows to be entered into or transmitted by means of computer or buys, sells, receives, | 5-20 Years Class B Felony<br><br>*See* Ark. Code Ann § 5-4-401(a)(3) | **Ark. Code Ann. § 9-27-318**<br><br>(c) A prosecuting attorney may charge a juvenile in either the juvenile or criminal division of circuit court when a case involves a juvenile:<br><br>(1) At least sixteen (16) |

| | | | | |
|---|---|---|---|---|
| | | exchanges, or disseminates any notice, statement, or advertisement or any child's name, telephone number, place of residence, physical characteristics, or other descriptive or identifying information for purposes of facilitating, encouraging, offering, or soliciting sexually explicit conduct of or with any child or another individual believed by the person to be a child, or the visual depiction of the conduct . . . . | | years old when he or she engages in conduct that, if committed by an adult, would be any felony |
| **California** | Yes; Discretionary for all juveniles (18 years or younger) | **Cal. Penal Code § 311.2**<br><br>(c) Every person who knowingly sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state possesses, prepares, publishes, produces, develops, duplicates, or prints any representation of information, data, or image . . . . that contains or incorporates in any manner, any film or filmstrip, with intent to distribute or exhibit to, or to exchange with, a person 18 years of age or older, or who offers to distribute, distributes, or exhibits to, or exchanges with, a person 18 years of age or older any matter, knowing that the matter depicts a person under the age of 18 years personally engaging in or personally simulating sexual conduct, as defined in Section 311.4, shall be punished by imprisonment in the county jail for up to one year, or by a fine not exceeding two thousand dollars ($2,000), or by both that fine and imprisonment, or by imprisonment in the state | Up to 1 Year<br><br>*See* Cal. Penal Code §311.2(c) | **Cal. Penal Code § 1170.17**<br><br>(a) When a person is prosecuted for a criminal offense committed while he or she was under the age of 18 years and the prosecution is lawfully initiated in a court of criminal jurisdiction without a prior finding that the person is not a fit and proper subject to be dealt with under the juvenile court law, upon subsequent conviction for any criminal offense, the person shall be subject to the same sentence as an adult convicted of the identical offense, in accordance with the provisions set forth in subdivision (a) of Section 1170.19, except under the circumstances described in subdivision (b) or (c). |

| | | | |
|---|---|---|---|
| | | prison. | |
| | | **Cal. Penal Code § 311.2** | Up to 1 Year |
| | | (d) Every person who knowingly sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state possesses, prepares, publishes, produces, develops, duplicates, or prints any representation of information, data, or image . . . . that contains or incorporates in any manner, any film or filmstrip, with intent to distribute or exhibit to, or to exchange with, a person under 18 years of age, or who offers to distribute, distributes, or exhibits to, or exchanges with, a person under 18 years of age any matter, knowing that the matter depicts a person under the age of 18 years personally engaging in or personally simulating sexual conduct, as defined in Section 311.4, is guilty of a felony. | *See* Cal. Penal Code §311.2(c) |
| | | **Cal. Penal § 311.3** | |
| | | (a) A person is guilty of sexual exploitation of a child if he or she knowingly develops, duplicates, prints, or exchanges any representation of information, data, or image . . . .  that contains or incorporates in any manner, any film or filmstrip that depicts a person under the age of 18 years engaged in an act of sexual conduct. | Up to 1 Year

*See* Cal. Penal Code § 311.3(d) |
| | | **Cal. Penal § 311.10** | |
| | | Any person who advertises for sale or distribution any obscene matter knowing that it depicts a | 2-4 Years in state prison or up to 1 year in county jail |

| | | person under the age of 18 years personally engaging in or personally simulating sexual conduct . . . is guilty of a felony | *See* Cal. Penal Code § 311.10 | |
|---|---|---|---|---|
| **Colorado** | Yes; Discretionary if 14 years or older and in the best interest of the juvenile and the public | **Colo. Rev. Stat. § 18-6-403**<br><br>(3) A person commits sexual exploitation of a child if, for any purpose, he or she knowingly . . . . (b) Prepares, arranges for , publishes, including but not limited to publishing through digital or electronic means, produces promotes, makes, sells, finances, offers, exhibits, advertises, deals in , or distributes, including but not limited to distributing through digital or electronic means, any sexually exploitative material . . . . (Class 6 felony; Class 4 if it is second or subsequent offense or the possession is of a video, video tape, or motion picture or more than twenty different items qualifying as sexually exploitative material.) . . . . (c) possesses with intent to deal in, sell, or distribute, including but not limited to distributing through digital or electronic means, any sexually exploitative material (Class 3 felony) | 1 year- 18 months Class 6 Felony<br><br>2-6 Years Class 4 Felony<br><br>4-12 Years Class 3 Felony<br><br>*See* Colo. Rev. Stat. 18-1.3-401(1)(a)(V)(A) | **C.R.S.A. § 19-2-518**<br><br>(1)(a) The juvenile court may enter an order certifying a juvenile to be held for criminal proceedings in the district court if:<br><br>(I) A petition filed in juvenile court alleges the juvenile is:<br><br>. . . .<br><br>(B) Fourteen years of age or older at the time of the commission of the alleged offense and is a juvenile delinquent by virtue of having committed a delinquent act that constitutes a felony; and<br><br>(II) After investigation and a hearing, the juvenile court finds it would be contrary to the best interests of the juvenile or of the public to retain jurisdiction. |
| **Connecticut** | Yes; Mandatory if 14 years or | **Conn. Gen. Stat § 53a-196**<br><br>**a) A person is guilty of importing child pornography when, with intent to promote child pornography, such person** | 1-20 Years Class B Felony<br><br>*See* Conn. Gen. Stat § 53a-35a | **C.G.S.A. § 46b-127**<br><br>(a) The court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court |

| | | | | |
|---|---|---|---|---|
| | older | **knowingly imports or causes to be imported into the state three or more visual depictions of child pornography of known content and character.** | | the case of any child charged with the commission of a . . . . class B felony or a violation of section 53a-54d, provided such offense was committed after such child attained the age of fourteen years and counsel has been appointed for such child if such child is indigent. |
| **Delaware** | Yes; Mandatory if child (18 years or younger) is unamenable to the rehabilitative process | **Del. Code Ann. Title 11, §1109**<br><br>**A person is guilty of dealing in child pornography when: The person knowingly , ships, transmits, mails or transports by any means . . . [child pornography]; The person knowingly receives for the purpose of selling or sells any . . . [visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act]; The person knowingly distributes or disseminates, by a means of computer or any other electronic or digital method, or by shows or viewings, any motion picture, video or other visual depiction of a child engaging in a prohibited sexual act or the simulation of such an act.  The possession or showing of such motion pictures shall create a rebuttable presumption of ownership thereof for the purposes of distribution or dissemination; The person, by means of a computer, intentionally compiles, enters, accesses, transmits, receives, exchanges, disseminates, stores,** | Up to 8 Years Class D Felony<br><br>*See* Del. Code Ann. Tit. 11, § 4205 | **10 Del. C. Section 1010**<br><br>(a) A child shall be proceeded against as an adult where:<br><br>. . . .<br><br>(2) The child is not amenable to the rehabilitative processes available to the court;<br><br>. . . . |

| | | | | |
|---|---|---|---|---|
| | | **makes, prints, reproduces or otherwise possesses any photograph, image, file, data, or other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act….; or The person knowingly advertises, promotes, presents, describes, transmits or distributes any visual depiction, exhibition, display or performance with intent to create or convey the impression that such visual depiction, exhibition, display or performance is or contains a depiction of a child engaging in a prohibited sexual act or in the simulation of such an act** | | |
| | | **Del. Code Ann. Tit. 11, § 1108**<br><br>**A person is guilty of sexual exploitation of a child when: The person knowingly photographs or films a child engaging in a prohibited sexual act or in the simulation of such an act, or otherwise knowingly creates a visual depiction of child engaging in a prohibited sexual act or in the simulation of such an act; or The person knowingly, finances or produces any motion picture, video or other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; or The person knowingly finances or produces any motion picture, video or other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; or The person knowingly publishes or makes available for public distribution or sale by any** | 2-25 Years Class B Felony<br><br>*See* Del. Code Ann. Tit. 11, § 4205 | |

| | | | | |
|---|---|---|---|---|
| | | means, . . . which depicts a child engaging in a prohibited sexual at or in the simulation of such an act, or knowingly publishes or makes available for public distribution or sale by any means, including computer, any other visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; or The person permits, causes, promotes, facilitates, finances, produces or otherwise advances an exhibition, display or performances of a child engaging in a prohibited sexual act or the simulation of such an act | | |
| **Florida** | Yes; Discretionary if 14 years or older | **Fla. Stat. Ann § 847.0135**<br><br>**A person who: (a) Knowingly complies, enters into, or transmits by use of computer; (b) makes, prints, publishes, or reproduces by other computerized means; (c) knowingly causes or allows to be entered into or transmitted by use of computer; or buys, sells, receives, exchanges, or disseminates [child pornography or information identifying a minor] [is guilty of a felony]** | Up to 5 Years Third Degree Felony<br><br>*See* Fla. Stat. Ann. § 775.082 | **Fla. Stat. Ann. § 985.56 (2007)**<br><br>**(2) Involuntary discretionary waiver.--** Except as provided in subsection (3), the state attorney may file a motion requesting the court to transfer the child for criminal prosecution if the child was 14 years of age or older at the time the alleged delinquent act or violation of law was committed. |
| | | **Fla. Stat. Ann. § 847.0137**<br><br>**[A]ny person in this state who knew or reasonably should have known that he or she was transmitting child pornography . . . to another person in this state or in another jurisdiction . . . . [or] to any person in this state commits a felony** | Up to 5 Years Third Degree Felony<br>*See* Fla. Stat. Ann. § 775.082 | |

| Georgia | Yes; Discretionary if at least 15 years of age and the court determines that it would be in the best interest of the child and the community | **Ga. Code Ann. § 16-12-100.2(c)(1)**<br><br>A person commits the offense of computer or electronic pornography if such person intentionally or willfully: Compiles, enters into, or transmits by computer or other electronic device; Makes, prints, publishes, or reproduces by other computer or other electronic device; Causes or allows to be entered into or transmitted by computer or other electronic device; or Buys, sells, receives, exchanges, or disseminates [child porn, or information identifying the child] | 1 - 20 years<br>*See* Ga. Code Ann. § 16-12-100.2(c)(2) (2007) | **Ga. Code Ann. § 15-11.30.2(4)**<br><br>(a) After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances, the court before hearing the petition on its merits may transfer the offense for prosecution to the appropriate court having jurisdiction of the offense if:<br><br>. . . .<br><br>(3) The court in its discretion determines there are reasonable grounds to believe that: |
| | | **Ga. Code Ann. § 16-12-100 (2007)**<br><br>It is unlawful for any person knowingly to create, reproduce, publish, promote, sell, distribute, give, exhibit, or possess with intent to sell or distribute any visual medium which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct. It is unlawful for any person knowingly to advertise, sell, purchase, barter, or exchange any medium which provides information as to where any visual medium which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct can be found or purchased.  It is unlawful for any person knowingly to bring or cause to be brought into this state any material which depicts a minor or a portion of a minor's | 5 - 20 years<br>*See* Ga. Code Ann. § 16-12-100(2)(g)(1) (2007) | (A) The child committed the delinquent act alleged;<br><br>(B) The child is not committable to an institution for the mentally retarded or mentally ill; and<br><br>(C) The interests of the child and the community require that the child be placed under legal restraint and the transfer be made; and |

| | | | |
|---|---|---|---|
| | | body engaged in any sexually explicit conduct. It is unlawful for any person knowingly to possess or control any material which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct. | (4) The child:<br><br>(A) Was at least 15 years of age at the time of the alleged delinquent conduct; |
| **Hawaii** | Yes; Discretionary if 16 years or older, unamenable to the rehabilitative process, and safety of the community requires it | **Haw. Rev. Stat. Ann. § 707-750**<br><br>A person commits the offense of promoting child abuse in the second degree if, knowing or having reason to know its character and content, the person:<br>(a) Disseminates child pornography;(b) Reproduces child pornography with intent to disseminate;(c) Disseminates any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography; or (d) Disseminates any pornographic material which employs, uses, or otherwise contains a minor engaging in or assisting others to engage in sexual conduct (Class B felony) | Up to 10 years (Class B felony)<br><br>*See* Haw. Rev. Stat. Ann. § 706-660 | **HRS § 571-22**<br><br>(a) The court may waive jurisdiction and order a minor or adult held for criminal proceedings after full investigation and hearing where the person during the person's minority, but on or after the person's sixteenth birthday, is alleged to have committed an act that would constitute a felony if committed by an adult, and the court finds that:<br><br>(1) There is no evidence the person is committable to an institution for the mentally defective or retarded or the mentally ill;<br><br>(2) The person is not treatable in any available institution or facility within the State designed for the care and treatment of children; or |

| | | | | |
|---|---|---|---|---|
| | | | | (3) The safety of the community requires that the person be subject to judicial restraint for a period extending beyond the person's minority. |
| **Idaho** | Yes; Discretionary if 14 years or older | **Idaho Code Ann. § 18-1507**<br><br>A person commits sexual exploitation of a child if, for any commercial purpose, he knowingly: (a) Causes, induces, or permits a child to engage in, or be used for, any explicit sexual conduct; or (b) Prepares, arranges for, publishes, produces, promotes, makes, sells, finances, offers, exhibits, advertises, deals in, possesses, or distributes any sexually exploitative material. | Up to 30 years<br><br>*See* Idaho Code Ann. § 18-1507 (5)(2007) | **Idaho Code §§ 20-508**<br><br>(1) After the filing of a petition and after full investigation and hearing, the court may waive jurisdiction under the juvenile corrections act over the juvenile and order that the juvenile be held for adult criminal proceedings when:<br><br>(b) A juvenile is alleged to have committed an act other than those enumerated in section 20-509, Idaho Code, after the child became fourteen (14) years of |

| | | | | |
|---|---|---|---|---|
| | | | | age which would be a crime if committed by an adult; or |
| **Illinois** | Yes; Discretionary if 13 years of age, probable cause that allegations are true, and in best interest of public | **720 Ill. Comp. Stat. Ann. 5/11-20.1**<br><br>A person commits the offense of child pornography who: (1) films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction or depicts by computer any child whom he knows or reasonably should know to be under the age of 18 . . . . where such child . . . . is:[engaged in sexual activity]; or (2) with the knowledge of the nature or content thereof, reproduces, disseminates, offers to disseminate, exhibits or possesses with intent to disseminate any [child pornography]; or (3) with knowledge of the subject matter or theme thereof, produces any stage play, live performance, film, videotape or other similar visual portrayal or depiction by computer which includes a child whom the person knows or reasonably should know to be under the age of 18 . . . . engaged in any activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection; or (4) solicits, uses, persuades, induces, entices, or coerces any child . . . . to appear in any stage play, live presentation, film, videotape, photograph or other similar visual reproduction or depiction by computer in which the child or severely or profoundly mentally retarded person is or will be | 4-15 Years Class 1 Felony<br><br>2-5 Years Class 3 Felony<br><br>*See* 730 Ill. Comp. Stat. Ann. 5/5-8-1 | **705 Ill. Comp. Stat. 405/5-805**<br><br>(3) Discretionary transfer.<br><br>(a) If a petition alleges commission by a minor 13 years of age or over of an act that constitutes a crime under the laws of this State and, on motion of the State's Attorney to permit prosecution of the minor under the criminal laws, a Juvenile Judge assigned by the Chief Judge of the Circuit to hear and determine those motions, after hearing but before commencement of the trial, finds that there is probable cause to believe that the allegations in the motion are true and that it is not in the best interests of the public to proceed under this Act, the court may enter an order permitting prosecution under the criminal laws. |

371

| | | | | |
|---|---|---|---|---|
| | | depicted, actually or by simulation, in any act, pose or setting described in subparagraphs (i) through (vii) of paragraph (1) of this subsection; or . . . . or (6) with knowledge of the nature or content thereof, possesses any film, videotape, photograph or other similar visual reproduction or depiction by computer of any child . . . . engaged in any activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection; (Class 3 felony) or (7) solicits, uses, persuades, induces, entices, or coerces a person to provide a child under the age of 18 . . . . to appear in any videotape, photograph, film, stage play, live presentation, or other similar visual reproduction or depiction by computer in which the child . . . . will be depicted, actually or by simulation, in any act, pose, or setting described in subparagraphs (i) through (vii) of paragraph (1) of this subsection (Except (6) all are Class 1 felony) | | |
| **Indiana** | Yes; Discretionary if 18 years or under, act would be a felony if committed by an adult, and child has previously been convicted of a felony or | **Ind. Code Ann. § 35-42-4-4**<br><br>A person who knowingly or intentionally: (1) manages, produces, sponsors, presents, exhibits, photographs, films, videotapes, or creates a digitized image of any performance or incident that includes sexual conduct by a child under eighteen (18) years of age; (2) disseminates, exhibits to another person, offers to disseminate or exhibit to another person, or sends or brings into Indiana for dissemination or exhibition matter that depicts or describes sexual conduct by a | 2-8 Years Class C Felony *See* Ind. Code Ann. § 35-50-2-6 | **Ind. Code § 31-30-3-6**<br><br>Sec. 6. Upon motion by the prosecuting attorney, the juvenile court shall waive jurisdiction if it finds that:<br><br>(1) the child is charged with an act which would be a felony if committed by an adult; and |

| | | child under eighteen (18) years of age; or (3) makes available to another person a computer, knowing that the computer's fixed drive or peripheral device contains matter that depicts or describes sexual conduct by a child less than eighteen (18) years of age commits child exploitation (Class C felony) | | (2) the child has previously been convicted of a felony or a nontraffic misdemeanor. |
| nontraffic misdemeanor | | | | |
| **Iowa** | Yes; Discretionary if: 14 years of age or older, probable cause that he committed the act, he is unamenable to rehabilitation, and it is in the best interest of the community | **Iowa Code § 728.12**<br><br>It shall be unlawful to knowingly promote any material visually depicting a live performance of a minor engaging in a prohibited sexual act or in the simulation of a prohibited sexual act (Class D felony) | Up to 5 Years Class D Felony<br><br>*See* Iowa Code § 902.9 | **Iowa Code § 232.45**<br><br>6. At the conclusion of the waiver hearing the court may waive its jurisdiction over the child for the alleged commission of the public offense if all of the following apply:<br><br>a. The child is fourteen years of age or older.<br><br>b. The court determines, or has previously determined in a detention hearing under section 232.44, that there is probable cause to believe that the child has committed a delinquent act which would constitute the public offense.<br><br>c. The court determines that the state has established that there are not reasonable prospects for rehabilitating the child if the juvenile court retains jurisdiction over the child and the child is |

| | | | | |
|---|---|---|---|---|
| | | | | adjudicated to have committed the delinquent act, and that waiver of the court's jurisdiction over the child for the alleged commission of the public offense would be in the best interests of the child and the community |
| **Kansas** | Yes; Presumed to be an adult if 14 years or older because offense is a severity level 5 | **Kan. Stat. Ann. § 21-3516**<br><br>Sexual exploitation of a child is . . . . (4) except as provided in subsection (a)(6), promoting any performance that includes sexually explicit conduct by a child under 18 years of age, knowing the character and content of the performance | Subject to Kansas Sentencing Guidelines: 50-55 months<br><br>Severity Level 5, prison felony<br><br>*See* Kansas Sentencing Guidelines Act,<br><br>Kan. Stat. Ann. § 21-4701, et seq. (2006) | **K.S.A. 38-2347**<br><br>(2) The alleged juvenile offender shall be presumed to be an adult if the alleged juvenile offender was: (A) 14, 15, 16 or 17 years of age at the time of the offense or offenses alleged in the complaint, if any such offense: (i) If committed by an adult, would constitute . . .  a nondrug severity level 1 through 6 felony . . . . |
| **Kentucky** | Yes; Discretionary if 16 years or older and a prior felony | **Ky. Rev. Stat. Ann. § 531.340**<br><br>(1) A person is guilty of distribution of matter portraying a sexual performance by a minor when, having knowledge of its content and character, he or she: (a) Sends or causes to be sent into this state for sale or distribution; or (b) Brings or causes to be brought into this state for sale or distribution; or (c) In this state, he or she: Exhibits for profit or gain; or Distributes; or Offers to distribute; or Has in his or her possession with intent to distribute, exhibit for profit or gain | Indeterminate sentences declared by jury;<br><br>No minimum term prescribed; Maximum term must be between 1 and 5 yrs (Class D felony)<br><br>*See* Ky. Rev. Stat. Ann. § 532.060(2) | **KRS § 635.020**<br><br>(3) If a child charged with a Class C or Class D felony has on one (1) prior separate occasion been adjudicated a public offender for a felony offense and had attained the age of sixteen (16) at the time of the alleged commission of the offense, the court shall, upon motion of the county attorney made prior to adjudication, and after the county attorney has |

374

| | | | | |
|---|---|---|---|---|
| | | or offer to distribute, any matter portraying a sexual performance by a minor. (2) Any person who has in his or her possession more than one (1) unit of material coming within the provision of KRS 531.300(2) shall be rebuttably presumed to have such material in his or her possession with the intent to distribute it. (Class D Felony) | | consulted with the Commonwealth's attorney, that the child be proceeded against as a youthful offender, proceed in accordance with the provisions of KRS 640.010. |
| | | **Ky. Rev. Stat. Ann. § 531.360**<br><br>A person is guilty of advertising material portraying a sexual performance by a minor when, having knowledge of its content and character thereof, he or she writes or creates advertising or solicits anyone to publish such advertising or otherwise promotes the sale or distribution of matter portraying a sexual performance by a minor. (Class D felony) | Indeterminate sentences declared by jury; No minimum term prescribed;<br><br>Maximum term must be between 1 and 5 yrs (Class D felony)<br><br>*See* Ky. Rev. Stat. Ann. § 532.060(2) (2008) | |
| **Louisiana** | No; only juvenile transfer in violent offenses | **La. Rev. Stat. Ann. § 14:81.1**<br><br>(A) (1) It shall be unlawful for a person to produce, distribute, possess, or possess with the intent to distribute pornography involving juveniles.<br><br>(2) Whoever distributes or possesses with the intent to distribute pornography involving juveniles shall be fined not more than ten thousand dollars and shall be imprisoned at hard labor for not less than five-years or more than ten years, without benefit of parole, probation, or suspension of sentence. | 5 - 10 years (punishment for all crimes except below exceptions)<br><br>See La. Rev. Stat. Ann. § 14:81.1(E) (2008) | **La. Rev. Stat. Ann. § 862**<br><br>A. The court on its own motion or on motion of the district attorney may conduct a hearing to consider whether to transfer a child for prosecution to the appropriate court exercising criminal jurisdiction if a delinquency petition has been filed which alleges that a child who is fourteen years of age or older at the time of the commission of the |

| | | | | |
|---|---|---|---|---|
| | | | | alleged offense but is not otherwise subject to the original jurisdiction of a court exercising criminal jurisdiction has committed any one or more of the following crimes:<br>(1) First degree murder.<br>(2) Second degree murder.<br>(3) Aggravated kidnapping.<br>(4) Aggravated rape.<br>(5) Aggravated battery when committed by the discharge of a firearm.<br>(6) Armed robbery when committed with a firearm.<br>(7) Repealed by Acts 2001, No. 301, § 2.<br>(8) Forcible rape if the rape is committed upon a child at least two years younger than the rapist. |
| **Maine** | Yes; Mandatory if juvenile (18 years or younger) commits a | **Me. Rev. Stat. Ann. tit. 17-A, § 283**<br><br>The person intentionally or knowingly disseminates or possesses with intent to disseminate any … material that depicts any minor who the person | Up to 5 years (Class C crime)<br><br>Up to 10 years (Class B crime) | **15 M.R.S.A. § 3101**<br><br>E. The Juvenile Court shall bind a juvenile over to the Superior Court if it finds:<br><br>(1) That there is probable cause to believe that a juvenile crime has been committed that would constitute murder or a Class A, Class B or Class C crime if the juvenile involved were an adult and that the juvenile to be bound |

376

| | Class B or C felony, and if there has been consideration of the seriousness of the crime, characteristics of the juvenile, and public safety | knows or has reason to know is a minor engaging in sexually explicit conduct. (Class C crime; if minor is under 12, Class B crime) | *See* Me. Rev. Stat. Ann. Title 17-A, § 1252 | over committed it; and  (2) After a consideration of the seriousness of the crime, the characteristics of the juvenile, the public safety and the dispositional alternatives in paragraph D, that:  (a) If the State has the burden of proof, the State has established by a preponderance of the evidence that it is appropriate to prosecute the juvenile as if the juvenile were an adult; or  (b) If the juvenile has the burden of proof, the juvenile has failed to establish by a preponderance of the evidence that it is not appropriate to prosecute the juvenile as if the juvenile were an adult. |
| | | **Md. Code Ann., Crim. Law § 11-207**  (a) A person may not:  (1) cause, induce, solicit, or knowingly allow a minor to engage as a subject in the production of obscene matter or a visual representation or performance that depicts a minor | Up to 10 years  *See* Md. Code Ann., Crim. Law § 11-207(b) (2008) | **Md. Code Ann., Cts. & Jud. Proc. §§ 3-8A-06**  (a) The court may waive the exclusive jurisdiction conferred by § 3-8A-03 of this subtitle with respect to a petition alleging delinquency by:  (1) A child who is 15 |

| | | engaged as a subject in sadomasochistic abuse or sexual conduct; | | years old or older; |
|---|---|---|---|---|
| **Maryland** | Yes; Discretionary if 15 years or older | (2) photograph or film a minor engaging in an obscene act, sadomasochistic abuse, or sexual conduct; | | |
| | | (3) use a computer to depict or describe a minor engaging in an obscene act, sadomasochistic abuse, or sexual conduct; | | |
| | | (4) knowingly promote, advertise, solicit, distribute, or possess with the intent to distribute any matter, visual representation, or performance: (i) that depicts a minor engaged as a subject in sadomasochistic abuse or sexual conduct; or (ii) in a manner that reflects the belief, or that is intended to cause another to believe, that the matter, visual representation, or performance depicts a minor engaged as a subject of sadomasochistic abuse or sexual conduct; or | | |
| | | (5) use a computer to knowingly compile, enter, transmit, make, print, publish, reproduce, cause, allow, buy, sell, receive, exchange, or disseminate any notice, statement, advertisement, or minor's name, telephone number, place of residence, physical characteristics, or other descriptive or identifying information for the purpose of engaging in, facilitating, encouraging, offering, or soliciting unlawful sadomasochistic abuse or sexual conduct of or with a minor. | | |

| | | **Mass. Ann. Laws ch. 272, § 29B** | 10 - 20 years *See* Mass. Ann. Laws ch. 272, § 29B | **Mass. Ann. Laws ch. 119, § 58** |
|---|---|---|---|---|
| **Massachusetts** | Yes; Discretionary if court makes determination that juvenile (17 years or younger) is a 'youthful offender' | Whoever, with lascivious intent, disseminates any visual material . . . [depicting child in a state of nudity or engaged in sexual conduct ], knowing the contents …or has in his possession any such visual material knowing the contents . . . with the intent to disseminate the same . . . | | If a child is adjudicated a youthful offender on an indictment, the court may sentence him to such punishment as is provided by law for the offense. The court shall make a written finding, stating its reasons therefore, that the present and long-term public safety would be best protected by:<br><br>(a) a sentence provided by law; or<br><br>(b) a combination sentence which shall be a commitment to the department of youth services until he reaches the age of twenty-one, and an adult sentence to a house of correction or to the state prison as is provided by law for the offense. The adult sentence shall be suspended pending successful completion of a term of probation, which shall include, but not be limited to, the successful completion of the aforementioned commitment to the department of youth services. Any juvenile receiving a combination sentence shall be under the sole custody and control of the department of youth services unless or |

| | | | | |
|---|---|---|---|---|
| | | | | until discharged by the department or until the age of twenty-one, whichever occurs first, and thereafter under the supervision of the juvenile court probation department until the age of twenty-one and thereafter by the adult probation department; provided, however, that in no event shall the aggregate sentence imposed on the combination sentence exceed the maximum adult sentence provided by law; or<br><br>(c) a commitment to the department of youth services until he reaches the age of twenty-one. |
| **Michigan** | Yes; Discretionary if 14 years or older | **Mich. Comp. Laws § 750.145c**<br><br>A person who distributes or promotes, or finances the distribution or promotion of, or receives for the purpose of distributing or promoting, or conspires, attempts, or prepares to distribute, receive, finance, or promote any child sexually abusive material or child sexually abusive activity is guilty of a felony | Up to 7 years *See* Mich. Comp. Laws § 750.145c(3) (2008) | **Mich. Comp. Laws § 712A.4**<br><br>(1) If a juvenile 14 years of age or older is accused of an act that if committed by an adult would be a felony, the judge of the family division of circuit court in the county in which the offense is alleged to have been committed may waive jurisdiction under this section upon motion of the prosecuting attorney. After waiver, the juvenile may be tried in the court having general criminal jurisdiction of the offense. |

| | | | | |
|---|---|---|---|---|
| **Minnesota** | Yes; Discretionary if 14 years or older | **Minn. Stat. § 617.247**<br><br>A person who disseminates pornographic work to an adult or a minor, knowing or with reason to know its content and character, is guilty of a felony | Up to 7 years<br>*See* Minn. Stat. § 617.247 (2007) | **Minn. Stat. § 260B.125**<br><br>When a child is alleged to have committed, after becoming 14 years of age, an offense that would be a felony if committed by an adult, the juvenile court may enter an order certifying the proceeding for action under the laws and court procedures controlling adult criminal violations. |
| | | **Minn. Stat. § 617.246**<br><br>A person who, knowing or with reason to know its content and character, disseminates for profit to an adult or a minor a pornographic work, as defined in this section, is guilty of a felony … | Up to 10 years<br>*See* Minn. Stat. § 617.246 (2007) | |
| **Mississippi** | Yes; Discretionary if 13 years or older | **Miss. Code Ann. § § 97-5-33**<br><br>1) No person shall, by any means including computer, cause, solicit or knowingly permit any child to engage in sexually explicit conduct or in the simulation of sexually explicit conduct for the purpose of producing any visual depiction of such conduct. (2) No person shall, by any means including computer, photograph, film, video tape or otherwise depict or record a child engaging in sexually explicit conduct or in the simulation of sexually explicit conduct. (3) No person shall, by any means including computer, knowingly send, transport, transmit, ship, mail or receive any photograph, drawing, sketch, film, video tape or other visual depiction of an actual child engaging in sexually explicit conduct. (4) No person shall, by any means including computer, receive with intent to distribute, distribute for sale, sell or attempt to sell in any manner any photograph, drawing, sketch, | 5 - 40 years<br>*See* Miss. Code Ann. § 97-5-35 | **Miss. Code Ann. § 43-21-157**<br><br>(1) If a child who has reached his thirteenth birthday is charged by petition to be a delinquent child, the youth court, either on motion of the youth court prosecutor or on the youth court's own motion, after a hearing as hereinafter provided, may, in its discretion, transfer jurisdiction of the alleged offense described in the petition or a lesser included offense to the criminal court which would have trial jurisdiction of such offense if committed by an adult. The child shall be represented by counsel in transfer proceedings. |

| | | | | |
|---|---|---|---|---|
| | | film, video tape or other visual depiction of an actual child engaging in sexually explicit conduct. | | |
| **Missouri** | Yes; Discretionary if 12 years or older | **Mo. Rev. Stat. § 573.035**<br><br>A person commits the crime of promoting child pornography in the second degree if knowing of its content and character such person possesses with the intent to promote or promotes child pornography or obscene material that has a minor as one of its participants, or portrays what appears to be a minor as a participant or observer of sexual conduct. (Class C felony; unless the person knowingly promotes such material to a minor, in which case it is a class B felony) | Up to 7 years (Class C felony)<br><br>5 - 15 years (Class B felony)<br><br>*See* Mo. Rev. Stat. § 558.011 | **Mo. Rev. Stat. 3 211.071**<br><br>1. If a petition alleges that a child between the ages of twelve and seventeen has committed an offense which would be considered a felony if committed by an adult, the court may, upon its own motion or upon motion by the juvenile officer, the child or the child's custodian, order a hearing and may, in its discretion, dismiss the petition and such child may be transferred to the court of general jurisdiction and prosecuted under the general law; |
| | | **Mo. Rev. Stat. § 573.025**<br><br>A person commits the crime of promoting child pornography in the first degree if, knowing of its content and character, such person possesses with the intent to promote or promotes obscene material that has a child as one of its participants or portrays what appears to be a child as a participant or observer of sexual conduct.  (Class B felony; unless the person knowingly promotes such material to a minor, in which case it is a class A felony) | 5 - 15 years (Class B felony)<br><br>10 - 30 years or life (Class A felony)<br><br>*See* Mo. Rev. Stat. § 558.011 | |
| **Montana** | No | **Mont. Code Ann. § 45-5-625**<br><br>A person commits the offense of sexual abuse of children if the person . . . . (b)  knowingly photographs, films, videotapes, | Life or up to 100 years (If child is over 16 years of age)<br><br>4 - 100 years (if child is under 16 years of age) | **Mont. Code Ann. § 41-5-206(1)(a), (b) (2007)**<br><br>Transfer statute does not include Mont. Code Ann. § 45-5-625 |

| | | develops or duplicates the photographs, films, or videotapes, or records a child engaging in sexual conduct, actual or simulated | 100 years (If child is under 12 years of age)<br><br>*See* Mont. Code Ann. § 45-5-625 | |
|---|---|---|---|---|
| **Nebraska** | Yes; Discretionary if 16 years or older | **Neb. Rev. Stat. § 28-1463.05**<br><br>It shall be unlawful for a person to knowingly possess with intent to rent, sell, deliver, distribute, trade, or provide to any person any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers (Class IIIA felony) | 1 - 5 years (Class IIIA felony) *See* Neb. Rev. Stat. § 28-105 | **Neb. Rev. Stat. 33 43-247**<br><br>In cases coming within ... subdivision (2) of section 43-247, when the juvenile is under the age of sixteen years, the county attorney shall, in making the determination whether to file a criminal charge...consider: [factors] |
| | | **Neb. Rev. Stat. § 28-1463.03**<br><br>1) It shall be unlawful for a person to knowingly make, publish, direct, create, provide, or in any manner generate any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. (2) It shall be unlawful for a person knowingly to purchase, rent, sell, deliver, distribute, display for sale, advertise, trade, or provide to any person any visual depiction of sexually explicit conduct which has a child as one of its participants or portrayed observers. | 1 - 6 years *See* Nev. Rev. Stat. § 200.730 | **Neb.Rev.St. § 43-247 (2)**<br><br>Any juvenile who has committed an act which would constitute a felony under the laws of this state |
| | | **Nev. Rev. Stat. § 200.725**<br><br>A person who knowingly prepares, advertises or distributes any item or material that depicts a minor engaging in, or simulating, or assisting others to engage in or simulate, sexual conduct (Category B felony) | 1 - 15 years *See* Nev. Rev. Stat. § 200.725 | **Nev. Rev. Stat. § 62B.330**<br><br>3. For the purposes of this section, each of the following acts shall be deemed not to be a delinquent act, and the juvenile court does not have jurisdiction over a |

| | | | | |
|---|---|---|---|---|
| **Nevada** | Yes; Mandatory if committed between 16 and 18 and not charged and identified until 20 years 3 months or identified until 21 | | | person who is charged with committing such an act: . . . . (e) A category A or B felony and any other related offense arising out of the same facts as the category A or B felony, regardless of the nature of the related offense, if the person was at least 16 years of age but less than 18 years of age when the offense was committed, and: (1) The person is not identified by law enforcement as having committed the offense and charged before the person is at least 20 years, 3 months of age, but less than 21 years of age; or (2) The person is not identified by law enforcement as having committed the offense until the person reaches 21 years of age. |
| | | **N.H. Rev. Stat. Ann. § 649-A:3-a** A person is guilty of a felony if such person: (a) Sells, delivers or provides, or offers or agrees to sell, deliver or provide, any visual representation of a child engaging in sexual activity; or (b) Presents or directs a visual representation of | Up to 7 years (Class B felony) *See* N.H. Rev. Stat. Ann. § 651-2 | **N.H. Rev. Stat. § 169-B:24** I. All cases before the court in which the offense complained of constitutes a felony or |

| | | | | |
|---|---|---|---|---|
| | | a child engaging in sexual activity, or participates in that portion of such visual representation which consists of a child engaging in sexual activity; or (c) Publishes, exhibits or otherwise makes available any visual representation of a child engaging in sexual activity; | | would amount to a felony in the case of an adult may be transferred to the superior court prior to hearing under RSA 169-B:16 as provided in this section. The court shall conduct a hearing on the question of transfer and shall consider, but not be limited to, the following criteria in determining whether a case should be transferred: |
| **New Hampshire** | Yes; Discretionary for all juveniles (17 years or younger) subject to a hearing | **N.H. Rev. Stat. Ann. § 649-B:3**<br><br>No person shall knowingly: (a) Compile, enter into, or transmit by means of computer; (b) Make, print, publish, or reproduce by other computerized means; (c) Cause or allow to be entered into or transmitted by means of computer; or (d) Buy, sell, receive, exchange, or disseminate by means of computer, any notice, statement, or advertisement, or any minor's name, telephone number, place of residence, physical characteristics, or other descriptive or identifying information, for purposes of facilitating, encouraging, offering, or soliciting sexual conduct of or with any child, or the visual depiction of such conduct. | Up to 7 years (Class B felony) *See* N.H. Rev. Stat. Ann. § 651-2 | (a) The seriousness of the alleged offense to the community and whether the protection of the community requires transfer.<br><br>(b) The aggressive, violent, premeditated, or willful nature of the alleged offense.<br><br>(c) Whether the alleged offense was committed against persons or property.<br><br>(d) The prospective merit of the complaint.<br><br>(e) The desirability of trial and disposition of the entire offense in one court if the minor's associates in the alleged offense were adults who will be charged with a crime.<br><br>(f) The sophistication |

| | | | |
|---|---|---|---|
| | | | and maturity of the minor.<br><br>(g) The minor's prior record and prior contacts with law enforcement agencies.<br><br>(h) The prospects of adequate protection of the public, and the likelihood of reasonable rehabilitation of the minor through the juvenile court system. |
| **New Jersey** | Yes; Discretionary if 14 years or older and elects to have case transferred | **N.J. Rev. Stat. § 2C:24-4**<br><br>Any person who knowingly receives for the purpose of selling or who knowingly sells, procures, manufactures, gives, provides, lends, trades, mails, delivers, transfers, publishes, distributes, circulates, disseminates, presents, exhibits, advertises, offers or agrees to offer, through any means, including the Internet, any photograph, film, videotape, computer program or file, video game or any other reproduction or reconstruction which depicts a child engaging in a prohibited sexual act or in the simulation of such an act is guilty of a crime. (Second degree crime) | 5 - 10 years (Second degree crime) *See* N.J. Rev Stat. § 2C:43-6 | **N.J.S.A. 2A:4A-27**<br>Any juvenile 14 years of age or older charged with delinquency may elect to have the case transferred to the appropriate court having jurisdiction. |
| **New Mexico** | Yes; Discretionary for all juveniles (18 | **N.M. Stat. § 30-6A-3**<br><br>It is unlawful for a person to intentionally distribute any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts a prohibited sexual act or simulation of such an act and if | 6 years imprisonment *See* N.M. Stat. § 31-18-15 | **N.M. Stat. § 32A-2-20**<br><br>A. The court has the discretion to invoke either an adult sentence or juvenile sanctions on a youthful offender. The children's court attorney shall file a notice of intent to invoke an adult sentence within ten |

| | | | | |
|---|---|---|---|---|
| | years or younger) | that person knows or has reason to know that a real child under eighteen years of age, who is not a participant, is depicted as a participant in that act. (Third degree felony) | | working days of the filing of the petition, provided that the court may extend the time for filing of the notice of intent to invoke an adult sentence, for good cause shown, prior to the adjudicatory hearing. A preliminary hearing by the court or a hearing before a grand jury shall be held, within ten days after the filing of the intent to invoke an adult sentence, to determine whether probable cause exists to support the allegations contained in the petition. |
| **New York** | Yes; Mandatory if 14 years or older | **N.Y. Penal Law § 263.11**<br><br>A person is guilty of promoting a sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than seventeen years of age. (Class D felony) | 1 (or 1/3 of maximum) - 7 years (Class D felony) *See* N.Y. Penal Law § 70.00 | **N.Y. Penal Law § 30.00**<br><br>2. A person fourteen or fifteen years of age is criminally responsible for acts . . . . defined in this chapter as . . . a sexually motivated felony, where authorized pursuant to section 130.91 of the penal law. |
| | | **N.Y. Penal Law § 263.10**<br><br>A person is guilty of promoting an obscene sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any obscene performance which includes sexual conduct by a child less than seventeen years of age (Class D Felony) | 1 (or 1/3 of maximum) - 7 years (Class D felony) *See* N.Y. Penal Law § 70.00 | |

| | | | | |
|---|---|---|---|---|
| **North Carolina** | Yes; Mandatory if 16 years or older | **N.C. Gen. Stat. § 14-190.17**<br><br>A person commits the offense of second degree sexual exploitation of a minor if, knowing the character or content of the material, he: (1) Records, photographs, films, develops, or duplicates material that contains a visual representation of a minor engaged in sexual activity; or (2) Distributes, transports, exhibits, receives, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity (Class F Felony) | 13 - 16 months (Class F felony, no criminal history, no aggravating or mitigating factors)<br><br>*See* N.C. Gen. Stat. § 15A-1340.17 | **N.C.G.S.A. § 7B-1601**<br><br>(a) Any juvenile, including a juvenile who is under the jurisdiction of the court, who commits a criminal offense on or after the juvenile's sixteenth birthday is subject to prosecution as an adult. A juvenile who is emancipated shall be prosecuted as an adult for the commission of a criminal offense.<br><br>(b) A juvenile who is transferred to and convicted in superior court shall be prosecuted as an adult for any criminal offense the juvenile commits after the superior court conviction. |
| **North Dakota** | Yes; Discretionary if 16 years or older | **N.D. Cent. Code § 12.1-27.2-04**<br><br>A person is guilty of a class C felony if, knowing the character and content of a performance, that person produces, directs, or promotes any performance which includes sexual conduct by a person who was a minor at the time of the performance | Up to 5 years (Class C felony) *See* N.D. Cent. Code § 12.1-32-01 | **N.D. Cent. Code § 27-20-34**<br><br>1. After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances or resolutions of this state, the court before hearing the petition on its merits shall transfer the offense for prosecution to the appropriate court having jurisdiction of |

| | | | | |
|---|---|---|---|---|
| | | | | the offense if:<br><br>a. The child is over sixteen or more years of age and requests the transfer; |
| | | **N.D. Cent. Code § 12.1-27.2-03**<br><br>A person is guilty of a class B felony if, knowing the character and content of a performance, that person produces, directs, or promotes any obscene performance which includes sexual conduct by a person who was a minor at the time of the performance. | Up to 10 years (Class B felony) *See* N.D. Cent. Code § 12.1-32-01 | |
| **Ohio** | Yes; Discretionary if 14 years or older | **Ohio Rev. Code Ann. § 2907.321**<br><br>No person, with knowledge of the character of the material or performance involved, shall do any of the following: (1) Create, reproduce, or publish any obscene material that has a minor as one of its participants or portrayed observers;  (2) Promote or advertise for sale or dissemination; sell, deliver, disseminate, display, exhibit, present, rent, or provide; or offer or agree to sell, deliver, disseminate, display, exhibit, present, rent, or provide, any obscene material that has a minor as one of its participants or portrayed observers; (3) Create, direct, or produce an obscene performance that has a minor as one of its participants;(4) Advertise or promote for presentation, present, or participate in presenting an obscene performance that has a minor as one of its participants; (6) Bring or | 2 - 8 years (Second degree felony) *See* Ohio Rev. Code Ann. § 2929.14 | **Ohio Rev. Code Ann. § 2152.10**<br><br>(B) Unless the child is subject to mandatory transfer, if a child is fourteen years of age or older at the time of the act charged and if the child is charged with an act that would be a felony if committed by an adult, the child is eligible for discretionary transfer to the appropriate court for criminal prosecution. |

| | | | | |
|---|---|---|---|---|
| | | cause to be brought into this state any obscene material that has a minor as one of its participants or portrayed observers. Second degree felony) | | |
| **Oklahoma** | Yes; Discretionary for all juveniles (18 years or younger) subject to a hearing and investigation | **Okla. Stat. Ann. Title 21 § 1040.8**<br><br>No person shall knowingly photograph, act in, pose for, model for, print, sell, offer for sale, give away, exhibit, publish, offer to publish, or otherwise distribute, display, or exhibit any book, magazine, story, pamphlet, paper, writing, card, advertisement, circular, print, picture photograph, motion picture film, electronic video game or recording, image, cast, slide, figure, instrument, statue, drawing, presentation, or other article which is obscene material or child pornography | Up to 20 Years (Felony) *See* Okla. Stat. Ann. Title 21 § 1040.8 | **10A Okla. Stat. Ann. § 2-2-403**<br><br>A. Except as otherwise provided by law, if a child is charged with a delinquent act as a result of an offense which would be a felony if committed by an adult, the court on its own motion or at the request of the district attorney shall conduct a preliminary hearing to determine whether or not there is prosecutive merit to the complaint. If the court finds that prosecutive merit exists, it shall continue the hearing for a sufficient period of time to conduct an investigation and further hearing to determine if the child should be held accountable for acts of the child as if the child were an adult if the child should be found to have committed the alleged act or omission. |
| | | **Or. Rev. Stat. §163.684**<br><br>A person commits the crime of encouraging child sexual abuse in the first degree if the person: (a)(A) Knowingly develops, duplicates, publishes, prints, | Up to 10 years (Class B felony) *See* Or. Rev. Stat. § 161.605 | **Or. Rev. Stat. § 419C.349**<br><br>The juvenile court, after a hearing except as otherwise provided in ORS 419C.364 or |

| | | | | |
|---|---|---|---|---|
| **Oregon** | Yes; Discretionary if 15 years or older | disseminates, exchanges, displays, finances, attempts to finance or sells any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child or possesses such matter with the intent to develop, duplicate, publish, print, disseminate, exchange, display or sell it; or (B) Knowingly brings into this state, or causes to be brought or sent into this state, for sale or distribution, any photograph, motion picture, videotape or other visual recording of sexually explicit conduct involving a child; and (b) Knows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse. (Class B felony) | | 419C.370, may waive a youth to a circuit, justice or municipal court of competent jurisdiction for prosecution as an adult if: <br><br> (1) The youth is 15 years of age or older at the time of the commission of the alleged offense; <br><br> (2) The youth, except as otherwise provided in ORS 419C.364 and 419C.370, is alleged to have committed a criminal offense constituting: <br><br> . . . . <br><br> (b) A Class A or Class B felony; |
| **Pennsylvania** | Yes; Discretionary if 14 years or older | **18 Pa. Cons. Stat. § 6312** <br><br> Any person who knowingly sells, distributes, delivers, disseminates, transfers, displays or exhibits to others, or who possesses for the purpose of sale, distribution, delivery, dissemination, transfer, display or exhibition to others, any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material depicting a child under the age of 18 years engaging in a prohibited sexual act or in the | Up to 7 years (Third degree felony) *See* 18 Pa. Cons. Stat. § 1103 | **42 Pa. C.S.A. § 6355** <br><br> **(a) General rule.--** After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances, of this Commonwealth, the court before hearing the petition on its merits may rule that this chapter is not applicable |

| | | simulation of such act commits an offense. (Third degree felony) | | and that the offense should be prosecuted, and transfer the offense, where appropriate, to the division or a judge of the court assigned to conduct criminal proceedings, for prosecution of the offense if all of the following exist:<br><br>(1) The child was 14 or more years of age at the time of the alleged conduct.<br><br>. . . . |
| **Rhode Island** | Yes; Discretionary if 16 years or older subject to hearing | **R.I. Gen. Laws § 11-9-1.3**<br><br>It is a violation of this section for any person to: (1) Knowingly produce any child pornography; (2) Knowingly mail, transport, deliver or transfer by any means, including by computer, any child pornography;  (3) Knowingly reproduce any child pornography by any means, including the computer | Up to 15 years *See* R.I. Gen. Laws § 11-9-1.3(b)(1) | **R.I. Gen. Laws § 14-1-7**<br><br>(b) Any child sixteen (16) years of age or older who is charged with an offense which would constitute a felony if committed by an adult shall, upon motion of the attorney general, be brought before the court and the court shall conduct a waiver hearing pursuant to § 14-1-7.1. |
| **South Carolina** | Yes; Discretionary if 16 years or older | **S.C. Code Ann. § 16-15-405**<br><br>An individual commits the offense of second degree sexual exploitation of a minor if, knowing the character or content of the material, he: (1) records, photographs, films, develops, duplicates, produces, or creates digital electronic file material that contains a visual representation of | 2 - 10 years *See* S.C. Code Ann. § 16-15-405 | **S.C. Code Ann. § 63-19-1210**<br><br>(4) If a child sixteen years of age or older is charged with an offense which, if committed by an adult, would be a misdemeanor, a Class E or F felony as defined in Section 16-1-20, or a |

| | | a minor engaged in sexual activity; or (2) distributes, transports, exhibits, receives, sells, purchases, exchanges, or solicits material that contains a visual representation of a minor engaged in sexual activity. (Felony) | | felony which provides for a maximum term of imprisonment of ten years or less, and if the court, after full investigation, considers it contrary to the best interest of the child or of the public to retain jurisdiction, the court, in its discretion, acting as committing magistrate, may bind over the child for proper criminal proceedings to a court which would have trial jurisdiction of the offense if committed by an adult. |
|---|---|---|---|---|
| **South Dakota** | Yes; Discretionary for all juveniles (18 years or younger) subject to hearing | **S.D. Codified Laws § 22-24A-3** <br><br> A person is guilty of possessing, manufacturing, or distributing child pornography if the person: (1) Creates any visual depiction of a minor engaging in a prohibited sexual act, or in the simulation of such an act;  (2) Causes or knowingly permits the creation of any visual depiction of a minor engaged in a prohibited sexual act, or in the simulation of such an act; or (3) Knowingly possesses, distributes, or otherwise disseminates any visual depiction of a minor engaging in a prohibited sexual act, or in the simulation of such an act (Class 4 felony) | Up to 10 years (Class 4 felony) *See* S.D. Codified Laws § 22-6-1 | **S.D. Codified Laws § 26-11-4** <br><br> Except as provided in § 26-11-3.1, the circuit court may, in any case of a delinquent child against whom criminal felony charges have been filed, after transfer hearing, permit such child to be proceeded against in accordance with the laws that may be in force in this state governing the commission of crimes. In such cases the petition filed under chapter 26-7A shall be dismissed. The hearing shall be conducted as provided by this section. |

393

| | | | | At the transfer hearing, the court shall consider only whether it is contrary to the best interest of the child and of the public to retain jurisdiction over the child. |
|---|---|---|---|---|
| **Tennessee** | Yes; Discretionary 16 years or older | **Tenn. Code Ann. § 39-17-1004**<br><br>It is unlawful for a person to knowingly promote, sell, distribute, transport, purchase or exchange material, or possess with the intent to promote, sell, distribute, transport, purchase or exchange material, that includes a minor engaged in: (A) Sexual activity; or (B) Simulated sexual activity that is patently offensive (Class C felony, if under 25 images; Class B felony, if over 25 images) | 3 - 15 years (Class C felony) 8 - 30 years (Class B felony) *See* Tenn. Code Ann. § 40-35-111 | **Tenn. Code Ann.**<br><br>a) After a petition has been filed alleging delinquency based on conduct that is designated a crime or public offense under the laws, including local ordinances, of this state, the court, before hearing the petition on the merits, may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction. The disposition of the child shall be as if the child were an adult if:<br><br>(1) The child was sixteen (16) years or more of age at the time of the alleged conduct . . . |
| **Texas** | Yes; Discretionary if 15 years or older | **Tex. Penal Code Ann. § 43.25(d)**<br><br>A person commits an offense if, knowing the character and content of the material, he produces, directs, or promotes a performance that includes sexual conduct by a child younger than 18 years of age | 2 - 10 years (Third degree felony) *See* Tex. Penal Code Ann. § 12.34<br><br>2 - 20 years | **V.T.C.A., Family Code § 54.02**<br><br>(a) The juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district |

| | | (Third degree felony if child is between 14 and 18 years of age, and second degree felony if child is below 14 years of age) | (Second degree felony) *See* Tex. Penal Code Ann. § 12.33 | court or criminal district court for criminal proceedings if: (1) the child is alleged to have violated a penal law of the grade of felony; (2) the child was: . . . . (B) 15 years of age or older at the time the child is alleged to have committed the offense, if the offense is a felony of the second or third degree or a state jail felony, and no adjudication hearing has been conducted concerning that offense; |
| | | **Tex. Penal Code Ann. § 43.26(a)** A person commits an offense if: (1) the person knowingly or intentionally promotes or possesses with intent to promote material described by Subsection (a)(1); and (2) the person knows that the material depicts the child as described by Subsection (a)(1) (Second degree felony) | 2 - 20 years (Second degree felony) *See* Tex. Penal Code Ann. § 12.33 | |
| **Utah** | Yes; Mandatory for all juveniles (18 years or younger) to have a preliminary hearing | **Utah Code Ann. § 76-5a-3** A person is guilty of sexual exploitation of a minor: (a) when the person knowingly produces, distributes, possesses, or possesses with intent to distribute, child pornography; or (b) if the person is a minor's parent or legal guardian and knowingly consents to or permits that minor to be sexually exploited under Subsection (1)(a). (Second degree felony) | 1 - 15 years *See* Utah Code Ann. § 76-3-203 | **Utah Code Ann. § 78A-6-703** 1) If a criminal information filed in accordance with Subsection 78A-6-602(3) alleges the commission of an act which would constitute a felony if committed by an adult, the juvenile court shall conduct a preliminary hearing. |
| **Vermont** | No | **Vt. Stat. Ann. tit. 13, § 2824** No person may, with knowledge of the character and content, promote any photograph, film or visual recording of sexual conduct by a | Up to 10 years *See* Vt. Stat. Ann. tit. 13, § 2825 | **Vt. Stat. Ann. tit. 33, § 5506** (a) After a petition has been filed alleging delinquency, upon |

| | | child, or of a lewd exhibition of a child's genitals or anus. This subsection does not apply to paintings, drawings, or to non-visual or written descriptions of sexual conduct | | motion of the state's attorney and after hearing, the juvenile court may transfer jurisdiction of the proceeding to district court, if the child had attained the age of 10 but not the age of 14 at the time the act was alleged to have occurred, and if the delinquent act set forth in the petition was any of the following: (1) arson causing death as defined in 13 V.S.A. § 501; (2) assault and robbery with a dangerous weapon as defined in 13 V.S.A. § 608(b); (3) assault and robbery causing bodily injury as defined in 13 V.S.A. § 608(c); (4) aggravated assault as defined in 13 V.S.A. § 1024; (5) murder as defined in 13 V.S.A. § 2301; (6) manslaughter as defined in 13 V.S.A. § 2304; (7) kidnapping as defined in 13 V.S.A. § 2405; (8) unlawful restraint as defined in 13 V.S.A. § 2406 or 2407; (9) maiming as defined in 13 V.S.A. § 2701; (10) sexual assault as defined in 13 V.S.A. § 3252(a)(1) or (a)(2); (11) aggravated sexual |

| | | | | assault as defined in 13 V.S.A. § 3253; or (12) burglary into an occupied dwelling as defined in 13 V.S.A. § 1201(c). |
|---|---|---|---|---|
| **Virginia** | Yes; Discretionary 14 years or older | **Va. Code Ann. § 18.2-374.1:1**<br><br>Any person who reproduces by any means, including by computer, sells, gives away, distributes, electronically transmits, displays with lascivious intent, purchases, or possesses with intent to sell, give away, distribute, transmit, or display child pornography with lascivious intent | 5 - 20 years *See* Va. Code Ann. § 18.2-374.1:1(C) | **Va. Code Ann. § 16.1-269.1**<br><br>A. Except as provided in subsections B and C, if a juvenile fourteen years of age or older at the time of an alleged offense is charged with an offense which would be a felony if committed by an adult, the court shall, on motion of the attorney for the Commonwealth and prior to a hearing on the merits, hold a transfer hearing and may retain jurisdiction or transfer such juvenile for proper criminal proceedings to the appropriate circuit court having criminal jurisdiction of such offenses if committed by an adult. |
| | | **Wash. Rev. Code § 9.68A.060**<br><br>A person who knowingly sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, any visual or printed matter that depicts a minor engaged in sexually explicit conduct (Class C felony) | Up to 5 years See Wash. Rev. Code § 9A.20.021 | **Wash. Rev. Code § 13.40.110**<br><br>(1) Discretionary decline hearing--The prosecutor, respondent, or the court on its own motion may, before a hearing on the |

| Washington | Yes; Discretionary for all juveniles (18 years or younger) | **Wash. Rev. Code § 9.68A.050**<br><br>A person who: (1) Knowingly develops, duplicates, publishes, prints, disseminates, exchanges, finances, attempts to finance, or sells any visual or printed matter that depicts a minor engaged in an act of sexually explicit conduct; or (2) Possesses with intent to develop, duplicate, publish, print, disseminate, exchange, or sell any visual or printed matter that depicts a minor engaged in an act of sexually explicit conduct (Class C felony) | Up to 5 years See Wash. Rev. Code § 9A.20.021 | information on its merits, file a motion requesting the court to transfer the respondent for adult criminal prosecution and the matter shall be set for a hearing on the question of declining jurisdiction. |
| West Virginia | Yes; Discretionary for all juveniles (18 years or younger) and if juvenile was previously convicted of a felony | **W. Va. Code § 61-8C-3**<br><br>Any person who, with knowledge, sends or causes to be sent, or distributes, exhibits, possesses or displays or transports any material visually portraying a minor engaged in any sexually explicit conduct is guilty of a felony | Up to 2 years *See* W. Va. Code § 61-8C-3 | **W. Va. Code § 49-5-10**<br><br>(g) The court may, upon consideration of the juvenile's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and similar personal factors, transfer a juvenile proceeding to criminal jurisdiction if there is probable cause to believe that:<br>. . . .<br>2) The juvenile, who is at least fourteen years of age, has committed an offense which would be a felony if the juvenile was an adult: Provided, That the juvenile has been previously adjudged delinquent for the commission of a crime which would be a felony if the juvenile was an adult; |

| Wisconsin | Yes; Discretionary if 15 years or older | **Wis. Stat. § 948.05**<br><br>1) Whoever does any of the following with knowledge of the character and content of the sexually explicit conduct involving the child may be penalized under sub. (2p): (a) Employs, uses, persuades, induces, entices, or coerces any child to engage in sexually explicit conduct for the purpose of recording or displaying in any way the conduct. (b) Records or displays in any way a child engaged in sexually explicit conduct. (1m) Whoever produces, performs in, profits from, promotes, imports into the state, reproduces, advertises, sells, distributes, or possesses with intent to sell or distribute, any recording of a child engaging in sexually explicit conduct may be penalized under sub. (2p) if the person knows the character and content of the sexually explicit conduct involving the child and if the person knows or reasonably should know that the child engaging in the sexually explicit conduct has not attained the age of 18 years. (2) A person responsible for a childs welfare who knowingly permits, allows or encourages the child to engage in sexually explicit conduct for a purpose proscribed in sub. (1) (a) or (b) or (1m) may be penalized under sub. (2p) (Class C felony if offender is an adult, Class F felony if offender is under 18 years of age) | up to 12 years, 6 months (Class I felony)<br><br>At least 5 years (Class C felony)<br><br>*See* Wis. Stat. § 939.50 (2007); Wis. Stat. § 939.617 (2007) (noting that the court can sentence below the mandatory minimum if "finds that the best interests of the community will be served and the public will not be harmed and if the court places its reasons on the record.") | **Wis. Stat. § 938.18**<br><br>**(1) Waiver of juvenile court jurisdiction; conditions for.** Subject to s. 938.183, a petition requesting the court to waive its jurisdiction under this chapter may be filed if the juvenile meets any of the following conditions:<br><br>. . . .<br><br>(c) The juvenile is alleged to have violated any state criminal law on or after the juvenile's 15th birthday. |

| Wyoming | Yes; Discretionary for all juveniles (age 18 or younger) upon determination of transfer hearing | **Wyo. Stat. Ann. § 6-4-303**<br><br>A person is guilty of sexual exploitation of a child if, for any purpose, he knowingly: Causes, induces, entices, coerces or permits a child to engage in, or be used for, the making of child pornography; Causes, induces, entices or coerces a child to engage in, or be used for, any explicit sexual conduct; Manufactures, generates, creates, receives, distributes, reproduces, delivers or possesses with the intent to deliver, including through digital or electronic means, whether or not by computer, any child pornography | 5 - 12 years<br>*See* Wyo. Stat. Ann. § 6-4-303(c) | **Wyo. Stat. Ann. § 14-6-237**<br><br>(a) After a petition alleging a child has committed a delinquent act is filed, the court may, on its own motion or that of any party any time prior to the adjudicatory hearing, order a transfer hearing to determine if the matter should be transferred to another court having jurisdiction of the offense charged for criminal prosecution as provided by law. Notice in writing of the time, place and purpose of the transfer hearing shall be given to the child and his parents, guardian or custodian at least three (3) days before the hearing. The transfer hearing shall be conducted in conformity with W.S. 14-6-222 through 14-6-224 except there shall be no jury. |

**E.  Appendix E: Memorandum by Chief U.S. Probation Officer**

See attached document.